**FILED**

OCT / 2 2010

CLERK

## UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH DAKOTA

TCF National Bank,

Case No.  /O - 4149

Plaintiff,

v.

**COMPLAINT**

Ben S. Bernanke, Janet L. Yellen, Kevin M.
Warsh, Elizabeth A. Duke, Daniel K.
Tarullo, and Sarah Bloom Raskin, the Board
of Governors of the Federal Reserve System,
in their official capacities,

Defendants.

For its Complaint, plaintiff TCF National Bank ("TCF") alleges as follows:

### INTRODUCTION

1.      TCF, a national bank and a leading issuer of debit cards, brings this action

to challenge the constitutionality of the Durbin Amendment. The Durbin Amendment

was included as Section 1075 of the recently enacted Dodd-Frank Wall Street Reform

and Consumer Financial Protection Act of 2010 (the "Dodd-Frank Act"), Public Law

111-203. TCF seeks a preliminary injunction against the enforcement of the Durbin

Amendment because this unprecedented legislation irrationally, prejudicially, and

illegally interferes with TCF's activities in a market that has been competitive and open

by imposing unconstitutional limitations on the ability of TCF and similarly situated

banks to recover their costs for providing a service crucial to bank depository customers

today. The Amendment also unconstitutionally treats TCF and a small group of other

banks differently from the other 99 percent of banks, savings and loan associations, and credit unions in this country which are not subject to the Amendment's confiscatory provisions. The provision should be enjoined prior to any implementation by the Board of Governors of the Federal Reserve System (the "Board").

2.     Today, TCF and other debit card issuing financial institutions pay for their debit programs by charging "interchange fees" to retailers for debit transactions. The Durbin Amendment drastically limits the types and amount of costs that a bank may recover from retailers for debit transactions. Under the literal terms of the Amendment, a debit card issuing bank will only be able to recover "incremental" electronic processing costs related to a particular transaction; all other costs of operating a debit card program-- which are the bulk of the actual costs--including substantial variable and fixed, or "sunk" costs, may not be recovered. The allowable costs are so negligible that regulated debit card issuers will not be able to recover the true expense of providing debit card services to customers. The deeply cut interchange fees that the Amendment will generate also deny TCF and other regulated banks a fair return on invested capital.

3.     There is no legislative history for the Amendment other than Senator Durbin's floor statements, which indicate the Amendment was aimed at reducing fees charged by credit card issuers and debit network operators, such as Visa and MasterCard. But the Amendment is entirely disconnected from that goal, regulating only debit card issuers with no restriction on others involved in credit and debit transactions, such as network operators and retailers. Any savings to those latter entities can be pocketed by them--there is no obligation under the Amendment to pass cost savings on to consumers.

2

Visa and MasterCard can continue to charge whatever they want to participants in their networks for their services. Only a small number of banks like TCF that issue debit cards are subject to this economic regulation.

4.      The provision is also arbitrarily limited to banks with assets of $10 billion or more, thus exempting 99 percent of banks, savings institutions, and credit unions that issue debit cards, and leaving TCF and other covered debit card issuers to shoulder the entire burden of this poorly conceived legislation. As a result of this discriminatory classification, TCF and similarly situated banks will not be able to compete on even ground with the thousands of banks, savings institutions, and credit unions with assets under $10 billion that are exempt from the rate regulations required by the Durbin Amendment.

5.      By April 21, 2011, the Durbin Amendment directs the Board to issue standards that set the maximum debit card "interchange" rates TCF and other regulated banks "may receive or charge," with those regulations to take effect just three months later. Given the Amendment's unambiguous directive that the Board set interchange rates solely by reference to the "incremental costs" of authorizing, clearing, or settling each debit transaction, while specifically barring consideration of "other costs" that banks incur in creating and administering their debit card programs--which is the bulk of their true costs--any regulations issued under this unfair statutory standard will necessarily be arbitrary, irrational, and confiscatory, depriving TCF of its constitutional rights and ability to recover its costs and a reasonable return on its invested capital.

3

6.     The Durbin Amendment is unprecedented commercial regulation.  Never before has Congress mandated that an agency drastically cut the price of an existing product or service to below actual cost and at the same time exempted 99 percent of the sellers from the price cut.

7.     TCF's business has been built on providing free checking and debit services to its customers.  TCF has been a leader in such consumer-oriented banking. Given this history, and because the market for depository bank customers is highly elastic, TCF cannot, in response to the Durbin Amendment, begin charging its customers for debit cards to recoup lost revenues; customers would quickly migrate to the exempt banks, use credit cards (issued by other banks) as debit cards, or return to the more inefficient use of written checks.  Nor can TCF drop its debit service--TCF's customers expect and demand that their checking accounts include this service.  TCF is left with no choice but to continue to provide debit cards at no cost to its customers.  In that event, TCF's costs will remain largely unchanged, but TCF will be able to recover only a small portion of those costs.

8.     Thus, the Durbin Amendment puts TCF and similarly-situated debit card issuing banks at a crossroads.  TCF can wait to challenge the Durbin Amendment after the forthcoming rulemaking process, or act now in light of the certainty that no rules that faithfully administer the Amendment will allow TCF to maintain a profitable debit card operation.

9.     This Complaint seeks a declaratory judgment that the Durbin Amendment's debit interchange fee provisions are unconstitutional and a preliminary injunction against

4

enforcement of the forthcoming Board rules that will implement the Amendment's unconstitutional mandate. Maintaining the status quo while this constitutional challenge is vetted imposes no hardship comparable to the impact that the Durbin Amendment will have on TCF and similarly situated banks. TCF, on the other hand, will be irreparably injured if the Board implements any regulations consistent with the clear mandates of the Durbin Amendment.

10.     A companion motion for a preliminary injunction seeks to enjoin the enforcement of regulations until a full hearing on the merits of the Amendment can occur. The temporary relief sought here is based on the practical reality that *any* interchange fee schedule that the Board adopts for debit cards *consistent with the explicit statutory requirements of the Durbin Amendment* will necessarily fail to supply TCF with full protection of its constitutional rights. The massive disruption that the Durbin Amendment imposes on debit card practices, without any hearings or careful examination in Congress, fully justifies the issuance of the preliminary injunction herein sought.

## PARTIES

11.     Plaintiff TCF National Bank ("TCF") is a national banking association chartered under the laws of the United States with its main office in Sioux Falls, South Dakota. As a debit card issuer with assets greater than $10 billion, TCF is subject to interchange fee regulation under the Durbin Amendment.

12.     Defendant Ben S. Bernanke, in his official capacity as Chairman of the Board, is jointly responsible for administering the Durbin Amendment.

5

13. Defendant Janet L. Yellen, in her official capacity as Vice Chair of the Board, is jointly responsible for administering the Durbin Amendment.

14. Defendant Kevin M. Warsh, in his official capacity as a member of the Board, is jointly responsible for administering the Durbin Amendment.

15. Defendant Elizabeth A. Duke, in her official capacity as a member of the Board, is jointly responsible for administering the Durbin Amendment.

16. Defendant Daniel K. Tarullo, in his official capacity as a member of the Board, is jointly responsible for administering the Durbin Amendment.

17. Defendant Sarah Bloom Raskin, in her official capacity as a member of the Board, is jointly responsible for administering the Durbin Amendment.

## JURISDICTION AND VENUE

18. The Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States.

19. The Court is authorized to enter a Declaratory Judgment pursuant to 28 U.S.C. § 2201 *et seq.* and Fed. R. Civ. P. 57.

20. Venue is proper under 28 U.S.C. § 1391(e)(3) and 28 U.S.C. § 1348 as TCF is located and/or resides in the State of South Dakota, no real property is involved, and the defendants are officers of the United States acting in their official capacity or an agency thereof.

## BACKGROUND

### I.
### TCF

21.    Founded in Minneapolis as Twin City Building and Loan Association, TCF has proudly served the savings and loan needs of the Twin Cities communities and beyond since first opening its doors in 1923. TCF initially offered attractive dividends on membership shares, which allowed it to grow quickly and open its second office in St. Paul in 1924. The following year, TCF grew nearly fivefold. After enduring the Great Depression, in 1936, TCF obtained a federal charter to become Twin City Federal Savings and Loan Association. TCF's assets grew from $3.5 million to $10 million over the next 10 years. By 1943, TCF was the 7th largest savings and loan in the United States with over $20 million in assets. By that time, TCF had distributed almost $3 million in dividends and financed over 14,000 homes. And TCF's growth continued. Spurred on by a post-World War II housing boom and generous interest rates, by 1960 TCF held assets of over $350 million and by 1972 its assets exceeded $1 billion.

22.    Like many thrifts and savings institutions, however, in the mid-1980s, TCF was affected by the savings and loan crisis that gripped the U.S. economy. Facing the risk of insolvency, TCF hired new leadership, including a new CEO from a working class background with experience as a Detroit police officer. TCF became a national bank in 1997. The hard work and difficult choices of its executives paid off, and TCF soon rebounded; expenses were cut, employee compensation was retied to performance, and numerous bad investments were sold off. By the time TCF's parent company went

public in 1986, the bank's future once again appeared promising. Today, TCF is the third largest banking association in Minnesota and does business in eight states, with its main office in Sioux Falls, South Dakota.

## II.
## TCF'S DEBIT/CHECKING ACCOUNT BUSINESS

### A.   TCF Introduced Totally-Free Checking And Became A Major Distributor Of The Debit Card.

23.   Checking accounts constitute the core of TCF's deposits (75 percent of savings account customers also have checking accounts), and, like all banks, these core deposits overwhelmingly fund the lending side of the business. In retail banking, it is necessary to have bank branches to open depository accounts. Approximately 99 percent of retail bank accounts in this country are opened in a bank branch. A customer must have a checking account in order to obtain a debit card, and the checking account must have deposits to fund debit card transactions. Branches are staffed with tellers and occupancy costs are incurred; data processing and operational costs are also incurred to maintain the depository side of a bank's business.

24.   In 1986, TCF introduced a free checking account which did not require its customers to maintain a specific balance, pay a monthly fee, or pay a fee for writing checks, as customers were then uniformly required to do. This product proved very successful, and TCF expanded its book of business from under 100,000 checking accounts at the time to about 1.5 million accounts today. This step was part of TCF's long-standing strategy of providing low-cost, convenient banking services to depository

8

customers. Other banks followed suit, and "free checking" products became commonplace.

25. In the 1970s, TCF was one of the first banks in Minnesota to introduce automatic teller machines ("ATMs"), another convenience for depository customers. TCF did not charge customers for the plastic cards necessary to withdraw cash from ATM machines. Today, TCF has 780 ATMs in use in its eight-state market area. TCF customers use them without charge, a practice followed today by virtually all other banks. ATM machines (and access to ATM networks) have all become necessary features of checking account products.

26. Finally, in 1995, TCF began distributing Visa branded cards for use as debit cards at merchant locations and at ATMs. Again, TCF decided not to charge customers for the enhanced functionality of their checking account. But TCF did incur enormous costs in creating its checking/debit program and continues to pour millions of dollars in costs each year into operating, maintaining, upgrading, and expanding its program.

27. These three significant business steps attracted millions of new customers to TCF's "Totally Free Checking" mainstay depository product. In recent years, TCF has added on-line banking and bill pay--again at no cost to the customer. At every step on this path, TCF consciously made its checking account functionality--and especially its debit card feature--as inexpensive and convenient to the consumer as possible. TCF's consumer-oriented strategy, which is now threatened by the Durbin Amendment, has been extremely successful with customers. Today, TCF has over $18 billion in assets and is the 47th largest commercial bank in the United States by assets; at the same time, TCF is

the 12th largest issuer of Visa debit cards. Each month, over 800,000 TCF customers use their TCF debit cards. Last year, TCF customers "swiped" their cards over 200 million times. From that activity, TCF received debit card interchange revenue of just over $100 million, from a swipe fee that amounts to a little less than 50¢ per average transaction of about $35.

## B.     The Development Of TCF's Depository Customer Base.

28.     TCF developed its depository account base through conveniently-located branches. TCF is an industry leader in supermarket branches with half of its branches in supermarkets. Today, its 440 branches are open long hours (even on Sundays and holidays) so customers can bank after work.

29.     Many of TCF's customers have modest incomes and often keep low balances. Many TCF customers have never had checking accounts before and were attracted by TCF's no-cost approach. When times are hard, as today, people come to recognize the convenience of the depository services that TCF has long offered at no cost to its customers. Under this strategy, TCF has targeted and created a depository customer base that is both price sensitive and accustomed to receiving all the services bundled into the TCF checking account free of charge--including the debit card.

30.     TCF's customer base is also subject to high rates of annual attrition. TCF must expend substantial advertising dollars each year just to maintain its account base. In recent years, TCF has been required to open 500,000 to 600,000 accounts each year just to maintain its customer base.

31.     As is evident from the high turnover rates, TCF has long faced stiff
competition for depository customers from banks that operate under the same regulatory
structure as TCF. Each TCF branch is surrounded by nearby branches of both larger and
smaller competitors as a result of this competitive environment. Almost all banks also
adopted totally free checking, which became standard in the industry. Accordingly, all
depository customers today expect not to be charged for writing checks or for swiping
debit cards.

32.     TCF has also learned from experience that, if it adds *any* charges to the
account, however justified, significant attrition is the immediate result. For example, new
federal regulations this year developed by the Board and applicable to all banks relating
to ATM and one-time debit card transactions have forced TCF to announce that it
implemented a monthly fee for some accounts. Even though this monthly fee may be,
and is, waived in most cases, by simply announcing the charge, new account volume was
reduced by approximately 33 percent and account attrition was increased by about
77 percent.

## C.     The Harm The Durbin Amendment Will Cause TCF.

33.     As discussed in greater detail below, the Durbin Amendment on its face
requires the Board to issue regulations limiting debit interchange fees by TCF and other
similarly situated banks that will not allow them to recover their costs, to say nothing of a
profit. It requires the Board to consider only a tiny share of the actual costs of a debit
card transaction. It explicitly forbids the Board from considering most of the variable
expenses of debit card transactions and all the overhead and fixed expenses that debit

11

banks like TCF incur before and after any "swipe" occurs. The narrow definition of allowed costs means that TCF's swipe yield will drop from about 1.35 percent of each transaction to about .26 percent. However, because the Durbin Amendment by its terms only applies to those banks with assets under $10 billion, 99 percent of TCF's direct competitor banks remain free to recover the full cost of their investment in their debit programs. The exemption means that TCF cannot recoup revenue lost as a result of the Durbin Amendment by charging a service fee to its customers for their debit cards, or else its exempt bank competitors--who will have no need to raise fees because they will have no lost revenue to recoup--will take TCF's customers.

34.     Today, a debit card is a necessary component of any checking account. Indeed, the term "checking account" has become a misnomer; today, neither checks nor cash are, in the eyes of the vast majority of banking consumers, adequate substitutes for debit cards. Retail banking today is at a point where debit card service is the core depository product; deposits which make it possible for banks to lend money to borrowers. Indeed, debit card fees are the revenue source for a bundle of deposit-related services necessary to provide the checking service.

35.     In an economic sense, a bank's checking/debit account product is no different from the standardized product any business in this country sells on a large scale to consumers. Just as Burger King must price its hamburger to recover all its costs--like advertising, building, and labor--not just the cost of the burger and bun--a bank must recover the entire economic cost of its debit service, which, up until the Durbin Amendment, all debit card issuing banks have done through interchange fees collected

12

from retailers. The Durbin Amendment allows regulated banks, so to speak, to recover only the cost of the bun.

36.     If TCF dropped its debit card feature or tried to charge its customers any sum, however small, for debit cards, customers--who are otherwise perfectly satisfied with TCF--would take their business to one of the 99 percent of banks, savings institutions, or credit unions that are exempt from the Durbin Amendment. Thus, the Durbin Amendment irrationally and arbitrarily discriminates against TCF and similarly-situated banks that will suffer a drastic and immediate drop in revenues when new rates become effective.

### III.
### DEBIT CARDS

**A.     The Development Of Debit Cards As A Payment System.**

**1.     Through World War II, Consumers Pay for Retail Purchases with Cash and Checks.**

37.     As retailers became nationwide businesses in America in the 20th Century, customers paid for purchases either with cash or by check. Both forms of payment have serious disadvantages. Cash can be stolen by employees or thieves, and cash is also expensive to transport and secure. A check, moreover, is simply a promise to pay. When a check bounces, the retailer takes the loss, and checkout lines are delayed while clerks verify information. From time to time, retailers tried to introduce in-house accounts or even payment cards for their own stores, but none of these devices proved successful on a nationwide basis.

13

## 2.     1950s:  Credit Cards are Developed.

38.     In the 1950s, banks first issued credit cards but typically restricted their use to select customers.  These cards allowed merchants to avoid the risk of cash or checks because they received a promise of payment from the bank on behalf of its customers. Merchants also benefited from an increased level of purchases of goods and services by customers armed with a credit facility.

39.     By the 1970s, a wide range of retailers in this country and around the world accepted bank credit cards.  The major brands--Visa and MasterCard--worked hard to sign up retailers to accept the cards, just as the banks that issued them worked hard to place credit cards with customers whose credit justified their use.  Notwithstanding a steady increase in usage over the years, some customers were wary of credit cards and the high interest rates that sometimes accompanied them.  Many other customers, especially young people without any credit histories or others with poor credit histories, did not have strong enough credit ratings to get credit cards.

40.     From the outset, retailers paid fees to the issuing banks for credit card usage. The fact that merchants were paying these fees to banks was then and is now invisible to the consumer.  Economists call this complex arrangement a "two-sided" market, because no merchant will accept a credit card unless there is a large enough cardholder base that will use them, while no consumer will use a credit card unless there are sufficient merchants who accept it.  Each side needs the other to participate in the market before it can operate efficiently.  With most credit cards, the transaction fees were borne by the retailers whose demand was relatively inelastic--such that fewer would exit the system.

14

Indirect compensation for retailers came from an increase in the ranks of credit card

customers from whom participating merchants acquired new business not otherwise

available to them; direct benefits to the retailers included reduced labor costs, faster

checkout lines, and, most importantly, shift of the risk of non-payment to the card issuer.

41.     By the end of the 20th Century, the credit card industry had become highly

concentrated.  Due to efficiencies of scale, small and mid-sized banks could not offer

credit cards in competition with the 11 biggest banks who came to dominate that market.

Thus, today there are many banks competing for depository accounts--which include

checking and debit services--but only a few who offer credit cards.

     3.     **1970s to 1990s:  Debit Cards are Developed.**

          a.     **In 1978, Congress Adopted the Electronic Funds Transfer Act.**

42.     The modern payment system using plastic cards was made possible by an

emerging technological ability to transfer funds and to keep records electronically.  In

1978, Congress passed the Electronic Funds Transfer Act, 15 U.S.C. § 1693 *et seq.*

("EFTA"), which was applicable to all financial institutions and stated that the "use of

electronic systems to transfer funds provides the potential for substantial benefits to

consumers," but added the caveat that the "unique characteristics of such systems"

require regulation with the "primary objective . . . [being] the provision of individual

consumer rights" set forth in the Act, 15 U.S.C. §§ 1693(a) and (b).  The Durbin

Amendment amends the EFTA, but ironically appears to have been premised on the

notion that, after its passage, banks will impose additional fees and burdens on the very

people the EFTA is intended to protect--consumers. And the Durbin Amendment is the first part of the EFTA that applies only to a very small number of banks.

43.     The EFTA imposed on the Board regulatory duties over electronic funds transfers. The Board was also required to report annually to Congress about private compliance with the EFTA and other matters, including competition within electronic funds transfer businesses. From 2000 to 2009, the Board issued ten annual reports that covered a broad range of developments in electronic funds transfer. Not one of these reports made reference to any problem with debit card interchange fees, or indeed with debit cards at all.

### b.     Debit Cards Become Commonplace.

44.     By the early 1990s, bank checking account customers generally carried ATM cards issued by their depository banks. ATM networks had developed that allowed a card issued by one bank to be used, typically for a fee, at ATMs of competitors locally and around the country. Visa or MasterCard, the two major bank card brands, operated these worldwide card networks, initially with credit cards and later with debit cards. Consumers began calling their ATM cards "cash cards."

45.     In 1995, Visa began a strong marketing effort to introduce its own debit card called the "Visa Check Card." As with credit cards, retailers were charged an interchange fee per transaction. The amount of these fees was negotiated between Visa (and MasterCard) and the individual merchants. The largest retailers negotiated the most favorable rates (less than one percent), and smaller retailers paid up to two percent or more--depending on the nature of their business, level of fraud risk, and other factors.

16

46.     TCF first offered the Visa check card to its customers in 1995. As noted
earlier, despite substantial start-up costs, TCF did not charge customers for debit cards.
Merchants paid interchange fees for debit transactions as they had done with credit cards,
except generally the fees were lower. Thus, since the turn of the 21st Century, customers
have come to expect the debit card as a "free" service that is part of their checking
account (just as in recent years they have come to expect free on-line banking and bill
pay).

47.     As debit card usage became commonplace, the mainstay checking account
product changed from a service that generated revenue from interest rate spread and
intermittent fees like overdraft charges, to a product that also generated debit interchange
fees. As debit card usage grew, debit cannibalized the other ways customers made
payments from their accounts. Today, one cannot separate out the debit service from a
checking account; more fundamentally, a bank cannot sell a checking account without
including a debit card service and, without checking accounts, a bank cannot operate its
branch system. Almost without exception, banks in this country--from the smallest to the
largest--depend on an established branch system to operate. Simply put, checking
accounts are where most Americans put their paychecks today, and debit cards are a
necessary component of those accounts.

### 4.     Starting Approximately 2000:  Debit Card Usage Exploded.

48.     From 2000 to 2006, debit card usage exploded, especially with younger
consumers who preferred to carry less cash. Over this six-year period, debit card
payments nationwide approximately tripled, with average annual growth rates close to

17

20 percent. Consumers responded favorably when retailers adopted point of sale

("POS") technology that made it easy and fast to use a debit card to pay for a small

purchase like a cup of coffee. Most consumers recognized that using their debit cards

was easier, faster, and safer than paying with cash--and much more efficient than paying

by check--and retailers reached the same conclusion. Consumers also liked the

"discipline" of debit spending instead of credit spending.

49.    During this period, the number of retailers (and the types of retailers) who

accept debit cards also expanded. Debit cards now can be used for food and beverages at

the ballpark, for online shopping, in vending machines, and at the gas pump. Merchants

of all types purchased POS technology to enjoy the benefits of debit cards and to avoid

the costs of other payment forms even though they paid fees to banks for debit usage and

did not pay fees to banks for cash or checks. But the avoided costs made acceptance of

debit cards a good business decision for them.

50.    The Wall Street Journal reported the cycle as follows: as late as 1995, debit

card use was minuscule; by 2000, debit transactions were still only a small fraction of

credit card transactions; yet, by the end of 2008, Visa debit card volume had overtaken

credit card volume by number of transactions, but not by value. In the next year, 2009,

total outstanding credit card debt dropped by almost $100 billion from $957 billion

to $866 billion, but debit usage continued to grow. Simultaneously, consumers cut back

sharply on the use of checks. Total check volume fell five percent per year each year

from 2000 to 2006. By 2005, aggregate debit card transaction value exceeded the sum of

aggregate cash and check transaction value for retailers.

51.     As for TCF, over the last 15 years, the average number of checks written each month per account dropped from 19 to 6, as average per account debit swipes soared from zero to 22 per month.  Cash withdrawal also dropped as debit became easier and ATM usage dropped too.  A glance at a typical TCF monthly checking account statement today is evidence of the major and irreversible change in how people now pay for purchases: it likely contains 4 to 6 checks and 20 to 30 debit transactions.  It also likely shows the customer's paycheck deposited by automated clearing house ("ACH") and perhaps electronic bill pay ("EFT") of major recurring bills like house and car payments or utilities.

52.     In light of these developments, retailers jumped on the debit card bandwagon in several ways.  First, many retailers simply stopped accepting checks--one often sees "NO CHECKS" signs posted at retailers today, even though checks clear at par because of a large federal subsidy.  Second, retailers encouraged customers to make small purchases by debit and arranged convenient POS terminals to reduce lines and congestion.  Third, retailers began allowing debit purchasers to get "cash back," further reducing ATM and teller traffic.  While the actual usage of debit cards is heavily skewed to younger people, almost everyone who has a bank account has a debit card today, and many people use their card several times a day.

53.     Thus, by the first decade of the 21st Century in this country, debit cards had become ubiquitous because banks distributed them at no charge and did not charge consumers to use them.  Today, credit cards are still more frequently used for "big ticket"

items, but debit cards are the mainstay payment system for small, especially day-to-day,
purchases like gasoline refills.

54.     As a result, from 2000 to 2009, TCF's annual debit card interchange
revenue grew from $29 million to over $100 million today.  It is these revenues that have
allowed TCF to deliver debit card and related deposit services to customers without
charge.

## B.     How Debit Cards Work Today.

55.     Debit cards today are markedly different products than credit cards--one key
difference being that the customer cannot use a debit card without first making a deposit
at the issuing bank.  As a practical matter, that means the issuing bank must have
branches and must pay the expenses that keep the branches open.  So today it is literally
true that TCF customers, and other banks' debit customers, make deposits primarily to
fuel their debit cards.  In other words, bank branches exist today in large part to collect
funds to enable debit purchasing by bank customers.

56.     Millions of debit card transactions occur in this country every day; TCF
alone processes nearly one million transactions daily.  For example, a TCF customer buys
four Twins tickets for $100 using her debit card; the customer swipes her card at the ticket
booth terminal and TCF "*authorizes*" the transaction virtually instantly (generally
because the card holder's account has sufficient funds); TCF reduces the available
balance in the customer's account by $100; the Twins then deposit the charge in its bank,
and that bank credits the team's account with $100 minus an interchange fee, say
2 percent (for a net deposit of $98); the merchant bank processes or "*clears*" the charge

20

through a card network, Visa, in TCF's case, where part of the $2 fee is deducted for switch fees to a transfer agent, part is deducted for service fees to Visa for its role in the transaction, and the remainder of the fee, along with the charge to the customer's account, is delivered electronically to the issuer's bank--TCF in this case--which debits the customer's account $100 and pays or *"settles"* that amount less the interchange fee to the Twins' bank. The issuing bank keeps its share of the interchange fee and may credit its customer with rewards for the transaction, depending on the type of debit card used.

57.  The customer incurs no direct transaction cost for a debit card transaction. The transaction is often faster than payment with cash and far faster than writing a check. Those retailers who might balk at accepting a check are willing to enter into an authorized debit sale; they know the issuer bank has guaranteed payment even if the debit cardholder has insufficient funds at time of settlement. The customer also obtains written proof of purchase by an electronic record.

58.  The bank benefits from the transaction by receiving a fee for the debit service. That fee is calibrated to cover the total costs of running the debit system, not just the costs of *"authorizing, clearing and settling"* the transaction. Banks also benefit because they deliver on their promise to consumers--free checking, including free debit service.

59.  The debit card benefits the merchant by facilitating a transaction that is both cheaper and faster than either cash or a check. Use of a debit card eliminates the risk of lost or stolen cash. It avoids the costs from bounced checks or from costly check verification systems that reduce the incidence of bounced checks. The retailer expenses

of handling returned checks are enormous and have dropped precipitously as consumers

migrated to debit. Most importantly, the merchant transfers to the issuing bank the risk

that a customer account has insufficient funds when the transaction settles. In that event,

the bank pays the merchant out of its own pocket. When a bank authorizes a debit

transaction on the strength of provisional credit in the customer's account, for example,

only to discover at settlement that the account lacks sufficient funds to cover the

obligation, whether or not the bank recovers the funds from the customer, the merchant is

paid. Thus, debit cards shift credit losses to the issuing banks that retailers had

traditionally absorbed with checks.

## C.    Battles Over Interchange Fees.

60.    There have been battles over interchange fees over the years. Retailers have

always complained about credit card interchange fees, but instead of abandoning the

services, the retailers used debit more and more in the last few years, which is powerful

evidence that today the value of debit card services is greater than the costs retailers

currently pay. Nevertheless, retailers have continued to complain that debit card fees are

too high. In several legal actions, retailers sued the card networks with whom they

contracted for interchange fees. In one major case several years ago, Wal-Mart and other

retailers recovered over a five-year period three billion dollars from Visa and

MasterCard, which effectively rebated a large share of past interchange fees. The Wal-

Mart case also reduced debit interchange fees for the largest retailers in the future. All

these claims were directed at Visa and MasterCard, which operate as hubs of this

growing and profitable network industry.

61. Complaints by retailers in other countries over interchange fees have led to direct administration by government. Most notably, in 2003, the Reserve Bank of Australia ordered a reduction in credit and debit interchange fees. But its regulation, which was aimed at alleged monopoly power of Visa and MasterCard, *explicitly allowed all debit card issuers to recover all their costs in delivering interchange services to retailers.* The Australian regulation thus stands in stark contrast to the Durbin Amendment, not only in the rates allowed but also in its scope. Australia has only a small number of issuing banks, all of which were covered by the same rule. Unlike the situation that TCF and similarly-situated banks face now, the Australian banks were in a position to recover from their depository customers virtually all the revenue they lost when interchange fees from retailers were regulated downward.

62. The issue of interchange fees also arose for credit cards in New Zealand, which is again served by a few very large banks. In September 2009, the New Zealand Commerce Commission brought enforcement actions against ANZ National Bank, Limited, ASB Bank, Limited, the Bank of New Zealand, Kiwibank Limited and New Zealand Post Limited. In 2009, these administrative actions were settled under terms that bear no relationship to the provisions of the Durbin Amendment. Far from imposing crippling limitations on cost recovery by issuer banks, these settlements allowed the banks to set an interchange fee as high as they desired. But the settlements did allow any individual bank to undercut the standard fee. In addition, the settlements placed limitations on the ability of both MasterCard and Visa to prohibit merchants from imposing surcharges on those customers who preferred to pay by card. But the

agreements allowed the banks to negotiate prohibitions against surcharges with individual merchants and to disclose in their customer forms those surcharges. These settlements did not impose the massive restrictions on cost recovery mandated by the Durbin Amendment.

63.     Notable economists at the Board and elsewhere developed substantial economic literature on credit and debit interchange fees, all of which call into question the wisdom of the Durbin Amendment. These studies are divided on whether some form of regulation of debit and credit card interchange fees is desirable. But none of the papers favoring regulation supports the approach taken in the Durbin Amendment with its explicit prohibition barring issuing banks from recovering virtually all their costs of setting up, operating, maintaining, and upgrading essential debit card services to retailers and bank customers. No analysis suggested that debit cards were in greater need of rate regulation than credit cards, and many demonstrated that the debit card system presents less need for regulation than the credit card system which is outside the purview of the Durbin Amendment. Not one of these studies even hinted that rate cuts should be joined by an exemption of 99 percent of the issuing banks, savings institutions, and credit unions. The Durbin Amendment represents a total disconnect with published academic and professional views on regulation of interchange fees for debit cards.

64.     One good example of these studies is a May 13, 2009 paper issued by four Board economists entitled, "Interchange Fees and Payment Card Networks: Economics, Industry Development and Policy Issues." Its lengthy comment on possible "Policy Interventions" concludes that "determining an appropriate regulated value for the

24

interchange fee can be quite challenging" because doing so "requires knowledge of social costs and benefits that are difficult, if not impossible, to measure accurately." Indeed, according to the Board economists, "the determination of which costs should be included in a cost-based fee is *necessarily arbitrary*...." (p. 48, emphasis added). The authors did not recommend regulation of interchange fees and, to the contrary, concluded that "the economic theory underlying the efficient interchange fee provides no rationale for either a strictly cost-based interchange fee or an interchange fee of zero" (*id.*).

65.     The failure to consult the Board is important to understanding how the Durbin Amendment resulted in a mandate to enact such unprecedented regulation. The Board has expertise in the economics of banking services. Although it appears the Board had reservations about the ability of any regulation to establish an efficient debit interchange rate, and apparently was also concerned with the possible consequences to the debit system of an imposed rate, the Board was nevertheless best postured to recommend an appropriate regulatory structure for debit interchange fees. Instead of calling on the Board to provide its expertise, Senator Durbin crafted his Amendment, on the one hand, to impose a confiscatory fee on the debit card industry and then, on the other hand, to exempt all but one percent of the debit card issuing banks. There is not the slightest indication in the extensive interchange fee literature from economists at the Board that the Board would have suggested or approved of this extraordinary regulatory structure had it been given discretion over whether and, if so, how to regulate debit interchange fees.

66.     Despite this background, as discussed next, the Durbin Amendment imposes dramatic, unwarranted regulation of cost recovery by a small percentage of issuing banks.

## IV.
## THE DURBIN AMENDMENT

67.     In 2009, Congress began a comprehensive overhaul of the financial services industries with the prime objective of seeking to avoid or minimize so-called "systemic risks" to the economy of this country. The key concern was the sudden suspension of credit in interbank and shadow bank transactions that occurred in late 2008. Congress carefully debated this legislation, but at no time during the course of that debate did it once address debit card interchange fees. Nor did it need to, for the simple reason that, far from increasing the volatility of the banking system, debit cards reduce it.

68.     At the 11th hour of this extended process, Senator Richard Durbin of Illinois introduced an amendment covering interchange fees for debit cards, but not credit cards, which generally carry higher fees and had been previously debated in Congress. Senator Durbin stated that, in 2009, banks had collected $20 billion in debit interchange fees, much of which went to the ten largest banks in the country--not including TCF. Senator Durbin did not, however, contend that the retailers had not received value for these payments, or that they had not agreed to make the payments, or even that the interchange market had been compromised by improper business practices or had failed to function efficiently in some other way.  Nor at any time did Senator Durbin investigate

26

whether any of the regulated banks possessed any measure of market power that allowed
them to raise prices unfairly.

## A.    How National Banks Are Regulated.

69.    The Durbin Amendment comes against a background of an extensive
system of bank regulation that is already in place. National banks, like TCF, are
regulated by the Office of the Comptroller of the Currency ("OCC"), the Board, and the
Federal Deposit Insurance Corporation ("FDIC"). This regulatory structure focuses
primarily on the safety and soundness (capitalization) of banks and covers all operational
activities, including bank dealings with its depositors, borrowers, and other financial
institutions. By and large, however, regulations issued by the OCC, the Board and the
FDIC do not require banks to follow specific pricing norms, but leave them free to set
their own prices for their services, e.g., interest rates on deposits or loans. By and large,
the regulatory rules apply even-handedly to all banks--large and small.

70.    In 2009, Congress passed the Credit Card Accountability, Responsibility
and Disclosure Act of 2009 ("CARD Act"), Public Law 111-24. The CARD Act required
the Board to set standards for penalty fees assessed by *credit card issuers*, requiring that
such fees be "reasonable and proportional" to the *actual costs* incurred when cardholders
committed certain breaches of their agreements. For example, if a one-day late payment
cost the card issuer $5, that issuer could not charge the customer $15 for that breach. But
the CARD Act made it clear that all costs (and a return on capital) could be recovered
under the "reasonable and proportional" standard. That regulation is similar to the
traditional equitable rules dealing with mortgage foreclosures that limit a lender to

27

recovery of principal, interest, and costs on foreclosure, i.e., what the lender is actually out of pocket. In short, in these instances, the regulation allows the regulated person to be made whole by charging the regulated fee. The CARD Act did not address interchange fees as is done by the Durbin Amendment, instead leaving the rates to free market forces, including vigorous antitrust enforcement.

71.     Outside of these cases, Congress and state legislatures have long regulated rates or fees for selected industries, usually utilities and other natural monopolies. Regulated parties were entitled to challenge the constitutionality of the rate determinations *before* they went into effect in order to ensure that a rate was not "confiscatory." Michigan Bell Telephone Co. v. Engler, 257 F.3d 587, 593 (6th Cir. 2001). The doctrines arising from this developed case law have long provided deference to agency discretion, and they allowed an agency to pick from a menu of different options to calculate rates. But, at the same time, the courts made clear that at the end of the day governmental bodies could not constitutionally dictate a rate that failed to provide the regulated entity with an opportunity to recover all of its costs and a return on capital consistent with the risk of the enterprise.

72.     Whether fees are unlawfully confiscatory or legitimate regulation is determined by a "just and reasonable" test. The constitutionality of any rate mandate is determined by the economic "impact of the rate order." A court addressing a confiscatory rate challenge must examine the "return investors expect given the risk of the enterprise," Duquesne Light Co. v. Barasch, 488 U.S. 299, 314 (1989), after the recovery of costs. The court must further determine whether the return that can be

28

expected upon implementation of the rate is "commensurate with returns on investments in other enterprises having corresponding risks," *id.*

73.    Courts apply both an enterprise test and a line of business test to determine whether a regulated rate is unlawfully confiscatory. A regulated business cannot be required to carry on "even a branch of business at a loss, much less the whole business" of the company as an enterprise. Brooks-Scanlon Co. v. Railroad Commission of Louisiana, 251 U.S. 396, 399 (1920) (Holmes, J.). In order to avoid a challenge that a rate is confiscatory, "the court must determine whether the [challenged rate] may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed," and yet protect the public interest. In re Permian Basin Area Rate Cases, 390 U.S. 747, 792 (1968). A "fair and reasonable" rate is another way to describe a non-confiscatory rate. FPC v. Texaco, 417 U.S. 380 (1974).

74.    In recent years, courts have struck down rate regulations that set forth unreasonably low rates. For example, in 2001, the U.S. Court of Appeals for the Ninth Circuit struck down a Nevada statute that compelled auto insurers to drop their rates 15 percent for a one-year period because the law did not provide "any mechanism to guarantee a constitutionally required rate of return." Guar. Nat'l Ins. Co. v. Gates, 916 F.2d 508, 512 (9th Cir. 1990). And, in 2001, the Sixth Circuit Court of Appeals struck down a Michigan statute that froze telephone rates and abolished an intrastate user fee because the statute did not provide "a mechanism to safeguard the right to earn a constitutional rate of return." Mich. Bell Tel. Co. v. Engler, 257 F.3d 587 (6th Cir. 2001).

**B.** **Genesis And Legislative History Of The Durbin Amendment.**

      **1.** **A Drug Store CEO Complains to Senator Durbin.**

      75.    The genesis of the Durbin Amendment, as Senator Durbin has publicly

confirmed, was a pitch by one of his Illinois constituents, Gregory D. Wassen, the Chief

Executive Officer of Walgreens, who apparently complained that Walgreens' credit card

interchange fees were too high. Walgreens, which is headquartered in Deerfield, Illinois,

is the largest drugstore owner and operator in the country. As Senator Durbin explained

in a May 5, 2010 floor speech, "I talked to a CEO of a major drugstore chain yesterday,

and he told me his top four expenses for his nationwide chain of drugstores: No.1,

salaries; No. 2, what he called mortgages and rent; No. 3, health care; No. 4, interchange

fees--the amount of money his company pays to credit card companies."

      76.    Senator Durbin's other floor statements also make clear that the intended

target of his Amendment were credit card companies and *network operators*, like Visa

and MasterCard. Senator Durbin claimed in those speeches that his amendment, which is

"a response to price fixing by Visa and MasterCard," will "clean[] up some of the worst

abuses by Visa and MasterCard." But Senator Durbin clearly missed the mark--the

Amendment does not address credit card interchange fees; has no direct impact on

network operators, Visa and MasterCard; exempts all debit card issuers with less than

$10 billion in assets; and does not mandate that retailers like Walgreens rebate any cost

savings to consumers.

      77.    Moreover, Senator Durbin did not claim to have performed any independent

market analysis of the impact of his Amendment on issuing banks or the overall

interchange fee structure, either before or after introduction of his Amendment. Nor did
Senator Durbin explain how the exemption, which allows 99 percent of issuing banks to
avoid the confiscatory cost recovery limitations, would impact the regulated banks or the
debit system. As a historical matter, neither he nor anyone else has supplied any
precedent for a statute that regulates a rate by refusing to allow recovery on all but a few
of the actual expenses incurred in giving rise to the regulated service. Nor has he or
anyone else shown how such regulation could create a stable regulatory system while
exempting all but a few of the sellers of the regulated service from its impact.

## 2. Durbin Amendment Added After Committee Hearings.

78.     Senator Durbin first offered his Amendment on May 3, 2010, two and one-
half months before the Dodd-Frank Act became law. At this late date, it was not
possible to schedule committee hearings in either House of Congress to examine the
proposal, which has revolutionary implications for TCF and similarly-situated banks in
the debit card industry. No affected person or institution whose position was hurt by the
proposed Amendment had an opportunity to lay out a case opposing the Amendment
before any Congressional committee. There is no record whatsoever of regulatory
agencies or experts being asked to supply information or advice to Congress on the
Amendment. There is no evidence that the views of the Board were either solicited or
obtained.

79.     The House of Representatives never even considered the Durbin
Amendment, and its form of debit interchange regulation. The House first saw the
Durbin Amendment after conference committee completed the Conference Report on the

Dodd-Frank Act, which itself was nearly 800 pages long (the relevant portions of the Durbin Amendment are about four pages of the Act).

80. Because the entire issue of interchange fee regulation lay outside the purpose and objectives of the Dodd-Frank Act, the impact of the Durbin Amendment on the operation of the debit interchange market was not addressed by Congress during the period before the Durbin Amendment was voted on in the Senate. Overall, Congress never studied the consequences to banks like TCF once the Durbin Amendment took from regulated banks the power to collect fees that retailers had agreed to pay. Nor did Congress ask whether and, if so, how banks regulated under the Durbin Amendment could recoup in some other way the revenue they stood to lose from disallowed costs, or to maintain a return on capital.

81. Indeed, while Congress and state legislatures have long delegated to administrative agencies the power to regulate rates and fees for certain service providers, in this case, Congress provided no finding of either monopoly power or market failure in the behavior of issuing banks for debit card services. Nor is there any empirical ground on which Congress could have made that determination. Certain large retailers have economic power to negotiate interchange fees. As one might expect, such retailers pay a smaller percentage than other retailers for debit interchange services--in return, of course, for delivering a high volume of reliable transactions.

### 3. The Evolution of the Durbin Amendment.

82. The basic regulatory structure of the Durbin Amendment has remained unchanged from the beginning: it requires the Board to limit the amount of any

32

interchange fee that an issuing bank "may receive or charge" to an amount that is "reasonable and proportional to the cost incurred by the issuer with respect to the transaction," specifically limiting the recoverable costs that may be considered to "the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction…."

83.    While the basic approach of limiting recoverable costs has not changed, the scope of the Durbin Amendment and the parties bound by its terms changed significantly on the road to passage. Indeed, the original version of the Durbin Amendment included price-cutting regulation of Visa's and MasterCard's "card network" fees, which Senator Durbin stated were the focus of his efforts. But that provision was dropped from the final version, thereby excluding from regulation the only two companies whose potentially dominant position might justify some government intervention akin to the Australian model. As a management consultant in the payments industry put it, the Durbin Amendment regulates "one part of a fee, of one form of payment, of one size of bank."

84.    The scope of banks covered by the Amendment also changed over time. In its original version, in an effort allegedly to protect community banks, the Durbin Amendment excluded from regulation any debit card issuer with $1 billion or less in assets, or about 91 percent of commercial banks and savings institutions. After considerable protest by banks and credit unions, Senator Durbin raised the exclusion to $10 billion. Of the 7,271 banks and savings institutions operating in this country, 7,175-- 99 percent of the total--are "under $10 billion" exempt banks; that 99 percent of banks operate over 48 percent of the total number of physical bank branches in this country. In

33

other words, *almost 99 percent of commercial banks and savings institutions in this
country who issue debit cards are unaffected by the forthcoming fee limitations.*

85. The Durbin Amendment also applies to credit unions that issue debit cards
and compete with banks like TCF for depository accounts. In this country, there are
7,551 credit unions (operating 21,345 branches), but only three credit unions exceed
$10 billion in assets. Millions of Americans have checking accounts at the exempt credit
unions. Many credit unions are significant direct competitors of TCF.

86. Moreover, as Senator Durbin was aware, Visa and MasterCard rules
prohibit retailers who accept their cards from discriminating against any card bearing
their "flag" so that retailers will not be able to decline to accept cards from exempt banks,
which will be able to continue recouping the full amount of their debit operation expenses
from retailers. In fact, Senator Durbin wrote Visa and MasterCard after the Dodd-Frank
Act passed and threatened antitrust action if they changed those rules, which would have
allowed retailers to reject cards from exempt banks that yielded unregulated (and much
higher) interchange fees.

87. One additional recoverable cost category was added prior to passage.
Complaints from many banks resulted in a complex provision giving regulated banks
some ability to recover specific fraud losses, from which retailers are fully insulated in
debit transactions. Even that provision does not allow issuer banks to recover any actual
losses for fraud. Instead, it only allows the Board to approve an upward "adjustment" to
any interchange fee if an issuer can show that this adjustment is reasonably necessary to
cover "costs incurred by the issuer *in preventing fraud* in relation to electronic debit card

34

transactions" (emphasis added). Even then, the exemption is only available if the issuer complies with regulations that the Board must issue in regard to fraud prevention practices, which include a showing that the issuing bank has implemented "cost-effective fraud prevention technology." This adjustment, Senator Durbin stated, could only be granted "on an issuer specific basis." There is no provision that allows the issuing bank to recover through interchange fee adjustments the added costs that it must bear to meet the new statutory standard. Nor is there any showing that existing fraud prevention efforts, which have effectively reduced these risks, have not been implemented in a cost effective fashion, even though the issuing banks have every incentive to prevent any losses that they themselves bear.

88.     As a practical matter, moreover, bank losses on card usage fall into two categories: fraud ("my sister used the card, I did not make these charges"); and overdraft write offs (insufficient funds in account at clearance and customer failed to deposit sufficient funds later). By its terms, the provision in the Durbin Amendment allowing an "adjustment" for "fraud prevention expenses" allows neither actual fraud losses nor insufficient funds losses to be compensated in the forthcoming rates.

89.     Also exempt from the Durbin Amendment are transactions involving "government administered payment programs and refillable prepaid cards." Congress apparently did not want issuers of Government debit cards to charge (or increase) annual account fees to the Government if the issuer's interchange fees were cut, so the Durbin Amendment excluded those transactions.

90. The net result of all of these exemptions is that a tiny percentage of all issuing banks will shoulder the entire burden of the Durbin Amendment. As an added slap, and demonstrating the total irrationality of the Amendment and its complete disconnect from the original purpose of the EFTA, no part of the Amendment requires retailers to pass even a penny of the windfall gains they will receive under the law on to consumers in the form of lower prices. This point has not gone unnoticed. On the passage of the Durbin Amendment, The Wall Street Journal, for example, reported that "Wal-Mart stores alone, the world's largest retailer, [will save] hundreds of millions annually."

## C. The Durbin Amendment As Enacted.

91. All the exemptions noted above--for network operators like Visa and MasterCard, for issuing banks under $10 billion in assets, and for government debit card transactions--were included in the Durbin Amendment as enacted.

92. The basic limitation on recoverable costs for covered banks, in the Durbin Amendment was added to the EFTA, 15 U.S.C. § 1693(o) *et seq*., by Section 920(a)(2) of the Dodd-Frank Act, which states that the "amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction." At first look, this provision appears to track the "reasonable and proportional" standard used in the CARD Act.

93. However, unlike the CARD Act, the Durbin Amendment, in Section 920(a)(4), states that, "[i]n prescribing regulations" the Board "shall . . . distinguish

36

between . . . the incremental cost incurred by an issuer for the role of the issuer in the

authorization, clearance, or settlement of a particular electronic debit transaction . . . and

other costs incurred by an issuer which are not specific to a particular electronic debit

transaction, which costs shall not be considered . . . ."

94.     In other words, on its face, the Durbin Amendment:

- *Allows* recovery of the "incremental cost incurred by the issuer . . ." in the "authorization, clearance, or settlement of a particular electronic debit transaction . . . ."

- *Disallows* recovery of all "other costs incurred by an issuer . . . which are not specific to a particular electronic debit transaction, which costs shall not be considered under paragraph (2) . . . ."

Thus, by narrowing the concept of "incremental costs" to only three of the least

expensive steps in the debit service, and ruling out all other costs, Congress has dictated a

legal regime that, when faithfully implemented by the Board, cannot possibly allow

covered debit issuers like TCF to recover the actual cost of the debit service, or make a

reasonable rate of return on a debit operation.

95.     The proper interpretation of the Durbin Amendment does not appear to be

subject to reasonable differences of opinion. As Senator Durbin explained on the floor of

the Senate on July 15, 2010:

> Paragraph (a)(4) [of the Durbin Amendment] makes clear that
> the cost to be considered by the Board in conducting its
> reasonable and proportional analysis is the incremental cost
> incurred by the issuer for the authorization, clearance or
> settlement of a particular electronic debit transaction, *as
> opposed to other costs incurred by an issuer that are not
> specific to the authorization, clearance or settlement of a
> particular electronic debit transaction.* (Emphasis added.)

96.     The limited scope of the three types of allowable costs that can be recovered from retailers makes the Durbin Amendment both confiscatory and structurally different from the CARD Act.  "Authorization" is the electronic approval of a particular debit transaction; "clearance" is the electronic processing of a debit card transaction; and "settlement" is the exchange of funds done exclusively by electronic means.  In most debit transactions, these three steps occur without human involvement.  Each of them happen in an instant.  Together the costs of these steps constitute only a tiny fraction of the costs of design, construction, organization, maintenance, operation, and upgrade of any bank's debit system, or of any bank's checking account product.

97.     The Durbin Amendment commands the Board to engage in rulemaking in the nine months following passage regarding allowed costs, after which the Board is required to announce "regulations" as to debit interchange fees received or charged by issuing banks.  The standards will be implemented just three months later, or just one year after passage of the Durbin Amendment.

**D.      The Effect Of The Durbin Amendment On TCF's Business And Customers.**

98.     The Durbin Amendment ushers in an unprecedented form of rate regulation that specifically prohibits an issuer from recovering all except a tiny fraction of the costs it must incur in operating a debit card service.  Non-exempt banks can no longer recover expenses of establishing a debit program, marketing/advertising the program, placing cards in the hands of customers, handling complaints or questions from customers, providing consumer benefits and many other costs of servicing this payment system, including fixed "sunk costs," like technology expenses and a fair allocation of retail

branch networks which gives rise to checking/debit depository accounts. Nor can they make a profit on debit cards.

99.    Knowledgeable commentators recognized the vast gulf between the costs of "authorization, clearance, or settlement" of a debit transaction and the overall costs of the debit aspect of checking accounts in this country. They believe that, if the Board faithfully applies the Durbin Amendment's pricing mandate, it will of necessity set standards that slash future debit interchange rates to somewhere between 5 percent and 20 percent of current rates (7 to 27 basis points for TCF), far below the actual costs of providing debit service in any debit bank.

100.    TCF was stunned when the Durbin Amendment became part of the Dodd-Frank Act because it disallows the overwhelming majority of the costs of debit service from the Board's consideration and disallows a profit. In the less than three months since the Dodd-Frank Act became law, TCF examined (a) the costs that the Durbin Amendment allows and the costs that the Durbin Amendment excludes; (b) whether there was some way TCF could recapture some or all of debit interchange revenue which the Durbin Amendment will cost TCF, particularly whether TCF could impose its own fees on customers for swiping or having a debit card; and (c) the profitability of the debit card aspect of TCF's checking account product after the Durbin Amendment becomes effective, the profitability of the checking account and depository side of TCF's business after the Durbin Amendment becomes effective, and the profitability of TCF's entire retail banking enterprise after the Durbin Amendment becomes effective.

39

**1.    The New Fees and the Reduction in Interchange Revenue to TCF.**

101.    As a first step, TCF computed the likely fee that the Board will issue based on TCF's own costs for "authorization, clearance and settlement" of an electronic debit transaction. As noted earlier, last year, TCF's customers "swiped" their debit cards just over 200 million times. Focusing only on these expenses, which are essentially the costs of electronic processing of the transaction (and in TCF's case are largely fees TCF pays to VISA for performing these tasks), the recoverable costs totaled about 26 basis points per swipe. At present, TCF receives a debit interchange fee from retailers averaging 1.35 percent--or 135 basis points--of the cost of each purchase by its customers using a TCF debit card; after the regulations go into effect, that yield will drop by about 80 percent. That means TCF's annual debit interchange revenue will drop from approximately $102 million to approximately $20 million.

102.    Next, TCF tried to determine whether it is reasonable to conclude that TCF will qualify for the "adjustment" of the regulated fee for "fraud prevention costs" under Section 5 of the Durbin Amendment and, if so, what additional debit interchange revenue is likely to be retained. The focus of Section 5 is "the development and implementation of cost-effective fraud prevention technology," not reimbursement of banks like TCF for debit fraud losses or insufficient funds debit losses. TCF does have fraud prevention technology in place today, which is highly effective, but its costs are only $3 million. Even if the Board was to allow TCF four basis points per swipe, the fraud adjustment would generate only $3 million of additional annual interchange revenue to TCF.

103. TCF concluded that its post-Durbin Amendment annual debit interchange revenue would drop from just over $100 million to, at best, $23 million.

## 2. The Durbin Amendment Debit Interchange Fees in Comparison to TCF's Disallowed Debit Card Costs.

104. Next, TCF compared the new Durbin Amendment debit interchange revenues with its actual costs that the Amendment commands the Board not to consider, first examining variable costs that all banks incur to provide debit services but that are not fairly encompassed in the Amendment's scope--"authorization, clearance and settlement"--and next considering fixed costs that are properly allocable to the debit card service as a part of TCF's checking account products, which are also excluded.

105. TCF and all other debit banks not exempt from the Durbin Amendment incur many *variable costs* other than those the Board is allowed to consider in setting an interchange fee--which we will call "disallowed variable costs." For example, the cost of creating the debit card and getting it into the customer's hands by mail, the cost of monitoring debit transactions for Bank Secrecy Act and other regulatory purposes, the expense of customer rewards programs, and the extensive costs of handling customer complaints through a 24-hour call center. As noted earlier, TCF also suffers fraud and insufficient funds costs which the Durbin Amendment excludes. The cost of preparing a written monthly statement and sending it to the customer is also disallowed, despite the fact that today most of the charges on TCF's statements are debit transactions. In 2009, these disallowed variable costs exceeded $29 million.

106.    Finally, TCF considered its disallowed *fixed costs* fairly allocable to debit

service, including a share of branch occupancy and equipment costs, branch labor, branch

support costs, and other fixed expenses like insurance and government fees for doing

business. Also, the cost of acquiring new accounts through advertising and premiums are

not included. For example, to choose two disallowed costs, TCF's internal data handling

relating to debit is over $26 million a year and its account premiums expense allocated to

debit is over $18 million a year. None of these expenses, as explained earlier, can be

avoided if TCF's debit interchange revenues drop.

107.    Turning to the checking account product as a whole, TCF analyzed the loss

of approximately $80 million in debit interchange revenue. In the most recent 12-month

period, TCF had a return on equity of 18.1 percent on its checking account product; after

subtracting an $80 million revenue loss due to the Durbin Amendment, TCF will have a

return on equity for that product of 6.7 percent. That return on equity is insufficient to

attract new capital in the industry in which TCF competes. In other words, if the damage

to debit revenues is examined in the context of the product of which the debit card is a

part, the return on that entire side of TCF's business after the Durbin Amendment falls

below the amount necessary to earn a fair return.

## 3.    No Alternative Source of Revenue is Available to TCF to Replace the Revenue TCF Loses After the Durbin Amendment.

108.    Thus, TCF and similarly situated banks are between a rock and a hard

place--they can continue to provide debit service free of charge as promised to consumers

and simply accept a huge drop in revenue, *or* they can seek to recover the lost revenue by

charging customers either a swipe fee or a monthly fee for maintaining depository accounts. Neither option is viable for any regulated bank, although the few that have credit card services can mitigate the harm to some extent.

109.    As a preliminary matter, TCF recognized that curtailing debit services is not a realistic option for TCF or any other regulated bank. Issuers with less than $10 billion in assets have branches surrounding all of TCF's branches. If TCF were to impose any fee for its debit card to cover the reduction in interchange mandated by the Durbin Amendment, it would lose customers to these competitors who have no reason to impose such a fee and rather have every incentive not to charge such a fee in order to attract TCF's customers. Due to the demographics of the TCF depository customer base, that migration is a business certainty unless TCF subsidizes its debit program. As noted, a branch banking system like the one TCF has created over the last 80 plus years cannot exist without a checking account product, and today a checking account without the debit card feature will not be accepted by most customers.

110.    The 11 largest banks have extensive credit card operations, and they may be able to weather the storm, at least in the short run, by steering their debit customers to credit card products whose interchange rates are generally higher than debit interchange and are unaffected by the Durbin Amendment. Eleven banks in America control this market. Small banks and medium-sized banks generally do not issue their own credit cards and, hence, will not be in a position to steer customers to their credit card business. TCF and virtually all the other banks in the country cannot compete against these banks

because the economies of scale of the credit card industry today make such competition nearly impossible.

111. Credit cards do compete with debit cards. About half of credit card charges in this country are "non-revolving," which means the customer pays his bill in full every month and never pays interest on his charges. These customers use credit cards the same way most people use debit cards. In addition, about 40 percent of the checking account customers of the biggest banks also carry credit cards issued by those banks. These are "non-branch" credit cards that are issued nationwide and marketed through the mail, internet, and other ways.

112. Many of TCF's customers also carry a credit card from one of these 11 credit card banks in addition to their TCF debit card. If TCF did impose a debit card fee, these 11 credit card banks will acquire customers from TCF. Since those customers can use the credit card as a substitute for their TCF debit card by paying the balance every month to avoid finance charges, their "non-revolving" credit card would function in the same way as their TCF debit card. In addition, those TCF customers who already have a credit card from one of the 11 credit card banks in addition to their TCF debit card may simply pull out their credit card versus using the TCF debit card to avoid any new fee.

113. So the biggest impacted banks may be able to respond, unless other regulatory forces intervene, in two ways to the Durbin Amendment that TCF and similarly-situated debit banks cannot--they may, subject to the restraints of the CARD Act, raise interest rates on the credit accounts that do revolve to recapture lost debit revenue; and they may offer credit cards on a profitable basis to certain non-revolving

customers who can substitute a credit card for purchases previously made on their debit cards. Credit card interchange fees, moreover, are generally higher than debit card interchange fees, and so the ultimate effect of the Durbin Amendment actually may be to increase interchange fees paid by retailers as to this group of card users. In the long run, it is doubtful whether these maneuvers could allow even these major banks to keep many of their customers from moving to exempt banks. Ironically, many TCF customers who now have credit cards issued by other banks would drop TCF if TCF added a fee to their debit cards.

114. TCF has no credit card programs; nor is it feasible for TCF to introduce them. In the past, two efforts to issue credit cards taught TCF that its deposit customer base does not have sufficient credit strength to justify issuing credit cards on a broad enough scale to make that business profitable. Both of these past efforts resulted in TCF taking large losses before it abandoned that market. Any credit card launch would be far more difficult in today's heavily regulated environment.

115. Nor is charging additional fees to customers for debit services a possible solution for TCF. TCF's entire business is founded on "free" checking and debit account services for customers. If TCF begins charging its customers a "swipe fee" or a monthly fee for services, customers will switch to one of the 99 percent of banks not affected by the Durbin Amendment, which can continue to offer free checking/debit account and recover all related costs as they do today. Each TCF branch is surrounded by branches of competitors who are exempt from the Durbin Amendment. Indeed, in Minnesota, for example, only seven banks that accept deposits will be subject to the forthcoming Durbin

Amendment regulations, while over 400 exempt banks and savings institutions (not counting credit unions) compete with TCF branches in Minnesota.

116. The conclusion TCF reached is that it must continue to provide debit services to its customers free of charge after the Durbin Amendment and accept an $80 million loss of revenue.

## 4. The Effect of the Durbin Amendment on TCF's Enterprise as a Whole.

117. As demonstrated above, on a line of business basis, TCF's debit card as part of its checking account business becomes unprofitable after the Durbin Amendment because the new interchange rate will not allow TCF or similarly-situated banks to recover their costs of providing that service. And if one considers the entire depository side of the business (except savings accounts), the return is not sufficient to continue to attract capital.

118. Turning to the entire TCF banking enterprise, and assuming that TCF is left with the loss of revenue that the Durbin Amendment portends, TCF's return on equity will fall far below industry standards over the last 15 years. In that period, commercial banks have earned on average roughly a 14 to 15 percent return on equity, and TCF has earned over 20 percent in many of those years. Currently, TCF as an enterprise is earning 12 percent on equity, and the Durbin Amendment will likely drop that by 40 percent, to less than 8 percent. A return on equity below 10 percent is not sufficient to attract new capital to a banking enterprise in this country.

119.    In sum, the Durbin Amendment compels the Board to issue a confiscatory rate or fee; there is no way the Board can order a debit interchange fee that is faithful to the statute but still allows regulated banks to recover their costs of debit services (to say nothing of recovering a profit).  And the effect of the loss of revenue that the Durbin Amendment mandates is to generate a return on equity for TCF and other regulated banks that is below the amount investors in banking concerns have demanded in recent years. Capital must go elsewhere.

## CLAIMS FOR RELIEF

### COUNT I
### Declaratory Judgment--Substantive Due Process

120.    Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

121.    TCF is a debit card issuing institution with assets exceeding $10 billion and, therefore, is subject to the Board's forthcoming debit interchange fee regulations under the Durbin Amendment.

122.    TCF has a property interest in its opportunity to charge debit interchange fees that allow it to recover (1) the costs of providing interstate debit card services to its customers, and (2) a reasonable return on the capital it has invested in its debit card operation.

123.    The Durbin Amendment arbitrarily and irrationally deprives TCF of its constitutionally-guaranteed property right to recover costs plus a reasonable return on the capital invested in its extensive, debit card operation.  The statute instructs the Board to

set interchange rates *solely* by reference to the "incremental costs" of authorizing,

clearing, or settling each debit transaction, while expressly prohibiting the Board from

considering all the "other costs" incurred by TCF in administering its overall debit card

program. The "incremental costs" the Board may consider when setting TCF's

interchange fee rate constitute only a small fraction of TCF's "other costs" associated

with the design, construction, organization, maintenance, operation, and upgrade of

TCF's debit card system. The price control affected by the Durbin Amendment is

arbitrary, discriminatory, and demonstrably irrelevant to the purported purpose of

reducing interchange fees imposed by card companies and debit network operators.

124.     The Durbin Amendment provides no supplemental mechanisms to ensure

TCF's right to recover its costs plus a reasonable rate of return on its debit card operation,

or to guarantee TCF the opportunity to challenge the unjust imposition of confiscatory

rates. Although the law contains a complex provision giving a regulated bank some

ability to recover specific fraud prevention costs, even that provision limits a bank to only

an upward "adjustment" to the Board's predetermined interchange fee if it can show that

the adjustment is reasonably necessary to cover "costs incurred by the issuer in

preventing fraud." This provision does not allow TCF to recover its actual fraud losses,

or its losses on transactions involving insufficient funds. Consequently, the Durbin

Amendment lacks adequate safeguards to protect regulated institutions from confiscatory

rates.

125.     The Durbin Amendment is thus facially unconstitutional under the Due

Process Clause of the Fifth Amendment of the U.S. Constitution because any debit card

interchange fee schedule the Board adopts consistent with the statute will necessarily

disregard most of the costs associated with TCF's debit card operation, thereby

preventing TCF from recovering its costs and earning a fair rate of return on its invested

capital.

126.   TCF is entitled to a judgment declaring that the Durbin Amendment

violates the Due Process Clause of the Fifth Amendment, pursuant to 28 U.S.C.

§§ 2201(a), 2202.

127.   TCF will suffer irreparable injury for which there is no adequate remedy at

law unless the Court issues an order enjoining the enforcement of the Durbin Amendment

against it.

## COUNT II
### Declaratory Judgment--Unlawful Regulatory Taking

128.   Plaintiff incorporates by reference the foregoing paragraphs as if fully set

forth herein.

129.   TCF has a property interest in its opportunity to charge debit interchange

fees that allow it to recover (1) the costs of providing interstate debit card services to its

customers, and (2) a reasonable return on the capital it has invested in its debit card

operation.

130.   By singling out banks with assets of $10 billion or more and instructing the

Board to set interchange rates *solely* by reference to the "incremental costs" of

authorizing, clearing, or settling debit card transactions, the Durbin Amendment (1)

necessarily precludes TCF from recovering its costs plus a reasonable return on the

49

capital it has invested in its debit card operation; (2) frustrates TCF's ability to compete on even ground with the exempt banks, savings and loans, and credit unions; and (3) singles out a small number of banks, including TCF, to bear a substantial competitive and financial burden. The Durbin Amendment therefore effects an unconstitutional taking of TCF's property without just compensation in violation of the Fifth Amendment of the U.S. Constitution.

131. TCF is entitled to a judgment declaring that the Durbin Amendment effects a taking of property without just compensation in violation of the Takings Clause of the Fifth Amendment, pursuant to 28 U.S.C. §§ 2201(a), 2202.

132. TCF will suffer irreparable injury for which there is no adequate remedy at law unless the Court issues an order enjoining the enforcement of the Durbin Amendment against it.

## COUNT III
### Declaratory Judgment--Denial of Equal Protection

133. Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

134. The Durbin Amendment requires the Board to promulgate regulations limiting the amount of any interchange fee that a debit card issuing bank "may receive or charge" to an amount that is "reasonable and proportional" to the "incremental cost incurred by an issuer . . . in the authorization, clearance, or settlement of a particular electronic debit transaction." The statute exempts from the Board's regulations "any issuer that, together with its affiliates, has assets of less than $10,000,000,000."

135.    TCF is a debit card issuer with assets exceeding $10 billion and, therefore, is subject to the Board's forthcoming debit interchange fee regulations under the Durbin Amendment.

136.    TCF is denied the equal protection of law as guaranteed by the Fifth Amendment because the Durbin Amendment's distinction between banks and other card issuers with assets of less than $10 billion and banks and other card issuers with assets of $10 billion or greater is not rationally related to a legitimate government purpose. By its terms, the Durbin Amendment exempts 99 percent of the debit card issuing banks in the country from the regulations it imposes on TCF and fewer than 100 other banks. This exemption for smaller institutions arbitrarily grants them an insuperable competitive advantage denied to TCF. The Amendment does not regulate fees charged by debit network operators or credit card companies, the purported goal of the legislation. No conceivable state of facts could provide a rational basis for the impact of this legislation.

137.    TCF is entitled to a judgment declaring that the Durbin Amendment violates its right to equal protection of law as applied to the United States through the Due Process Clause of the Fifth Amendment, pursuant to 28 U.S.C. §§ 2201(a), 2202.

138.    TCF will suffer irreparable injury for which there is no adequate remedy at law unless the Court issues an order enjoining the enforcement of the Durbin Amendment against it.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff TCF National Bank demands that the Court order equitable relief against defendants, the members of the Board of Governors of the Federal Reserve System in their official capacities, as follows:

1.     A judgment declaring that the Durbin Amendment imposes an unconstitutionally confiscatory regulatory structure on regulated banks, in violation of the Due Process clause of the Fifth Amendment.

2.     A preliminary and permanent injunction against the implementation of the forthcoming regulations under the Durbin Amendment.

3.     The allegations of this Complaint demonstrate a strong likelihood that the provisions of the Durbin Amendment will so constrict interchange fees on debit cards that TCF and similar banks will be forced to bear confiscatory losses if those provisions are implemented, and TCF will present proper evidence to support each of the allegations. It also shows that these losses are attributable to the multiple weaknesses of the Durbin Amendment among whose key flaws are:

> a.     The Durbin Amendment squeezes the revenues of regulated banks so that they cannot recover at any time and in any manner the fixed and common costs needed to create the business infrastructure needed to create, support, and upgrade their business systems. TCF will show that any set of Board regulations that are consistent with the explicit commands of the Durbin Amendment will necessarily be confiscatory and in violation of the Due Process Clause of the Fifth Amendment to the Constitution.
>
> b.     The Durbin Amendment draws unprincipled and irrational distinctions between banks by size even though these distinctions bear no relationship to any of the possible

> infirmities of the interchange system that treats large and
> small banks the same in every relevant business particular.
> These irrational distinctions deny the banks the equal
> protection of the laws, stated in the Equal Protection Clause
> of the Fourteenth Amendment, as applied through the Due
> Process Clause of the Fifth Amendment.

    c.    The legislative history of the Durbin Amendment reveals no
rational basis for the adoption of this structure; nor can any be
inferred independently for a statute whose main consequence
is likely to put additional strains on key banking institutions
which the Dodd-Frank Act is intended to shore up.

4.    TCF seeks by this preliminary injunction only to preserve the status quo

ante which has featured explosive growth of debit cards as a preferred form of payment

relative to cash, checks and credit cards and symbiotic benefits by consumers, retailers,

and debit banks. There is no public interest that will be subject to dislocation if this

Court scrutinizes the Durbin Amendment to see whether it applies with long established

principles that forbid both confiscation of and invidious discrimination against TCF and

other banks regulated by the Durbin Amendment.

5.    In sum, the preliminary injunction TCF seeks is in no way intended to

interfere with the Board's formulation of the regulations pursuant to the Durbin

Amendment. Indeed, TCF has cooperated and will cooperate with that project in

whatever way possible so that the final regulations can be examined by this Court. There

is a strong likelihood of success on the merits of TCF's claims; TCF will suffer

irreparable injury if injunctive relief is not granted; and the balance of equities favor

issuing a preliminary injunction so that the Durbin Amendment cannot go into effect until

its regulations, when finally promulgated, are reviewed by this Court.

6.    Its costs and disbursements herein.

7.    Such other and further relief as the Court deems equitable and just.


Dated: October 12, 2010.          MEIERHENRY SARGENT LLP

                                   By: _____
                                       Mark V. Meierhenry
                                       Clint Sargent
                                       315 South Phillips Avenue
                                       Sioux Falls, South Dakota 57104
                                       (605)336-3075
                                       mark@meiehenrylaw.com
                                       clint@meierhenrylaw.com

                                   *Of Counsel:*

                                       Richard A. Epstein (California Bar #43329)
                                       Constitutional Scholar
                                       4842 So. Woodlawn Avenue
                                       Chicago, Illinois 60615
                                       (773)450-4476

                                   KELLY & BERENS, P.A.
                                       Timothy D. Kelly (Minnesota Bar #54926)
                                       Sarah E. Bushnell (Minnesota Bar #0326859)
                                       3270 IDS Center
                                       80 South Eighth Street
                                       Minneapolis, Minnesota 55402
                                       (612)349-6171

                                   *Attorneys for Plaintiff*