UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA

TCF National Bank,

               Plaintiff,

v.

Ben S. Bernanke, Janet L. Yellen, Kevin M.
Warsh, Elizabeth A. Duke, Daniel K.
Tarullo, and Sarah Bloom Raskin, the
Board of Governors of the Federal Reserve
System, in their official capacities,

               Defendants.

Case No. 4:10-cv-04149-LLP

**PLAINTIFF'S MEMORANDUM
OF LAW IN SUPPORT OF ITS
MOTION FOR A
PRELIMINARY INJUNCTION**

## INTRODUCTION

Plaintiff now moves to preliminarily enjoin enforcement of a facially

unconstitutional new and unprecedented federal law that will irreparably harm its

business.  Under a test developed by the Supreme Court dealing with the regulation of

rates, the statute cannot be enforced without violating TCF's constitutional right to earn a

just and reasonable return.

## FACTS

The facts are set forth in detail in the Complaint and will not be fully restated here.

In short, in the Durbin Amendment,[1] Congress has required that on July 21, 2011, certain

banks that issue debit cards must drastically reduce the interchange fees they charge to

merchants for debit services.  Today debit services are funded by transaction fees--called

---

[1] The Durbin Amendment is part of the Dodd-Frank Wall Street Reform and
Consumer Financial Protection Act of 2010, Pub. L. No. 111-203, 124 Stat. 1376, 2068.

"interchange fees--paid by merchants to banks that issue debit cards,[2] generally between one to two percent of each purchase.[3] The Durbin Amendment restricts regulated debit issuing banks to recover only three discrete costs of debit transactions from merchants: the authorization, clearance and settlement of individual electronic debit transactions. The statute explicitly forbids regulated banks from charging retailers for "any cost" of a debit transaction other than those three electronic steps: in other words, it excludes variable costs that are needed to service the customer's account, and all fixed costs that are incurred in order to establish, maintain and operate the system.

The Durbin Amendment also does not permit regulated banks[4] to make a profit on their debit services charges to merchants.

The Durbin Amendment exempts from its mandated rate reductions debit card issuing banks with less than $10 billion in assets, which is 99 percent of all banks that issue the cards, including many banks with whom TCF competes.[5] TCF is one of only about 60 banks who are subject to the Durbin Amendment price cuts.[6] These banks constitute a widely heterogeneous group. Three of them have assets 100 times TCF's assets: Bank of America Corporation at $2.36 *trillion*, JPMorgan Chase & Co., at $2.01 *trillion*, and Citigroup at $1.94 *trillion*. Wells Fargo & Company is the fourth bank

---

[2] Affidavit of Earl D. Stratton dated November 3, 2010 (the "Stratton Aff."), ¶¶ 14-15, 18.

[3] Affidavit of David M. Stautz dated November 3, 2010 (the "Stautz Aff.") (TCF's average interchange fee is equal to 1.35 percent), ¶ 11; Stratton Aff. (same),¶ 16).

[4] In fact, debit card issuers are commercial banks, savings and loan associations, and credit unions. We use the term "regulated banks" or "exempt banks" to refer to all three institutions.

[5] Stratton Aff., ¶ 3.

[6] Stratton Aff., ¶ 3.

at over $1.23 *trillion.* The banks that rank from fourth through tenth have assets of $283 *billion* to $162 *billion.*[7] By these standards, at $18 billion TCF is hardly a "big" bank.[8]

As mandated by the Durbin Amendment, the Board of Governors of the Federal Reserve (the "Board") is now in the process of implementing its detailed provisions by formulating "standards" as to how much regulated debit card issuers must reduce their interchange rates to merchants. The Board must issue these standards no later than April 21, 2011.

The gist of the Complaint is that all the banks over the $10 billion or more in assets threshold are caught in a withering crossfire between the two inescapable commands of the Durbin Amendment. First, the Durbin Amendment's cost recovery and profit prohibitions result in an over 80 percent reduction in current TCF interchange income.[9]

Second, the Durbin Amendment's exemption for banks with assets under $10 billion, which exempts about 50 percent of the bank branches nationwide,[10] prevents banks regulated by the Durbin Amendment from recovering lost interchange income by charging their own customers a fee for holding or using their debit cards. TCF faces active competition in all of its locations from the exempted banks which are free to continue to charge the current, much higher interchange rates.[11] TCF's customer base,

---

[7] Stratton Aff., Ex. A.
[8] *Id.,* ¶ 4.
[9] Stautz Aff., ¶ 18.
[10] Stratton Aff., ¶ 23.
[11] Stratton Aff., ¶ 10.

3

moreover, is highly price sensitive and accustomed to receiving debit services free of charge.[12]  If TCF charges use fees to its customers, it will lose those customers.[13]

Nor can TCF drop debit cards.  Today's consumers are accustomed to debit services at no charge, and no bank in this country could sell a checking account without a debit card feature.[14]  In effect, TCF is caught between the two iron pincers of the Durbin Amendment.

TCF has applied the terms of the Durbin Amendment to its own debit card costs and determined the permissible rates that the Board is compelled by the statute to issue. Today, on a typical debit card transaction of about $35, TCF receives a $0.47 interchange fee, which works out to 1.35 percent of the dollar value of the transaction;[15] after the Durbin Amendment takes effect, TCF will receive about $0.07 per transaction, for a rate of about 0.26 percent.[16]  That 80 percent decrease in debit revenues will cost TCF about $80 million in the year following the effectiveness of the statute.[17]  In both the long and the short run, denying TCF a recovery on its investments in the debit card system will drop its return on equity to levels far below those necessary for TCF to attract and retain capital.[18]

---

[12] Declaration of Anne Layne-Farrar dated November 3, 2010 (the "Farrar Decl."), Ex. A; Stratton Aff., ¶ 9.

[13] Farrar Decl., Ex. A; Stratton Aff., ¶ 23.

[14] Farrar Decl., Ex. A; Stratton Aff., ¶ 12.

[15] Stratton Aff., ¶ 16.

[16] Stautz Aff., ¶ 11.

[17] Stautz Aff., ¶ 18.

[18] Affidavit of Ben Crabtree dated November 2, 2010 (the "Crabtree Aff."), ¶ 6; Affidavit of John R. Chrin, November 4, 2010 (the "Chrin Aff."), ¶¶ 5, 7, 9, 10; Stautz Aff., ¶ 20.

In support of this motion to strike down the Durbin Amendment, TCF submits four affidavits and a declaration:

1.  **Investment Banker John Chrin.**  John Chrin has been an investment banker for over 20 years and has raised over $2 billion in financing for financial institutions and mergers or acquisitions in the financial services industries.  Chrin opines, based on expectations of the effect on its business of the Durbin Amendment that TCF developed, that the Durbin Amendment will terminate the ability of TCF to raise capital at market rates as it has done in the past.

2.  **Financial Analyst Ben Crabtree.**  Ben Crabtree has been a financial analyst for brokerage companies and others for over 40 years covering, among other businesses, financial institutions.  He opines that a financial institution like TCF must demonstrate a consistent return on equity of 14 percent or more to have access to capital markets (something TCF has had for many years).  If the Durbin Amendment cuts TCF's return on equity to seven or eight percent, Crabtree opines, TCF will no longer be able to raise capital at market rates.

3.  **Expert Economist Anne Layne-Farrar.**  Dr. Farrar is a quantitative economist who, at TCF's request, examined the effect of TCF imposing an $8.33 per month fee on its 850,000 checking account customers that use TCF debit cards monthly and, using econometric analysis, concluded that TCF "should expect to lose at least 160,000 to 260,000 [checking] accounts over a span of several months" as TCF customers migrate to exempt banks that need not charge a fee for their debit cards.  Using the midpoint of 210,000 accounts, TCF would lose annual revenue of about $70 million, a loss level very close to simply accepting the $80 million loss that the Durbin Amendment compels.  If the loss of accounts was 260,000, TCF would lose over $85 million in annual revenue.

4.  **TCF Executive David M. Stautz.**  David Stautz is an Executive Vice President and Assistant Treasurer of TCF and is knowledgeable about the costs on the depository side of the bank's business.  After the Durbin Amendment became law, he isolated TCF's costs of "authorization, clearance and settlement" of debit transactions for the period August 2009 to July 2010, versus all the other costs TCF bears for debit transactions.  He concluded that, if the Durbin Amendment had been in effect during that period, TCF would have received about $20 million in interchange fees from retailers versus the approximately $102 million it did receive--an

about $80 million difference. He also concluded that TCF's internal rate of return on capital would be reduced by 62 percent to 6.7 percent for its checking accounts, and its return on equity would be reduced from 9.4 percent to 5.5 percent for the entire banking enterprise.

5.    **TCF Executive Earl Stratton.** Earl Stratton is a senior executive at TCF in charge of certain operations, including the depository side of the business. He provides general facts about TCF, the debit industry and TCF's checking account and debit card services, including a history of TCF's debit card efforts. He also explains why imposition of a monthly fee for debit use would not be feasible for TCF.

## ARGUMENT

The two key factors that courts consider when a party seeks a preliminary injunction are likelihood of success on the merits by that party and a demonstration of irreparable injury to that party if the injunction is not entered.[19] Where the basis for a preliminary injunction is alleged facial unconstitutionality of a statute, the moving party must make "a threshold showing that it is likely to prevail on the merits," and then "the district court should . . . proceed to weigh the other *Dataphase* factors." *Planned Parenthood v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008).

Whenever the constitutionality of a federal law is challenged, there is a presumption--which the plaintiff may rebut--that the challenged statute is constitutional. *INS v. Chada*, 462 U.S. 919, 944 (1983). TCF explains below why the presumption has been rebutted here.

---

[19] *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113-14 (8th Cir. 1981). Two other considerations--balance of hardships between the parties and the public interest--are also considered. *Id.* at 114. *See also Winter v. Natural Res. Def. Council*, 129 S.Ct. 365, 374 (2008).

A.    **TCF Is Likely To Succeed On The Merits.**

1.    **The Durbin Amendment Violates Due Process by Mandating a Fee that Allows Recovery of Only a Fraction of the Cost of the Regulated Service.**

The Durbin Amendment is facially unconstitutional because it reduces the amounts TCF and other regulated debit card issuers may recover from merchants for debit interchange transactions to only a fraction of the actual costs, both fixed and variable, of providing debit services.  The Amendment states that debit issuer banks may only charge retailers for the expenses of "authorization, clearance or settlement of a particular electronic debit transaction."  The Amendment also mandates that "other costs incurred by an issuer shall not be considered" by the Board in determining the interchange fees merchants pay for that service.

And the Durbin Amendment prohibits regulated banks from earning a profit to retailers for debit card transactions.

For the about 60 banks nationwide who are not exempted from these restrictions, the category of recoverable expenses is so narrow, and the category of excluded costs is so broad, that there is no conceivable scenario under which the Board could issue fee standards that would allow any covered bank to recover all its actual costs of debit service from merchants, to say nothing of a positive return on capital.[20]

For well over 100 years, the Supreme Court has examined rate regulations issued by Congress or state legislatures, or administrative bodies acting at their behest, under the Due Process Clause of the Fifth Amendment to the United States Constitution.  This body

---

[20] Stautz Aff., ¶ 13.

7

of law was developed in connection with the regulation of natural monopolies, that is, industries like power, light and electricity, where the services in question are most cheaply provided by a single source. Competition is not present in these markets, because huge front-end costs are needed to build the facilities that supply the services. Any single supplier could, if left unchecked, raise its prices above a competitive level, which in turn would result in social losses--high prices, reduced output and a decline in consumer and producer well-being--traditionally associated with monopoly behavior.[21]

But, just as the existence of monopoly market power created a risk of abuse of consumers, the existence of governmental power to regulate rates of suppliers created a risk of abuse of those providers who had already committed their capital to create and provide the service. Excessive rate reductions could confiscate the property of a public utility by denying to its investors a reasonable rate of return on their investments.

---

[21] One leading casebook described the original theoretical basis for government rate regulations as follows:

> **The Natural Monopoly** The classic case for rate regulation is the "natural monopoly." A natural monopoly exists, in the economic sense, when there is a relation between the size of the market and the size of the most efficient firm in that market such that one firm of efficient size can produce all the market can absorb at a remunerative price and can continually expand its capacity at less cost than that of a new firm entering the business . . . . By and large, in highly developed countries like the United States, few industries will fall into the in the natural monopoly category."

STEPHEN G. BREYER, RICHARD B. STEWART, CASS R. SUNSTEIN & ADRIAN VERMEULE, ADMINISTRATIVE LAW AND REGULATORY POLICY: PROBLEMS, TEXT, AND CASES 223 (6th ed. 2006).

In order to combat this risk, under the Due Process Clause, the Supreme Court has struck down rates that it has termed as "so 'unjust' as to be confiscatory."[22]  By the same token, it has upheld rates for regulated natural monopolies that are "just and reasonable."[23]  As stated in one decision, "[t]he just compensation safeguarded to the utility by the Fourteenth Amendment is a reasonable return on the value of the property used at the time that it is being used for the public service, and rates not sufficient to yield that return are confiscatory."[24]

The Supreme Court has developed a standard that implements the constitutional safeguards against confiscation in order to distinguish between rates that, in Justice Brandeis's words, are "constitutionally compensatory,"[25] versus those that are unconstitutionally "confiscatory," because they do not allow the regulated business to recover its actual costs of the service at issue, plus a return on capital.  The two leading cases that deal with how the line between the two is drawn are *FPC v. Hope Natural Gas Co.*, 320 U.S. 591 (1944), and *Duquesne Light Co. v. Barasch*, 488 U.S. 299 (1989).

In 1944, the Court explained in *Hope Natural Gas*:

> The rate-making process under the Act, i.e., the fixing of "just and reasonable" rates, involves a balancing of the investor and the consumer interests.  Thus we stated in the *Natural Gas Pipeline Co.* case that "regulation does not insure that the business shall produce net revenues." 315 U.S. at 590.  But such considerations aside, the investor interest has a legitimate concern with the financial integrity of the company whose rates are being regulated.  From the investor or company point of view it is

---

[22] *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 307 (1989).

[23] *FPC v. Texaco Inc.*, 417 U.S. 380, 387 (1974).

[24] *Bd. of Pub. Util. Comm'rs v. N.Y. Tel. Co.*, 271 U.S. 23, 31 (1926).

[25] *Missouri ex rel. Southwestern Bell Tel. Co. v. Pub. Svc. Comm'n*, 262 U.S. 276, 290-91 (1923) (Brandeis, J., concurring).

9

important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock. Cf. *Chicago & Grand Trunk R. Co. v. Wellman*, 143 U.S. 339, 345, 346. By that standard the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital. See *State of Missouri ex rel. Southwestern Bell Tel. Co. v. Public Service Commission*, 262 U.S. 276, 291 (Mr. Justice Brandeis concurring).

320 U.S. at 603. In 1989, Chief Justice Rehnquist explained in *Duquesne Light*:

Similarly, an otherwise reasonable rate is not subject to constitutional attack by questioning the theoretical consistency of the method that produced it. "It is not theory, but the impact of the rate order which counts." *Hope*, 320 U.S., at 602. The economic judgments required in rate proceedings are often hopelessly complex and do not admit of a single correct result. The Constitution is not designed to arbitrate these economic niceties. Errors to the detriment of one party may well be canceled out by countervailing errors or allowances in another part of the rate proceeding. The Constitution protects the utility from the net effect of the rate order on its property.

488 U.S. at 314. Thus, the Constitutional line is between rates that allow the regulated entity to "maintain its financial integrity," *Hope Natural Gas*, 320 U.S. at 605, and those that compel a rate "so 'unjust' as to be confiscatory" *Duquesne Light*, 488 U.S. at 307. Today, a confiscatory rate is a rate "threatening [a regulated business's] 'financial integrity.'" *Verizon Communications, Inc. v. FCC*, 535 U.S. 467, 524 (2002).

Other courts have applied these principles in other rate-making contexts, including outside of monopoly or utility situations.[26] Regulations undercutting cost recovery or a

---

[26] *See, e.g., Giles Lowry Stockyards, Inc. v. Dept. of Agric.*, 565 F.2d 321, 324 (5th Cir. 1977) (livestock auction rates); *Yellow Cab Co. v. City of Chicago*, 919 F. Supp. 1133, 1140 (N.D. Ill. 1996) (taxicab rates); *Keystone Ins. Co. v. Foster*, 732 F. Supp. 36, 38 (E.D. Pa. 1990) (auto insurance rates); *Kavanau v. Santa Monica Rent Control Bd.*,

profit must be carefully reviewed in competitive situations where market forces are already at play. The test is clear: if the "net effect of the rate order" does not allow recovery of all the seller's actual costs plus a return on capital consistent with the risk of the enterprise, the rate regulation will be stricken. *Duquesne Light*, 488 U.S. at 314.

Recent case law in courts other than the Supreme Court shows the standard developed in *Hope Natural Gas* and *Duquesne Light* continues to have real teeth today in a broad range of industries. In *Jersey Central Power & Light Co. v. F.E.R.C.,* 810 F.2d 1168 (D.C. Cir. 1987), the Court of Appeals for the District of Columbia was faced with a question of whether an adjustment in the rate base of an electric utility should be made for $400 million in lost investments in nuclear power by the regulated company in recent years. The public utility commission refused to hold a hearing or to allow an increase in rates, despite the financial distress of the utility. The court held that, under *Hope Natural Gas*, it was not constitutionally sufficient for the state regulation to allow the firm a rate that would stave off bankruptcy, but do little more:

> At oral argument before the *en banc* court, counsel for the Commission indicated that the "end result" test *did* allow a court to set aside a rate order when the company would otherwise go bankrupt and the Commission had

---

941 P.2d 851, 858-59 (Cal. 1997) (residential dwelling rents); *CalFarm Ins. Co. v. Deukmejian*, 771 P.2d 1247, 1252-53 (Cal. 1989) (auto and other consumer insurance rates); *Palomar Mobilehome Park Ass'n v. Mobile Home Rent Review Comm'n*, 20 Cal. Rptr. 2d 371, 372-73 (Cal. Ct. App. 1993) (mobile home rental rates).

For example, in *Mora v. Mejias*, 223 F.2d 814 (1st Cir. 1955), the First Circuit held facially unconstitutional an administrative order fixing maximum prices for the sale of rice in Puerto Rico because the regulated price required rice suppliers to sell below cost. The Government admitted that the regulation imposed a loss on the rice sellers, and the court recognized that the law was a naked attempt to subsidize rice consumers at the expense of rice importers--as the Durbin Amendment subsidizes merchants at the expense of debit card issuing banks.

refused to take that into account. The source of this constricted standard is elusive, not to say invisible. *Hope Natural Gas* talks not of an interest in avoiding bankruptcy, *but an interest in maintaining access to capital markets, the ability to pay dividends, and general financial integrity.* While companies about to go bankrupt would certainly see such interests threatened, companies less imminently imperiled will sometimes be able to make that claim as well. Jersey Central alleges that it is such a company. The contention that no company that is not clearly headed for bankruptcy has a judicially enforceable right to have its financial status considered when its rates are determined must be rejected.

810 F.2d at 1180 (emphasis added).

*Jersey Central* was, in turn, relied on by the California Supreme Court recently in *CalFarm Insurance Co. v. Deukmejian*, 771 P.2d 1247 (Cal. 1989), which addressed Proposition 103, adopted by referendum, that required automobile insurers in a competitive market to charge 20 percent below their 1987 rates, while allowing possible administrative relief for insurance carriers that were "substantially threatened" with insolvency by the price cut. The California Supreme Court, applying *Jersey Central,* struck down Proposition 103 prior to its implementation because it denied any insurance company the minimum rate of return guaranteed under the *Hope Natural Gas* formula. Quoting the *Hope* standard, the Court stated emphatically that "[i]f 'insolvency' is defined as 'bankruptcy,' it is clear that rate relief cannot be confined to companies threatened with insolvency." *Id.* at n.9.

*CalFarm* is an example of how the constitutional law of rate regulation protects firms that operate in competitive markets.

The Ninth Circuit in *Guaranty National Insurance Co. v. Gates,* 916 F.2d 508 (1990), also applied the test to an automobile insurance statute from Nevada. The court

12

struck down as confiscatory, and before implementation, a Nevada insurance statute that used a facially insufficient definition of an "inadequate" rate. The Nevada statute stated, "[r]ates are inadequate if they are clearly insufficient, together with the income from investments attributable to them, to sustain projected losses and expenses in the class of business of which they apply." *Id.* at 515. The Nevada statute essentially preserved the ability of insurance companies to recoup the costs of their insurance policies, but offered no opportunity for profits. The Ninth Circuit held that, although the Nevada statute offered insurers an opportunity to "break even . . . it does not guarantee the constitutionally required 'fair and reasonable return.'" *Id.* (*citing Hope Natural Gas*).

In *Michigan Bell Telephone Co. v. Engler*, 257 F.3d 587 (6th Cir. 2001), even more recently, the Sixth Circuit reached the same conclusion regarding a regulation in some ways comparable to the Durbin Amendment. In that case, the Michigan Public Service Commission applied a methodology that allowed two legacy telephone service providers to recover their costs under the so-called TSLRIC (Total Service Long Run Incremental Cost) methodology, which was defined as follows:

> Total service long run incremental costs means, given current service demand, including associated costs of every component necessary to provide the service, 1 of the following:
>
> (i) The total forward-looking cost of a telecommunication service, relevant group of service, or basic network component, using current least cost technology that would be required if the provider had never offered the service.
>
> (ii) The total cost that the provider would incur if the provider were to initially offer the service, group of service, or basic network component.

*Id.* at 595.

13

The Sixth Circuit granted Michigan Bell's request for a preliminary injunction on the ground that this formula did not allow the utility to recover its constitutionally guaranteed rate of return under the *Hope Natural Gas* test because it made no allowance for any positive return. *Id.* at 596. The statutory scheme at issue there was far more favorable to the regulated entities than the Durbin Amendment,[27] which allows for cost recovery of at most only a fraction of the actual costs needed to operate a debit card system.

One of the most instructive features of *Michigan Bell Telephone* was how it reached back to pre-*Hope Natural Gas* decisions to affirm an injunction to a rate system before it was put into effect. And it rejected the suggestion that efforts to impose a loss on one aspect of a business could be offset by the gains that might be generated in another area. *Mich. Bell Tel.,* 257 F.3d at 594. The Sixth Circuit relied on an earlier Supreme Court decision in *Brooks-Scanlon Co. v. Railroad Commission,* 251 U.S. 396 (1920), where the Railroad Commission of Louisiana ordered Brooks-Scanlon, a lumber company, to operate one of its businesses, a narrow gauge rail line, at a loss of $1,500 per month. In invalidating the order, Justice Holmes stated:

> A carrier cannot be compelled to carry on even a *branch* of business at a loss, much less the whole business of carriage . . . . The plaintiff may be making money from its sawmill and lumber business but it no more can be compelled to spend that than it can be compelled to spend any other money

---

[27] Those entities were free to recover "associated costs of every component necessary to provide the service," 257 F.3d at 595, whereas the Durbin Amendment identifies the costs of three electronic processing steps "which costs shall be considered" in setting a rate for debit interchange and, as to "other costs incurred by an issuer," those "costs shall not be considered." Pub. L. No. 111-203, sec. 1075, § 920(a)(4), 124 Stat. 1376, 2068 (2010).

to maintain a railroad for the benefit of others who do not care to pay for it.

*Id.* at 399 (emphasis added).

That same position had been articulated earlier in *Northern Pacific Railway Co. v. State of North Dakota*, 236 U.S. 585 (1915), where Justice Hughes, writing for a unanimous Court, held:

> But, broad as is the power of regulation, the state does not enjoy the freedom of an owner . . . . If [a common carrier] has held itself out as a carrier of passengers only, it cannot be compelled to carry freight . . . . In such a case, it would be no answer to say that the carrier obtains from its entire intrastate business a return as to the sufficiency of which in the aggregate it is not entitled to complain . . . . [I]n *Missouri Pacific Railway v. Nebraska*, 217 U.S. 196, it was held that the carrier could not be required to build mere private connections, and the adequacy of the receipts from its entire business did not enter into the question. And this was so because the obligation was not involved in the carrier's public duty and the requirement went beyond the reasonable exercise of the state's protective power.

*Id.* at 595-96.

These principles require the Court to hold the Durbin Amendment facially unconstitutional. First, the Government here seeks to regulate an industry in which suppliers like TCF have no monopoly power and thus already are able to earn at most a competitive rate of return.[28] If a competitive rate of return is the gold standard of rate regulation, the Durbin Amendment rate regulation serves no beneficial purpose against the banking industry, which is every bit as competitive as the Durbin Amendment's beneficiary, the retail industry.

TCF can only retain its constitutionally protected competitive rate of return by tapping into some alternative revenue stream to offset the loss of interchange revenue.

---

[28] Stratton Aff., ¶ 10.

15

But TCF's unregulated right to charge its customers for debit services cannot fill that gap in light of competition from exempt banks allowed by the Amendment.[29]  The just compensation required to avoid confiscatory rates demands more than a hypothetical opportunity to mitigate that is not practical.  The natural monopolist, by way of contrast, needs to receive no alternative revenue stream to secure a competitive rate of return.  But a regulated firm in a competitive industry does.  The rate regulation here necessarily cuts revenues and necessarily drives rates below the constitutional minimum.

Second, on its face, the Durbin Amendment bars the recovery from retailers of "other costs" of debit service beyond the modest costs of electronically authorizing, clearing or settling debit transactions.[30]  This structure alone makes the rate "confiscatory" and hence unconstitutional.

Third, The Durbin Amendment facially bars issuing banks from earning a profit from retailers for the debt services the retailers receive.  Under *Hope Natural Gas*, *Jersey Central*, and *Michigan Bell Telephone*, this restriction independently makes the rate "confiscatory" and unconstitutional.

We ask the Court to step back from the detail of the rate cases and apply some constitutional common sense to the utterly unprecedented and illogical nature of the Durbin Amendment.  This law mandates an 80 percent fee drop in a highly functioning market (and delivers a companion windfall to retailers) but then exempts all but a handful of suppliers of the subject service from its restraints.  The evil that the foregoing cases

---

[29] Farrar Decl., Ex. A; Stratton Aff., ¶ 23.
[30] *See generally*, Stautz Aff.

16

sought to avoid was forcing a supplier of any service to sell at a rate that fails to recoup its overall investment, yet that evil is manifest on the face of the Durbin Amendment. Simply stated, no rate scheme in the history of the United States has combined the two key features of the Durbin Amendment. Joining those features together makes the scheme facially unconstitutional under the test set forth in the ratemaking cases.

2.   **The Durbin Amendment Violates Equal Protection by Exempting 99 Percent of Debit Issuing Banks from its Regulations.**

While the Constitutional test for ratemaking under the Due Process Clause is one that requires the "financial integrity" of the regulated supplier must be maintained, the test under the Equal Protection Clause is less demanding for the Government. Courts review economic legislation under a rational basis standard. *See, e.g., City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985). Thus, courts look to whether the challenged law bears a rational relationship to a permissible state objective. *Id.* at 448. Courts will strike down legislation using the rational basis test, however, where there is no rational connection between the law and its purposes. *See, e.g., Allegheny Pittsburgh Coal v. Webster County*, 488 U.S. 336 (1989). Even under this government-friendly test, however, the Durbin Amendment fails to pass muster because the under $10 billion asset exemption is a pure political contrivance that makes mitigation of its rate cutting impossible and therefore advances no legitimate government end. There is no rational basis for setting up an arbitrary dividing line between regulated banks like TCF (about 60 debit issuers, or less than 1 percent of all debit issuers) and exempt banks (the other 7,000, or over 99 percent), like all but a few of TCF's competitors.

In many cases, of course, there are good reasons for drawing an arbitrary statutory line. So long as children are too immature to drive on public highways, some minimum age must be established for getting driving licenses, so states are allowed to choose which teenagers should be allowed to apply for licenses and which should not. But in this instance, there is no rational connection to imposing any line between large and small banks in the first place, given that they operate in direct competition with each other.[31]

The exemption for banks below $10 billion in assets also will manifestly distort the operation of the entire debit card system, by giving banks whose asset base is just below that figure a strong incentive to stay there. No bank would be foolhardy enough to expand its asset base at the cost of having to radically reduce its debit revenue.

The purpose of sound regulation is to introduce or advance competition, not to destroy it. Right now, under current conditions, it is incontestable that the largest and the smallest banks compete effectively for debit card users. There are no collateral health or safety justifications for a regulation whose sole purpose is to drastically change an existing, highly efficient market and give retailers what amounts to a windfall.

From an Equal Protection standpoint, the Durbin Amendment is unique: no other regulatory structure so drastically cuts pricing in a mature and highly-efficient market for a few targeted sellers and then exempts from its regulatory effect so large a number of the other sellers with whom they compete. There is no economic theory or evidence that supports the peculiar structure of the Durbin Amendment, nor is there a regulatory structure of payment card interchange fees anywhere in the world that is comparable.

---

[31] Stratton Aff., ¶ 10.

**a.** **The Absence of Any Legislative History for the Durbin Amendment Complicates Applying the Equal Protection Test.**

As set forth in the Complaint, the Durbin Amendment was an 11th hour addition to the omnibus financial services reform bill and had nothing to do with the core purpose of that bill.  On the vital question of the exemption of certain banks, moreover, there were no committee hearings or similar processes whereby interested persons could make a public record of the social purposes supporting the exemption and how those purposes were to be achieved.

In fairness to Senator Durbin, he did make statements on the floor of the Senate in support of his Amendment, but those statements were directed at why he contended interchange rates debit issuing banks charged to retailers must be reduced--not why it made any sense to exempt 99 percent of the banks in the country from rate cuts he insisted Congress needed to mandate.  One can search the record in vain to find any rationale for the exemption of all except a handful of debit card issuing bank other than the obvious one--that is how many banks, savings institutions and credit unions Senator Durbin needed to satisfy to gather adequate political support to get his Amendment passed.  The use of naked political power to cobble together a winning political coalition does not supply a rational basis for any legislation.

19

**b.**    **The Economic Literature in Regard to Regulation of Payment Card Interchange Fees.**

Scholars and others have studied payment card markets, both credit and debit, extensively in recent years.  Some of those studies have concluded that interchange fees ought to be regulated, and some have concluded they ought not be regulated.[32]

The overall desirability of the current system, however, is well-established in the academic and industry literature.  Here are two examples.  First:

> In the case of payment card systems, this economic balancing [between merchants and consumers] generally leads to merchant and cardholder prices that involve merchants bearing a larger fraction of the total system costs than do cardholders.  This is not due to payment card system market power over merchants, but because demand sensitivity is generally much greater on the cardholder side of the market than on the merchant side of the market.  Cardholders deciding which payment card to carry and use can and do play off competing payment card systems; merchants, on the other hand, generally find it profitable to accept cards from all major payment card systems so as not to lose profitable incremental sales from consumers that use only one payment card.

Klein et al, *supra* note 32 at 573-74.

Second:

> In such a two-sided market, an efficient pricing structure must discriminate between the two customers groups based upon the cost of serving each group and their relative demand elasticities.  Because merchant demand for credit cards is less elastic than consumer demand, an efficient pricing structure will place a larger cost burden on merchants.

Steven Semeraro, *The Economic Benefits of Credit Card Merchant Restraints:  A Response to Adam Levitin,* 56 UCLA L. REV. DISCOURSE 25, 26 (2009).[33]

---

[32] *See* Benjamin Klein, Andres V. Lerner, Kevin M. Murphy & Lacey L. Plache, *Competition in Two-Sided Markets:  The Antitrust Economics of Payment Card Interchange Fees*, 73 ANTITRUST L. J. 571, 573-74 (2006).

20

But on a subject that has received extensive academic analysis for over 25 years, *not one single commentator* who has looked at this question has proposed or defended any regulatory scheme that bears even a remote resemblance to the drastic price controls of the Durbin Amendment joined with the massive exemption of so many sellers of debit service. This absence is stunning.[34] It reveals that no skilled economist approaching interchange fees objectively has even considered a regulatory structure that joins together the two key pieces of the Durbin Amendment.

We submit that the total absence of support for the Durbin Amendment's two-part structure in the scholarly literature is no accident. All the papers agree that card payment systems are what economists call a two-sided market where the product or service at issue has customers on two different sides. A classic example is a newspaper which generates revenue from both subscribers and advertisers. In other words, the obviously high costs of creating, printing and delivering a newspaper are borne by both advertisers and subscribers. But the Durbin Amendment--at least as to regulated banks--forbids card issuers from recovering all except a few costs of the service from retailers and then, as a practical matter, does the same thing for customers because it exempts so many competitors that the regulated banks cannot impose use fees on any customers or they will lose them to the unregulated banks. So the result of the Durbin Amendment is that

---

[33] *See also* Sujit Chakravorti, *Externalities in Payment Card Networks: Theory and Evidence*, REV. OF NETWORK ECON. Vol. 9, Iss. 2, Art. 3 at 6 (2010).

[34] Attached hereto as Exhibit A, by way of example, are listed 27 scholarly papers that prove our point. We invite the Government to show the Court any scholarly article prior to its passage that examined or defended the Durbin Amendment structure for payment card interchange fee regulation. We believe that it cannot be done.

regulated banks cannot charge either side of the market the amount necessary to even recover their costs of debit services, nor allow TCF to earn a profit on the debit service. This novel structure is not rationally related to any permissible regulatory purpose.

### c.  Foreign Systems of Rate Regulation in Australia and New Zealand Offer No Support for the Rationality of the Durbin Amendment.

In recent years, other countries have regulated payment card interchange fees, with mixed results. The most closely studied situation is the Australian experience, where national regulators imposed a severe maximum limit on the fees that Visa and MasterCard could charge for interchange transactions. That decision took place in a concentrated market with only a few banks, all of whom were subject to the same regulatory regime and all of whom would pass their costs back to banking customers. In that setting, *the regulated banks could pass their fees along to customers because all competitors were subject to an identical pricing regime.* So these efforts do not provide a rational basis for the Durbin Amendment.

Yet even there the regulatory structure did not function as well as might have been hoped, for any system of regulation that eliminates some distortions necessarily creates others.[35] The Australian system produced higher direct fees for consumers, smaller reward packages, and an unintended assist to a large non-bank card issuer whose unitary system--that issuer acts as its own acquiring and issuing institution--is out from

---

[35] For discussion, see Richard A. Epstein, *The Regulation of Interchange Fees: Australian Fine-Tuning Gone Awry*, 2005 COLUM. BUS. L. REV. 551, 557-565 (2005).

22

underneath the system of rate control even though its total fees are larger than those collected by either Visa or MasterCard. Chakravorti, *supra* note 33 at 14-17.[36]

The New Zealand regulatory scheme also operated in a highly concentrated market that subjected all four major banks to the same regulatory regime. New Zealand did not set any maximum interchange fees. But its provisions allowed any bank to lower the fees that it charged customers, thereby maintaining competition. The New Zealand legislation also allowed retailers to impose surcharges on debit card use, which the Durbin Amendment prohibits.

**B.**     **The Durbin Amendment Threatens TCF With Irreparable Harm.**

In order to show irreparable harm for purposes of a preliminary injunction, the moving "party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Iowa Utilities Board v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996), *citing Packard Elevator v. I.C.C.*, 782 F.2d 112, 115 (8th Cir. 1986). While it is speculation whether the debit market will continue to function as efficiently after the Durbin Amendment as it has until now, it is a certainty that TCF will suffer a huge loss of revenue that it cannot mitigate once the Durbin Amendment regulations are put into place:

1.     TCF's average interchange rate will drop to .26 percent of each transaction from 1.35 percent;[37]

2.     If TCF tries to impose a swipe fee or a monthly fee, it will lose hundreds of thousands of customers who can bank at the exempted

---

[36] *See also id*; Semeraro, *supra* at 26.
[37] Stautz Aff., ¶ 11.

banks because they continue to enjoy the current interchange fees from retailers;[38]

3.  TCF cannot withdraw from the debit card market because no bank can offer a depository account today--a checking account--without a debit card feature;[39]

4.  All of TCF's costs of its debit card service will remain but only a fraction of its revenues will survive.  TCF, which has had an above-market return on equity in recent years, will suffer a loss to its return on equity that will drop the figure below the amount necessary to attract capital.[40]

Courts have long held that economic loss of the type TCF will suffer from the Durbin Amendment constitutes irreparable harm.  In *Iowa Utilities Board, supra*, the Eighth Circuit granted a stay of implementation of FCC telecommunications pricing rules which legacy carriers alleged "will force [them] to offer their services to requesting carriers at prices below actual costs, causing [the legacy carriers] to incur irreparable losses in customers, goodwill and revenue." 109 F.3d at 426.  The FCC argued that the legacy carriers could recover any lost business through competition under the new rules, but the court of appeals concluded the "threat of unrecoverable economic loss . . . does qualify as irreparable harm." *Id.* (citations omitted).  TCF is in a much more exposed position than the legacy carriers in *Iowa Utilities Board* because the pricing rules there applied to all sellers of telecommunications services--no one was exempted.

But even if TCF could raise its prices to customers for debit services, the decision in *Michigan Bell Telephone* still finds that the balance of hardships cut in favor of a

---

[38] Farrar Decl., Ex. A; Stratton Aff., ¶ 23.  TCF currently imposes a fee for certain PIN debit transactions in a small number of locations.

[39] Stratton Aff., ¶ 12.

[40] Stautz Aff., ¶¶ 18-21; Crabtree Aff., ¶¶ 5-6; Chrin Aff., ¶¶ 5, 7, 9, 10.

utility that is subject to a far less draconian scheme than the one at issue.  Further, as it

loses customers, TCF will lose goodwill associated with its business.  As the court

explained in *Michigan Bell Telephone*, goodwill is real and cognizable harm for purposes

of issuing an injunction:

> Although the plaintiffs may recoup their losses by raising rates, and
> consequently would not suffer irreparable financial harm, there are other
> forms of irreparable harm which may befall them if the court does not
> enjoin enforcement of MTA §§ 701 and 310(7), respectively, *pendent lite*.
> The plaintiffs assert that they will lose customer goodwill if they are forced
> to recoup losses by substantially raising rates and fees for the period during
> which this action may be litigated.  This court has held that even if higher
> rates and fees do not drive customers away, loss of established goodwill
> may irreparable harm a company.[41]

257 F.3d at 599.

Finally, as investment banker John Chrin explains, TCF has already suffered

damages to its stock price and its ability to recover on the value of its assets or business

because the stock market looks to likely future events and adjusts the market price

accordingly.[42]  This means TCF will suffer in terms of its ability to make acquisitions and

"would likely suffer a permanent reduction in value if it sought a sale (change in

control),"[43] because buyers would factor into any offer the reduction in net income the

---

[41] Note that the prospect of obtaining recoupment here is far lower given that
TCF's customers can leave the company to do business with any of TCF's many
competitors while (in 2001 at least) Michigan Bell was the only local exchange carrier in
what was then a noncompetitive local exchange market.

[42] Chrin Aff., ¶¶ 9, 11.

[43] Chrin Aff., ¶ 9.

Durbin Amendment compels.  Investment banker Chrin is of the view that this loss, which has not been suffered yet, is unrecoverable.[44]

## C.   The Balance Of Hardships Strongly Favors TCF.

The third *Dataphase* factor requires the court to balance the potential harm to TCF if the injunction is denied against the potential harm to the federal government and others if the injunction is granted.  As a preliminary matter, this element of the test works well in private disputes between competing parties, but less well where the party opposing the relief will not itself suffer direct harm if the relief is granted.  As demonstrated below, the balance at issue here tips decidedly in TCF's favor on this factor.

The harm to TCF from denial of the injunction is serious and certain.  From a long-term profitable business with over 400 branches employing more than 7,000 people,[45] TCF will become a business with a return on equity insufficient to attract new capital.  TCF will experience an 80 percent decrease in debit revenues, which will cost it roughly $80 million in the year following implementation of the Durbin Amendment alone.  The extreme elasticity of the depository banking market will preclude TCF from dropping its debit card service or charging customers to possess or use their debit cards.

If the Court denies the preliminary injunction, TCF will face going forward with an uneconomic business model:  that is, TCF must continue offering customers and merchants debit services at unprofitable levels with no way to recover its costs or a fair rate of return from either retailers or the bank's customers.

---

[44] Chrin Aff., ¶ 9.
[45] Stratton Aff., ¶ 5.

And, if the injunction is denied but TCF ultimately wins the case, it is highly unlikely TCF will not be able to recoup its losses from the Government.

Comparative hardship is not a hypothetical concept--it requires the Court to examine genuine burdens. What the Durbin Amendment portends is regulated and exempt banks selling exactly the same product--a Visa debit card--but TCF will get one-quarter of one percent revenue from retailers and the over 7,000 exempt banks will get 1.35 percent; if preliminary relief is denied, competitors with locations that surround TCF's locations will compete at an insuperable advantage.[46]

In contrast, the federal government will incur no harm if the preliminary injunction is granted. As demonstrated above, there is a substantial likelihood that the Durbin Amendment will be found to be unconstitutional, so it is unclear whether the Government even has an interest in enforcing the law in the first place. *See, e.g., Planned Parenthood v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir. 1987). One district court in this circuit has stated that, where the government's identified interest is its duty to enforce a law, it "should prefer resolution of the constitutional issues" before commencing enforcement efforts. *See Doe v. Miller*, 216 F.R.D. 462, 471 (S.D. Iowa 2003).

The governmental process is also unharmed by the injunction TCF seeks. TCF is not attempting to enjoin the Board's rulemaking process, which is currently underway.

---

[46] To add insult to injury, at least one exempt bank has announced that it plans to add a debit card with new "rewards," apparently because it expects to enjoy real price advantage over the TCFs of this world.

Instead, TCF only seeks an injunction prohibiting enforcement of Section 2 of the Durbin Amendment which requires TCF to cut interchange rates below cost.

Likewise, it is dubious that retailers who stand to benefit from the Durbin Amendment will suffer serious harm if the injunction is granted is dubious. For the time being, merchants will simply continue paying the debit interchange rates that they *agreed to pay* under their existing contracts with the card networks.[47] This *status quo* is what caused the explosion of debit card usage in the last ten years, which has undeniably benefited retailers, to say nothing of consumers and banks. Indeed, today many retailers steer customers away from cash and checks, preferring debit cards instead.[48] The current rates are based on considerations like the fact that banks pay fraud and overdraft losses on debit transactions, unlike checks where the retailers bear those losses.[49]

And there is no contention that, under the current pricing, any retailer is not profitable. The published financials as to the largest retailers show they are very profitable.[50]

---

[47] Stratton Aff., ¶ 14.
[48] Stratton Aff., ¶ 17.
[49] *Id.*, ¶ 19.
[50] Senator Durbin has publicly acknowledged, by way of example, that the genesis of the Durbin Amendment was complaints from one of his Illinois constituents, the CEO of Walgreens (7,496 locations; 238,000 employees), that payment card interchange fees were too high. 156 Cong. Rec. S3453-03 (daily ed. May 10, 2010) (statement of Sen. Durbin). The Walgreens Annual Report for 2009 shows that the company had revenues of $63.335 billion and net income (read to mean after all interchange fees) of over $2 billion. The annual report crows: "This is the Company's 35th consecutive year of record sales. It's also the 34th consecutive year Walgreens has raised its quarterly dividend." WALGREENS CO., 2009 ANNUAL REPORT 4, 24 (2009). In 2009, that increase was 22.2 percent. There is not a word about payment card interchange fees in the annual report. Assuming Walgreens pays a 1 percent debit interchange fee, that will drop to 1/4

Maintenance of a long-standing commercial *status quo* is a common objective of a preliminary injunction. *See, e.g., United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998) ("[A] court should flexibly weigh the case's particular circumstances to determine whether . . . justice requires the court to intervene to preserve the status quo until the merits are determined.") (citation omitted); *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.*, 477 F.3d 854, 873 n.13 (6th Cir. 2007) ("It is well established that the 'purpose of a preliminary injunction is simply to preserve the status quo . . . .'"). Finally, there is not the slightest evidence that the Durbin Amendment is emergency legislation to forestall disaster to retailers; instead, it simply gives them a windfall that they get to keep.  That is not an interest which deserves much weight.

Thus, the severe harm that TCF will suffer if the injunction is denied greatly outweighs any corresponding harms to the federal government and retailers if the injunction is issued.

**D.**     **The Public Interest Favors Entry of the Injunction.**

The final *Dataphase* factor--the public interest served by granting injunctive relief--overwhelmingly favors TCF given the strong public interest in remedying constitutional violations and the drastic public consequences of altering the *status quo* while this case is pending.

---

of 1 percent, and if half of its revenues come from debit transactions, the Durbin Amendment will yield an instant benefit to Walgreens of $237 million per year.

1. **Enjoining Enforcement of the Durbin Amendment Serves the Public Interest by Preventing the Violation of Constitutional Rights.**

Courts in the Eighth Circuit and elsewhere have ruled that the public has an almost insurmountable interest in assuring the constitutionality of laws. *See Doe*, 216 F.R.D. at 471; *see also Mich. Bell Tel.*, 257 F.3d at 600; *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) (*citing Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 383 (1979)); *Planned Parenthood*, 822 F.2d at 1400.

In dealing with these financial issues, the Sixth Circuit in *Michigan Bell Telephone* noted that the equities in favor of the government and the rate base customers were weak because "the ability of the plaintiffs to issue refunds substantially diminishes the harm that may befall their subscribers if an injunction is granted, and is outweighed by the harm that may befall the plaintiffs." 257 F.3d at 599. That same ability exists here in the event that all or part of the Durbin Amendment is sustained, given the ability of all issuing banks to refund payments to the card network company which can then make individual adjustments with its retail customers. That side of the market is far more stable than the relationship that TCF has with its own customers.

Cases on preliminary injunctions drawn from other fields tell a similar story.

In *Doe*, for example, the district court granted a temporary restraining order enjoining the Iowa Attorney General from enforcing a state statute that prohibited convicted sex offenders from residing within 2,000 feet of schools or child-care facilities. 216 F.R.D. at 464. Despite the undeniable public safety interests at stake in that case, the district court determined that, under the *Dataphase* analysis, the public interest still

30

favored enjoining enforcement of the law: "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* at 471 (citations omitted).

Likewise, the Sixth Circuit, in *Michigan Bell Telephone*, affirmed a preliminary injunction against the enforcement of an unconstitutionally confiscatory rate-setting statute upon finding that "the public is certainly interested in the prevention of enforcement of ordinances which may be unconstitutional." *Mich. Bell Tel.*, 257 F.3d at 600 (citation omitted).

In this case, TCF has demonstrated that the Durbin Amendment violates TCF's constitutional rights under the Due Process and Equal Protection Clauses of the Fifth Amendment. Consequently, the public has a strong interest in preventing enforcement of the Durbin Amendment against TCF.

**2.      Enjoining Enforcement of the Durbin Amendment Serves the Public Interest Because it Poses the Fewest Public Consequences.**

The Supreme Court has stated that the question of "public interest" in a preliminary injunction is a question of the "public consequences" in issuing an injunction. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). The "public consequences" wrought by the Durbin Amendment demonstrate for several reasons that the public interest is best served by enjoining enforcement of the statute until TCF's constitutional challenge can be fully adjudicated.

First, the Durbin Amendment threatens to disrupt the continued operation of a national payment card system that operates at a very high level of convenience and security for consumers, banks and retailers alike. The Durbin Amendment overhauls a

31

debit card industry that has been thriving--if not booming--since the late 1990s. Through

the operation of normal market forces, banks, merchants and consumers have

collaboratively established a debit card infrastructure that is both ubiquitous and

reliable.[51]

On the other hand, implementing the Durbin Amendment would represent a

radical, unstudied change to an industry that countless Americans rely on every day. The

Durbin Amendment does not respond to any clamorous public demand, and its effect on

the overall U.S. debit card industry is unknown, especially given the fact that the statute

is truly unprecedented in nature.

Second, the Durbin Amendment inhibits the free market by distorting competition

amongst the players in the debit card industry. In effect, Congress has placed its thumb

on the scale by favoring buyers over sellers and small sellers over larger ones. The

Durbin Amendment will allow retailers to benefit from a debit card system that banks

like TCF will be forced to subsidize at a loss. Similarly, the Durbin Amendment will

enable smaller, exempt banks to benefit from the competitive disadvantage placed upon

their larger market opponents like TCF. At the same time, such a system is unlikely to

expand, innovate or make card payments easier, faster or safer.

Third, the debit card system has been embraced by both consumers and merchants

because the system is superior to cash or checks in many circumstances that arise every

day in this country. In that regard, it is of crucial importance that the Durbin Amendment

does not require merchants to share with consumers the windfall they will receive when

---

[51] Stratton Aff., ¶¶ 15-19.

they start to free ride in the debit card marketplace. Indeed, one court has stated that as "for the public interest lower rates are always an attraction" *Public Service Co. of New Hampshire v. Patch*, 167 F.3d 15, 27-28 (1st Cir. 1998), but this attraction is starkly absent from the Durbin Amendment. Consumers will receive no benefit from selected banks being required to subsidize retailers.

In sum, there is little risk in maintaining the *status quo* of a well-functioning debit card system that has produced system-wide benefits to all relevant players, including the same merchants who now embrace the Durbin Amendment. Yet, at the same time, the massive disruptions for the rapid imposition of an untested system are too large to bear and impossible to undo if and when the Durbin Amendment is implemented. Thus, enjoining enforcement of the Durbin Amendment for the duration of this lawsuit would pose the fewest "public consequences" and thereby best serve the public interest.

## CONCLUSION

The basic theory of confiscatory ratemaking applies with more power to regulation directed at firms in competitive industries than those that operate as natural monopolies. The cut in rates under the Durbin Amendment are far larger than those ever attempted under any rate scheme ever passed anywhere in the United States, and the exemption for banks that operate half the branches in this country is unprecedented and makes it impossible for regulated banks like TCF to mitigate the loss of revenues the Durbin Amendment will cost it. A preliminary injunction should be granted in order to prevent the massive dislocation that will flow from allowing implementation of this flawed regulatory scheme that, on its face, violates the Constitution. Enjoining the enforcement

of the Durbin Amendment is the only safe path for preventing the massive dislocation that will flow from implementing a flawed regulatory scheme that, on its face, violates all established principles applicable to the constitutional guarantees under the Takings, Due Process and Equal Protection Clauses.

Dated:  November 4, 2010.

MEIERHENRY SARGENT LLP

By: _____

Mark V. Meierhenry
Clint Sargent
315 South Phillips Avenue
Sioux Falls, South Dakota 57104-6318
(605) 336-3075
mark@meierhenrylaw.com
clint@meierhenrylaw.com

**_Of Counsel_:**

VENABLE LLP
Benjamin R. Civiletti
William D. Coston
Martin L Saad
575 Seventh Street N.W.
Washington, D.C. 20004
(202) 344-4000
brciviletti@Venable.com
wdcoston@Venable.com
mlsaad@Venable.com

Richard A. Epstein (California Bar #43329)
Constitutional Scholar
4824 So. Woodlawn Avenue
Chicago, Illinois 60615
(773) 450-4476

34

KELLY & BERENS, P.A.
Timothy D. Kelly (Minnesota Bar #54926)
Sarah E. Bushnell (Minnesota Bar #0326859)
3720 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
(612) 349-6171

*Attorneys for Plaintiff*