# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH DAKOTA
### SOUTHERN DIVISION

TCF NATIONAL BANK,

        Plaintiff,

    v.

BEN S. BERNANKE, JANET L. YELLEN,
KEVIN M. WARSH, ELIZABETH A. DUKE,
DANIEL K. TARULLO, and SARAH
BLOOM RASKIN, in their official capacities
as members of the Board of Governors of the
Federal Reserve System; and JOHN WALSH,
in his official capacity as Acting Comptroller
of the Currency,

        Defendants.

Case No.  4:10-cv-04149-LLP

Judge Lawrence L. Piersol

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
PLAINTIFF'S CLAIMS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF
CAN BE GRANTED AND FOR LACK OF SUBJECT MATTER JURISDICTION AND
DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR A
PRELIMINARY INJUNCTION**

*OF COUNSEL*:
KATHERINE H. WHEATLEY
Associate General Counsel
YVONNE F. MIZUSAWA
Senior Counsel
Board of Governors of the
  Federal Reserve System
20th & C Streets NW
Washington, DC 20551
202-452-3779


*OF COUNSEL*:
HORACE G. SNEED
Director of Litigation
ERNEST C. BARRETT, III
Senior Counsel
Office of the Comptroller of
the Currency
250 E. Street, S.W.
Washington, DC 20219
202-874-4822

TONY WEST
Assistant Attorney General

BRENDAN V. JOHNSON
United States Attorney, District of South Dakota

DIANA RYAN
Assistant United States Attorney, District of South
Dakota

ARTHUR R. GOLDBERG
Assistant Director,
Federal Programs Branch

BRADLEY H. COHEN
NATHAN M. SWINTON
Trial Attorneys
Federal Programs Branch
U.S. Department of Justice, Civil Division

**ATTORNEYS FOR DEFENDANTS**

### TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................................iii

PRELIMINARY STATEMENT .......................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 4

   I.   THE STRUCTURE OF THE PAYMENT CARD NETWORK  ................................ 4

   II.  FEES ASSOCIATED WITH DEBIT CARD TRANSACTIONS ............................ 6

   III.  SECTION 1693o-2................................................................................................ 8

   IV. THE BOARD'S ROLE AS REGULATOR ............................................................ 9

   V.  PLAINTIFF TCF BANK...................................................................................... 9

   VI. PROCEDURAL HISTORY ................................................................................ 11

ARGUMENT ..................................................................................................................... 12

  I. PLAINTIFF'S DUE PROCESS AND TAKINGS CLAIMS SHOULD BE
     DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH
     RELIEF CAN BE GRANTED ............................................................................. 12

     A.  Plaintiff Has Failed to Identify a Cognizable Property Interest in its Receipt of
        Debit Interchange Fees Necessary to State a Due Process or Takings Claim........ 12

     B.  Plaintiff Does Not Possess the Required Characteristics of a Public Utility
        Necessary to Invoke the Ratemaking Jurisprudence.. .......................................... 19

     C.  Plaintiff's Due Process and Takings Challenges to § 1693o-2 Fail Under
        the Proper Standard, Which is Rational Basis Review. ................................. 25

     D.  Plaintiff's Facial Challenge to the Statute is Not Ripe. ................................. 27

  II. PLAINTIFF'S EQUAL PROTECTION CLAIM SHOULD BE DISMISSED
     FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE
     GRANTED ......................................................................................................... 33

  III. THE COURT LACKS JURISDICTION OVER PLAINTIFF'S CLAIMS
      AGAINST THE OCC ......................................................................................... 35

  IV. IN THE ALTERNATIVE, PLAINTIFF'S MOTION FOR A PRELIMINARY
      INJUNCTION SHOULD BE DENIED ............................................................... 37

     A.  Legal Standard for Preliminary Injunctions.. ...................................................... 37

i

B.   Plaintiff is Unlikely to Prevail on Its Constitutional Claims.................................. 38

C.   Plaintiff Has Not Shown Irreparable Harm. ..................................................... 38

D.   A Preliminary Injunction Would Substantially Harm Other Interested Parties, Including Consumers, and Would be Adverse to the Public Interest .................... 42

CONCLUSION............................................................................................................. 45

# <u>TABLE OF AUTHORITIES</u>

## CASES

*Aventure Commc'ns Tech.,  LLC v. Iowa Utils. Bd.*,
　　734 F. Supp. 2d 636 (N.D. Iowa 2010)....................................................................42

*Able v. United States*,
　　44 F.3d 128 (2d Cir. 1995)..........................................................................37, 38

*Barket, Levy & Fine, Inc. v. St. Louis Thermal Energy Corp.*,
　　21 F.3d 237 (8th Cir. 1994) ...............................................................................33

*Bd. of Governors of the Fed. Reserve Sys. v. MCorp Fin. Inc.*,
　　502 U.S. 32 (1991)...............................................................................................36

*Bd. of Regents of State Colls. v. Roth*,
　　408 U.S. 564 (1972)..............................................................................................13

*Branstad v. Glickman*,
　　118 F. Supp. 2d 925 (N.D. Iowa 2000).................................................................43

*Bristol-Myers Squibb Co. v. Shalala*,
　　923 F. Supp. 212 (D.D.C. 1996) ..........................................................................41

*Brown v. Brienen*,
　　722 F.2d 360 (7th Cir. 1983) ...............................................................................14

*Calfarm Ins. Co. v. Deukmejian*,
　　771 P.2d 1247 (Cal. 1989) ...................................................................................24

*Dataphase Sys., Inc. v. CL Sys., Inc.*,
　　640 F.2d 109 (8th Cir. 1981) ...............................................................................37

*DeNaples v. Office of the Comptroller of the Currency*,
　　No. 10-1568, 2010 WL 5135326 (3d Cir. Dec. 17, 2010)..........................................36

*Duquesne Light Co. v. Barasch*,
　　488 U.S. 299 (1989)..............................................................................20, 21, 23, 30

*FCC v. Beach Commc'ns, Inc.*,
　　508 U.S. 307 (1993)..............................................................................................33, 35

iii

*Farmers' & Merchs.' Bank of Monroe, N.C. v. Fed. Reserve Bank of Richmond, Va.*,
  262 U.S. 649 (1923) ..................................................................................................... 17

*Fed. Power Comm'n v. Hope Natural Gas Co.*,
  320 U.S. 591 (1944) ............................................................................................... 20, 29

*Fireman's Fund Ins. Co. v. Quackenbush*,
  87 F.3d 290 (9th Cir. 1996) ........................................................................................ 32

*First Nat. Bank in Plant City, Fla. v. Dickinson*,
  396 U.S. 122 (1969) ..................................................................................................... 17

*Fitzgerald v. Racing Ass'n of Cent. Iowa*,
  539 U.S. 103 (2003) ............................................................................................... 33, 34

*Geddes v. N.w. Mo. State Univ.*,
  49 F.3d 426 (8th Cir. 1995) ........................................................................................ 13

*Giles Lowery Stockyards, Inc. v. Dep't of Agric.*,
  565 F.2d 321 (5th Cir. 1977) ...................................................................................... 25

*Groos Nat'l Bank v. Comptroller of the Currency*,
  573 F.2d 889 (5th Cir. 1978) ...................................................................................... 36

*Guaranty National Insurance Co. v. Gates*
  916 F.2d 508 (9th Cir. 1990) ...................................................................................... 24

*Hamm v. Grose*,
  15 F.3d 110 (8th Cir. 1994) ........................................................................................ 12

*Hanten v. Sch. Dist. of Riverview Gardens*,
  183 F.3d 799 (8th Cir. 1999) ...................................................................................... 16

*Hawkeye Commodity Promotions, Inc. v. Miller*,
  432 F. Supp. 2d 822 (N.D. Iowa 2006)....................................................................... 14

*Hawkeye Commodity Promotions, Inc. v. Vilsack*,
  486 F.3d 430 (8th Cir. 2007) ........................................................................... 13, 14, 17

*Heller v. Doe*,
  509 U.S. 312 (1993)..................................................................................................... 26

*Hill v. Grp. Three Hous. Dev. Corp.*,
  799 F.2d 385 (8th Cir. 1986) ...................................................................................... 15

iv

*Hindes v. Fed. Deposit Ins. Corp.*,
   137 F.3d 148 (3d Cir. 1998)...................................................................36

*Iowa Utilities Board v. FCC*,
   219 F.3d 744 (8th Cir. 2000) ..........................................................28, 29

*Iowa Utils. Bd. v. FCC*,
   109 F.3d 418 (8th Cir. 1996) ..........................................................38, 39

*Kai v. Ross*,
   336 F.3d 650 (8th Cir. 2003) ...............................................................37

*Kavanau v. Santa Monica Rent Control Bd.*,
   941 P.2d 851 (Cal. 1997) .....................................................................25

*Keystone Ins. Co. v. Foster*,
   732 F. Supp. 36 (E.D. Pa. 1990) .........................................................25

*Knapp v. Hanson*,
   183 F.3d 786 (8th Cir. 1999) ...............................................................34

*Koster v. City of Davenport, Iowa*,
   183 F.3d 762 (8th Cir. 1999) ...............................................................25

*Lehnhausen v. Lake Shore Auto Parts Co.*,
   410 U.S. 356 (1973)) ............................................................................33

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997)..............................................................................37

*Mead Johnson Pharm. Grp. v. Bowen*,
   655 F. Supp. 53 (D.D.C. 1986), *aff'd*, 838 F.2d 1332 (D.C. Cir. 1988) ....................41

*Mich. Bell Tel. Co. v. Engler*,
   257 F.3d 587 (6th Cir. 2001) ..........................................................23, 24

*Minn. Ass'n of Health Care Facilities v. Minn. Dep't of Pub. Welfare*,
   742 F.2d 442 (8th Cir. 1984) ..............................................20, 21, 24, 26

*Mora v. Mejias*,
   223 F.2d 814 (1st Cir. 1955)................................................................24

*Nebbia v. New York*,
   291 U.S. 502 (1934)........................................................................26, 27

*Norton v. Utah Wilderness Alliance*,
    542 U.S. 55 (2004)..................................................................................44

*Packard Elevator v. Interstate Commerce Comm'n*,
    782 F.2d 112 (8th Cir. 1986) ................................................................40

*Palomar Mobilehome Park Ass'n v. Mobile Home Rent Review Comm'n*,
    20 Cal. Rptr. 2d 371 (Cal. Ct. App. 1993) ..........................................25

*In re Permian Basin Area Rate Cases*,
    390 U.S. 747 (1968)..............................................................................20

*Planned Parenthood Minn., N.D., S.D. v. Rounds*,
    530 F.3d 724 (8th Cir. 2008) ..........................................................37, 38

*Rathmann Grp. v. Tanenbaum*,
    889 F.2d 787 (8th Cir. 1989) ................................................................39

*Reed v. Vill. of Shorewood*,
    704 F.2d 943 (7th Cir. 1983) ..........................................................15, 16

*Richenberg v. Perry*,
    73 F.3d 172 (8th Cir.1995) ...................................................................37

*Ridder v. Office of Thrift Supervision*,
    146 F.3d 1035 (D.C. Cir. 1998).............................................................36

*Rural Iowa Indep. Tel. Assoc. v. Iowa Util. Bd.*,
    385 F. Supp. 2d 797 (S.D. Iowa 2005) ............................................29, 32

*Shaw v. Or. Pub. Emps.' Ret. Bd.*,
    887 F.2d 947 (9th Cir. 1989) ................................................................26

*Sherley v. Sebelius*,
    704 F. Supp. 2d 63 (D.D.C. 2010) ........................................................44

*Sierra Club v. Robertson*,
    28 F.3d 753 (8th Cir. 1994) ..................................................................33

*Smiley v. Citibank (South Dakota), N.A.*,
    517 U.S. 735 (1996)..............................................................................17

*Tex. State Bank v. United States*,
    423 F.3d 1370 (Fed. Cir. 2005).............................................................13

*U.S. W. Commc'ns, Inc. v. Minn. Pub. Utils. Comm'n*,
    55 F. Supp. 2d 968 (D. Minn. 1999)................................................................20, 29, 32

*United States v. Salerno*,
    481 U.S. 739 (1987)........................................................................................ 32

*United States v. Visa U.S.A., Inc.*,
    163 F. Supp. 2d 322 (S.D.N.Y. 2001)......................................................... 5

*Usery v. Turner Elkhorn Mining Co.*,
    428 U.S. 1 (1976)............................................................................................ 25

*Verizon Commc'ns, Inc. v. FCC*,
    535 U.S. 467 (2002)........................................................................22, 28, 29

*In re Visa  Check/MasterMoney Antitrust Litigation*,
    192 F.R.D. 68 (E.D.N.Y. 2000) .................................................................4, 5

*Watkins Inc. v. Lewis*,
    346 F.3d 841 (8th Cir. 2003) ...................................................................... 39

*Wis. Gas Co. v. Fed. Energy Regulatory Comm'n*,
    658 F.2d 669 (D.C. Cir. 1985) .................................................................... 40

*Williams v. Geithner*,
    Civ. No. 09-1959 ADM/JJG, 2009 WL 3757380 (D. Minn. Nov. 9, 2009).............. 16

*Yellow Cab Co. v. City of Chicago*,
    919 F. Supp. 1133 (N.D. Ill. 1996) ........................................................... 25

## STATUTES, REGULATIONS, RULES, AND LEGISLATIVE HISTORY

12 U.S.C. § 36(f)...............................................................................................17

12 U.S.C. § 84(a)(1)..........................................................................................17

12 U.S.C. § 85 ....................................................................................................17

12 U.S.C. § 342...................................................................................................17

12 U.S.C. § 1818(i)(1) ...............................................................................3, 35, 36

15 U.S.C. § 1693o-2 ................................................................................................passim

16 U.S.C. § 824e(a) .......................................................................................................31

42 U.S.C. § 7172(a)(1)(B) & (C) ..................................................................................31

47 U.S.C. § 205(a) .........................................................................................................31

49 U.S.C. § 60502 ..........................................................................................................31

12 C.F.R. §§ 205.1-205.20 (Regulation E) ...................................................................18

156 Cong. Rec. S3589-90 (daily ed. May 12, 2010) (statement of Sen. Richard
        Durbin) ..............................................................................................26, 27, 34, 35

156 Cong. Rec. S4977 (daily ed. June 16, 2010) (statement of Sen. Richard
        Durbin) ...........................................................................................................34

156 Cong. Rec. S5914 (daily ed. July 15, 2010) (statement of Sen. Jack Reed)..............43

Debit Card Interchange Fees and Routing, 75 Fed. Reg. 81722 (proposed Dec. 28,
        2010) (to be codified at 12 C.F.R. Part 235)......................................passim

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-
        203, 124 Stat. 1376 (2010)................................................................... 1

Electronic Fund Transfer Act, 15 U.S.C. §§ 1693-1693r ........................................ 1, 18

Fed. R. Civ. P. 12(b)(6)...........................................................................................12, 35

Mich. Comp. Laws Ann. § 484.2101(2)(a) (2010) ........................................................25

## PRELIMINARY STATEMENT

On July 21, 2010, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) ("Dodd-Frank"), which amended the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693-1693r ("EFTA"), by adding a new section regarding debit card interchange transaction fees. Section 1693o-2(a)(3) of the amended EFTA requires the Board of Governors of the Federal Reserve System ("the Board") to prescribe regulations establishing standards for electronic debit fees that are "reasonable and proportional" to the costs incurred by the debit card issuer with respect to the transaction. The statute exempts banks with combined assets of less than $10 billion from interchange fee regulation.

Plaintiff TCF Bank, a debit card issuer with more than $10 billion in assets, moves to preliminarily enjoin enforcement of § 1693o-2 on two grounds. First, while admitting that the Board has yet to issue its final regulations, Plaintiff argues that § 1693o-2(a), on its face, violates the Takings and Due Process Clauses of the Fifth Amendment by reducing the future debit interchange fees that Plaintiff believes it will receive from the Visa network by an amount large enough to constitute an unconstitutional confiscation of Plaintiff's property. This challenge is based solely upon Supreme Court caselaw addressing utility rate-setting. Second, Plaintiff argues that § 1693o-2's exemption for banks with assets under $10 billion has no rational basis and thus violates the Equal Protection Clause of the Fourteenth Amendment. Both of these claims should be dismissed as a matter of law for failure to state a claim upon which relief can be granted.

In order to state a due process or takings claim under the Fifth Amendment, Plaintiff must demonstrate that it has a cognizable property interest in its receipt of future debit interchange fees. Plaintiff has altogether failed to identify any statute, regulation, or contract guaranteeing it

the level of debit interchange fees it currently receives.  This lack of a property interest is not surprising given that Plaintiff's interest in these fees is completely dependent upon the discretion of Visa and other factors beyond Plaintiff's control.  Rather than a legal entitlement, Plaintiff merely has a unilateral expectation of receipt of interchange fees.

Even if it could show a cognizable property interest, Plaintiff does not possess the "partly public, partly private" status or any other characteristics of a public utility necessary to invoke the legal standards applicable to utility rate regulation.  Plaintiff readily admits that § 1693o-2(a) does not regulate the amount that Plaintiff may charge its customers for providing deposit accounts.  Also, Plaintiff is not engaged in any government-mandated continuous production of services for the benefit of the public.  Therefore, none of the possible rationales for applying the constitutional standard for reviewing utility rate-setting are present in the instant case. Instead, Plaintiff's claim falls under rational basis review, and § 1693o-2(a) easily passes muster under this standard because it maintains a reasonable relation to a proper legislative purpose, namely preventing retailers and consumers from having to bear a disproportionate amount of the costs of the debit card system.

Assuming *arguendo* that Plaintiff possesses a cognizable property interest and the rate-setting cases apply, Plaintiff's due process and takings claims are nevertheless premature because the Court cannot ascertain whether Plaintiff can receive a constitutionally permissible rate of return solely based on the plain language of the statute.  Contrary to Plaintiff's assertion, the Board can consider factors other than the authorization, clearance, or settlement ("ACS") costs that are specific to a particular electronic debit transaction.  In addition, the statute's requirement that the Board "establish standards" for assessing debit interchange fees does not obligate the Board to set a specific rate for debit interchange fees.   Moreover, even if the Board

does set such a rate, the fees Plaintiff receives may later be adjusted for fraud prevention costs, leaving the final rate altogether uncertain.  In short, Plaintiff's claim is not ripe and should therefore be dismissed.

Plaintiff's other challenge to the statute, attacking its exemption for small banks under the Equal Protection Clause, similarly fails to state a claim because § 1693o-2(a)(6) has at least two rational bases, including protecting smaller banks from the loss of revenues which could result from interchange fee regulation and preventing the reduction of the availability of debit cards to consumers.

As a separate matter, Plaintiff's claims against the Office of the Comptroller of the Currency ("OCC") for declaratory and injunctive relief (added on January 27, 2011 in Plaintiff's Amended Complaint) are precluded by federal law and therefore must be dismissed for lack of subject matter jurisdiction.  Pursuant to 12 U.S.C. § 1818(i)(1), Plaintiff is barred from seeking injunctive or declaratory relief in an effort to block an enforcement action by a banking agency, including where an agency has yet to engage in any sort of enforcement action or proceeding. Given these multiple defects, Plaintiff's claims are insufficient to advance past the pleading stage and the complaint should be dismissed.

Even if the complaint survives, however, a preliminary injunction should not be granted in this case because the harm that Plaintiff alleges regarding a potential reduction of interchange income, loss of customers, and decline in stock price is not impending and is highly speculative. By contrast, the harm an injunction would cause third parties, specifically the merchants and consumers who currently bear much of the cost of interchange fees, would be substantial. Injunctive relief would further damage the public's interest in relying on Congress's collective judgment and the Board's expertise to balance the competing demands inherent in financial regulation

and ensure a properly functioning payment-card system.  For all of these reasons, Plaintiff's motion for a preliminary injunction should be denied, and Plaintiff's complaint should be dismissed in its entirety.

## FACTUAL BACKGROUND

## I.   THE STRUCTURE OF THE PAYMENT CARD NETWORK

In the past two decades, consumers in the United States have shifted away from checks and cash as a form of payment and toward payment cards, including credit, debit, and prepaid cards.[1]  Nearly 38 billion debit card payments were made in the United States in 2009.  *See* Debit Card Interchange Fees and Routing, 75 Fed. Reg. 81722, 81723 (proposed Dec. 28, 2010) (to be codified at 12 C.F.R. Part 235) ("*Notice of Proposed Rulemaking*").  Debit cards are now used in 35 percent of noncash payment transactions, and have eclipsed checks as the most frequently used noncash payment method.  *Id.* n.3.

The current payment card system was established in the 1970s by Bank of America, operating its BankAmericard system, the predecessor to Visa U.S.A. ("Visa").[2]  Visa and MasterCard International ("MasterCard") are currently the two largest payment card associations in the United States, accounting for three-fourths of the payment card market in 2008.[3]  Visa does not issue payment cards; instead, it licenses member banks to do so.  *See In re Visa Check/MasterMoney Antitrust Litigation,* 192 F.R.D. 68, 72 (E.D.N.Y. 2000).  Any financial

---

[1]   Robin A. Prager, Mark D. Manuszak, Elizabeth K. Kiser, and Ron Borzekowski, *Interchange Fees and Payment Card Networks: Economics, Industry Developments, and Policy Issues*, Federal Reserve Board, Division of Research and Statistics and Monetary Affairs, at 24 (May 13, 2009) ("*Prager Article*"), *available at* http://www.federalreserve.gov/pubs/feds/2009/200923/200923pap.pdf.

[2]   James M. Lyon, *The Interchange Fee Debate: Issues and Economics*, Federal Reserve Bank of Minneapolis (June 2006) ("*Lyon Article*"), *available at* http://www.minneapolisfed.org/publications_papers/pub_display.cfm?id=3235.

[3]   Walter W. Eubanks, Cong. Research Serv., RL 34647, *Payment Card Interchange Fees: An Economic Assessment*  (2008) ("*CRS Report*").  Because TCF uses Visa as a clearing network, Am. Compl. ¶ 27, the Board will focus its discussion on Visa.

institution that is eligible for FDIC deposit insurance may join Visa.  *See United States v. Visa U.S.A., Inc.,* 163 F. Supp. 2d 322, 332 (S.D.N.Y. 2001).  Visa members have the right to issue Visa cards and to acquire Visa transactions from merchants that accept Visa cards.  *Id.*  In exchange, they must follow Visa's bylaws and regulations.  *Id.*

Card networks offer several different types of payment cards.  A credit card allows a cardholder to make a purchase and pay off the card-issuing institution over time.  *In re Visa*, 192 F.R.D. at 72.  Purchases made on a "travel and entertainment" card, or charge card, must be paid off at the end of the month.  *Id.*  A debit card allows a holder to access his or her bank account directly.  *Id.*  As a result, debit cards are generally offered only to customers who have checking accounts at the issuing bank.  One of the original purposes of debit cards was to help banks reduce the high cost of processing checks.  *Id.* at 75.

A debit card may be used to withdraw funds from an automated teller machine (ATM) or as a "point of sale card," where payment for a purchase is deducted directly from the cardholder's deposit account.  *Id.* at 72; *see* Am. Compl. ¶ 27.  Issuing banks can offer both "signature debit" cards, which generally require cardholders to authorize transactions by signing receipts like a credit card, and PIN debit cards, which evolved from ATM networks and typically require the holder to authorize a transaction by entering a personal identification number (PIN). *See, e.g., Notice of Proposed Rulemaking*, 75 Fed. Reg. at 81723.

The Visa network used by TCF is organized as a so-called "four-party system" in which the four parties are the consumer, the bank issuing the debit card to the consumer (the "issuer"), the merchant, and the merchant's bank (the "acquirer").[4]  *Prager Article* at 9-10.  In a typical four-party-system transaction, the consumer initiates a purchase by presenting his or her debit

---

[4] "Four-party" system is actually a misnomer because the network acts as a fifth party. *Prager Article* at 10 n.14.

card to a merchant. An electronic-authorization request with a specific dollar amount and the cardholder's identity is sent from the merchant to the acquirer to the network, which then forwards it to the issuing bank. *Id.* at 10; *see also* Visa International Operating Regulations, statement of Core Principles ("*Visa Core Principles*") at 11 (App. A).[5] The issuer checks the transaction against its file of active card accounts, and sends a message authorizing or declining the transaction through the network to the merchant. *Prager Article* at 10. Later, the issuer posts a charge for the transaction to the customer's account, and the acquirer posts a credit to the merchant's account. *Id.* Within a few days, the network clears the transaction and determines interchange and network fees, and the issuer and acquirer send and receive payments through their accounts at settlement banks associated with the network. *Id.* at 11.

## II.   FEES ASSOCIATED WITH DEBIT CARD TRANSACTIONS

Various fees are associated with every debit card transaction. The interchange fee, which accounts for the bulk of the fees assessed,[6] is paid by the acquirer to the card-issuing bank. *Prager Article* at 11. Switch fees are charged by the network to both acquirers and issuers. *Notice of Proposed Rulemaking*, 75 Fed. Reg. at 81723-24. The acquirer charges the merchant a fee, a large portion of which typically is the interchange fee. *Id.* The most recent data gathered by the Board indicates that debit and prepaid debit card interchange fees totaled $16.2 billion in 2009. *Id.* at 81725. The average interchange fee for all debit transactions in 2009 was 44 cents per transaction (or 1.14% of the transaction amount) — 56 cents per transaction for signature debit (or 1.53% of the transaction amount), and 23 cents for PIN debit (or .56% of transaction

---

[5]   *Available at* http://usa.visa.com/download/merchants/visa-international-operating-regulations-core.pdf.
[6]   Some sources estimate that the interchange fee comprises 70-90% of the fees in a typical transaction. *Lyon Article*.

amount). *Id.* Interchange fees may also vary by merchant type, merchant sales volume, or card program within the network. *Prager Article* at 12.

In the United States, interchange fees are determined at the network level. *Id.* at 6, 12. According to Visa, the fees "are determined by Visa and provided on Visa's published fee schedule, or may be customized where Members have set their own financial terms for the interchange of a Visa Transaction or Visa has entered into business agreements to promote acceptance and Card usage."[7] *Visa Core Principles* at 9. Interchange fees are "consistently monitored and adjusted" by Visa, "sometimes increased and sometimes decreased — in order to ensure that the economics present a competitive value proposition for all parties." *Id.* at 10. "Visa may establish different interchange reimbursement fees in order to promote a variety of system objectives, such as enhancing the value proposition for Visa products, providing incentives to grow merchant acceptance and usage, and reinforcing strong system security and transaction authorization processes." *Id.*

As competition for cardholders has intensified, issuers increasingly have turned to rewards programs, which offer cash back, points, airline miles, and other incentives, to attract and retain cardholders.[8] Rewards programs are funded in part by interchange-fee revenue. *2009 GAO Report* at 26.

---

[7] Visa's most recent schedule of interchange reimbursement fees is available at http://usa.visa.com/download/merchants/october-2010-visa-usa-interchange-rate-sheet.pdf.

[8] U.S. Gov't Accountability Office, GAO 10-45, *Credit Cards: Rising Interchange Fees Have Increased Costs for Merchants, but Options for Reducing Fees Pose Challenges*, 26 n.34 (2009) ("*2009 GAO Report*").

### III.    SECTION 1693o-2

On July 21, 2010, Congress passed Dodd-Frank, amending the EFTA by adding new provisions regarding debit card interchange transaction fees.  The law does not apply to credit card interchange fees.

Specifically, § 1693o-2(a)(1) authorizes the Board to "prescribe regulations . . . regarding any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction . . . ."  15 U.S.C. § 1693o-2(a)(1).  Under § 1693o-2(a)(2), "[t]he amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction."  *Id.*  In establishing standards for determining whether an interchange transaction fee is reasonable and proportional, the Board must "consider the functional similarity between – (i) electronic debit transactions; and (ii) checking transactions . . . " and "the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction."  15 U.S.C. § 1693o-2(a)(4).  The Board, however, may not consider "other costs incurred by an issuer which are not specific to a particular electronic debit transaction . . . ."  *Id.*

In addition, the Board may allow for adjustments to an interchange fee to account for an issuer's costs in preventing fraud, provided that the issuer complies with fraud-prevention standards.  15 U.S.C. § 1693o-2(a)(5)(A).  Section 1693o-2(a)(6) exempts issuers that, together with affiliates, have assets totaling less than $10 billion, and § 1693o-2(a)(7) exempts debit cards for government-administered payment programs and certain reloadable prepaid debit cards.[9]

---

[9] To address concerns about anti-competitive behavior by networks and issuing banks, other parts of § 1693o-2 limit networks' ability to impose certain restrictions on merchants who accept payment cards.  For example, § 1693o-2(b)(1) directs the Board to prescribe rules

## IV.    THE BOARD'S ROLE AS REGULATOR

The Board is in the midst of the rulemaking required by § 1693o-2.  Within days of the passage of Dodd-Frank, Board staff began meeting with parties interested in the interchange fee rulemaking, including representatives of merchants and retailers, representatives of card-issuing banks, Visa, MasterCard, American Express, and others to discuss the interchange fee provisions.  In September 2010, the Board distributed surveys to issuers, payment-card networks, and merchant acquirers to assist it in developing proposed new rules governing interchange fees. *Notice of Proposed Rulemaking*, 75 Fed. Reg. at 81724.

In December 2010, the Board issued its proposed rule.  The Board requested public comment on two alternative standards for determining whether the amount of an interchange fee is reasonable and proportional to the issuer's transaction costs.  *Id.* at 81726.  Public comments on the proposed rule are due by February 22, 2011.  *Id.* at 81722.  The Board's regulations must be prescribed in final form by April 21, 2011, but do not take effect until July 21, 2011.  15 U.S.C. § 1693o-2(a)(8)(c) & (9).

## V.    PLAINTIFF TCF BANK

Plaintiff TCF Bank is a debit-card issuing national bank with its main office in Sioux Falls, South Dakota with assets over $10 billion.  Am. Compl. ¶ 11.  According to its website, TCF serves customers in Minnesota, Illinois, Michigan, Wisconsin, Indiana, Colorado, Arizona and South Dakota.[10]  *See also* Am. Compl. ¶ 23.  In its 2009 Annual Report, TCF reported card

---

prohibiting an issuer or network from restricting the number of payment-card networks on which a merchant can process a transaction to fewer than two unaffiliated networks and from restricting merchants' ability to route debit transactions over any network that may process the transaction. Plaintiff does not seek to enjoin the Board's regulations authorized by § 1693o-2(b)(1) or any of the other anti-network restriction provisions in § 1693o-2(b), several of which have already gone into effect.

[10] *Available at* http://www.tcfbank.com/About/index.jsp.

revenue, primarily from interchange fees, of $104.8 million, up slightly from 2008, an average interchange rate of 1.34% of the value of each transaction, and an average of 843,825 active card users.[11]  TCF was the 10th largest issuer of Visa Classic debit cards in the U.S. for the three months ended Sept. 30, 2009.  *TCF 2009 Annual Report,* Form 10-K, at 18.  A recent industry report has estimated that while a typical Midwestern bank derives 8% of its revenue from interchange and overdraft fees (including just 2% from debit interchange fees alone), TCF appears to be dependent on these sources for 28% percent of its revenue.[12]

Although TCF alleges that its "business has been built on providing free checking and debit services to customers," Am. Compl. ¶ 7, as of December 2010, its website advertised five kinds of checking accounts, all of which carry monthly maintenance fees between $4.95 and $15 if minimum balance or direct deposit requirements are not met. [13]  The website advertises that each checking account comes with a free TCF check card or Premier Plus charge card, and that, for some accounts, card holders earn rewards.  *Id.*  TCF also charges standard account service fees, such as fees for nonsufficient funds or overdrafts.  *Id.*

On January 5, 2011, TCF announced that it would "eliminate the minimum balance requirements and offer even more ways to avoid the monthly maintenance fees" for "customers who actively use their TCF checking account . . . ,"[14] signaling an effort to return to free

---

[11] *See* TCF Financial Corp., 2009 Annual Report, Form 10-K, at 24, *available at* http://phx.corporate-ir.net/External.File?item=UGFyZW50SUQ9MzE4Mjl8Q2hpbGRGRJRD0tMXxUeXBlPTM=&t=1 ("*TCF 2009 Annual Report*").

[12] *See Another Round Of M and A for Midwest Banks,* The Wall Street Transcript, http://www.twst.com/yagoo/stifelfbanks1.html (last visited February 18, 2011).

[13] *Available at* http://www.tcfbank.com/PersonalBanking/pb_checking_home.jsp.

[14] TCF's Jan. 5, 2011 News Release is available at http://ir.tcfexpress.com/phoenix.zhtml?c=95289&p=irol-newsArticle&ID=1513371&highlight=.

checking for at least some customers.[15]  A TCF spokesman is quoted as saying that "most of its more than 1 million checking-account customers will meet these new requirements."  *Star Tribune Article.*

## VI.   PROCEDURAL HISTORY

Plaintiff filed its complaint in the present case on October 12, 2010.  Doc. No. 1.  Citing "massive disruptions" that would result from the "rapid imposition" of the Board's regulations, *see* Pl.'s Br. at 33, Plaintiff immediately sought a preliminary injunction, *see* Doc. Nos. 16-21, and requested a hearing on November 24, 2010, *see* Doc. No. 12.  Plaintiff filed a proposed order, specifically asking that the injunction "not prevent the Board from completing the rulemaking required by [the Act,]", but rather mandate only that "no rule shall become effective on July 21, 2011, or thereafter . . . ."   [Proposed] Findings of Fact, Conclusions of Law, and Order for Preliminary Injunction at 10, ¶ 2 (Doc. No. 22).  At a scheduling hearing, the Court agreed to hear Plaintiff's facial challenge to the statute on an expedited basis, Tr. of Proceedings re Status Conference at 23 (Doc. No. 37), and a preliminary injunction hearing was scheduled for January 12, 2011, Doc. No. 34 at 1.  On December 8, 2010, Plaintiff requested that the Court reschedule the hearing date to allow time for potential amicus parties to submit briefs to the Court.  Doc. No. 43 at 2.  The Court reset the hearing on Plaintiff's motion for a preliminary injunction for April 4, 2011.  Doc. No. 47 at 1.  On January 27, 2011, Plaintiff filed an Amended Complaint seeking declaratory and injunctive relief against the OCC to prohibit it from undertaking an enforcement action against Plaintiff in conjunction with yet-to-be issued

---

[15] Chris Serres, *Free TCF Checking Accounts are Coming Back*, Minneapolis Star Tribune, Jan. 5, 2011 ("*Star Tribune Article*"), *available at* http://www.startribune.com/business/112980874.html?elr=KArksD:aDyaEP:kD:aUzyaUi D3aPc:_Yyc:aU7DYaGEP7vDEh7P:DiUs.

regulations by the Board as authorized by Section 1693o-2(a).  *See* Am. Compl. ¶¶ 1, 9, 18, 98, 120, Prayer for Relief, ¶ 2 (Doc. No. 51).

**ARGUMENT**

**I.     PLAINTIFF'S DUE PROCESS AND TAKINGS CLAIMS SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED**

As mentioned above, the preliminary injunction hearing in this case was scheduled based on the Court's understanding that Plaintiff was challenging the statute on its face, rather than the Board's yet-to-be promulgated regulations authorized by the statute.  Tr. of Proceedings re Status Conference at 5 (Doc. No. 37) at 19-20.  Setting aside the serious ripeness problem that undercuts Plaintiff's challenge due to the absence of any final regulations, *see infra*, pp. 27-32, there are several overarching reasons why Plaintiff's claims fail as a matter of law, *regardless* of when they are brought.  Defendants therefore move, under Federal Rule of Civil Procedure 12(b)(6), to dismiss Plaintiff's due process and takings claims for the following reasons.[16]

**A.     Plaintiff Has Failed to Identify a Cognizable Property Interest in its Receipt of Debit Interchange Fees Necessary to State a Due Process or Takings Claim**

Plaintiff contends that § 1693o-2(a) prohibits the Board from considering an issuer's costs in a debit card transaction beyond the costs of authorizing, clearing, or settling debit transactions such that issuers subject to the regulation will be unable to earn a reasonable rate of return on their investment.  This restriction, Plaintiff maintains, violates the Due Process Clause and the Takings Clause of the Fifth Amendment.[17]

---

[16] Actions are subject to dismissal when a party fails to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the pleadings are construed in the light most favorable to the nonmoving party, and the district court must assume that all the facts alleged in the complaint are true.  *Hamm v. Grose*, 15 F.3d 110, 112 (8th Cir. 1994).

[17] Count II of Plaintiff's Amended Complaint alleges that § 1693o-2(a) effects a

For Plaintiff to state a claim for a takings violation, it must first identify a protected property interest.  *See Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 439 (8th Cir. 2007); *see also Tex. State Bank v. United States*, 423 F.3d 1370, 1378 (Fed. Cir. 2005) (stating that the "'bedrock requirement' of any successful takings challenge" is that the "plaintiffs must identify a property interest cognizable under the Fifth Amendment.").  Likewise, to succeed on its due process claim, Plaintiff must show "more than an abstract need or desire" for reimbursement of interchange fees at Visa's current rate, but instead must demonstrate "a legitimate claim of entitlement to it."  *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972); *see also Geddes v. N.w. Mo. State Univ.*, 49 F.3d 426, 429 (8th Cir. 1995) (holding that a plaintiff's invocation of due process rights are dependent on its showing a constitutionally protected liberty or property interest).  "Property interests . . . are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law — rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."  *Roth*, 408 U.S. at 577.

A cognizable property interest must be more than a party's unilateral expectation of access to a particular source of revenue.  In *Hawkeye*, the owner of TouchPlay video lottery machines brought an action against state officials alleging, among other things, that state legislation banning the lottery game violated the owner's property rights under the Takings and Due Process Clauses.  486 F.3d at 435.  Specifically, Hawkeye alleged that it had invested about $6.8 million in the venture, had been granted a state retailer license, and had locations contracts securely in place, but that the state ban on the game deprived it of its property interest in

---

"Regulatory Taking," but except for a one-word mention on the last page of its Memorandum in Support of Motion for Preliminary Injunction, the takings argument is not developed in Plaintiff's motion papers.  Nonetheless, because a cognizable property interest is required to bring either a takings or a substantive due process claim, Defendants address both claims here.

continuing its TouchPlay business or its contracts. *Id.* at 435-36, 439.  The district court held that Hawkeye did not possess a protected property interest in future revenue from its license and contracts, *see Hawkeye Commodity Promotions, Inc. v. Miller*, 432 F. Supp. 2d 822, 851-54 (N.D. Iowa 2006), and the Eighth Circuit affirmed, 486 F.3d at 439-40 (acknowledging Hawkeye's general property interest in its machines and the business itself, but concluding that it neither possessed a property interest in the state license or locations contracts necessary to pursue its takings claim).

Likewise in this case, Plaintiff has not shown that its contract with Visa entitles it to debit interchange fees at the current level, nor has Plaintiff pointed to any statute or regulation guaranteeing it these fees.  As the Eighth Circuit explained in *Hawkeye*, even if private contractual obligations are a form of property rights, the private contract alleged to be affected by government action must typically establish something more than a "mere unilateral expectation of continued rights or benefits."  *Id.* at 440 (internal quotation marks and citation omitted); *see also Brown v. Brienen*, 722 F.2d 360, 364 (7th Cir. 1983) ("Only interests substantial enough to warrant the protection of federal law and federal courts are [Fifth] Amendment property interests.").

Plaintiff alleges that it has a property interest in "its opportunity to charge debit interchange fees" including the ability to recover "(1) the costs of providing interstate debit card services to its customers, and (2) a reasonable return on the capital it has invested in its debit card operation."  *See* Am. Compl. ¶¶ 123, 130.  However, this interest in the future ability to charge debit interchange fees is entirely dependent upon whether Plaintiff is entitled to debit interchange fees as they currently exist (*i.e.*, the "property" allegedly affected by the regulation in question).  *See, e.g.*, Am. Compl. ¶ 35.  To make this determination, the Court must assess

whether the currently-received debit interchange fees function as Plaintiff's property, or whether these fees are dependent on Visa's business judgment and other factors beyond Plaintiff's control.  *See*, *e.g.*, *Hill v. Grp. Three Hous. Dev. Corp.*, 799 F.2d 385, 392 (8th Cir. 1986) (finding no cognizable property interest where "[t]here remains much room for an owner's discretion and business judgment"); *Reed v. Vill. of Shorewood*, 704 F.2d 943, 948 (7th Cir. 1983) (defining property as "what is securely and durably under state (or . . . federal) law, as distinct from what you hold subject to so many conditions as to make your interest meager, transitory, or uncertain").

Plaintiff's takings and due process claims both fail as a matter of law because Plaintiff has not pointed to any statute, regulation, or contract establishing that it is legitimately entitled to the current level (or *any* level) of debit interchange fees.  As Plaintiff readily acknowledges, it does not negotiate the level of the default debit interchange fees it receives; rather, these fees are dictated by Visa.  Indeed, in its submission to the Court, Plaintiff stated that it issues its debit card using the signature debit services of the Visa network, *see* Stautz Aff. ¶ 11-12; Stratton Aff., ¶ 8, and that it has not entered into bilateral agreements with any merchant acquirers, *see* Stratton Aff. ¶ 14 ("The Company has never negotiated with any merchant for an interchange fee; instead, *we accept the share Visa delivers to us*.") (emphasis added).

Plaintiff's concession that Visa controls its debit interchange rates is also consistent with Visa's public representations.  According to the network's website, interchange fees are "consistently monitored and adjusted" by Visa, "sometimes increased and sometimes decreased — in order to ensure that the economics present a competitive value proposition for all parties." *Visa Core Principles* at 10.  Visa, furthermore, "may establish different interchange reimbursement fees in order to promote a variety of system objectives, such as enhancing the

value proposition for Visa products, providing incentives to grow merchant acceptance and usage, and reinforcing strong system security and transaction authorization processes."[18]   *Id*. Notably, Visa does not identify an issuing bank's costs and/or overall profitability as one of its considerations in setting interchange fees.   In fact, Visa could provide "incentives to grow merchant acceptance" by reducing interchange fees received by card issuers or even *eliminating* Plaintiff's debit interchange fee income altogether.   This point is underscored by the fact that when PIN debit networks were first introduced in the 1990s, some networks structured interchange fees to flow *from* the card issuer's bank *to* the merchant's bank (instead of the other way around, as is presently the case) in order to compensate merchants for the costs of installing PIN terminals and making other necessary system changes.   *See Notice of Proposed Rulemaking*, 75 Fed. Reg. at 81724.   The rise and fall of debit interchange fees over the course of the past decade[19] also demonstrates that the current collection of such fees by issuers is not necessarily guaranteed by participation in a debit card network.[20]   These combined circumstances dictate that Plaintiff's interest in these fees is, at best, "meager, transitory, or uncertain."   *See Reed*, 704 F.2d at 948.

---

[18] To the extent that Plaintiff's property interest in these fees is dependent on Visa negotiating with merchants in Plaintiff's favor, Plaintiff's subsidiary interest in these fees remains a unilateral expectation which is not protected.   *See*, *e.g.*, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 809 (8th Cir. 1999) (holding that a subcontractor had no cognizable property interest in primary contractor's securing a bid on a government contract).

[19] The current high level of interchange for Plaintiff's signature debit product is a relatively recent phenomenon, following a decline in late 2003 and early 2004, which was due in part to the settlement of litigation surrounding signature debit cards.   *See Notice of Proposed Rulemaking,* 75 Fed. Reg. at 81724, n. 14.

[20] Visa's ability to unilaterally alter the debit interchange fees that Plaintiff receives based on Visa's discretionary assessment of system objectives irrefutably undercuts Plaintiff's claim of entitlement.   *See*, *e.g.*, *Williams v. Geithner*, Civ. No. 09-1959 ADM/JJG, 2009 WL 3757380, at *6-7 (D. Minn. Nov. 9, 2009) (finding that borrowers had no cognizable property interest in a loan modification where the modification was dependent on the broad discretion afforded to private loan servicers under the servicers' contract with Fannie Mae).

Even if Plaintiff could point to a particular contractual provision specifying a certain level of debit interchange fees to which Plaintiff is entitled, Plaintiff's unilateral expectation under that private contract would not be sufficient to establish a cognizable property interest. In *Hawkeye*, the court concluded that Hawkeye's expectation that its private contracts would not be modified or nullified by state regulation was severely undermined by its participation in the heavily regulated gaming industry, language in the contracts with Hawkeye's partners which contemplated changes due to government intervention, and the experience of regulations in other jurisdictions. *See Hawkeye*, 486 F.3d at 440. The court concluded that Hawkeye's locations contracts, which allowed for the termination of the contract due to a change in the law or regulation, did not establish a cognizable property interest under Iowa law. *Id.*

These same factors are present in this case. Government regulation of fees associated with payment transactions initiated by bank customers has long been a recognized part of the banking system.[21] *See, e.g.*, 12 U.S.C. § 342; *Farmers' & Merchs.' Bank of Monroe, N.C. v. Fed. Reserve Bank of Richmond, Va.*, 262 U.S. 649, 654-55 (1923) (describing the previous "exchange" fee that banks charged for presentment of a check, prior to the clearance of checks at par through the Federal Reserve System). The Supreme Court explicitly affirmed the Federal Reserve's ability to essentially eliminate such fees imposed by banks that had joined the Federal Reserve System. *See Farmers' and Merchs.' Bank*, 262 U.S. at 665 (recognizing Federal Reserve Banks' statutory ability to collect at par any check presented to any Federal Reserve

---

[21] Limitations on the revenue-generating capability of banks are an even more entrenched part of federal bank regulation. The National Bank Act of 1864, which applies to national banks like Plaintiff, regulates interest rates that banks can charge customers, *see Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 737 (1996) (citing 12 U.S.C. § 85), and the McFadden Act of 1927 imposes limits on where national banks could establish branches, *see First Nat. Bank in Plant City, Fla. v. Dickinson*, 396 U.S. 122, 124-25 (1969) (citing 12 U.S.C. § 36(f)). National banks are also restricted in how much they can loan to one particular borrower. *See* 12 U.S.C. § 84(a)(1).

member bank).  Moreover, Congress began regulating the transfer of electronic funds in 1978.
*See* 15 U.S.C. §§ 1693a-1693r.  The EFTA, in turn, authorized the Board to regulate electronic
fund transfers, including automated clearing house ("ACH") transactions, a form of electronic
payment that results in a debit to customer deposit accounts.  *See* 12 C.F.R. §§ 205.1-205.20
(Regulation E).  In addition, just as there was language in Hawkeye's contracts contemplating
changes due to government regulation, Visa informed Plaintiff and other card issuers that the
default debit interchange rates may ultimately be set by government regulators.  *See*, *e.g.*, Visa
Form S-1 (2007)[22] at 14 (identifying as a "Risk Related to Our Business" the fact that
"[i]nterchange fees are subject to significant legal and regulatory scrutiny worldwide, which may
have a material adverse impact on our revenues, our prospects for further growth and our overall
business").

Finally, even if the Board's yet-to-be-issued final regulation under § 1693o-2(a) never
went into effect, Plaintiff's expectation of collecting a high level of interchange fees, on par with
its past performance,[23] remains highly speculative.  Other provisions contained in § 1693o-2 now
limit networks' ability to impose certain restrictions on merchants who accept payment cards.  In
particular, § 1693o-2(b)(1) directs the Board to prescribe rules prohibiting an issuer or network
from restricting the number of payment-card networks on which a merchant can process a
transaction and from restricting merchants' ability to route electronic debit transactions to a
particular network.  The Board's debit-card routing rules will for the first time allow a merchant
to direct the routing of an electronic debit transaction to its preferred network, and presumably

---

[22] *Available at* http://www.sec.gov/Archives/edgar/data/1403161/000119312507242653/ds1.htm.
[23] *See*, *e.g.*, Stratton Aff. ¶ 16 (stating that Plaintiff had over 200 million "swipes" in the preceding year); Stautz Aff. ¶ 11 (calculating Plaintiff's losses under § 1693o-2(a) based on the time period from August 1, 2009 through July 31, 2010).

-18-

merchants will favor a network that charges lower debit interchange fees. *See* 15 U.S.C. § 1693o-2(b)(1); *Notice of Proposed Rulemaking*, 75 Fed. Reg. at 81748-81752. The import of this change is that the networks will now be forced to compete for merchants' business, pressuring Visa to reduce the debit interchange fees for TCF's signature debit card product. Plaintiff does not challenge the constitutionality of this part of the statute and cannot rightly claim an entitlement to fee income it received prior to the implementation of this change in law, which effectively reduces the monopoly power of the Visa network, leaving Plaintiff's future debit interchange fee income in doubt.

Thus, Visa's complete discretion to set default interchange fees, the Federal Reserve System's longstanding regulation of fees associated with payment transactions initiated by bank customers, and Congress's newly enacted § 1693o-2(b) allowing merchants to use less expensive networks, collectively serve to undermine any claim by Plaintiff that it has a legitimate entitlement to any particular debit interchange fee arrangement or rate.[24] Without a cognizable property interest, both Plaintiff's takings and due process claims fail as a matter of law and should be dismissed.

B.   Plaintiff Does Not Possess the Required Characteristics of a Public Utility Necessary to Invoke the Ratemaking Jurisprudence

Even if Plaintiff could establish the property interest that is a necessary component of any takings or due process claim, its claims would still be subject to dismissal under the correct legal standard. At the core of Plaintiff's argument that § 1693o-2 will impose a confiscatory debit interchange fee regime is its effort to analogize its situation to that of a public utility. In doing

---

[24] Furthermore, to the extent that Plaintiff asserts a property interest in "earning a profit from retailers for the debt [sic] services the retailers receive," *see* Pl. Br. at 16, its claim is undermined by a number of other revenue streams available for Plaintiff's checking/debit account product. *See infra*, pp. 22-24.

so, Plaintiff relies exclusively upon a legal standard articulated by the Supreme Court that has never been applied by the Court outside of the public utility context. Under this standard, the government grants a utility a natural monopoly, but retains some control over the utility's costs and revenues and therefore must "enable the company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed . . . ." *Fed. Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 605 (1944). The Constitution thus provides some basic protection to investors in utilities because these investors are required by the government to employ their assets in the public interest. *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 307 (1989).[25]

Courts within the Eighth Circuit have taken to heart the Supreme Court's guidance on the significance of the "partly public, partly private status of utility property," *see Duquesne Light Co.*, 488 U.S. at 307, and have declined to apply this caselaw outside of the utility context, *see, e.g.*, *U.S. W. Commc'ns, Inc. v. Minn. Pub. Utils. Comm'n*, 55 F. Supp. 2d 968, 989 (D. Minn. 1999) ("Public utilities, which have a hybrid public and private status, must be analyzed in a slightly different manner than other entities under the Takings Clause."). Indeed, the Eighth Circuit has specifically declined to apply the *Hope Natural Gas* standard to entities that do not possess the characteristics of public utilities. In *Minnesota Association of Health Care Facilities, Inc. v. Minnesota Department of Public Welfare*, a nursing home claimed that a state statute violated the Due Process Clause by, as a condition of participation in the state's medicaid

---

[25] Even if the utility cases had any applicability, courts are very deferential to agency expertise; in fact, since upholding the rate-setting in *Hope Natural Gas* in 1944, the Supreme Court has yet to strike down a single rate-setting, either by a legislature or agency, as being unconstitutionally confiscatory. *See Duquesne Light Co.*, 488 U.S. at 310 (emphasizing that it is only "[a]t the margins [that] these questions have constitutional overtones"); *see also In re Permian Basin Area Rate Cases*, 390 U.S. 747, 767 (1968) (courts are "without authority to set aside any rate" that falls within a "zone of reasonableness.") (citation omitted).

program, limiting the rates nursing homes could charge residents not receiving medical assistance.  742 F.2d 442, 445 (8th Cir. 1984).  The court rejected the nursing home's effort to liken its situation to that of a public utility, reasoning that "Minnesota nursing homes, unlike public utilities, have freedom to decide whether to remain in business and thus subject themselves voluntarily to the limits imposed by Minnesota on the return they obtain from investment of their assets in nursing home operation."  *Id.* at 446.  Because "[t]his voluntariness forecloses the possibility that the statute could result in an imposed taking of private property which would give rise to the constitutional right of just compensation," the court held that it was unnecessary "to employ the adequacy standards applicable to state regulation of public utility rates."  *Id.*

Because Plaintiff lacks the defining traits of a public utility, this Court should likewise decline to apply the legal standards reserved for utilities to Plaintiff's claims.  Underpinning the Supreme Court's limited application of these standards is its recognition that utilities typically possess certain salient attributes, particularly government compulsion to serve the public, *see*, *e.g.*, *Duquesne Light*, 488 U.S. at 307 ("As public utilities, both Duquesne and Penn Power are under a state statutory duty to serve the public.").  Plaintiff cannot show that it possesses these characteristics.   Plaintiff's participation in the banking industry is not required by the government, nor is Plaintiff engaged in the type of "continuous production of output for the benefit of the public" that commentators have identified as the hallmark of a classic utility.[26]

---

[26] *See, e.g.,* William P. Barr, et al., *The Gild That is Killing the Lily:  How Confusion Over Regulatory Takings Doctrine Is Undermining the Core Protections of the Takings Clause*, 73 Geo. Wash. L. Rev. 429, 438 (2005) (defining a "classic utility regime" as one in which "a distinct form of government action requires a private firm to engage in a continuous production of output for the benefit of the public."); Elizabeth Drews, *Takings in the Context of Telecommunications and Electric Utility Restructuring in Texas*, 7 Tex. Tech Admin. L.J. 241, 242-43 (2006) ("Traditionally, utilities are common carriers required to make their facilities

The Board's yet-to-be-issued standards under § 1693o-2(a) regulate an altogether different type of economic activity. Unlike rates charged by a public utility, interchange fees are not payments made by customers in exchange for services they receive from an issuing bank. Rather, they are payments made by merchants to the debit card network, which the network in turn pays the issuing banks in order to encourage card use as well as to expand the number and types of businesses that accept cards. *See* Visa International Operating Regulations (October 15, 2010) at 899-900.[27] As Plaintiff has explicitly asserted in this litigation, the product being offered to customers is not the debit card by itself but rather the entire checking account. *See* Am. Compl. ¶ 35 (describing debit cards as just one part of the "checking service"); ¶ 36 (referring to Plaintiff's combined "checking/debit account product"). Interchange fees, which are completely dependent on the Visa network's assessment of overall system objectives, constitute just one of the many mechanisms by which issuing banks can derive revenue on this product.

Plaintiff's concession on this point undermines its analogy between the revenue it receives from a consumer's deposit account and the fee a utility receives from a consumer for providing natural gas or electricity. Plaintiff unambiguously retains the ability to charge fees to its customers for their deposit accounts, distinguishing its predicament from that of the regulated entities in *Hope Natural Gas*, *Duquesne Light*, and the other cases on which it seeks to rely. Whereas those entities were subject to government regulation of their one stream of revenue

---

available to serve the public."). Historically, utilities also possessed monopoly power, *see*, *e.g.*, *Verizon Commc'ns, Inc. v. FCC*, 535 U.S. 467, 477 (2002) (noting that "modern utility regulation" was implemented "to offset monopoly power"). This rationale further undermines Plaintiff's analogy, for as Plaintiff admits in its pleadings, it "ha[s] no monopoly power." Pl. Br. at 15.

[27] *Available at* http://corporate.visa.com/_media/visa-international-operating-regulations.pdf.

(rates charged to customers) to make a reasonable rate of return on the product being offered, Plaintiff has multiple sources of revenue for the deposit account that it offers its customers. Plaintiff admits that it has an "unregulated right to charge its customers for debit services."  *See* Pl. Br. at 16.  This alone forecloses Plaintiff's ability to rely on public utility ratemaking caselaw.[28]  Plaintiff states that it has non-interchange revenue sources available to it, noting that it can seek to maintain its current profit margins by "tapping into some alternative source of revenue to offset the loss of interchange revenue." [29]  Pl.'s Br. at 15; *see also* Am. Compl. ¶ 109 (acknowledging that TCF "can seek to recover the lost revenue by charging customers either a swipe fee or a monthly fee for maintaining depository accounts").  Regardless of Plaintiff's stated concerns about its ability to compete in a regulated market, Plaintiff's position is a far cry from *Duquesne Light* where the utility's only source of revenue was determined by the Pennsylvania Utility Commission that was required by law to simultaneously assess the value of the property and set a rate of return.  488 U.S. at 310 n.7.

In sum, Plaintiff lacks the defining characteristics of a public utility because it is not required by the government to provide debit card services to the public, and the alleged

---

[28] Although in rare cases a court may question whether a utility is being forced "to subsidize [its] regulated services with income from . . . revenues generated from unregulated services," *see Mich. Bell Tel. Co. v. Engler,* 257 F.3d 587, 594 (6th Cir. 2001), such circumstances are not present here.  Section 1693o-2(a) does not require Plaintiff to subsidize a possible reduction in interchange fee revenue with revenue from another service it provides. Rather, Plaintiff's total "rate" for its "checking/debit account product," *see* Am. Compl., ¶ 36, consists of not only debit interchange fees, but also many other fees charged to its customers over which it has complete control.

[29] In response to a regulation unrelated to § 1693o-2(a), Plaintiff implemented a monthly fee for some checking accounts.  Stratton Aff. ¶ 11.  Plaintiff also disclosed in its 2009 Annual Report that it recently "introduced a new anchor checking account product that will replace the TCF Totally Free Checking product."  *See TCF 2009 Annual Report* at 18.  This "new product will carry a monthly maintenance fee on [certain] accounts . . . ."  *Id*.  These actions demonstrate that Plaintiff has other accessible sources of revenue for its deposit account product and that it has already availed itself of some of these sources.

confiscatory "rate" does not regulate the fees Plaintiff charges its customers for the service in question.  Plaintiff's ratemaking authorities are therefore inapposite.  *See Minn. Ass'n of Health Care Facilities*, 742 F.2d at 446 (holding that because a nursing home was not required to participate in a regulated market, its voluntary decision to do so "foreclose[d] the possibility that the statute could result in an imposed taking of private property").

Courts outside of this Circuit have on rare occasion applied the standards from *Hope Natural Gas* to non-utility entities, but these entities, unlike Plaintiff, shared traits in common with public utilities.  In *Mora v. Mejias*, for instance, the challenged administrative order fixing wholesale prices for rice sales also forced merchants to sell their existing stocks of rice, thereby making the merchants' situation "analogous to that of a public utility which is ***required*** to devote its property to the service of the public."  223 F.2d 814, 818. (1st Cir. 1955) (emphasis added). A similar element of compulsion was present in *Guaranty National Insurance Co. v. Gates*, where the challenged statute setting insurance rates also compelled automobile insurers to provide service to their customers for a certain period of time, notwithstanding any prior cancellation or renewal policy.  916 F.2d 508, 513 (9th Cir. 1990); *see also Calfarm Ins. Co. v. Deukmejian*, 771 P.2d 1247, 1250 (Cal. 1989) (analyzing constitutionality of voter initiative that required automobile insurers to renew policies except in limited circumstances).  Finally, although the court in *Michigan Bell Telephone Co. v. Engler* applied the *Hope Natural Gas* standard to the challenged provisions of the Michigan Telecommunications Act, that same statute also indicated that, unlike debit card issuing banks, telephone companies were serving the greater public good.  *See* 257 F.3d 587, 591 (6th Cir. 2001) (noting that the purpose of the Act

was to ensure that "'every person has access to just, reasonable, and affordable basic residential telecommunication service'" (quoting Mich. Comp. Laws Ann. § 484.2101(2)(a) (2010))).[30]

Unlike in *Mejias*, *Guaranty National*, and *Michigan Bell*, there is no element of compulsion in the present case, nor is Plaintiff serving the public good. The Board immediately recognized this important distinction in interpreting § 1693o-2(a), rightly pointing out that "[i]ssuers are unlike public utilities, which, in general, are required to make their services regularly available to the public." *Notice of Proposed Rulemaking*, 75 Fed. Reg. at 81733 n.44.

C.    Plaintiff's Due Process and Takings Challenges to § 1693o-2(a) Fail Under the Proper Standard, Which is Rational Basis Review

As the Eighth Circuit observed in *Koster v. City of Davenport, Iowa*, "'[i]t is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on the one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.'" 183 F.3d 762, 768 (8th Cir. 1999) (citing *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976)). Accordingly, instead of importing a legal standard reserved for entities possessing the characteristics of public utilities, the Court should apply rational basis review to Plaintiff's claims. Under this standard, if a statute or regulation has "a reasonable relation to a proper

---

[30] Other cases cited by Plaintiff in support of this point are similarly inapposite because each involved regulation that targeted a company's sole source of revenue. *See Giles Lowery Stockyards, Inc. v. Dep't of Agric.*, 565 F.2d 321 (5th Cir. 1977) (regulation of charges assessed by stockyard owners to farmers and ranchers for selling their livestock); *Yellow Cab Co. v. City of Chicago*, 919 F. Supp. 1133 (N.D. Ill. 1996) (regulation of amount taxi cab companies could charge drivers leasing their vehicles); *Keystone Ins. Co. v. Foster*, 732 F. Supp. 36 (E.D. Pa. 1990) (freeze on rates charged by automobile insurers); *Kavanau v. Santa Monica Rent Control Bd.*, 941 P.2d 851 (Cal. 1997) (regulation setting maximum cap on yearly rent increases); *Palomar Mobilehome Park Ass'n v. Mobile Home Rent Review Comm'n*, 20 Cal. Rptr. 2d 371 (Cal. Ct. App. 1993) (regulation setting maximum cap on rents charged by mobile home park operators). Unlike the regulations in these cases, § 1693o-2 limits just one of the several streams of revenue Plaintiff has available for its deposit accounts.

legislative purpose, and [is] neither arbitrary nor discriminatory, the requirements of due process are satisfied." *Nebbia v. New York*, 291 U.S. 502, 516 (1934) (upholding regulation setting the price of milk); *see also Minn. Ass'n of Health Care Facilities*, 742 F.2d at 447 (upholding nursing-home regulation because it satisfied the *Nebbia* standard).

> The Supreme Court has described the contours of rational basis review as follows:
>
> [R]ational-basis review . . . is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. [A] classification neither involving fundamental rights nor proceeding along suspect lines is accorded ***a strong presumption of validity***. Such a classification cannot [be found unconstitutional] if there is a rational relationship between the [challenged government action] and some legitimate governmental purpose. . . . [A] classification must be upheld . . . if there is ***any reasonably conceivable state of facts*** that could provide a rational basis for the classification.

*Heller v. Doe*, 509 U.S. 312, 319-20 (1993) (emphases added) (citations and internal quotation marks omitted).  A court applying rational basis review may "hypothesize the motivations of the . . . legislature to find a legitimate objective promoted by the provision under attack."  *Shaw v. Or. Pub. Emps.' Ret. Bd.*, 887 F.2d 947, 948-49 (9th Cir. 1989) (internal quotation marks omitted).

Section 1693o-2(a) easily meets this standard.  In the decade prior to the statute's passage, both debit card use and interchange fee rates had rapidly risen, increasing the financial strain on large and small retailers alike.  These retailers, in turn, often passed on these costs to their consumers.  The main objective of § 1693o-2(a) was thus two-fold:  (1) to give retailers leverage in negotiating these fees with Visa and MasterCard to ensure that such fees are reasonable, *see* 156 Cong. Rec. S3589 (daily ed. May 12, 2010) (statement of Sen. Richard Durbin) (stating that "small businesses—which currently have no bargaining power against these monopolies, such as Visa and MasterCard—deserve a voice in the process"), and (2) to prevent retailers and consumers from having to bear a disproportionate amount of the costs of the debit

card system, *see id* (describing § 1693o-2(a) as "relat[ing] to consumer protection [and] . . . our economy and making sure it thrives, and thrives in a responsible way" by "making sure interchange fees are reasonable across the board").[31]   Congress's decision to link debit interchange fees more closely to issuing banks' costs per transaction certainly bears a "reasonable relation[ship]" to the "proper legislative purpose" of alleviating the burdens placed on retailers and consumers under the pre-existing system.[32]  *See Nebbia*, 291 U.S. at 516.  For these reasons, § 1693o-2(a) meets the requirements of due process, and the Court should dismiss Plaintiff's due process and takings claims pursuant to Federal Rule of Civil Procedure 12(b)(6).

D.    Plaintiff's Facial Challenge to the Statute is Not Ripe

Even if the Court were to conclude *both* that Plaintiff has a protected property interest in debit interchange fees *and* that the rate-setting cases could be applied to the type of regulation contemplated by this statute, Plaintiff's facial challenge is not ripe because the plain language of the statute makes it impossible for the Court to determine that the interchange fee standard authorized by the statute is "confiscatory."

Plaintiff summarizes its facial challenge as follows: "the Durbin Amendment bars the recovery from retailers of 'other costs' of debit service beyond the modest costs of electronically authorizing, clearing or settling debit transactions" and "[t]his structure alone" makes the rate "confiscatory."  Pl. Br. at 16; *see also* Am. Compl. ¶ 126 (alleging that § 1693o-2(a) is "facially

_____

[31] Moreover, to achieve these two purposes, Congress rationally directed the Board to consider not just the costs of a transaction, but the "functional similarity" between "electronic debit transactions" and "checking transactions that are required within the Federal Reserve bank system to clear at par" when determining what costs are reasonable and proportional with respect to a particular debit card transaction.  *See* 15 U.S.C. § 1693o-2(a)(4)(A).

[32] In addition to § 1693o-2(a)'s mandate that interchange fees be reasonable and proportional to the cost incurred by an issuing bank in a transaction, Plaintiff's due process and takings claims are based on the statute's exemption for institutions with less than $10 billion in assets.  This exemption likewise survives rational basis review.  *See infra*, pp. 33-35.

unconstitutional").  At the November 15, 2010 hearing, Plaintiff reiterated its position that the Board could consider only these "ACS" costs and that there was therefore no "discretion" under the statute.  Tr. of Proceedings re Status Conference at 7-8, 13, 17 (Doc. No. 37).

This self-serving and cramped interpretation of the statute ignores both the plain language of § 1693o-2(a)(4)(B)(ii) and other provisions of the statute which leave Plaintiff's rate indeterminate.  Under the statute, the Board *can* consider non-ACS costs that are specific to a particular electronic debit transaction.  *See* 15 U.S.C. § 1693o-2(a)(4)(B)(ii).  In addition, the statute's requirement that the Board "establish standards" for assessing debit interchange fees does not obligate the Board to set a specific rate for debit interchange fees.  *See* 15 U.S.C. § 1693o-2(a)(3)(A).  Moreover, even if the Board does set such a rate, the fees Plaintiff receives may later be adjusted for fraud prevention costs, leaving the final rate altogether uncertain.  15 U.S.C. § 1693o-2(a)(5) (directing the Board to make "[a]djustments to interchange transaction fees for fraud prevention costs.").[33]

In *Iowa Utilities Board v. FCC*, 219 F.3d 744, 753 (8th Cir. 2000), *rev'd in part on other grounds in Verizon Commc'ns, Inc. v. FCC*, 535 U.S. 467 (2002), plaintiffs brought a takings claim based on *Hope Natural Gas* and *Duquesne Light* challenging the fee methodology mandated by the Telecommunications Act of 1996.  The Eighth Circuit held that the facial challenge to the statute was not ripe.  *Id.* at 754.  As the court explained, "'[i]t is not theory but

---

[33] Currently, two possible interchange fee standards have been proposed, one of which allows an "issuer-specific" assessment of allowable costs.  *Notice of Proposed Rulemaking*, 75 Fed. Reg. at 81736-37.  Although both alternatives propose a "cap" of 12 cents per transaction, *id.* at 81736, 81738, that cap was based on a Board proposal regarding what constitutes "allowable costs," which may be subject to change, and on limited transaction data submitted by card issuers in response to Board surveys on the transaction volume and variable cost of authorization, clearing, and settlement.  *Id.* at 81734-37.  There is nothing in the statute that requires the cost limitations to remain in effect as currently proposed.  Thus, at this stage it is not possible to determine what factors the final regulation will consider.

the impact of the rate order which counts,'" *id.* (quoting *Hope Natural Gas*, 320 U.S. at 602), noting that until the actual rates were established, the court could not conclude whether the impact of methodology would drive rates in such a way so as to constitute a taking.  219 F.3d at 754.  Moreover, the court stated that it would not disregard *Chevron* deference or construe the statute in an unnecessarily narrow fashion in an effort to interpret the statute in accordance with plaintiffs' views.  *Id.*  The Supreme Court affirmed the Eighth Circuit's holding on this point, rejecting plaintiffs' argument that it should preemptively consider the statute's method for calculating economic costs, as opposed to the actual rates plaintiffs received.  *See Verizon Commc'ns*, 535 U.S. at 523-25 ("The Eighth Circuit did not think that such a serious [constitutional] question [regarding methodology's 'inherent inadequacy'] was in the offing and neither do we."); *see also Rural Iowa Indep. Tel. Assoc. v. Iowa Util. Bd.*, 385 F. Supp. 2d 797, 826-27 (S.D. Iowa 2005) (citing *Verizon Commc'ns* and concluding that the plaintiff's takings claim were not ripe because the utility board had not yet set applicable rates); *U.S. W. Commc'ns, Inc.*, 55 F. Supp. 2d at 989-90 (holding that because the utility commission had not yet reached a final decision concerning the disputed prices and because plaintiff still had an opportunity to have its public rates increased, plaintiff's takings claim was not ripe for review).

The Supreme Court has thus made it abundantly clear that "th[e] want of any rate to be reviewed is significant, given that this Court has never considered a taking challenge on a ratesetting methodology without being presented with specific rate orders alleged to be confiscatory."  *Verizon Commc'ns*, 535 U.S. at 524.  Given this, "the general rule is that any question about the constitutionality of ratesetting is raised by rates, not methods, and this means that the policy of construing a statute to avoid constitutional questions where possible is presumptively out of place when construing statutes prescribing methods."  *Id.* at 525; *see also*

*Duquesne Light Co.*, 488 U.S. at 314 ("The Constitution protects the utility from the **net effect** of the rate order on its property." (emphasis added)).

With this in mind, Plaintiff's facial attack on § 1693o-2(a)(4), based only on the statutory "considerations" the Board is required to undertake (*i.e.*, the methods by which a rate may ultimately be prescribed), provides an insufficient basis upon which to challenge the "rate" to be imposed. Directly contravening the Eighth Circuit's guidance in *Iowa Utils Bd.*, Plaintiff construes the statute narrowly and in a manner inconsistent with the statute's plain language to construct a "rate." Plaintiff surmises that the "proper interpretation" of "other costs" in § 1693o-2(a)(4)(B)(ii) should be all costs that "are not specific to the authorization, clearance or settlement of a particular electronic debit transaction" (*i.e.*, ACS costs). Am. Compl. ¶ 96. The statute, however, reads differently, defining "other costs" that the Board may not consider as those "incurred by an issuer which **are not specific to a particular electronic debit transaction**." 15 U.S.C. § 1693o-2(a)(4)(B)(ii) (emphasis added). Interpreting this language, the Board has stated that *the statute is silent* with respect to non-ACS costs connected with a particular transaction. *See Notice of Proposed Rulemaking*, 75 Fed. Reg. at 81734.[34] Until the Board reviews data on these potential costs and makes a determination about whether any other non-ACS costs specific to a particular transaction will be included in the final regulation, the premise of Plaintiff's claim, reflected in both their complaint and motion, is demonstrably false based on the plain language of the statute.

---

[34] Although the Board has initially proposed not to include other, non-ACS costs associated with a particular transaction (such as cardholder rewards or costs associated with providing customer service to cardholders for particular transactions), *see Notice of Proposed Rulemaking*, 75 Fed. Reg. at 81734, it has requested comments on whether it should allow for such costs, and if so, which of these costs should be included. *Id.* at 81735. The Board has also requested comments on the potential inclusion of a limited set of fixed costs connected with a particular debit transaction. *Id.* at 81736.

Second, even if the Court were to consider the effects of the restriction imposed by § 1693o-2(a)(4)(B)(ii), other sections of § 1693o-2(a) make facial review of the statute under the ratemaking jurisprudence untenable.  This is because the Board is not required to set a rate, and even if it does set a rate, it may adjust that rate for fraud prevention costs.  Section 1693o-2(a)(3)(A) states that the Board shall prescribe regulations "**_to establish standards for assessing_** whether the amount of any interchange transaction fee" is ultimately "reasonable and proportional to the cost incurred by the issuer with respect to the transaction."  15 U.S.C. § 1693o-2(a)(3)(A) (emphasis added).  These "standards" could include a defined rate or could provide a general framework under which the networks prescribe the amount of any interchange transaction fee.[35]  Either way, the statute does not mandate a fixed rate.[36]  Moreover, the statute also requires the Board to prescribe regulations by which interchange transaction fees can be adjusted for fraud prevention costs.  The statute does not restrict what factors the Board is allowed to consider in prescribing regulations for the fraud prevention cost adjustment.  *See*, *e.g.*, 15 U.S.C. § 1693o-2(a)(5)(B)(ii)(VII) (permitting the Board to consider "such other factors as

---

[35] At the December 16, 2010 hearing in which the Board approved the notice of proposed rulemaking, Governor Warsh emphasized this distinction stating: "[a] first reading of the statute says that the Board shall establish standards for interchange fees, it doesn't say we should establish prices."  He then questioned whether the statute required "price setting" or whether the decision to set rates was a "judgment" of the staff.  *See* video of December 16th Board meeting, *available at* http://www.youtube.com/watch?v=IaJqZMfqXNY ("Meeting Video") at 25:35-26:05.  The staff did not point to any requirement in the statute that the Board set a rate, but rather emphasized its own policy judgment that "actual values" in the standard would help avoid negative economic incentives and minimize administrative burdens.  *Id.* at 26:07-26:28.

[36] This is in marked contrast to the explicit ratemaking authority granted to the Federal Energy Regulatory Commission (FERC) and Federal Communications Commission (FCC).  *See*, *e.g.*, 16 U.S.C. § 824e(a) (FERC "shall determine" and "fix . . . by order" rates and charges of electricity utility companies); 42 U.S.C. § 7172(a)(1)(B) & (C) (FERC explicitly granted power for the "establishment, review and enforcement of rates" charged by sellers of electricity and natural gas); 49 U.S.C. § 60502 (FERC "has the duties and powers related to the establishment of a rate or charge for the transportation of oil by pipeline"); 47 U.S.C. § 205(a) (FCC "is authorized and empowered to determine and prescribe" charges of common carriers).

the Board considers appropriate.").  In fact, in its pleadings, Plaintiff admits that the Board may "increase or 'adjust' the allowable interchange fee for regulated debit issuers like TCF for certain fraud prevention costs on an issuer specific basis."  *See* Stautz Aff. ¶ 12.  The Board has not yet even published a proposed regulation on fraud-prevention costs, but has instead asked for comments on a "technology-specific" versus "non-prescriptive" approach.  *See Notice of Proposed Rulemaking*, 75 Fed. Reg. at 81742-43.  In the absence of final rulemaking by the Board further defining the "rate" to be established, the considerations listed in the statute provide no clear indication of the rate to be received by Plaintiff.

Finally, even if Plaintiff could theoretically mount a facial challenge to the statute by alleging an unconstitutional rate, it must demonstrate "that application of the regulations will inevitably lead to a confiscatory result." *Fireman's Fund Ins. Co. v. Quackenbush*, 87 F.3d 290, 294 (9th Cir. 1996).  In other words, Plaintiff must show that *any conceivable application* of the statute will lead to a confiscatory result. *See United States v. Salerno*, 481 U.S. 739, 745 (1987) (emphasis added) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.").  Plaintiff has not even come close to doing so. Therefore, this Court should follow the lead of other courts in this Circuit, who when faced with a similar lack of a final rate, dismissed the rate-setting challenge for lack of ripeness. *See Rural Iowa Indep. Tel. Assoc.*, 385 F. Supp. 2d at 828 (dismissing plaintiff's takings claim as "fatally premature" because "the [Iowa Utilities] Board did not set any applicable rates in any of its decisions."); *U.S. W. Commc'ns, Inc.*, 55 F. Supp. 2d at 990 (dismissing plaintiff's takings claim because the Minnesota Public Utility Commission "ha[d] not reached a final decision.").[37]

---

[37] Plaintiff's claims against the OCC are obviously even less ripe since the OCC cannot

## II.   PLAINTIFF'S EQUAL PROTECTION CLAIM SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

Plaintiff contends that § 1693o-2(a)(6) violates the Equal Protection Clause by exempting banks with less than $10 billion in assets from the Board's regulation because, according to Plaintiff, this distinction is "a pure political contrivance" and an "arbitrary dividing line."  Pl. Br. at 17.  This claim should also be dismissed.

Laws establishing economic classifications and that do not involve protected classes are subject to "rational-basis review."  *Fitzgerald v. Racing Ass'n of Cent. Iowa,* 539 U.S. 103, 107 (2003).   Under "rational-basis review, a classification in a statute . . . bear[s] a strong presumption of validity . . . and those attacking the rationality of the legislative classification have the burden 'to negative every conceivable basis which might support it.'" *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314-15 (1993) (quoting *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 364 (1973)). "In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is ***any reasonably conceivable state of facts*** that could provide a rational basis for the classification." *Id.* at 313 (emphasis added).

Under rational-basis review, the Eighth Circuit "accept[s] at face value contemporaneous declarations of the [governmental] purpose or, in the absence thereof, rationales constructed after the fact, unless an examination of the circumstances forces [the court] to conclude that they

---

initiate a regulatory enforcement action prior to the promulgation of the regulations themselves. This ripeness problem may even deprive Plaintiff of standing.  *See*, *e.g.*, *Sierra Club v. Robertson*, 28 F.3d 753, 758-59 (8th Cir. 1994) (holding that the mere existence of basic agency guidelines, prior to agency action, does not establish that an "injury is actual or certain to ensue.").  Regardless, through the clearly expressed intent of Congress by federal statute, this Court lacks jurisdiction over Plaintiff's claims against the OCC, *see infra*, at 35-37.

could not have been a goal of the [classification]." *Barket, Levy & Fine, Inc. v. St. Louis Thermal Energy Corp.,* 21 F.3d 237, 240 (8th Cir. 1994) (internal quotation marks omitted).

As with its due process challenge,[38] Plaintiff has not met its heavy burden to negative every conceivable basis which might support the passage of § 1693o-2, as there are at least two plausible explanations for Congress's decision to exempt banks with less than $10 billion in assets.

First, the exemption was intended to safeguard small banks, community banks, and credit unions from the loss of revenues which could result from regulation of interchange fees. Although the overall purpose of the Durbin amendment was to give merchants, consumers, and small businesses leverage to negotiate reasonable interchange fees with Visa and Mastercard, the $10 billion exemption was necessary to protect these smaller institutions. As Senator Durbin stated in his floor statement introducing the bill, "we are not trying to create any hardship on community banks and credit unions. Instead, we are going after the largest banks and credit card companies for what I consider to be unreasonable conduct when it comes to the treatment of small businesses and retail businesses . . . ." 156 Cong. Rec. S3590 (daily ed. May 12, 2010) (statement of Sen. Richard Durbin). The $10 billion exemption was thus designed to "to preserve the ability of small banks and credit unions to compete with big banks in issuing debit cards." 156 Cong. Rec. S4977 (daily ed. June 16, 2010) (statement of Sen. Richard Durbin).

As the Supreme Court has repeatedly held, a legislature's desire to help one class of businesses is a rational legislative purpose, even if it disadvantages another. *Fitzgerald*, 539 U.S. at 109 ("That difference, harmful to the racetracks, is helpful to the riverboats . . . . [e]ach

---

[38] The same standard of review, discussed, *supra,* pp. 25-27, applies to both due process and equal protection claims. *See Knapp v. Hanson*, 183 F.3d 786, 790 (8th Cir. 1999) (noting that "[b]oth theories utilize the rational basis analysis").

reflects a rational way for a legislator to view the matter"). The desire to safeguard small banks thus constitutes a rational basis for § 1693o-2's exemption. *See Beach Commc'ns*, 508 U.S. at 316 (recognizing that, in crafting legislation, "Congress had to draw the line somewhere").

A second justification for § 1693o-2(a)'s exemption is Congress's desire to ensure the availability of debit cards for consumers. By making the regulations applicable only to issuing banks with less than $10 billion in assets, Congress sought to ensure that smaller banks would continue to issue debit and credit cards, thereby insulating consumers from a possible cessation of these services by small banks unable to absorb the increased costs associated with lower interchange fees. As Senator Durbin stated, "[s]ome have argued that we would reduce credit availability by regulating credit card interchange rates. However, the amendment's reasonable fee requirement only applies to debit cards; it doesn't apply to credit cards. . . . [and it] exempts small banks and credit unions with assets under $10 billion which, as I say, includes 99 percent of all banks, credit unions and thrift savings and loans . . . ." 156 Cong. Rec. S3589 (daily ed. May 12, 2010). Congress reasonably could have believed that exempting small and community banks from the regulations would enable them to continue to provide debit cards to consumers. Accordingly, for this alternative reason, § 1693o-2(a)(6) survives equal protection scrutiny.

## III.   THE COURT LACKS JURISDICTION OVER PLAINTIFF'S CLAIMS AGAINST THE OCC

As a separate matter, Plaintiff's claims for declaratory and injunctive relief as they pertain to the OCC are precluded by federal statute and therefore must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1). Under 12 U.S.C. § 1818(i)(1), except as specifically provided, "no court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any notice or order under [12 U.S.C. §§ 1818, 1831o, or 1831p-1], or to review, modify, suspend, terminate, or set aside any such notice or order." The Supreme Court has

affirmed the scope of this "plain, preclusive language," *Bd. of Governors of the Fed. Reserve Sys. v. MCorp Fin. Inc.*, 502 U.S. 32, 39-40 (1991) (holding that the district court lacked jurisdiction to enforce an automatic stay in bankruptcy against the Board's enforcement proceeding), and multiple circuit courts have likewise held that § 1818(i)(1) bars actions seeking injunctive or declaratory relief in an effort to block an enforcement action by a banking agency, *see, e.g.*, *Ridder v. Office of Thrift Supervision*, 146 F.3d 1035 (D.C. Cir. 1998); *Hindes v. Fed. Deposit Ins. Corp.*, 137 F.3d 148 (3d Cir. 1998); *Groos Nat'l Bank v. Comptroller of the Currency*, 573 F.2d 889 (5th Cir. 1978).

This broad jurisdictional bar, furthermore, applies where the agency in question has yet to engage in any sort of enforcement action or proceeding.   Section 1818(i)(1) withdraws jurisdiction from the Court to "***affect by injunction or otherwise*** the *issuance* or enforcement of any notice or order" (emphasis added).  The preclusion of jurisdiction to affect the *issuance* of a notice thus clearly covers complaints filed before any notice has been issued.  *See Groos*, 573 F.2d at 893 (dismissing under § 1818(i)(1) claim where plaintiffs had "attempt[ed] to steal a march on the Comptroller" by seeking declaratory and injunctive relief "before the agency began formal proceedings"); *DeNaples v. Office of the Comptroller of the Currency*, No. 10-1568, 2010 WL 5135326, at *3 (3d Cir. Dec. 17, 2010) ("The jurisdictional bar set forth in § 1818(i)(1) is not limited to judicial determinations that would 'affect' agency proceedings outstanding at the time that the action is commenced.  Rather, § 1818(i)(1) imposes an expansive prohibition, stripping federal courts of jurisdiction ***whenever a determination could affect an agency decision***." (emphasis added)).

In the present case, the injunctive and declaratory relief sought by Plaintiff against the OCC would necessarily "affect" the latter's ability to undertake any enforcement actions or

proceedings related to debit card interchange fees.  Were the Court to grant Plaintiff the requested relief, it would deny the OCC the ability to address the issue first and thereby "affect" any administrative proceedings that might be conducted pursuant to the Board's final regulation. Accordingly, because § 1818(i)(1) deprives the Court of jurisdiction to grant the relief Plaintiff seeks against the OCC, the Court should dismiss Plaintiff's claims against the agency pursuant to Rule 12(b)(1).

## IV.   IN THE ALTERNATIVE, PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION SHOULD BE DENIED

### A.   Legal Standard For Preliminary Injunctions

A request for preliminary injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original) (quotations omitted).  The Eighth Circuit requires the district court to weigh four factors in deciding whether to grant or deny preliminary injunctive relief including: "(1) whether there is a substantial probability movant will succeed at trial; (2) whether the moving party will suffer irreparable injury absent the injunction; (3) the harm to other interested parties if the relief is granted; and (4) the effect on the public interest."  *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 112 (8th Cir. 1981); *see also Kai v. Ross*, 336 F.3d 650, 653 (8th Cir. 2003).

As this Court pointed out in its December 9, 2010 order, *see* Doc. No. 45, where the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme, there must be much more than a "fair chance" that the moving party will prevail on the merits — there must be a "likelihood" of such an occurrence.  *See Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 731 (8th Cir. 2008) (en banc) (citing *Able v. United States*, 44 F.3d 128, 131 (2d Cir.1995)); *Richenberg v. Perry*, 73 F.3d 172,

-37-

173 (8th Cir.1995) (per curiam).  The rationale for this more rigorous standard "reflects the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." *Planned Parenthood*, 530 F.3d at 732 (quoting *Able*, 44 F.3d at 131).   The burden lies on the moving party.  Only *after* the moving party makes a threshold showing that it is likely to prevail on the merits may the district court then proceed to weigh the other *Dataphase* factors.  *Id*.  Plaintiff cannot satisfy its heavy burden here.

      B.    <u>Plaintiff Is Unlikely to Prevail on Its Constitutional Claims</u>

As explained above, *see supra* at 12-37, Plaintiff is unlikely to prevail on any of its constitutional claims.  Plaintiff's due process and takings claims fail because of Plaintiff's lack of a property interest in debit interchange fees and the inapplicability of the ratemaking jurisprudence to the instant case.  Moreover, even assuming *arguendo* that Plaintiff possesses a cognizable property interest and the rate-setting cases apply, Plaintiff's facial challenge to the statute is not ripe and must be dismissed.  Plaintiff's equal protection claim also fails because there are at least two rational bases behind § 1693o-2(a)(6), each of which is sufficient for the Court to reject Plaintiff's claim.  Plaintiff's claims against the OCC should also be dismissed because 12 U.S.C. § 1818(i)(1) deprives the Court of jurisdiction to grant the relief Plaintiff seeks against the OCC.

      C.    <u>Plaintiff Has Not Shown Irreparable Harm</u>

In addition to not showing a likelihood of success on the merits, Plaintiff is not threatened with irreparable harm.  The Eighth Circuit requires as a threshold matter that the moving party establish that "the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Iowa Utils. Bd. v. FCC,* 109 F.3d 418, 425 (8th Cir. 1996).  In

addition, where, as here, a plaintiff seeks identical declaratory and injunctive relief in its complaint, its burden to demonstrate irreparable harm is "heavier" because the "preliminary injunction will in effect give the movant substantially the relief it would obtain after a trial on the merits."  *Rathmann Grp. v. Tanenbaum,* 889 F.2d 787, 790 (8th Cir. 1989).  "Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction."  *Watkins, Inc. v. Lewis*, 346 F.3d 841, 845 (8th Cir. 2003).

Plaintiff alleges that it will be irreparably harmed by the future loss of interchange fee revenue.  It posits two derivative injuries from this future loss of income — the loss of consumer goodwill and damage to its stock price — both of which it attributes to the "draconian scheme" of § 1693o-2(a).  *See* Pl. Br. at 23-25.  These alleged injuries are neither imminent nor certain.

As demonstrated by Plaintiff's willingness to wait months following the enactment of § 1693o-2(a) to move for a preliminary injunction, and then to postpone a January hearing on its motion for an injunction for convenience of amici, Plaintiff's alleged harm is decidedly not imminent.  This is because any regulation of interchange fees promulgated by the Board will not go into effect until July 21, 2011.  *See* 15 U.S.C. § 1693o-2(a)(9) ("This subsection shall take effect at the end of the 12-month period beginning on July 21, 2010.")  At this point, the Board has yet to promulgate a final regulation.  No regulated bank, including Plaintiff, will be limited in the amount of interchange fees it can recover prior to this date as a result of § 1693o-2(a).  Plaintiff's claim that it might suffer significant economic losses to its interchange fee revenue, to consumer goodwill, and/or its stock price, depending on the content of a regulation that has not even been issued, is therefore an insufficient basis on which to immediately enjoin § 1693o-2(a).  *See Iowa Utils. Bd.*, 109 F.3d at 425 ("In order to demonstrate irreparable harm, a party must

show that the harm is certain and great and of such imminence that there is a clear and ***present*** need for equitable relief." (emphasis added)).

Plaintiff's allegation of harm is uncertain because Plaintiff has failed to provide sufficient evidence to establish that, in the absence of an injunction, customers will no longer maintain deposit accounts at TCF Bank and/or investors will no longer invest in its stock. *See Packard Elevator v. Interstate Commerce Comm'n*, 782 F.2d 112, 115 (8th Cir. 1986) ("Bare allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur. . . . [T]he [petitioner] must show that the alleged harm will directly result from the action which the [petitioner] seeks to enjoin.") (second alteration and emphasis in original) (quoting *Wis. Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

Specifically, Plaintiff claims that if it attempts to impose a swipe fee or monthly fee to make up for the income lost due to lower interchange fees, "it will lose hundreds of thousands of customers who can bank at the exempted banks . . . ." Pl. Br. at 23-24. This alleged harm is predicated on two unsupported assumptions: (1) that exempt banks will continue to "enjoy the current interchange fees from retailers," and (2) that exempt banks will feel no need to institute account fees. But these two purported "facts" are guesses at best. Although Visa has indicated that it will maintain separate payment schedules for regulated and exempt banks,[39] exempt banks will likely receive lower interchange fee income. This is because of the expected effects of the implementation of the Board's debit card routing rules which will for the first time allow a merchant to direct the routing of an electronic debit transaction to its preferred network, and presumably merchants will favor the network with lower debit interchange fees. *See* 15 U.S.C.

---

[39] *See* David Morrison, *Visa Will Support Dual Interchange Schedule*, Credit Union Times, Jan. 7, 2011, *available at* http://www.cutimes.com/News/2011/1/Pages/Visa-Will-Support-Dual-Interchange-Schedule.aspx.

§ 1693o-2(b)(1); *Notice of Proposed Rulemaking*, 75 Fed. Reg. at 81748-81752.  Given this context, it is altogether possible that exempt banks will choose to institute account fees for their deposit accounts, similar to regulated banks, to supplement any decrease in interchange fee revenue, thus toppling the chief pillar upon which Plaintiff's allegation of harm rests.[40] Moreover, even if these institutions do not raise their fees, TCF Bank holds certain competitive advantages vis-a-vis these smaller institutions, including having broader access to ATM machines and branch locations.   In addition, industry norms for acceptable swipe or monthly fees will probably shift in the wake of Dodd-Frank, as larger regulated banks, such as Bank of America, have already begun to implement fees for deposit-account services.[41]   In the end, Plaintiff's alleged harm of losing customers due to competition from smaller banks constitutes mere speculation.  It thus cannot serve as grounds for granting a preliminary injunction.

Moreover, Plaintiff's claim of lost market share, without more, would not be a sufficient legal basis on which to claim irreparable injury.  *See Bristol-Myers Squibb Co. v. Shalala*, 923 F. Supp. 212, 221 (D.D.C. 1996) (mere speculation about potential market share does not constitute irreparable injury); *Mead Johnson Pharm. Grp. v. Bowen*, 655 F. Supp. 53, 56 (D.D.C. 1986) (purported loss of market share was "pure speculation."), *aff'd*, 838 F.2d 1332 (D.C. Cir. 1988).

---

[40] Specifically, the Board's limitations on payment card restrictions may give merchants the ability to process transactions over multiple networks.  *See* 15 U.S.C. § 1693o-2(b)(1) (directing the Board to promulgate rules prohibiting exclusivity arrangements).  Should this occur, networks such as Visa would face competitive pressure to institute a low fee schedule applicable to all banks.  *See* Tim Chen*, Fed Looks to Cap Interchange, Checking Institutions Cringe,* Forbes Blog Moneybuilder (Jan. 7, 2011), *available at* http://blogs.forbes.com/moneybuilder/2011/01/07/fed-looks-to-cap-debit-interchange-checking-institutions-cringe/?boxes=Homepagechannels.

[41] Bank of America, which like Plaintiff is subject to regulation under § 1693o-2, recently instituted monthly maintenance fees for certain checking accounts.  Several other regulated banks, including Wells Fargo, Wachovia, and Chase, followed suit.  Ylan Q. Mui, *Bank of America to Change Fees for Checking Accounts, Cites Increased Regulation*, Wash. Post, Jan. 5, 2011, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2011/01/05/AR2011010505358.html.

Finally, the Court should reject Plaintiff's claim that its stock has suffered due to interchange-fee regulation.  Plaintiff's stock price has continually fluctuated in the past twelve months, leaving little indication that its business is threatened by § 1693o-2(a) or that any decline in its stock price is attributable to interchange-fee regulation.  In fact, Plaintiff's stock was trading at a significantly *lower* rate in the twelve-month period prior to the enactment of § 1693o-2(a).  For example, in November 2009, it was trading at roughly $11-$12 per share and did not consistently rise to more than $15 per share until March 2010.[42]  On July 21, 2010, the date of passage of Dodd-Frank, Plaintiff's stock was trading at $15.24 per share.[43]  After a dip in early November, the stock price increased again and by mid-February was trading at $16.38.[44]  After the Board's announcement of its Notice of Proposed Rulemaking on December 16, 2010, Plaintiff's stock price dropped, but it has since risen.[45]  For all of these reasons, Plaintiff has not shown that it will be irreparably harmed in the absence of a preliminary injunction.

> D.   A Preliminary Injunction Would Substantially Harm Other Interested Parties, Including Consumers, and Would Be Adverse to the Public Interest

The Court further has no basis to issue a preliminary injunction because TCF has failed to meet its burden of showing that this injunction will not cause harm to defendants, third parties, and the public interest.  Whereas the irreparable-harm analysis focuses only on the harm to the moving party, a balancing of the harms takes into account the potential injury to both parties to the dispute as well as "other interested parties, including the public." *Aventure Commc'ns Tech.,*

---

[42] TCB Interactive Stock Chart, http://www.nasdaq.com/aspx/dynamic_charting.aspx?selected=TCB&symbol=TCB&timeframe=1y&charttype=line (last visited February 18, 2011) ("*TCF Stock Chart*").

[43] TCF Investor Relations, Historical Price Lookup, http://ir.tcfexpress.com/phoenix.zhtml?c=95289&p=irol-stockLookup&t=HistQuote&control_firstdatereturned= (last visited February 18, 2011).

[44] *TCF Stock Chart.*

[45] *TCF Stock Chart.*

*LLC v. Iowa Utils. Bd.*, 734 F. Supp. 2d 636, 666 (N.D. Iowa 2010).  The relief that Plaintiff seeks, if granted, would injure not just the named Defendants, but other non-named interested parties, including networks, merchants, and consumers, all of whom have an interest in the Board's yet-to-be-determined final regulations.

At its core, the proposed relief would cut deeply against the strong public interest in well-functioning payment card networks, not to mention the public's interest in having ultimate policy decisions behind the regulation of electronic transfer of funds rest with Congress's legislative vision and the Board's implementation.  *See Branstad v. Glickman*, 118 F. Supp. 2d 925, 943 (N.D. Iowa 2000) (noting that the "concrete considerations" for a public-interest analysis include "reference to the purposes and interests any underlying legislation was intended to serve").

In passing § 1693o-2, Congress sought to provide the Board with authority to establish standards for assessing whether the amount of interchange transaction fee charged is "reasonable and proportional" to the costs incurred by the issuer with respect to the transaction.  The Board was asked to prescribe regulations in which it considered the "functional similarity" between electronic debit transactions and checking transactions that are required within the Federal Reserve System to clear at par.  Moreover, Congress wanted the Board to examine the various incremental costs incurred by an issuer specific to a particular electronic debit transaction.  Congress recognized the potential negative impact on merchants and consumers as a result of high debit interchange fees.  *See*, *e.g.*, 156 Cong. Rec. S5914 (daily ed. July 15, 2010) (statement of Sen. Jack Reed) ("These provisions [from the Durbin Amendment] will allow small businesses to invest more and pass on greater savings to their customers rather than spend their earnings on unreasonable interchange fees.").  At the same time, Congress empowered the Board to consider the interests of the issuers and networks (and consumers) by prescribing regulations which take into account adjustments for fraud prevention costs.  *See* 15

U.S.C. § 1693o-2(a)(5)(B).  Finally, Congress addressed the perceived abuse of monopoly power by debit card networks in previously establishing exclusivity arrangements.  *See id.* § 1693o-2(b)(1)-(3). This interventionist approach made sense given that in the same legislation, Congress attempted to tackle the various ways in which unregulated markets had malfunctioned in recent years.  Thus, the Board has been tasked with finding the proper balance of incentives to appeal to the issuer banks, merchant acquirers, networks, and consumers in a way which will permit a well-functioning debit card network.

The Board has yet to issue final regulations, which presumably will reflect its longstanding expertise about how best to assess the myriad of competing and sometimes conflicting demands placed on debit card networks that would best effectuate Congress's goals.  "It is in the public interest for courts to carry out the will of Congress and for an agency to implement properly the statute it administers."  *Sherley v. Sebelius*, 704 F. Supp. 2d 63, 73 (D.D.C. 2010) (citation and quotation marks omitted).

Unhappy with Congress's determination of how payment card networks should be regulated, Plaintiff invites this Court to bypass the expertise of the Board and impose its own vision of what constitutes a "just and reasonable" rate.  This is precisely the sort of "wholesale [programmatic] improvement by court decree" that the Supreme Court has deemed inappropriate, observing that unlike the elected branches of government, courts "lack both expertise and information to resolve" these sorts of competing policy considerations.  *Norton v. Utah Wilderness Alliance*, 542 U.S. 55, 64, 66 (2004). This Court should decline Plaintiff's invitation to interfere with the Board's yet-to-be-issued final regulations and deny Plaintiff's Motion for a Preliminary Injunction.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that this Court dismiss all of Plaintiff's claims.  In the alternative, the Court should deny Plaintiff's Motion for a Preliminary Injunction and schedule briefing on any remaining claims only after the Board of Governors has issued its final regulation.

Dated:  February 18, 2011

TONY WEST
Assistant Attorney General

BRENDAN V. JOHNSON
United States Attorney, District of South Dakota

*OF COUNSEL***:**
KATHERINE H. WHEATLEY
Associate General Counsel
YVONNE F. MIZUSAWA
Senior Counsel
Board of Governors of the
  Federal Reserve System
20th & C Streets NW
Washington, DC 20551
202-452-3779

DIANA RYAN
Assistant United States Attorney, District of South Dakota

ARTHUR R. GOLDBERG
Assistant Director,
Federal Programs Branch

s/ Bradley H. Cohen

*OF COUNSEL***:**
HORACE G. SNEED
Director of Litigation
ERNEST C. BARRETT, III
Senior Counsel
Office of the Comptroller of
the Currency
250 E. Street, S.W.
Washington, DC 20219
202-874-4822

BRADLEY H. COHEN (DC Bar No. 495145)
NATHAN M. SWINTON (NY Bar No. 802649)
Trial Attorneys
Federal Programs Branch
U.S. Department of Justice, Civil Division
Telephone:  (202) 305-9855
Fax:  (202) 318-0486
Email:  bradley.cohen@usdoj.gov

Mailing Address:
Post Office Box 883
Washington, D.C. 20044

Courier Address:
20 Massachusetts Ave, N.W.
Washington, D.C. 20001

**ATTORNEYS FOR DEFENDANTS**