# UNITED STATES DISTRICT COURT
# DISTRICT OF SOUTH DAKOTA
# SOUTHERN DIVISION

| | |
|---|---|
| **TCF NATIONAL BANK** | ) |
| Plaintiff, | ) |
| v. | ) Case No. 4:10-cv-04149-LLP |
| **BEN S. BERNANKE,** *et al* | ) |
| Defendants | ) |

## BRIEF OF STATE BANKERS ASSOCIATIONS AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF TCF NATIONAL BANK

Ronald A. Parsons, Jr.
JOHNSON, HEIDEPRIEM & ABDALLAH LLP
P.O. Box 2348
Sioux Falls, SD 57101-2348

Joseph J. Witt *
MINNESOTA BANKERS ASSOCIATION
9521 West 78th Street
Eden Prairie, MN 55344
(952) 835-3900
* *appearing pursuant to approved pro hac vice motion*

Counsel for State Bankers Associations

# **TABLE OF CONTENTS**

I.       Introduction and Interests of the State Bankers Associations ............................1

II.      SBAs' Position on the Durbin Amendment, Generally ......................................2

III.     SBAs' Position on the Durbin Amendment, Specifically..................................4

IV.     The Board's Proposed Interchange Rule ............................................................6

V.      Conclusion .........................................................................................................8

Appendix A – List of Amicus Curiae ......................................................................... A-1

I. **Introduction and Interests of the State Bankers Associations**

The State Bankers Associations (SBAs)[1] are pleased to provide this brief in support of TCF National Bank (TCF) with respect to its motion for a Preliminary Injunction in this case. The subject matter of this Preliminary Injunction has a tremendous impact on TCF, but it also has an impact on the banking industry as a whole. The SBAs very much appreciate the opportunity to share our positions with the Court.

The twenty-two SBAs signing on to this brief have more than 4,400 member banks. The SBAs' members are a fairly diverse group of banks. We have members that are small and large institutions, operating in large metropolitan areas, the suburbs, and rural areas. The SBAs provide a wide range of services, but our member banks generally list our advocacy on behalf of the banking industry as the most important service that we provide.

The SBAs took a keen interest in the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 ("the Dodd-Frank Act"), and in the Durbin Amendment, Section 1075 of the Dodd-Frank Act. We focused most heavily on the part of the Durbin Amendment that requires the Federal Reserve Board ("the Board") to set the maximum interchange rate to be collected by covered debit card issuing banks, which became Section 920(a) of the Electronic Fund Transfer Act, 12 USC 1693o-2(a) ("Section 920(a)"). Many parts of the Dodd-Frank Act will impact our member banks, and the Durbin Amendment is certainly one of the most significant provisions in that law. Virtually all banks issue debit cards, and they use debit card interchange fees to offset costs associated with managing their debit card portfolios.

---

[1] The State Bankers Associations consist of 22 state banking trade groups. The Minnesota Bankers Association, lead *amicus,* is joined by the 21 associations listed in Appendix A.

The SBAs respectfully request that this Court enter the Preliminary Injunction requested by TCF, declaring Section 920(a) confiscatory, unconstitutional and invalid and prohibiting the Board from implementing Section 920(a) in its entirety.

### II. SBAs' Position on the Durbin Amendment, Generally

TCF's papers have explained the Durbin Amendment and its history. We will not restate all of that information, but we did wish to explain the associations' position on that amendment. The SBAs took an aggressive position against the Durbin Amendment.

The SBAs oppose efforts to restrict the ability of banks to charge for their products and services. Our member banks are for-profit businesses. We believe that banks should be able to collect revenues to cover their costs of providing a product or service, plus make a reasonable rate of return. When we see a national, state or local effort to unfairly restrict our fees or charges, we seek to become involved. One of our industry's biggest battles in this regard involved state and local attempts to restrict automated teller machine (ATM) fees. We took the position that restricting ATM fee revenue, without considering all of the costs that go into providing this service, was bad public policy.

The Durbin Amendment actually raises a similar issue. It also restricts revenues without considering all of the costs associated with providing debit card services. We believe that retailers receive great benefits from the electronic payment system and from accepting debit cards. For example, gas stations are able to sell gas 24 hours a day, even if their stores are not open, through pay-at-the-pump facilities. Many retailers significantly increase their sales figures by accepting electronic payments for sales over the telephone or online. In fact, Internet-based retailers rely exclusively on electronic payments for their existence.

Retailers benefit from the electronic payment system so much that many of them no longer accept checks. These retailers have made the decision that cash and electronic payments by credit card and debit card are their accepted forms of payment. It is our belief that the main reason that retailers like electronic payments is that they can drastically reduce their fraud losses and other overhead costs. Losses from bad checks are often borne by the retailers, while losses from lost, stolen or fraudulent debit and credit cards are most often borne by the issuing bank.

While retailers clearly like the electronic payment system, they evidently do not want to help pay for it. Retailers pay for the convenience and security of the electronic payment system through interchange fees. As fully explained by TCF's papers, the Durbin Amendment essentially requires the Board to set the maximum interchange fee that is payable from the retailer to the bank that issued the debit card.

There were two main reasons that we opposed the Durbin Amendment. First, from a philosophical standpoint, our members were opposed to this type of government price fixing, especially in a business-to-business transaction. Second, we opposed the Durbin Amendment because we were concerned that it would ultimately restrict interchange revenues in a way that did not allow banks to recover all of the costs that are associated with providing the service, plus a reasonable rate of return. It is wrong for the government to restrict a business's income without considering all of its costs and without allowing for a reasonable rate of return. We were directly concerned about the loss of debit card interchange fee income, and we were also concerned about the precedent that this amendment sets with respect to the pricing of other products and services offered by banks.

Politically, the Durbin Amendment faced a major battle because of its impact on small banks and credit unions. To address that political problem, Senator Durbin's original

amendment exempted banks under $1 billion from the interchange price controls. Even with that exemption, the amendment still lacked enough support to pass, so Senator Durbin increased his original exemption so that all banks under $10 billion would be exempt from the amendment's price controls. It should be noted that there is no legitimate legal or regulatory basis for the asset size limit used for the exemption. It was simply an arbitrary number chosen to help garner enough votes to pass the amendment. On the face of the statute, banks are treated differently based upon an arbitrary asset size limit.

The small bank exemption did not change the positions of our associations on the Durbin Amendment. The Durbin Amendment is bad policy for the banking industry, with or without the exemption, and so we continued to oppose it. Unfortunately, the banking industry did not have a lot of opportunity to provide its input on the amendment because it was offered so late in the legislative process. The amendment was offered while the bill was on the Senate floor, without any hearings on the substance of the amendment in the Senate or in the House, or even any real debate on the Senate floor. For such a massive proposition, the amendment was passed rather hastily without the traditional consideration, debate, and scrutiny accorded major legislation.

### III. SBAs' Position on the Durbin Amendment, Specifically

While the SBAs opposed the Durbin Amendment from a policy standpoint, we have also closely analyzed the specifics of the amendment. Once we looked at its practical implications, our major concern was that the factors that the Board could consider when setting the maximum interchange rate could be read narrowly, resulting in a significant reduction in interchange revenues.

A narrow reading of the amendment suggested that the Board could consider only the actual costs of processing a single transaction, plus some fraud prevention costs, but no other costs related to the debit card service. The interchange fee had to be "reasonable and proportional" to the costs of processing an individual transaction. If the Board read those factors narrowly, we knew that the amendment would have a devastating impact on debit card revenues.

When discussing this amendment, we have used an analogy to demonstrate our concerns and the terrible predicament in which it will leave our member banks. Suppose that you own and operate a toll bridge that allows vehicles to cross over a river. You have invested a lot of money in your bridge. You incurred costs to build the bridge, including charges from engineers, architects, builders and pavers. You have ongoing routine maintenance costs associated with operating the bridge, including charges for fixing potholes, replacing lights and removing snow. You also plan for major repairs like repaving the roadway every few years. Finally, you hire employees to work in your toll booths. When you budget for revenues and expenses, you consider all of those different factors.

People like using your bridge, but they decide that your toll prices are too high. They convince Congress to pass a law stating that the federal government will set all toll bridge prices. Further, when the federal government sets the price, only the actual cost of accepting the toll from each driver crossing the bridge can be considered. That pricing restriction would be horrible for toll bridge owners because it is too narrow; the cost of the toll booth employee is just one factor that goes into pricing that service. It is in fact a small part of the total cost structure. That type of law would be unfair and confiscatory because toll bridge owners would never be allowed to recoup the costs of designing, building, maintaining or improving their bridges. They

would be required to offer their service well below their total costs, with no chance of receiving a reasonable rate of return.

That analogy is just what happened with the Durbin Amendment. The retailers like using the electronic payment system because the system works, and it works well. According to the ATM and Debit News 2010 EFT Data Book, in 2010 there were 41 billion debit card transactions worth $1.6 trillion. The electronic payment system is safe, secure and fast. It can handle 10,000 transactions per second. Nonetheless, the retailers convinced Congress to reduce the fees that they pay for this important service.

Debit card issuers have invested good money into providing a valuable product for their customers. Debit card programs specifically, and checking accounts in general, are expensive to administer. We were gravely concerned that the Board would set the maximum interchange rate at a confiscatory level that would not allow banks to recoup their actual costs of offering debit cards, with no chance of getting a reasonable rate of return.

### IV. The Board's Proposed Interchange Rule

Again, the specifics of the Board's proposed interchange rule have been well described by TCF's papers. Without repeating all of their information, we want to state the SBAs' reaction to the proposed maximum interchange rates.

A strict reading of the Durbin Amendment suggested that the factors that the Board could consider when setting the maximum interchange rate were severely limited. However, if the Board had any discretion at all to set the maximum interchange rates, they did not use it. The resulting maximum interchange rate of $0.07 to $0.12 – or $0.12 – is significantly lower than the current rates received by debit card-issuing banks. We have heard estimates suggesting that

banks covered by the Durbin Amendment will lose seventy to eighty-five percent of their interchange fee revenues.

The Board's proposal would severely restrict interchange revenues, and we believe that it limits revenues without fully accounting for all of the debit card-issuing bank's costs. What costs will not be covered by that reduced revenue stream? TCF has described its specific situation, which is compelling. From an industry standpoint, all banks agree that the proposal does not account for all of the costs of issuing and administering a debit card portfolio, nor does it provide for development of future product enhancements.

It also fails to account for an extremely important factor: fraud. In the vast majority of cases, the card issuing bank – not the consumer and not the retailer – is liable for fraudulent charges that result from lost or stolen cards. Once a retailer receives approval for a transaction, the retailer receives payment, even if the card is later determined to be a lost or stolen card. The issuing bank takes the loss for that type of fraudulent activity. The Board's proposal does not give card issuing banks any sort of revenue offset to cover their actual fraud losses on their debit card portfolios, which is devastating to card issuers.[2] In addition, the proposal did not allow for any revenue to offset the costs of fraud prevention software and systems in which banks must invest.[3]

As a result of the Board's proposed rule, banks have begun to consider changing their debit card and/or checking account policies and pricing. Some banks are considering a $50 maximum transaction amount for debit card purchases, which would help them reduce fraud

---

[2] Based on information in the proposed rule, these losses were $719 million in 2009 alone for the 38 out of the 131 issuers who were sent a survey that responded with specific fraud loss information. *See* Debit Card Interchange Fees and Routing, Proposed Rule 75 Fed. Reg. 81722, 81741 (Dec. 28, 2010) (12 C.F.R. part 235).
[3] The Board indicated that these costs were $0.022 per signature based debit transaction and $0.012 for PIN debit. *See id.*

losses. Consumers would be forced to choose an alternative payment method for purchases over that limit. Other banks have announced that they will no longer offer, or else will restrict, "free checking" accounts. Consumers will likely pay more for banking services. If the results from other countries' debit card pricing restrictions are any indication, consumers will not see a corresponding reduction in the price of retail goods, meaning overall consumer costs will go up as a result of the Durbin Amendment and the Board's proposed rule.

TCF's papers include good information about policy makers' reactions to the Board's proposed interchange fee rule, including statements made and questions raised during a Congressional hearing held on February 17, 2011 before the House Financial Services Committee's Subcommittee on Financial Institutions and Consumer Credit. The SBAs were pleased with the hearing and with other recent statements on this subject. For example, the NAACP has recently written to House Speaker John A. Boehner in order to express its concerns regarding the proposed rule's potentially disastrous impact upon the banking options available to historically underserved communities.[4] We believe that policy makers understand that covered banks will be forced to offer this service at a price well below their total costs, with no chance at a reasonable rate of return, and that there is no guarantee that consumers will see any financial benefits as a result of this government price fixing.

V.  **Conclusion**

The undersigned state bankers associations, as *amicus curiae*, would like to thank the Court for considering this information. We are gravely concerned that the Board's proposed rule implementing the Durbin Amendment will cause great harm to the banking industry, through

---

[4] See attached Exhibit A.

8

both the reduced interchange fees and the unfortunate precedent that it would set. Banks will be required to offer a product and service at a price well below their costs, with no chance to earn a reasonable rate of return. The Durbin Amendment, on its face, treats banks differently based upon an arbitrary asset size distinction, which has no legal or regulatory justification.

For the foregoing reasons, as well as those set forth by TCF National Bank in its brief, we respectfully suggest that this Court should enter a Preliminary Injunction declaring Section 920(a) confiscatory, unconstitutional and invalid and prohibiting the Board from implementing Section 920(a) in its entirety.

Dated this 11th day of March, 2011.

**JOHNSON, HEIDEPRIEM & ABDALLAH LLP**

BY  /s/  Ronald A. Parsons, Jr.
    Ronald A. Parsons, Jr.
    P.O. Box 2348
    Sioux Falls, SD 57101-2348
    (605) 338-4304

    Joseph J. Witt
    MINNESOTA BANKERS ASSOCIATION
    9521 West 78th Street
    Eden Prairie, MN 55344
    (952) 835-3900

    *Counsel for State Bankers Associations*

# APPENDIX A

Arkansas Bankers Association

Colorado Bankers Association

Florida Bankers Association

Illinois Bankers Association

Indiana Bankers Association

Iowa Bankers Association

Kansas Bankers Association

Kentucky Bankers Association

Michigan Bankers Association

Missouri Bankers Association

Montana Bankers Association

Nebraska Bankers Association

North Carolina Bankers Association

Oklahoma Bankers Association

Oregon Bankers Association

Pennsylvania Bankers Association

Texas Bankers Association

Utah Bankers Association

Vermont Bankers Association

West Virginia Bankers Association

Wisconsin Bankers Association

## CERTIFICATION OF SERVICE

I hereby certify that on March 11, 2011, I caused the foregoing **Brief of State Bankers Associations as Amicae Curiae in support of Plaintiff TCF National Bank** to be served on all parties by sending a copy to their attorneys of record via electronic mail through the CM/ECF filing system.

       /s/   Ronald A. Parsons, Jr.
      Ronald A. Parsons, Jr.