UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| TCF National Bank,<br><br>                    Plaintiff,<br><br>v.<br><br>Ben S. Bernanke, Janet L. Yellen, Kevin M. Warsh, Elizabeth A. Duke, Daniel K. Tarullo, and Sarah Bloom Raskin, the Board of Governors of the Federal Reserve System, in their official capacities; and John Walsh, Comptroller of the Currency, in his official capacity,<br><br>                    Defendants. | Case No. 4:10-cv-04149-LLP<br><br><br><br>**BRIEF OF ECONOMISTS AND LAW AND ECONOMICS SCHOLARS AS AMICAE CURIAE IN SUPPORT OF PLAINTIFF TCF NATIONAL BANK** |

## INTERESTS OF AMICI

The amici curiae submitting this brief are economists and law and economics scholars who teach and conduct research on issues of consumer protection and the regulation of consumer credit and payment cards.  A list of amici is set forth in the appendix hereto.

Amici have no financial interest in any party to the case or in the outcome of the case.

## INTRODUCTION

Amici submit this brief in support of plaintiff TCF National Bank's challenge to the "Durbin Amendment," Section 1075 of the Dodd-Frank Wall Street Reform and Consumer Financial Protection Act of 2010 (the "Dodd-Frank Act"), Public Law 111-203.  Amici submit this brief because of the extreme public importance of this case to consumers, the banking system, and innovation in the payment card industry.  If allowed to take effect, the Durbin

Amendment would have disastrous consequences for consumers and the economy and would establish an irrational and arbitrary distinction between two tiers of banks that could dampen competition in the banking industry and weaken the stability of the banking system. The Durbin Amendment will make it impossible for the nation's most important debit card issuers to cover their costs of serving consumers through interchange fees, thereby leading to efforts to increase other bank fees on consumers. This term repricing will injure all consumers by making them pay more for payment cards, but the harm will fall hardest on lower-income consumers who will be unable to afford those fees. As a result, many low-income consumers who today have access to free checking will be driven out of the mainstream financial system and will be forced to rely on a variety of high-cost non-bank financial products, such as non-bank prepaid cards, check cashers, and pawn shops.

The Durbin Amendment places price controls only on debit interchange fees and not credit card interchanges fees. Banks that issue credit cards as well as debit cards can thus recoup some of their reduced debit card revenues by encouraging customers to switch transactions from debit cards to credit cards. Because credit cards can be used for transactional purposes similar to debit cards simply by paying the entire balance due on the card each month, for many consumers there is a very high rate of substitutability between the two products, and if debit cards become substantially more expensive to use in comparison to credit cards (or become less beneficial, such as by an elimination of reward debit cards), many consumers will switch. Ironically, however, credit cards generally charge higher interchange fees than debit cards, thus a large consumer switch from debit cards to credit cards will eliminate much of the savings promised to merchants from the Durbin Amendment. Moreover, this switch will create

an arbitrary distinction among that subset of financial institutions covered by the Durbin Amendment. Banks that issue both debit and credit cards—typically the very largest banks—will thus have this opportunity to offset decreased debit card revenues by encouraging customers to make greater use of credit cards. Because very large banks offer a range of services that others may not, including credit cards, they may also be able to impose new fees on debit card fees and still retain them through cross-marketing of other services or because certain consumers desire other attributes of very large banks. Given that many consumers today could use credit cards for many transactions but instead choose to use debit cards, inducing these consumers to switch from their more-preferred to less-preferred payment forms will result in economic harm to them.

By contrast, banks such as TCF that do not issue credit cards will be unable to recoup their lost debit card revenues. Under the Durbin Amendment, therefore, instead of market outcomes being determined by free competition based on the quality of service provided by banks to their customers, market success will depend on the relative ability of various banks to be able to evade its onerous provisions by switching consumers away from their preferred payment methods to alternatives. In reality, therefore, banks such as TCF will find themselves surrounded in the marketplace: squeezed on one side by smaller banks that are politically favored by the Durbin Amendment and on the other by very large banks that have a comparative advantage in recouping the punitive losses imposed by the Durbin Amendment through the ability to evade the Amendment by switching customers to other products or cross-marketing additional products that can compensate for debit card losses.[1]

---

[1] This assumes that a two-tier system of pricing debit card interchange fees is able to be sustained. But the Durbin Amendment allow merchants to choose among different routing systems for transactions, which by allowing them to choose the cheapest system might drive the fees for smaller issuers down to the same rate as others. David S. Evans, Robert E. Litan, & Richard Schmalensee, *Economic Analysis of the Effects of the Federal Reserve Board's*

The only clear beneficiaries of this legislation will be retail merchants and especially big box retailers that will save tens of millions of dollars and shift those costs on to the backs of consumers.  Consumers and the economy will suffer from this politically-induced market structure: consumers will pay more and get less from debit cards, consumers will shift from a more-preferred form of payment to a less-preferred (credit, pre-paid cards, or paper-based payments such as cash or checks), competition will be reduced in the banking industry, and many lower-income consumers will be driven out of the mainstream banking system entirely. By making debit payments substantially more expensive for banks and consumers the Durbin Amendment will also discourage innovation and slow the movement to an electronic payments economy.  Amici accordingly urge this Court to uphold plaintiff's legal challenge to this unconstitutional legislation for the legal reasons stated in TCF's amended complaint.


## BACKGROUND

The facts have been set forth in detail elsewhere and will not be recounted fully here. Under the Durbin Amendment, by April 21, 2001, the Federal Reserve must establish a price for interchange fees that are "reasonable and proportional" to issuer's costs of issuing debit cards with the final regulation to take effect three months later (July 21, 2011) for all financial institutions with over $10 billion in assets.  In fact, however, the Federal Reserve has interpreted the Durbin Amendment to permit recovery of only "incremental" electronic processing costs related to particular transactions and excludes all other costs associated with issuing and administering debit card programs, such as costs related to issuing cards to

---

*Proposed Debit Card Interchange Fee Regulations on Consumers and Small Businesses*, (Working Paper, Feb. 22, 2011), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1769887.  It should also be noted that in making this decision merchants will be unlikely to consider other features of the transaction other than cost, such as the security or accuracy of the routing network, thus encouraging a "race to the bottom" with respect to those features.

customers, customer service inquiries (24 hours per day), monitoring debit transactions for regulatory purposes, issuing statements to consumers, rewards programs, and various other costs and risks excluded by the Durbin Amendment's calculation of the allowable costs. The Durbin Amendment also disallows allocation of any percentage of fixed costs, such as the costs of operating bank branches or attracting new customers that could be allocated as proportional expenses to debit card operations.

Because most of the actual costs of debit card operations are excluded from the Durbin Amendment's definition of allowed costs, TCF and other similarly-situated banks are guaranteed to be unable to recover from interchange fees the full costs of operating debit card operations. According to TCF's amended complaint, for example, the Durbin Amendment excludes approximately $85 million in various costs incurred by TCF to operate its debit program.

On December 13, 2010, the Federal Reserve published a proposed rule to implement the Durbin Amendment.[2] The proposed rule requests comment on two alternatives for establishing "reasonable and proportional" interchange fees as those terms are defined by the Durbin Amendment. Although the details matter for regulatory purposes, it is sufficient for current purposes to observe generally that under the Federal Reserve's proposal, interchange fees could under various circumstances range from 7 to 12 cents per transaction. This range would amount to approximately an 80 percent decrease in interchange fee rates and drive allowable costs from interchange fee revenue well below actual costs of operating debit programs.

---

[2] *See* Debit Card Interchange Fees and Routing, 75 Fed. Reg. 81,722 (proposed Dec. 13, 2010) (to be codified at 12 C.F.R. pt. 235).

5

Amici endorse the various theories provided in plaintiff's briefing with respect to the legal infirmities of the Durbin Amendment's unequal, arbitrary, and confiscatory terms. Rather than reprising those legal arguments here, the purpose of this brief by economists and law and economics scholars is to provide information to the Court regarding the economics of payment cards and the detrimental impact of the Durbin Amendment for consumers and the economy.

Ultimately, there are no sound economic theories that justify the onerous and arbitrary price controls on interchange fees imposed by the Durbin Amendment.  This legislation is explicable solely as a piece of special-interest legislation to enable merchants to redistribute their business costs onto bank consumers.  According to one estimate, if banks are unable to offset their interchange fee revenues from different revenue streams their total income will be reduced by approximately 9.4 to 10.8 percent, a staggering blow to a still-reeling banking system.[3]  According to the Federal Deposit Insurance Corporation, approximately 12% of American banks remain at risk of failure.[4]  Last year, bank failures were their highest number in 18 years and so far this year, bank failures are slightly ahead of last year's pace.  By creating a nuclear tripwire that would cause any bank that moves from under to over $10 billion to suffer millions of dollars in losses in interchange fees, the Durbin Amendment also entrenches the dominant position of the largest banks in the economy today by protecting them from competition by more efficient new rivals.

In addition, reducing debit card interchange fees will lead to higher banking fees and the end of free checking for many bank customers and driving as much as one million

---

[3] Evans, et al., *supra* note 1, at 22.
[4]  *See* Press Release, FDIC-Insured Institutions Earned $21.7 Billion in the Fourth Quarter of 2010: Reduced Loss Provisions Contributed to Full-Year Profit of $87.5 Billion, Feb. 23, 2011, *available at* http://www.fdic.gov/news/news/press/2011/pr11044.html.

consumers out of the mainstream banking system and to greater use of check-cashers, pawn shops, prepaid cards, and other high-cost alternatives.  Moreover, by capping interchange fees for debit but not credit cards, the law will encourage greater use of credit cards, which have higher interchange fees than debit cards.  The overall scale of this substitution from debit to credit is difficult to predict, but it is conceivable that in the end this substitution could wipe out much of the expected gains from Congress's intervention.  This, in turn, can be expected to produce a still further regulatory dialectic, as merchants return to Washington with open lobbying wallets to demand price controls on credit card interchange fees as well.[5]  Thus, although arbitrary imposition of price controls by the Durbin Amendment makes little sense as a matter of economic policy, the advantage to politicians is obvious.  Despite claims by interest groups to the contrary, there is no proof that interchange fees set in debit card markets are anything but fair to consumers and merchants and an important contributor to economic efficiency.

Government intervention in complex, well-functioning markets, absent demonstrable evidence of a market failure or that the regulation will produce benefits, will likely lead to far larger costs than those imposed by the theoretical imperfections that intervention is meant to correct.  Caution is especially warranted where intervention is not for the benefit of consumers and the competitive process but simply to enrich big box retailers and other special interests.  While intervention in a market system is appropriate where necessary to ensure that markets are functioning efficiently for the benefit of consumers, in the United States rebalancing the scales of the competitive process solely to favor one interest over another is an extreme

---

[5] An article in *Business Week* noted that merchants spent "years and millions of dollars" lobbying for political intervention.  Brian Burnsed, *Credit-Card Fee Reform Stays on the Back Burner*, BUS. WK., Oct. 16, 2009, *available at* http://www.businessweek.com/smallbiz/content/oct2009/sb20091016_047806.htm.

measure typically reserved only for instances in which there is convincing evidence of market failure.  No such evidence exists here.

Instead, merchant special interests have persuaded Congress that although they receive massive benefits from consumer use of universal carriage and acceptance of debit cards they would prefer not to have to pay for those benefits but instead make others do so.  In short, even though retailers benefit substantially from debit cards, they would prefer that their costs be subsidized by consumers and the taxpayers, as is the case with checks and cash.  And while debit cards may *appear* to be more expensive to merchants than paper alternatives, this is only because merchants can externalize much of the cost of paper-based payment systems or ignore many of their implicit costs, such as time or labor costs or handling and transporting cash securely.  As a matter of total social costs—including the costs to consumers in time and inconvenience and taxpayers in printing money and dealing with problems such as theft and tax evasion—electronic payments are almost certainly less expensive than the alternatives.

I.  **THE DURBIN AMENDMENT WILL MAKE DEBIT CARDS MORE EXPENSIVE AND LESS AVAILABLE, STRANGLE INNOVATION, SLOW THE ADOPTION OF ELECTRONIC PAYMENTS, DRIVE MANY CONSUMERS OUT OF THE MAINSTREAM BANKING SYSTEM, AND ENCOURAGE A SUBSTITUTION TO CREDIT CARDS**

The intended purpose of the Durbin Amendment is to reduce interchange fees on debit cards issued by major card issuers in order to reduce fees paid by merchants.  According to one estimate, if the proposed Federal Reserve Rule is adopted, issuer revenues from interchange

fees would be reduced by approximately $13.6 billion annually, which would be in the first instance a direct savings of the same amount to merchants.[6]  But this does not account for the fact that in order to offset lost revenues banks subjected to the Durbin Amendment will be forced to transfer much of those costs currently paid by merchants on to bank consumers in the form of higher bank fees.  In 2009, for example, 76 percent of bank accounts qualified for free checking, an increase from just 7.5 percent in 2001.[7]  A major cause of this growth of access to free checking was growth in interchange fee revenues from consumer bank accounts.  By making debit cards more expensive to carry and use, consumers will have incentives to shift to alternatives such as credit cards, prepaid cards, cash, and checks.  Although some consumers will substitute other types of electronic payments such as credit cards—which, ironically charge *higher* interchange fees than debit cards—others will increase their use of paper-based payments, thereby moving in the opposite direction from an electronic payments economy.  In addition, the confiscatory rate that debit card issuers will be permitted to charge for debit cards will stifle future investments in quality innovation such as increased speed and security.  Finally, some bank customers will be unable to afford the new bank fees and will be forced out of the mainstream financial system.

Recent congressional testimony by David W. Kemper of Kansas City-based Commerce Bank illustrates the devastating effect that implementation of the Durbin Amendment will have on banks and bank customers.[8]  According to Kemper, it costs Commerce Bank about $230 per year to maintain a consumer checking account, including branch costs, administrative, data

---

[6] Card Hub Interchange Fee Study (2010), http://education.cardhub.com/interchange-fee-study-2010/.

[7] Evans et al., *supra* note 1, at 27.  Evans et al., note that the percentage of free checking accounts fell last year from 76 to 65 percent in part because of new Federal Reserve Regulations that severely limited banks' ability to impose fees on overdrawn accounts.

[8] *Understanding the Federal Reserve's Proposed Rule on Interchange Fees: Implications and Consequences of the Durbin Amendment: Hearing before the Subcomm. on Financial Institutions and Consumer Credit of the H. Comm. on Financial Services*, 112th Cong. (2011) (testimony of David W. Kemper, Chairman, President and C.E.O. Commerce Bank, on behalf of the American Bankers Association and the Consumer Bankers Association).

processing, and issuing statements among other costs.  Its overall profit margin on the average

checking account is approximately 13 percent, or about $35.  Kemper estimates that under the

Federal Reserve's proposal debit card rules interchange revenues would be cut by as much as

85 percent (holding transaction volume constant), resulting in a cut of about $62 per account.

According to Kemper, "This means that our profit on a typical checking account goes from $35

to a *negative* $27 and would leave our bank in the unfortunate position of losing money, on

average, for each account.  Our experience is no different than large and small banks around

the country."  Moreover, as Kemper notes, the term "checking account" is a misnomer today,

as the typical debit card users on average performs 26 debit card transactions per month

compared to writing just 5 checks.  Kemper also notes that by reducing bank revenues the

Durbin Amendment will also reduce the capital base for lending of banks, thereby further

constricting credit markets that have not yet returned to normal.  Because banks use leverage

off their capital base to make loans, Kemper estimates that for the industry as a whole a 70

percent loss in interchange income could mean a constriction of lending by as much as $100

billion per year.  In addition, a dramatic drop in interchange revenues could threaten the

solvency of marginal financial institutions, thereby exacerbating the continued instability in the

banking system.[9]

     Recent analysis by economists David S. Evans, Robert E. Litan, and Richard

Schmalensee confirms Kemper's dire predictions of the negative impact on bank customers.

They estimate that as a result of the higher fees and loss of banking services resulting from the

Durbin Amendment, and the Federal Reserve's regulatory implementation, consumers and

small businesses will suffer losses of up to $33.4-$38.6 billion on the first 24 months that the

proposed rules are in effect.  The average consumer checking account will lose between

---

[9] *Id.* at 6.

approximately $56 and $64 in annual revenue and the average small business account will lose

between $79 and $92 if the Board's proposals are implemented.  Moreover, they estimate that

only about half of the savings to merchants will be passed onto consumers in the form of lower

prices and higher-quality service with the remainder being pocketed as windfall profits.[10]

   This is unsustainable.  Banks cannot continue to offer debit cards where doing so would

result in a substantial loss to the institution.  The implications are clear: banks will be forced to

increase other fees on debit card users or debit card accounts or discontinue debit card services

for some customers.  In fact, the Federal Reserve Board itself in discussing its interchange

proposal acknowledged that issuers would not be permitted to recover their full costs, but

"issuers have sources of revenue in addition to interchange fees, such as cardholder fees, to

help cover their costs."[11]

   Market trends and other data indicate that large financial institutions in fact have begun

to make pricing adjustments to reallocate costs onto consumers.  According to recent

congressional testimony by Visa's Joshua R. Floum, a recent survey by the Independent

Community Bankers of America "found that 93 percent of its members will be required to

charge their customers for services that are currently offered for free and 72 percent of its

members will no longer offer free checking because of the new law and Federal Reserve

---

[10] Evans, *et al.*, *supra* note 1, at 20.  This prediction of partial pass-through is based on several factors: markets for banking services are typically more competitive than for retail goods, the per transaction savings would be extremely small (perhaps 2 cents on a $10 transaction, that merchants face  costs in actually changing their posted prices (called "menu costs") that make them unlikely to incur the cost of changing prices for such a small cost change, the tendency of merchants to engage in focal point pricing (such as $9.99) that makes it unlikely that they would move away from the focal point for a change of a couple of cents, and price predictability (that consumers and merchants prefer stable prices).  Thus, it is likely that merchants will retain much of the savings of lower interchange fees rather than passing it on to consumers.

[11] Debit Card Interchange Fees, 75 Fed. Reg. at 81,737.

rule."[12]  A survey by the American Bankers Association similarly found that in response to the

Durbin Amendment and proposed Federal Reserve rule, 81 percent of its members would "cut

debit rewards programs" and "increase current checking account maintenance fees."[13]  Sixty-

nine percent said that they would impose or increase annual fees on debit cards and 66 percent

said they would eliminate free checking.  Only 2 percent said that they would take no action.

A survey of members of the Credit Union National Association found that 91 percent of credit

unions offering debit cards anticipate making some change to their rates, fees, and/or services

as a result of interchange regulation.[14]  The most common changes that credit unions anticipate

making will be to introduce or increase fees on debit cards, increase overdraft fees, or eliminate

free checking accounts.

        News reports this year have confirmed these predictions of new fees and fewer benefits

for bank customers.  Bank of America and J.P. Morgan Chase have both started experimenting

with new fees on debit card users, such as monthly fees for debit cards and checking

accounts.[15]  The monthly fees are waiveable if customers meet certain criteria, such as

maintaining a certain minimum balance.  Other reports indicate that banks are considering

imposing annual fees of $25 to $30 on debit cards or limiting the number of debit card

transactions that a customer can make each month, eliminating debit card reward programs,

---

[12] *Understanding the Federal Reserve's Proposed Rule on Interchange Fees: Implications and Consequences of the Durbin Amendment: Hearing before the Subcomm. on Financial Institutions and Consumer Credit of the H. Comm. on Financial Services*, 112th Cong. (2011) (statement by Joshua R. Floum, on behalf of Visa, Inc.)

[13] American Bankers Association Debit Interchange Survey,  http://regreformtracker.aba.com/2011/02/new-survey-interchange-rule-would.html.

[14] *Understanding the Federal Reserve's Proposed Rule on Interchange Fees: Implications and Consequences of the Durbin Amendment: Hearing before the Subcomm. on Financial Institutions and Consumer Credit of the H. Comm. on Financial Services*, 112th Cong. (2011) (testimony of Frank Michael, President and C.E.O. Allied Credit Union, on behalf of the Credit Union National Association).

[15] Robin Sidel, *Checking Isn't Free at More Branches*, WALL ST. J., Feb. 19-20, 2011, at B1.

charging fees for cash back at the point of sale, and limits on the number of debit card transactions per month.[16]

The prediction that many banks will increase bank customer fees and reduce benefits is also consistent with the observed effects following the imposition of interchange price controls in Australia in 2003. In Australia, following the regulation, annual fees increased by an average of 22% on standard credit cards and annual fees for rewards cards increased by 47%-77%, costing consumers hundreds of millions of dollars.[17] Moreover, grace periods for when interest starts accumulating were shortened dramatically,[18] and issuers also increased revenues from other fees, such as late fees and over-limit fees.[19] Card rewards and other benefits were also scaled back significantly. As the GAO Report summarized, "In Australia, issuers reduced rewards and raised annual fees following that country's interchange fee cap."[20]

The consequences of imposing new fees on debit card accounts are likely to fall most heavily on low-income consumers. Low income consumers are also least likely to be able to have these fees waived by using other bank services, maintaining minimum balances, or meeting other criteria for fee waivers. Because they will be unwilling or unable to pay these new bank fees, many low income consumers will simply cancel their accounts and drop out of the mainstream banking system. They will instead be forced to rely on a variety of high-cost fringe banking products, such as check cashers and prepaid cards. Approximately one million

---

[16] Robin Sidel, *At Banks, New Fees Replacing Old Levies*, WALL ST. J., Jan. 5, 2011, at C1.

[17] *See* ROBERT STILLMAN ET AL., REGULATORY INTERVENTION IN THE PAYMENT CARD INDUSTRY BY THE RESERVE BANK OF AUSTRALIA: ANALYSIS OF THE EVIDENCE 13-15 (CRA International, 2008).

[18] *See* Keith Bradsher, *U.S. Looks to Australia on Credit Card Fees*, N.Y. TIMES, Nov. 25, 2009, *available at* http://www.nytimes.com/2009/11/25/your-money/credit-and-debit-cards/25card.html?_r=1 ("Interest now starts accumulating on many cards 33 or 44 days after the start of a billing period, instead of the previous 55 days.").

[19] Howard Chang et al., *The Effect of Regulatory Intervention in Two-Sided Markets: An Assessment of Interchange-Fee Capping in Australia*, 4 REV. NETWORK ECON. 328, 339 (2005).

[20] U.S. GOVERNMENT ACCOUNTING OFFICE, CREDIT CARDS: RISING INTERCHANGE FEES HAVE INCREASED COSTS FOR MERCHANTS, BUT OPTIONS FOR REDUCING FEES POSE CHALLENGES 46 (2009) [hereinafter GAO Report], *available at* http://www.gao.gov/new.items/d1045.pdf.

consumers are expected to become unbanked as a result of the Durbin Amendment and the predictable market adjustments to it.[21]

In addition to increasing fees on customers to offset the loss of interchange fee revenues, banks are also likely to reduce the quality of cards, such as by reducing or eliminating a variety of services, such as transaction alerts, loyalty programs, and fraud protections that exceed the minimum legally required.  JP Morgan Chase, for example, has already announced that it will eliminate rewards programs for its new customers.[22]  Issuers will also limit investments in new technologies that could improve processing speed, security, and reliability for consumers, which also occurred in Australia as a result of price controls.[23]  Because those improvements in quality cannot be recovered in the price charged, card issuers will have incentives to redirect their innovation efforts toward other products where they can recoup their investments.  As Federal Reserve economist Sujit Chakravorti notes, payment card networks historically have been much more innovative than others, such as those that process checks.[24]  For example, Congress had to pass a law to facilitate electronic transmission of checks, something that card networks had been doing for more than two decades before then. In fact, British banks have announced plans to abolish checks by 2018.[25]  To the extent that the Federal Reserve's final rule fails to fully reimburse banks for fraud prevention costs—the preliminary rule makes no allowance for fraud prevention at all—this too would tend to deter investments in fraud prevention.

[21] Evans et al., *supra* note 1, at 48.
[22] Kate Fitzgerald, *JPM Phasing Out Debit Rewards Program*, AM. BANKER, Nov. 9, 2010.
[23] Stillman, *supra* note 17, at 4.
[24] Sujit Chakravorti, *Externalities in Payment Card Networks: Theory and Evidence* 20 (Federal Reserve Bank of Chicago Financial Markets Group, Policy Discussion Paper Series PDP 2009-8, 2009).
[25] Elizabeth Fullerton, *Britain Bounces Checks After 300 Years*, REUTERS, Dec. 16, 2009, http://www.reuters.com/article/idUSTRE5BF2FU20091216.

The proposed Federal Reserve regulation could also discourage innovation by interpreting the Durbin Amendment as applying to any similar payment system, even if it does not take the form of a payment card.  Thus, the Federal Reserve determined that the Durbin Amendment would apply to any emerging technologies, such as smart phone payments, that bill purchases directly to an account.[26]  Smart phones, for example, might be used by consumers to bypass the cash register completely, simply by transmitting their purchase and payment record directly from their phone.  This technology is embryonic today, but if covered by the Durbin Amendment, the strict price controls would slow or perhaps even kill the development of this technology.  Thus, not only will the Durbin Amendment temper innovation within the debit card market, it may also dampen the innovation of new payment technologies that would otherwise provide a self-correcting competitive check on payment cards.

Finally, an alternative strategy for banks and their customers would be to increase usage of credit cards, which today carry substantially higher interchange fee rates than debit cards— on average about 50 percent higher.[27]  Consumers who have credit cards can use them much like a debit card by simply paying their balance in full every month.  Because credit and debit can be used as close substitutes for many, an increase in the relative cost (or decrease in the relative benefits) of debit cards is likely to encourage many consumers to shift to greater use of credit cards, thereby offsetting some of the potential cost savings from the Durbin Amendment.[28]  But this substitution would also reduce consumer welfare by encouraging consumers who would prefer to use debit cards to use credit cards instead.  There are several

---

[26] James DeLong, *Mobile Payments and the Durbin Amendment*, DIGITAL SOCIETY, Feb. 15, 2011, http://www.digitalsociety.org/2011/02/mobile-payments-the-durbin-amendment/.
[27] *See* GAO Report at 10.
[28] *See* Andrew T. Ching & Fumiko Hayashi, *Payment Card Rewards Programs and Consumer Payment Choice*, 34 J. BANKING & FIN. 1773, 1783-84 (2010).

reasons why consumers might prefer to use debit rather than credit.  For example, debit cards enforce a budgetary restraint on consumers, which some might appreciate as a mechanism for self-control.  Those who revolve balances from month to month on credit cards also often use debit cards, because by revolving they lose the benefit of the "float" during the billing and payment grace period.[29]  More generally, if consumers prefer to use debit rather than credit for whatever reason, forcing them to shift to credit will reduce their overall economic welfare.

In contrast to very large issuers, however, TCF does not issue credit cards and as demonstrated in the expert economic analysis of Anne Layne-Farrar submitted by TCF in this case, TCF will be unable to increase other bank fees without substantial customer attrition.[30]

In summary, under the Durbin Amendment, consumers will be unambiguously worse off: bank services will cost more and many consumers will be driven out of the mainstream banking system entirely.  The financial stability of many banks will be weakened and the loss of revenues will reduce their asset base for lending.  Merchants will receive a substantial windfall and can be expected to only pass on some of that to consumers through lower prices.

## II.  THE DURBIN AMENDMENT WILL BENEFIT MERCHANTS WHILE HARMING CONSUMERS AND THE ECONOMY

The Durbin Amendment will create a huge windfall for merchants who will continue to be the beneficiaries of the global debit card payment network but will only be required to pay a small fraction of the costs associated with delivering those benefits to them and instead will be able to externalize most of those costs onto bank customers.

---

[29] Jonathan Zinman, *Debit or Credit?*, 33 J. BANKING & FIN. 358, 360 (2009); Tom Brown & Lacy Plache, *Paying with Plastic: Maybe Not So Crazy*, 73 U. CHICAGO L. REV. 63, 84 (2006).
[30] Declaration of Anne Layne-Farrar, *Assessing TCF Customer Price Sensitivity in Relation to the Durbin Amendment*, TCF Nat'l Bank v. Bernanke, No. 4:10-cv-04149-LLP (D.S.D. Nov. 4, 2011).

This wealth transfer from consumers to merchants will be large, especially to big box retailers that sell many big-ticket items to consumers and process many electronic payments. For example, Home Depot recently reported to stock analysts that it expects to "benefit" by $35 million a year from the enactment of the Durbin Amendment.[31]  Notably, in reporting this, Home Depot's CEO indicated his belief that all or most of that windfall would be retained by the company rather than passed on to consumers in the form of lower prices or higher quality.

Nor is there any reason to expect that much of the windfall to merchants from lower debit interchange fees would be passed through to consumers.  First, merchants today are entitled by law to provide cash discounts to consumers but choose not to do so.  Given their unwillingness to discount for cash today, it seems doubtful that merchants will substantially pass through interchange fee savings to consumers.  No merchants, including the big box retailers who have been the most committed supporters of the Durbin Amendment, have committed to pass-through of any of their cost savings from the Durbin Amendment and no economist anywhere in the world has provided any convincing reason to assume that a substantial amount of cost savings would be passed through to consumers.  In Australia, which imposed price controls on interchange fees several years ago, there is no evidence that cost savings were passed through in lower retail prices for consumers.[32]  Second, even if retail prices do fall slightly as the result of interchange price controls, there is no evidence or any other reason to believe that retail price reductions would fall enough to offset higher prices for bank customers (including the costs to those driven to non-mainstream financial service providers) or will benefit all retail consumers equally.  Consumers driven out of the

---

[31] Seeking Alpha, The Home Depot's CEO Discusses Q4201 Results—Earnings Call Transcript, Feb. 22, 2011, http://seekingalpha.com/article/254224-the-home-depot-s-ceo-discusses-q4-2010-results-earnings-call-transcript?part=qanda.

[32] Joshua S. Gans & Stephen P. King, *A Theoretical Analysis of Credit Card Reform in Australia*, 79 ECON. REC. 462, 471-72 (2003); Stillman, *supra* note 17, at 4.

mainstream financial system by higher bank fees, for example, hardly seem better off by potentially being able to save a couple of pennies on lumber or high-end stereo equipment. Determining the relative degree with respect to which cost savings will be passed through to retail consumers versus bank consumers is an extraordinarily difficult calculation that depends crucially on the competitive circumstances of various markets.  Because of the rushed manner in which the Durbin Amendment was enacted, of course, no serious consideration was actually given to this question before Congress acted.  Subsequent analysis, however, concludes that because the banking industry is more competitive than the retailing, a larger percentage of cost changes are more likely to be passed through to bank customers than retail customers.[33]  Thus, once the catastrophic effects of the Durbin Amendment for low-income bank customers is added to higher prices for bank services for everyone else, it is highly unlikely that consumers on net will benefit from interchange price controls.

## III.    THE BENEFITS OF DEBIT CARDS TO CONSUMERS, MERCHANTS, AND THE ECONOMY

Today debit cards and credit cards together account for over half of the payments made every year in the United States in terms of number of transactions.  And, prior to the enactment of the Durbin Amendment, debit cards were approaching cash as the single most common payment device in the economy.  In 2009, debit cards accounted for 35% of transactions in the economy, the single most popular non-cash form of payment.[34]  The rapid growth in the popularity of debit cards in recent years testifies to their vast superiority to legacy payment systems such as cash and checks.  Electronic payments provide the backbone of a global

---

[33] Evans, et al., *supra* note 1, at 20.
[34] Evans et al., *supra* note 1, at 17.

economy and financial system that enables people to go almost anywhere in the world at any time and immediately purchase goods and services 24 hours a day in person, over the phone, or via the Internet.  The usefulness of cash, by contrast, ends at the nation's borders—and checks may not be accepted even in a neighboring state.  Moreover, ownership of debit cards is essentially universal for any consumer who has a bank account.  The benefits of universally-accepted debit cards are universal to all consumers as well: virtually every consumer benefits from the convenience, security, and low cost of debit cards relative to available alternatives.

Debit cards provide numerous benefits to merchants and consumers that would be lost if the Durbin Amendment succeeds in driving consumers out of the mainstream banking system and shifting consumers from debit cards to legacy payment systems.  Debit cards provide the merchant with real-time authorization of funds availability and almost immediate payment, unlike checks, which can take several days to clear.  Consumer liability for fraud involving a debit card is capped by federal law at $50 but most banks limit consumer liability to zero in most instances.[35]  Because of the delay and risk of nonpayment an increasing number of merchants now refuse payment by check in some or all circumstances.  In the alternative merchants can make use of check verification systems, but the fees charged by those are comparable to the interchange fees paid for cards.[36]  Debit card networks have developed very sophisticated fraud monitoring systems as opposed to checks which have no built-in capacity to monitor and respond to fraud.  Consumers also have to pay to have checks printed and mailed at their own expense, whereas debit cards are issued and replaced for free.  Moreover,

---

[35] *Id*. at 30.  Evans, et al., note that consumers were protected from $788 million in debit card fraud losses in 2008.  By contrast, check fraud cost $1.024 billion that year, despite a decline in check usage.

[36] For example, Telecheck, one of the more well-known check verification services, appears to charge 1.39% plus a 35-50 cent fee to guarantee check payments.  *See* TeleCheck Verification & Check Guarantee, http://www.instamerchant.com/check-guarantee.html (noting that "industry average" is 1.85% plus a 35 cent to 50 cent per item fee).  Murphy reports that check verification fees cost about 0.92 basis points.  Report of Kevin M. Murphy at 8, TCF Nat'l Bank v. Bernanke, No. 4:10-cv-04149-LLP (D.S.D. Mar. 4, 2011) [hereinafter Murphy Report] (citing *Check Authorization—2009*, THE NILSON REPORT #953 (July 2010).

merchants that accept checks impose costs on both their own bank the consumers' banks for clearing services, yet the merchant receives the full par value of the check, imposing those costs on the banks' customers instead.

Payment cards also offer consumers an itemized purchase record, facilitating tracking and budgeting of their spending and regularized payment schedules.  Using cash, in contrast, can make it more difficult to keep records, track household expenditures, and maintain a family budget.[37]  Checks are also of limited usefulness when traveling because many merchants will refuse to accept checks from out of town customers.  Moreover, some categories of merchants (such as restaurants) refuse to accept checks because of the nonpayment risk and delay between provision of services and receipt of payment.  Thus it is especially ironic (and illustrative of the superficial level of congressional understanding of the market issues that motivate the Durbin Amendment) that in Senator Durbin's speech on the Senate floor he used the purchase of a meal in a *restaurant* to illustrate what he perceived as the injustice of debit card interchange fees—while simultaneously acknowledging that restaurants no longer generally accept checks in payment.[38]

---

[37] A recent survey of Italian consumers found that 68% of consumers reported that monthly statements made it easier for them to track their finances and that 47% reported that they "frequently" forgot payments that they had made during the course of the month and were reminded by their credit card statements.  *See* Press Release, Associazione Bancaria Italiana (ABI), Banks: Italian consumers "give good grades" to payment cards for convenience and safety (January 23, 2009), *available at* http://www.abieurope.eu/Resources/art646/Italian%20consumers%20%E2%80%9Cgive%20good%20grades%E2%80%9D%20to%20payment%20cards_23%20jan%202009.pdf.

[38] *See Restoring American Financial Stability Act of 2010: Hearing on the Interchange Amendment before the Senate Floor*, 111th Cong. (May 5, 2010) (statement of Sen. Richard Joseph Durbin, Sen. Majority Whip), *available at* http://www.fmi.org/docs/interchange/Durbin_Interchange_Floor_Speeches.pdf ("Let me give you an illustration. I go to the same restaurant and instead of using a credit card, I pay by check. It used to be done a lot but not much anymore. The restaurant takes your check to their bank and their bank calls your bank, transfers the funds in, and no fee is involved.  However, if you use a debit card, which would take the money directly out of my checking account, the same as with my check, it turns out the interchange fee is applied. So many restaurants and retail establishments are saying: Why is it with a check the bank gets no extra money and with a debit card the credit card company gets money. What is that all about? Should it be the same fee as a credit card?").

Thus, despite the Durbin Amendment's instruction to the Federal Reserve to consider the "functional similarity" between debit cards and "checking transactions that are required within the Federal Reserve bank system to clear at par,"[39] they *fundamentally are not similar.*[40] Debit cards provide merchants with a range of benefits in terms of speed, security, and ubiquity of acceptance that simply do not exist for checks.

Debit cards also provide many benefits to merchants that cash does not. Debit cards relax the liquidity constraints for consumers for purchasing goods and services. Liquidity constraints arise when a consumer has sufficient funds in his bank account but does not have enough in his wallet at the time to complete a purchase or the merchant will not accept a check. By relaxing consumer liquidity constraints, electronic payments enable merchants to make optimal pricing decisions, such as by putting products on sale in order to move merchandise, and consumers to save by purchasing on sale. Access to immediate liquidity may be of overriding importance in one particular instance: in an emergency where a consumer may need access to funds immediately, such as for a car repair, hotel room, food, or some other pressing situation in which cash or checks may not be feasible. Finally, debit cards facilitate e-commerce, reducing merchants' overall operating costs by enabling impersonal transactions and enabling low-cost around-the-clock shopping at the consumer's convenience. And, in turn, this ability to shop on-line at any time facilitates consumers' ability to shop for the best price on products, promoting competition and consumer choice. Cards also facilitate consumer returns of defective or unsatisfactory products by keeping an electronic record of the transaction.

---

[39] Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, §1075(a)(4)(A) (2010).
[40] *See* Letter from John Walsh, Acting Comptroller of the Currency, to Jennifer J. Johnson, Secretary, Board of Governors of the Federal Reserve System (Mar. 4, 2011), *available at* http://www.aba.com/aba/documents/blogs/DoddFrank/OCCletter3711.pdf.

Cash imposes a range of labor and administrative costs on merchants, including the time spent by employees receiving, protecting, and counting cash (instead of more valuable functions such as customer service), as well as errors and other bookkeeping and accounting costs that are reduced through electronic payments. Cards enable the potential of a complete elimination of employee cash handling, such as cashier-free self-checkout purchasing or pay at the pump at gas stations. In fact, because American currency is made of cotton fibers and changes hands frequently, it also can transmit infectious disease.[41]

Debit cards also reduce the cost and risk to merchants of handling cash, such as time, counting errors, and theft or embezzlement by employees and others. Cash has no built-in security or easy money trail to prevent theft. As a result, merchants spend vast sums on protections against theft, including counterfeit detection, armored cars to transfer cash, safes, and security guards to prevent theft by employees and others. For example, in response to widespread theft of cash by parking lot employees, several years ago the Washington, D.C.-area Metro transit system eliminated cash from its parking facilities, requiring customers to use electronic payment cards instead. This step reduced the risk of theft as well as the overall costs of Metro parking operations by eliminating the need for parking lot attendants. A study commissioned by the U.S. Postal Service in 1994 found that the processing costs alone of card transactions would be about one half the cost of processing cash or checks—even before the innovation of now-widespread technological innovations such as card readers, electronic, signatures, and automatic electronic payments.[42] The Postal Service study also concluded that

---

[41] *See, e.g.*, Richard W. Rahn, *Currency that Kills*, WASH. TIMES, November 11, 2009, http://www.washingtontimes.com/news/2009/nov/11/currency-that-kills/; AnnaMaria Andriotis & Aleksandra Todorova, *Can You Catch Swine Flu from Money?*, SMARTMONEY, April 30, 2009, http://www.smartmoney.com/Spending/Travel/Can-You-Catch-Swine-Flu-from-Money/.
[42] U.S. GOVERNMENT ACCOUNTING OFFICE, U.S. POSTAL SERVICE: PROPOSED POLICY TO ACCEPT CREDIT AND DEBIT CARDS MAKES SENSE CONCEPTUALLY 7 (1994), *available at* http://www.gao.gov/products/152034. By way of costs, while noting that the move to credit card acceptance could entail a $45 million up-front cost, the

accepting cards would reduce the risk of loss from embezzlement and theft.  Many airlines today refuse to accept cash on-board, requiring electronic payments instead.

An excellent example of the benefits to merchants from accepting payment cards is the ePark system of Minneapolis-St. Paul International Airport.[43]  If a consumer uses the same payment card entering and exiting the airport's parking facility then the consumer need not even pull a parking ticket or wait in line for a cashier.  The airport reports that this innovation saved the airport $1.5 million per year in operating its parking facilities by allowing it to reduce its staff by 34 percent (from 117 employees to 77).[44]  As a result of this massive savings on labor costs, the airport offers a $2 per day discount for those using ePark—despite interchange fees.  In addition, it reduced the time for airport customers to check out from an average of approximately 3 *minutes* for manual checkout to a mere 14 *seconds* for ePark.[45]

Debit cards are much less costly for consumers than cash and checks—costs that merchants ignore because consumers bear them.  Thus, to the extent that merchants gripe that their *private* costs of electronic payments are higher than for cash and checks, this in large part is because merchants ignore the costs that they externalize on consumers and society.  Paper based payments *appear* less expensive to merchants because merchants are able to externalize much of the costs associated with those types of payments onto consumers.  Debit cards and other types of electronic payment reduce the need to carry large amounts of cash, thereby protecting consumers from the risk of theft or loss.  In fact, research suggests that consumers

---

Post Office also noted that the infrastructure necessary to accommodate fully 75% of its walk-up business would cost only $7 million, suggesting substantial, if diminishing, returns to the up-front investment.

[43] *MSP Airport Wins International Excellence Award for Innovation in Parking*, BUSINESS WIRE, Mar. 7, 2005, *available at* http://www.allbusiness.com/government/government-bodies-offices-regional-local/5031791-1.html.

[44] Rick Decker, *At MSP—Innovation, They Name is Parking*, PARKING TODAY, Jun.  2007, *available at* http://www.parkingtoday.com/articledetails.php?id=534.

[45] *Id*.

are more likely to use electronic payments and to carry less cash in high-crime areas.[46]   In order to avoid carrying large amounts of cash consumers instead might have to make for frequent trips to ATMs, an inconvenient and time-consuming process, or use out-of-network ATMs and incur transaction fees.[47]   In addition, ATMs are costly to maintain, stock, repair, and secure—all costs borne by banks and their customers.  ATMs may also be a magnet for criminal activity.

Debit cards also facilitate convenience and speed at checkout.  Checks, for example, are notoriously slow at checkout, causing delay and inconvenience for all other customers waiting in line.[48]   Economist Kevin Murphy notes, for example, that checks take about 25 seconds more to process at checkout than debit cards, labor costs that account for approximately 0.2 percent of the average purchase amount.[49]   Another study concluded that the time it took to check out with a debit card was 50 percent less than with checks.[50]   On average, authorization and verification was almost 4 times faster for debit cards than for checks.[51]   Cash slows checkout times when customers fumble in their wallets for exact change or wait to receive change from the cashier.  As processing speed for electronic transfers has increased, such as the now-widespread practice of waiving the signature requirement for many smaller transactions, the relative superiority of electronic payments to cash and checks has become even greater and for

---

[46] *See* David B. Humphrey et al., *Cash, Paper, and Electronic Payments: A Cross-Country Analysis*, 28 J. MONEY, CREDIT & BANKING 914, 934 (1996).

[47] Today cash back at the checkout register incurs no fee for the consumer, although the Durbin Amendment might lead to the imposition of a fee in the future.

[48] See, e.g., Daniel Garcia-Swartz et al., *The Move Toward a Cashless Society: A Closer Look at Payment Instrument Economics*, 5 REV. NETWORK ECON. 175 (2006).  According to a recent Federal Reserve study, 34.6% of consumers say that debit cards are "very fast" and only 6.7% say the same about checks.  Kevin Foster, Erik Meijer, Scott Schuh, & Michael A. Zabek, *The 2008 Survey of Consumer Payment Choice* (Federal Reserve Bank of Boston, Public Policy Discussion Papers No. 09-10, 2010).

[49] Murphy Report at 7.

[50] Elizabeth Klee, *How People Pay: Evidence from Grocery Store Data*, 55 J. MONETARY ECON. 526 (2008).

[51] Garcia-Swartz, et al., *supra* note 48, at 533.  On average 9.4 seconds for debit and 35.5 seconds for checks.

increasingly small transactions.  Cash and checks, by contrast, are just as slow, inconvenient, and cumbersome as ever.

There are also many social costs to cash and checks that are excluded from merchants' private cost calculations.  For example, cash facilitates tax evasion and illegal black market activity because it is anonymous and leaves no paper trail.[52]  It is estimated, for example, that 70 to 80 percent of OECD currency stock is either held in the domestic underground economy or in developing countries.[53]  In a study of the impact of the growth of debit card usage from 1988 to 2003, Amromin and Chakravorti found substantial substitution of debit cards for small denomination currency but almost no impact on larger denomination currency, which they attribute to the continued usage of large bills for the purpose of tax evasion and criminal activity.[54]  In addition, the government bears the cost of printing cash and replacing worn cash: In 2009 the Federal Reserve Board budgeted over $600 million just to print Federal Reserve notes (which includes on the cost of paper bills only and excludes the cost of minting coins).[55] The Secret Service spent $360 million in 2009 on anti-counterfeiting and other financial crimes enforcement, a figure that excludes the tasking of other law enforcement resources and merchant and bank expenditures on self-help as well.[56]  Once the full costs are considered, one

[52] Mathias Drehman, Charles Goodhart, & Malte Krueger, *The Challenges Facing Currency Usage: Will the Traditional Transaction Medium Be Able to Resist Competition from new Technologies?*, 17 ECONOMIC POLICY 195 (2002).  Charles T. Clotfelter, *Tax Evasion and Tax Rates: An Analysis of Individual Returns*, 65 REV. ECON. & STAT. 363 (1983) (noting that cash-only businesses make auditing of tax returns much more difficult).  This automatic creation of an audit trail that makes it more difficult to evade taxes might explain the hostility of some businesses for the consumer preference for electronic payments.

[53] Kenneth Rogoff, *Blessing or Curse? Foreign and Underground Demand for Euro Notes*, 13 ECONOMIC POLICY 263, 265 (1998).

[54] Gene Amromin & Sujit Chakravorti, *Debit Card and Cash Usage: A Cross-Country Analysis* (Federal Reserve Bank of Chicago, Working Paper No. 2007-04, 2007).

[55] *See* FEDERAL RESERVE BOARD, 2009 NEW CURRENCY BUDGET, http://www.federalreserve.gov/generalinfo/foia/2009newcurrency.htm (last visited Apr. 2, 2010).

[56] U.S. SECRET SERVICE, DEPARTMENT OF HOMELAND SECURITY, FISCAL YEAR 2009: STRATEGIC CONTEXT CONGRESSIONAL JUSTIFICATION USSS-8 (2009), http://www.dhs.gov/xlibrary/assets/budget_fy2009.pdf.

study of European countries estimated that a country may save 1% or more of its GDP by switching from all paper to all electronic payments.[57]

IV.     **THE INTERCHANGE FEE IS THE HEART OF THE GLOBAL DEBIT PAYMENT CARD NETWORK**

At the heart of the global electronic payment system is the interchange fee.  To understand its importance, it is necessary to recognize that payment cards are what economists refer to as a two-sided market.[58]  Payment cards are a platform that links together consumers and merchants through the medium of billions of consumers and thousands of financial institutions around the world.  The role of the platform—here the payment card networks that establish the interchange fee for the system—is to balance the competing demands of consumers and merchants in order to maximize the value of the overall system.  Two-sided markets are common in the economy.  Newspapers, for example, are two-sided markets that link together advertisers with consumers through the medium of providing newsworthy information.  Shopping malls are also two-sided markets, linking together retailers with shoppers.

A common characteristic of two-sided markets is that the prices paid by the two sides of the market do not necessarily bear any relationship to the costs imposed by the users.  What matters instead is the overall value of the platform to all users and whether each user benefits more than it costs them.  For example, newspaper advertisers pay substantially more than the incremental cost associated with running their advertisements and newspaper readers pay

---

[57] David Humphrey et al., *Cost Savings from Electronic Payments and ATMs in Europe* 2 (Federal Reserve Bank of Philadelphia, Working Paper No. 03-16, 2003).
[58] For an explanation, *see* Todd J. Zywicki, *The Economics of Payment Card Interchange Fees and the Limits of Regulation*, (ICLE Financial Regulatory Program White Paper Series, 2010), *available at* http://www.laweconcenter.org/images/articles/zywicki_interchange.pdf, and sources discussed therein.

substantially less than the incremental cost of producing its news content and delivering it to their door.  Moreover, newsstand buyers pay a substantially higher price than subscribers, despite the higher cost of home delivery.  Yet it would be obviously nonsensical for Congress to pass a law fixing national newspaper advertising rates at the incremental cost of producing advertisements, and force newspapers and their readers to bear the newspaper's remaining costs.

Other examples of price differentials within two-sided markets abound.  For example, the Adobe Reader is given away for free download to consumers to read PDF documents, thereby forcing those who produce documents via Adobe Acrobat to bear the full cost of the software's production.  Internet search engines such as Google provide free search information to consumers by requiring advertisers to pay the full cost of the development and improvement of the search engine.  Yet no one yet has proposed that Congress outlaw free search engines in order to make Internet users pay more and Google's advertisers less—although that would be precisely analogous to the Durbin Amendment's logic.

For similar reasons, the Durbin Amendment's implicit belief that interchange fees should in some way reflect the cost of debit card transactions to various parties in the system is fundamentally misguided as a matter of economics.  The economic goal is to maximize the overall value of the entire system, thereby maximizing the surplus that can be divided among the system's participants.[59]  Trying to fix prices among various actors *within* the system according to their respective costs, therefore, misses the point.  It similarly would be misguided to try to centrally plan prices according to the relative *benefits* (instead of costs) received by the actors in the system: which, given the immense benefits to merchants from the global debit card network (a network that merchants, of course, have done nothing to create or maintain)

---

[59] Richard Schmalensee, *Payment Systems and Interchange Fees*, 50 J. INDUS. ECON. 103, 105 (2002).

would result in a price much higher than the minuscule price set by the Durbin Amendment. Indeed, given that merchants continue to accept debit cards, it is evidence that the benefits of doing so much exceed the costs (just as their increasing refusal to accept checks indicates the opposite).

It is especially ironic that major retail chains such as 7-Eleven are strident supporters of the Durbin Amendment.  Convenience stores frequently charge low prices for products such as milk and gasoline in order to draw customers into the store; those who also buy high-markup candy bars and soft drinks subsidize those who buy only milk.  In addition, they often charge product manufacturers "slotting fees" for access to premium shelf space, which are then used to subsidize the retail price of other products (such as milk) and other forms of non-price competition (such as wider aisles or improved customer service).[60]  When retailers accept these slotting fees they are functionally acting as a two-sided market, as the manufacturer or wholesaler is paying a premium to the store in order to obtain preferred access to consumers with the store itself serving as merely a pass-through.  By some estimates, slotting fees, rather than sales to consumers, contributes up to 50-75% of net supermarket profits.[61]

Economists generally believe that regulatory intervention is warranted only if it can be demonstrated that there is a significant market failure preventing them from being set at the "right" level from an overall economic welfare perspective and that regulation will actually improve economic outcomes.  With respect to intervention to regulate interchange fees, no consensus exists on either point.[62]  The welfare implications of interchange fees within these theoretical models depend crucially on the nature of the assumptions made at the outset, many of which bear only a slight resemblance to reality and some of which are very nearly

---

[60] See Benjamin Klein & Joshua D. Wright, *The Economics of Slotting Contracts*, 50 J. L. & ECON. 421 (2007).
[61] John Stanton, *Rethinking Retailers' Fees*, 60 FOOD PROCESSING 32 (1999).
[62] *See* Murphy Report.

arbitrary.[63]  Even then, there is no consensus on whether current fees are too high, too low, or just right, once all social costs and benefits are taken into account, nor is there a consensus that there is any market failure at all to be addressed.[64]  Moreover, interchange fees vary by industry, merchant, and consumer, thus it is highly unlikely that abstract economic models could capture all of these market nuances or that a one-size-fits-all price, much less a punitively low price, would fit any industry well.  As Professor Steven Semeraro observes regarding the difficulty of intervening in a two-sided market where optimal pricing practice bears minimal relationship to cost, "Forcing cardholders to internalize some particular set of costs is just as likely to lead to the inefficient underuse of cards as it is to eliminate any anticompetitive overuse."[65]

Leaving aside theory, real-world experience belies the merchants' claim that interchange fees are too high relative to the benefits they receive.  If fees really were too high, the number and rate of merchants accepting cards would be decreasing, not increasing.  It is unlikely that merchants pay too much for the substantial benefits that they receive from widespread credit card usage and acceptance.  It is equally plausible—perhaps more so in light of the available evidence—that merchants are simply trying to avoid paying for the benefits that they receive and instead are seeking to externalize some of their costs onto consumers and society.

Amici are aware of *no* economic support for the arbitrary and confiscatory level of allowed interchange fees imposed by the Durbin Amendment.  Indeed, the GAO Report

---

[63]*See* Robin A. Prager et al., *Interchange Fees and Payment Card Networks: Economics, Industry Developments, and Policy Issues* 21 (Divisions of Research & Statistics and Monetary Affairs, Federal Reserve Board, Finance and Economics Discussion Series No. 2009-23, 2009), *available at* http://www.federalreserve.gov/PUBS/FEDS/2009/200923/200923pap.pdf.

[64] *See* Chakravorti, *supra* note 24.

[65] Steven Semeraro, *The Economic Benefits of Credit Card Merchant Restraints: A Response to Adam Levitin*, 56 UCLA L. REV. DISCOURSE 25, 32 (2009).

exhaustively discussed the difficulties with various proposed regulatory interventions and noted that they were all fraught with difficulty. Of all the possible interventions reviewed by the GAO, the idea of a flat price cap such as the one imposed by the Durbin Amendment was the most dramatic, intrusive, and unworkable.[66]

## V.     BECAUSE DEBIT CARDS ARE HELD NEARLY UNIVERSALLY BY CONSUMERS ANY REDISTRIBUTIVE EFFECTS OF DEBIT CARDS ARE MINIMAL

Merchants often complain that being obliged to pay for the benefits that they receive from accepting payment cards results in a forced redistribution among consumers. But even if this argument is valid for credit cards—a proposition that amici reject[67]—it is manifestly irrelevant for debit cards. Because debit cards are nearly-universally held—according to one estimate 92 percent of consumers owned debit cards in 2008[68]—there is no unidirectional redistribution effect. Virtually every consumer has the option to use a debit card for a purchase if he or she chose to do so. Moreover, every consumer benefits from the growth of the global payment card network and the efficiency, security, and other benefits that it generates to consumers, merchants, and the economy generally. That a consumer chooses instead to use cash or check instead is thus a matter of free choice. The argument that cash and check payers are somehow forced to subsidize card payers also ignores that the costs of cash and checks are heavily subsidized by the taxpayers—including those who use debit cards—thus meaning that debit users are forced to subsidize cash and check users. Debit card users also subsidize cash

---

[66] GAO Report at 46-47.
[67] Retailers make decisions to create cross-subsidies among consumers throughout the retail sector so to single out this one cross-subsidy for special concern is irrational. *See* Zywicki, *supra* note 58.
[68] Susan Herbst-Murphy, *Trends and Preferences in Consumer Payments: Lessons from the Visa Payment Panel Study* 1 (Payment Cards Center, Discussion Paper No. 10-02, 2010).

and check users through the time the spend waiting for use of these slower payment technologies at checkout.

That the merchant's purported concern about cross-consumer subsidies is little more than a red herring is evidenced by the approach taken by merchants that operate their own in-house credit operations. Many retailers, especially department stores and big box retailers, operate proprietary credit operations in addition to accepting bank-type cards and other forms of payment. When a retailer operates its own proprietary credit program, it bears the cost of operating the program as well as the risk of nonpayment. Thus, by definition, the retailer incurs costs associated with operating a credit program that it does not incur when it accepts cash. Despite this increased cost, however, department stores do not charge a higher price for credit customers than cash—essentially forcing cash consumers to subsidize the store card's users. Instead, they are heard to complain only when a consumer's preferred payment card is used. In fact, Target not only charges the same price for users of its store card, it actually charges a *lower* price to users of its store card than it does for cash users, providing five percent off every purchase for those who use its Red card—despite the higher costs associated with credit users.[69]

Finally, it should be remembered that the law already guarantees merchants the right to provide cash discounts. Most have chosen not to do so—instead they have lobbied Congress to intervene in the marketplace to fix debit card interchange prices. Why they have chosen not to exercise their right to offer a cash discount is obvious: they fear the competitive consequences from doing so. But the business decision to accept debit cards is fundamentally no different from any other business decision made to remain competitive in the market place and respond to consumer preferences, such as to hire friendly sales clerks, offer free parking, or maintain

---

[69] Target, REDcards Rewards & Benefits, https://redcard.target.com/redcard/content/rcw_benefits_tgt_rewards.

clean and pleasant store facilities for customer enjoyment.[70]  As such, congressional

intervention to stifle pro-consumer competition is no more appropriate for debit cards than for

any other consumer benefit freely offered by merchants in a competitive market.  Intervening

in a well-functioning market simply because competition "forces" merchants to provide goods

and services that consumers want makes no more sense than Congress outlawing free parking

or helpful employees.

## VI.   THE ANTITRUST ARGUMENTS FOR REGULATING INTERCHANGE FEES ARE ECONOMICALLY UNSOUND

Merchant interest groups and congressional allies have justified interchange price

controls as a justified response to an allegedly anticompetitive market among debit card

networks.[71]  But this concern about competition in the debit card market is fundamentally

flawed for several reasons.[72]

First, the claim that there is a duopoly in the payment card network ignores the obvious

fact suggested above, that debit card networks compete not just with each other, but other types

of payment cards (including credit cards issued by American Express and Discover), and other

types of electronic payments (such as Paypal).  Second, there is no evidence that overall debit

interchange fees have been systematically rising over time; instead, signature debit fees have

---

[70] Some merchants do not accept cards.  For example, the grocery store chain ALDI, which operates over 1,000 stores in 31 states, accepts debit cards but not credit cards, apparently in order to offer its customers "the lowest possible prices."  *See* ALDI Frequently Asked Questions, http://www.aldifoods.com/us/html/company/3503_ENU_HTML.htm?WT.z_src=main.
[71] *Restoring American Financial Stability Act of 2010: Hearing on the Interchange Amendment before the Senate Floor*, 111th Cong. (May 12, 2010) (statement of Sen. Richard Joseph Durbin, Sen. Majority Whip) *available at* http://www.fmi.org/docs/interchange/Durbin_Interchange_Floor_Speeches.pdf.
[72] Todd Zywicki & Josh Wright, *Durbin's Antitrust Fantasies: The Flawed Economics Behind Democrat's Price Control Plan*, WASH. TIMES, June 17, 2010, at B4.

fallen while PIN debit fees have risen, suggesting a convergence in their rates rather than an increase.[73]

Third, economists long ago rejected the idea that market structure (the number of competitors in a market) determines whether a market will produce competitive outcomes.[74] Markets with many competitors can nonetheless produce anticompetitive results and markets with few major competitors often have vigorous competition (such as Coke and Pepsi). So instead of relying on crude and often-erroneous indicators such as market structure as a proxy for competition, antitrust economists and regulators now require actual evidence of anticompetitive effect. There is no evidence of anticompetitive effect in the debit card market.

Mistaking market structure for competition is especially erroneous in the context of the payment card market. If insufficient competition among the networks mattered, then presumably the card networks would exploit consumers at least as much as they supposedly exploit merchants. But they do not. In fact, those economists who believe that interchange fees might be too high argue that the problem, if there is one, arises from an *excess* of bank competition for customers, not a deficit of competition among networks. Under this theory— and it is entirely theoretical—because consumers are the primary decisionmakers as to which cards to carry and use, issuers compete too aggressively for customers, producing excessively low prices for consumers.[75] Higher merchant interchange fees are merely a byproduct of heated competition for consumers, not a scheme to exploit merchants. This is why higher

---

[73] *See* chart in Andrew Martin, *How Visa, Using Card Fees, Dominates a Market*, N.Y. TIMES, Jan. 4, 2010, http://www.nytimes.com/2010/01/05/your-money/credit-and-debit-cards/05visa.html?_r=1&hp=&pagewanted=all. Because signature debit remains somewhat more popular than PIN debit in terms of transaction volume, as a weighted average interchange fees on debit have probably remained mostly stable.

[74] U.S. DEPARTMENT OF JUSTICE & FEDERAL TRADE COMMISSION, HORIZONTAL MERGER GUIDELINES 2, *available at* http://www.ftc.gov/os/2010/08/100819hmg.pdf.

[75] *See, e.g.*, Jean-Charles Rochet & Jean Tirole, *Platform Competition in Two-Sided Markets*, 1 J. EUR. ECON. ASS'N 990 (2003).

merchant prices are mirrored by lower cardholder prices and is precisely why, by artificially reducing merchant prices, the Durbin amendment will result in higher prices for consumers.

Proper antitrust analysis would take account of all of the benefits and costs of the system, including the benefits to consumers and the economy from an enlargement of the payment network, not just the parochial interests of merchants in paying less for the benefits that they receive.  Moreover, if competition is driven primarily by consumer choice among issuers, then it does not matter for merchants whether there are two, 10 or 20 payment networks.  In theory, in such a market additional competition could even exacerbate the problem and lead to higher interchange fees.

Although it is theoretically possible for consumers to be harmed by prices that are too low rather than too high, it should be obvious that such situations (if they exist in the real world) would be anomalous rather than typical.  The current state of economic knowledge does not support the conclusion that low prices and spirited competition for consumers is a bad thing or that consumer welfare and the economy will be improved by an intervention that results in higher bank fees for consumers.

Economists dislike monopoly when it exists because it allows the monopolist to reduce output and increase price above competitive levels, thereby creating monopoly profits.  Yet there is no evidence that credit card issuers or networks are earning monopoly profits from interchange fees or other aspects of credit card operations: return on assets for large credit card banks have been largely constant for 25 years even as interchange fees have tended to rise over that period.[76]  The reason is obvious: if there are any profits generated by interchange fees above the full costs of operation, those fees are competed away in heated competition for customer loyalty through lower prices and improved card quality (including benefits).

---

[76] GAO Report at 24 Fig. 4.

Moreover, there is no evidence that output in the debit card market is too low—indeed, critics claim that any market failure is because there are too many card transactions, not too few.  This high output and heated competition for customers indicates that competition on the consumer side of the market is very strong.  That card issuers cater to, rather than exploit, consumers belies the notion of an anticompetitive market once all market actors are considered.

## <u>CONCLUSION</u>

The Durbin Amendment is an unconstitutional intervention into a market that has generated enormous benefits to merchants, consumers, and the economy.  Tacked on to the Dodd-Frank financial legislation at the last moment with no hearings or deliberation, the law is simply a favor to merchant special interest groups with no economic justification.[77] Consumers will pay more and get less for debit cards: fees and other costs of debit cards will increase even as innovation and quality stagnates.  Many consumers will be unable to afford new bank fees and as a result will drop out of the mainstream financial system and turn to check cashers and high-cost prepaid cards.  Other consumers will substitute to greater use of credit cards, which have higher interchange fees than debit cards, thereby further distorting the payment system.

While this expected substitution to greater use of credit cards will allow many very large banks to recoup some of their losses from lower debit card revenues, banks such as TCF that do not issue credit cards will be unable to avail themselves of this substitution.  TCF will thus find itself between the proverbial rock and hard place: attacked on one side by very large

---

[77] In fact, both former Senator Christopher Dodd and Congressman Barney Frank, for whom the Dodd-Frank Act is named, have both recently publicly criticized the Durbin Amendment and called for its reconsideration.  *See* Peter Schroeder, *More Lawmakers Cautioning Fed on Interchange Rules*, The Hill, Dec. 30, 2010, *available at* http://thehill.com/blogs/on-the-money/banking-financial-institutions/135507-list-of-lawmakers-cautioning-on-interchange-rules-grows.

banks that issue credit cards and perhaps may be able to impose new fees on bank customers

and attacked on the other side by smaller banks exempted from the Durbin Amendment and

which can thus continue to charge a market-based interchange fee and thus can continue to

offer less-expensive and higher-quality cards (such as rewards cards) to customers.  This

arbitrary confiscation of TCF's ability to earn a reasonable rate of return on its provision of

debit cards to the public is unconstitutional, as is the arbitrary distinction drawn among

different institutions by the Durbin Amendment.

   Dated this 11th day of March, 2011.

JOHNSON, HEIDEPRIEM & ABDALLAH LLP


BY    _/s/  Ronald A. Parsons, Jr._
  Ronald A. Parsons, Jr.
  P.O. Box 2348
  Sioux Falls, SD 57101-2348
  (605) 338-4304
  ron@jhalawfirm.com

  Todd J. Zywicki
  GMU Foundation Professor of Law
  Editor, Supreme Court Economic Review
  George Mason University School of Law
  3301 Fairfax Dr.
  Arlington, VA 22201
  (703) 993-9484
  Email: tzywick2@gmu.edu

<u>**APPENDIX – LIST OF AMICI**</u>

Donald J. Boudreaux, Professor of Economics, George Mason University, and former Chairman, George Mason University Department of Economics.

Henry N. Butler, George Mason University Foundation Professor of Law, George Mason University School of Law, and Executive Director of the George Mason University Center for Law & Economics.

Keith N. Hylton, Hon. Paul J. Liacos Professor of Law, Boston University School of Law.

Geoffrey A. Manne, Lecturer in Law, Lewis & Clark Law School, and Executive Director, International Center for Law & Economics.

Roger E. Meiners is Chairman, Department of Economics, Goolsby Distinguished Professor of Economics and Law, University of Texas-Arlington.

Paul H. Rubin, Samuel Candler Dobbs Professor of Economics, Emory University.

Vernon Smith, Professor of Law and Economics and George L. Argyros Endowed Chair in Finance and Economics at Chapman University, and 2002 Nobel Laureate in Economics.

Joshua D. Wright, Associate Professor, George Mason University School of Law and Department of Economics.

Bruce Yandle is Alumni Distinguished Professor of Economics Emeritus and Dean Emeritus, Clemson University.

Todd J. Zywicki, George Mason University Foundation Professor of Law, George Mason University School of Law, and former Director, Office of Policy Planning, Federal Trade Commission.

## CERTIFICATION OF SERVICE

I hereby certify that on March 11, 2011, I caused the foregoing **Brief of Economists and Law and Economics Scholars as Amicae Curiae in support of Plaintiff TCF National Bank** to be served on all parties by sending a copy to their attorneys of record via electronic mail through the CM/ECF filing system.

*/s/  Ronald A. Parsons, Jr.*
Ronald A. Parsons, Jr.

## CERTIFICATION OF COMPLIANCE

I hereby certify that this brief complies with Local Civil Rule 7.1(B)(1) because it contains 11,763 words exclusive of the caption, signature block, and certificate of service. The brief has been prepared in proportionately spaced typeface in 12 point Times New Roman font. I have relied upon the word count feature of Microsoft Word in preparing this certificate.

*/s/  Ronald A. Parsons, Jr.*
Ronald A. Parsons, Jr.