Case No. 4:10-cv-04149-LLP
Judge Lawrence L. Piersol

# UNITED STATES DISTRICT COURT
# DISTRICT OF SOUTH DAKOTA
# SOUTHERN DIVISION

TCF NATIONAL BANK,

*Plaintiff,*

v.

BEN S. BERNANKE, JANET L. YELLEN, KEVIN M. WARSH, ELIZABETH A. DUKE, DANIEL K. TARULLO, SARAH BLOOM RASKIN, AND JOHN WALSH,

*Defendants.*

# BRIEF FOR THE RETAIL LITIGATION CENTER, INC.
# AS AMICUS CURIAE IN SUPPORT OF DEFENDANTS'
# MOTION TO DISMISS AND OPPOSITION TO MOTION FOR
# PRELIMINARY INJUNCTION

Thomas K. Wilka (Counsel of Record)
HAGEN, WILKA & ARCHER, LLP
600 South Main Avenue, Suite 102, P.O. Box 964
Sioux Falls, SD 57104
Tel: (605) 334-0005
Fax: (605) 334-4814

W. Stephen Cannon
Todd Anderson
Richard O. Levine
Evan P. Schultz
CONSTANTINE CANNON LLP
1301 K Street N.W., Suite 1050 East
Washington, DC 20005
Tel: (202) 204-3500
Fax: (202) 204-3501

Jeffrey I. Shinder
CONSTANTINE CANNON LLP
335 Madison Avenue, 9th Floor
New York, NY 10017
Tel: (212) 350-2700
Fax: (212) 350-2701

*Counsel for Retail Litigation Center, Inc.*

191036.2

## TABLE OF CONTENTS

I.     INTEREST OF AMICUS AND SUMMARY OF ARGUMENT ......................................1

II.    FACTUAL BACKGROUND ........................................................................................3

      A.     The Durbin Amendment will inject competition and transparency that has been absent from the debit card market..........................................................................3

            1.     The current system forces merchants to pay billions of dollars in debit interchange fees to banks. ..........................................................................3

            2.     Banks benefit from issuing debit cards, even without any subsidy from merchants. ................................................................................................6

            3.     Debit networks fix the price of interchange for rival issuers, and can change it at will.....................................................................................7

            4.     Networks have used market power to force merchants to accept these high interchange fees that are unrelated to costs.................................................9

            5.     Regulation is the appropriate response to the market failure in  the debit card market.................................................................................................11

      B.     The Durbin Amendment seeks to benefit the public by lowering debit interchange fees and offering debit routing options to merchants..............................................12

            1.     The amendment benefits the public. ........................................................12

            2.     The amendment is narrowly tailored. ......................................................13

      C.     TCF's opposition brief is based on fundamental factual errors............................13

            1.     The fruit of anticompetitive conduct is not "property" to which TCF is entitled...................................................................................................13

            2.     TCF's "marketplace risk" discussion demonstrates that it cannot rely on Visa continuing to fix high interchange rates. ...........................................14

            3.     It is indisputable that debit systems thrive without any interchange fees at all..........................................................................................................15

            4.     Issuing banks will be able to recover *all costs* and earn a return after the Durbin Amendment is in effect................................................................15

III.   ARGUMENT .........................................................................................................16

      A.     The Durbin Amendment is not a taking under the Fifth Amendment. ..................16

191036.2

1.      TCF has a "heavy burden" and "uphill battle" here, because Congress must have wide leeway to govern. ............................................................16

2.      TCF chose not to discuss *Penn Central*, whose test governs regulatory taking cases. ................................................................................18

3.      The Durbin Amendment does not effect a taking under *Penn Central*. ....19

     a.      TCF has no reasonable "distinct investment-backed expectations" in continuing to charge exorbitant levels of debit card interchange. ..................................................................................19

          i.      Visa gave TCF actual notice not to expect any level of debit interchange. ................................................................20

          ii.      Federal and state laws heavily regulate the banking industry, and so preclude TCF's taking claim. .................22

          iii.      Because it continues to receive millions of dollars and other benefits from both its debit and broader deposit operations, TCF cannot show sufficient economic impact for a taking. ..........................................................24

          iv.      Because TCF is free to charge other debit card fees, TCF cannot show sufficient economic impact. ..........................28

     b.      The Durbin Amendment is precisely the sort of public program legislation that defeats a taking claim. ..........................................29

B.      The proper remedy for a taking violation is just compensation............................31

C.      If any Durbin Amendment provisions violate equal protection, they are severable........................................................................................32

IV.      CONCLUSION................................................................................35

191036.2

# TABLE OF AUTHORITIES

## CASES

*Alaska Airlines, Inc. v. Brock*, 480 U.S. 678 (1987) .................................................. 33, 34

*Armour and Co, Inc. v. Inver Grove Heights*, 2 F.3d 276 (8th Cir. 1993) ............................ 19, 30

*Baltimore & Ohio R.R. Co. v. United States*, 345 U.S. 146 (1953) ............................................. 27

*Branch v. United States*, 69 F.3d 1571 (Fed. Cir. 1995) ........................................................... 30

*Cal. Housing Securities, Inc. v. United States*, 959 F.2d 955 (Fed. Cir. 1992) .......................... 30

*Castle v. United States,* 301 F.3d 1328 (Fed. Cir. 2002) ............................................................ 30

*Concrete Pipe and Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*,
   508 U.S. 602 (1993) ................................................................................................... *passim*

*Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211 (1986) .......................................... *passim*

*F.D.I.C. v. Mahoney*, 141 F.3d 913 (9th Cir. 1998) .................................................................... 30

*Fahey v. Mallonee,* 332 U.S. 245 (1947) ..................................................................................... 22

*FHA v. The Darlington, Inc.*, 358 U.S. 84 (1958) ....................................................................... 22

*First English Evangelical Lutheran Church of Glendale v. County of L.A.*, 482 U.S. 304 (1987)
   ................................................................................................................................................ 32

*Free Enter. Fund v. Public Co. Accounting  Oversight Bd.*, 130 S. Ct. 3138 (2010) ............. 33, 34

*Golden Pacific Bancorp v. United States*, 15 F.3d 1066 (Fed. Cir. 1994) .................................. 30

*Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430 (8th Cir. 2007) ................. *passim*

*I.N.S. v. Chadha*, 462 U.S. 919 (1983) ................................................................................. 34, 35

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation*, No. 05-md-1720
   (JG) (JO) (E.D.N.Y. Oct. 19, 2005) ...................................................................................... 15

*In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003), *aff'd sub
   nom. Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir.), *cert. denied sub
   nom. Leonardo's Pizza by the Slice, Inc. v. Wal-Mart Stores, Inc.*, 544 U.S. 1044 (2005)
   ................................................................................................................................................ 14

*Keystone Bituminous v. DeBenedictis*, 480 U.S. 470 (1987) ........................................... 17, 26, 29

191036.2

*Lingle v. Chevron U.S.A. Inc.,* 544 U.S. 528 (2005)............................................................ *passim*

*Meriden Trust & Safe Deposit Co. v. F.D.I.C.,* 62 F.3d 449 (2d Cir. 1995) ............................... 30

*Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub. Welfare,*
    742 F.2d 442 (8th Cir. 1984) ...................................................................... 24

*Minn. v. Block,* 660 F.2d 1240 (8th Cir. 1981) .................................................... 18, 30

*Outdoor Graphics, Inc. v. City of Burlington, Iowa,* 103 F.3d 690 (8th Cir. 1996).............. 19, 29

*Pa. Coal Co. v. Mahon,* 260 U.S. 393 (1922)........................................................ 16, 17

*Palazzola v. R.I.,* 533 U.S. 606 (2001) ................................................................. 19

*Penn Central Transp. Co. v. N.Y.C.,* 438 U.S. 104 (1978)...................................... *passim*

*Resolution Trust Corp. v. Ford Motor Credit Corp.,* 30 F.3d 1384 (11th Cir. 1994) ................. 30

*Ruckelshaus v. Monsanto Co.,* 467 U.S. 986 (1984) ........................................ 19, 20, 29

*Scott v. City of Sioux City, Iowa,* 736 F.2d 1207 (8th Cir. 1984) ......................... 19, 29

*Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency,* 535 U.S. 302 (2002). 17, 19, 26, 29

*United States v. Winstar Corp.* 518 U.S. 839 (1996).................................................. 22

*Wash. Legal Found. v. Legal Found. of Wash.,* 271 F.3d 835 (9th Cir. 2001)............................ 30

## CONSTITUTIONAL PROVISION

U.S. Const. amend. V............................................................................................ *passim*

## FEDERAL STATUTES

12  U.S.C. §1817(b) .................................................................................................. 23

12 U.S.C. § 360 ......................................................................................................... 23

12 U.S.C. § 5302......................................................................................................... 35

15 U.S.C. § 1601 *et seq.*............................................................................................ 24

Banking Act of 1935, Pub. L. No. 74-305, 49 Stat. 684 (1935) ..................................... 23

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203,
    124 Stat. 1376 (2010).......................................................................................... 1

Electronic Fund Transfer Act, § 920 *et seq.*, 15 U.S.C. § 1693o-2 ....................................... *passim*

191036.2

Fair and Accurate Credit Transactions Act of 2003, Pub. L. No. 108-159,
    117 Stat. 1952 (2003)........................................................................... 23

Federal Reserve Act, ch. 6, 38 Stat. 251 (1913) .................................................. 22

Financial Institutions Regulatory and Interest Rate Control Act of 1978, Pub. L. No.  95-630,
    92 Stat. 3641 (1978)........................................................................... 23

Glass–Steagall Act, Pub. L. No. 73-66, 48 Stat. 162 (1933) ..................................... 23

## FEDERAL REGULATIONS

74 Fed. Reg. 59033 (Nov. 17, 2009)............................................................ 24

75 Fed. Reg. 37526 (June 29, 2010) ........................................................... 24

Debit Card Interchange Fees and Routing, Notice of Proposed Rulemaking,
    75 Fed. Reg. 81722  (Dec. 28, 2010) .................................................. 6

## OTHER AUTHORITIES

156 Cong. Rec. S3695 (daily ed. May 13, 2010)(statement of Sen. Richard Durbin) ................ 12

Board of Governors of the Federal Reserve System, Regulations, *available at*
    http://www.federalreserve.gov/bankinforeg/reglisting.htm................................. 23

Digital Transactions, *Durbin Amendment Will Hurt, But It's No Apocalypse for Debit, McKinsey Report Says* (Mar. 7, 2011), *available at*
    http://www.digitaltransactions.net/news/story/2960....................................... 25

Donna Borak, *Visa Mulls Litigation 'Options' in Debit Battle*, American Banker, Feb. 17, 2011
    ........................................................................................ 32

Eric Dash, *MasterCard Will Pay $1.8 Billion to American Express*, N.Y. Times, June 26, 2008,
    *available at* http://www.nytimes.com/2008/06/26/business/26credit.html .................... 14

FDIC Law, Rules and Regulations, *available at*
    http://www.fdic.gov/regulations/laws/rules/2000-50.html ............................... 23

FDIC, Important Legislation, *available at*
    http://www.fdic.gov/regulations/laws/important/index.html............................. 23

Joseph W. Saunders, *Proposed Debit Rules Would Harm All*, American Banker, Feb. 1, 2011.  32

Letter from American Banking Association and state banking associations to Members of the
    U.S. Senate and House of Representatives, Feb. 8, 2011 ................................ 32

191036.2

Lloyd Constantine *et. al*, *Repairing the Failed Credit Market:  Lessons From an Historically Interventionist Federal Reserve and the Recent Visa Check/MasterMoney Antitrust Litigation*, 2 N.Y.U. J. of L. & Bus. 147 (Fall 2005) ................................................. 4, 23

Ltr. from Visa General Counsel Joshua R. Floum to Louise L. Roseman, Nov. 8, 2010, at 13, 17, *available at* http://www.federalreserve.gov/SECRS/2011/February/20110204/R-1404/R-1404_020311_63677_497738932765_1.pdf .............................................................. 8, 13

Press Release, *Durbin Statement On His Debit Card Swipe Fee Amendment* (May 13, 2010), *available at* http://durbin.senate.gov/showRelease.cfm?releaseId=324958 ..................... 13

Press Resease, *Discover Financial Services Reaches $2.75 Billion Settlement Agreement in Antitrust Dispute with Visa and MasterCard,\* (Oct. 27, 2008), *available at* http://investorrelations.discoverfinancial.com/phoenix.zhtml?c=204177&p=irol-newsArticle&ID=1218112&highlight= ........................................................................... 14

U.S. Gov't Accountability Office, GAO-10-45, *Credit Cards: Rising Interchange Fees Have Increased Costs for Merchants, but Options for Reducing Fees Pose Challenges* 8 (2009) ........................................................................................................................................... 5

Visa, Inc. Registration Statement (Form S-1) (Nov. 9, 2007), *available at* http://www.sec.gov/Archives/edgar/data/1403161/000119312507242653/ds1.htm.....9, 15

## APPENDICES

Press Release, *TCF Bank Announces Checking Product Enhancements and Introduces Mobile Banking* (Jan. 5, 2011), App. A ..................................................................... 3, 6

Report of Stephen Craig Mott, Oct. 29, 2010, App. B .......................................... *passim*

Report of Steven C. Salop, Oct. 27, 2010, App. C ............................................... *passim*

Report of Kenneth J. Morrison, Oct. 27, 2010, App. D.................................................. 7

Visa International Operating Regulations, Apr. 2010, App. E .................................... 8, 9

Visa Inc., Annual Report (Form 10-K) (Nov. 19, 2010), App. F ................................... 9

MasterCard Rules, Section 9.4 (Oct. 29, 2010), App. G ........................................ 8, 20

James C. Miller III, *Addressing the Debit-Card Industry's Market Failure*, Prepared for the Retail Industry Leaders Association, Feb. 2011, App. H ................................................ 12

*TCB-TCF Discusses Lawsuit Challenging Durbin Amendment Conference Call*, Oct. 12, 2010, App. I ......................................................................................................................... 25, 27

## COURT DOCUMENTS

TCF Am. Compl., Jan. 27, 2011, Dkt. No. 51 .................................................... *passim*

191036.2

Defs.' Br., Feb. 18, 2010, Dkt. No. 63 .............................................................................. 16, 20, 32

TCF Opp. Br., Mar. 4, 2011, Dkt. No. 97 ................................................................................ *passim*

Decl. of Gregory J. Pulles, Mar. 3, 2011, Dkt. No. 98 ........................................................ 7, 8, 9

Aff. of Earl D. Stratton, Nov. 3, 2010, Dkt. No. 20 .................................................................. 8

Decl. of John R. Chrin, Mar. 2, 2011, Dkt. No. 103 ................................................................. 14

Decl. of Kevin M. Murphy, Mar. 2, 2011, Dkt. No. 100 ........................................................... 15

TCF Prelim. Inj. Br., Nov. 4, 2010, Dkt. No. 16 ...................................................................... 16

Decl. of David M. Stautz, Mar. 3, 2011, Dkt. No. 102 ......................................................... 25, 28

191036.2

## I.    INTEREST OF AMICUS AND SUMMARY OF ARGUMENT

The Retail Litigation Center, Inc. ("RLC") is a public policy organization that identifies and engages in legal proceedings that affect the retail industry.  The RLC, whose members include some of the country's largest retailers, was formed to provide courts with retail industry perspectives on significant legal issues, and to highlight the potential industry-wide consequences of legal principles that may be determined in pending cases.

America's merchants, including RLC members, are forced to pay over $16 billion dollars annually to the banks such as TCF that issue debit cards, in the form of "interchange" fees: money that debit card networks take from merchants every time they accept debit cards for payment, which is then given to the banks that issue debit cards.  These fees have increased dramatically over the past decade, including during the recent recession, even though the cost of processing these transactions has been in decline.  This situation did not come about through competition or through a healthy market for debit cards.  To the contrary, debit card networks such as Visa and MasterCard, and the banks that issue their debit cards, have imposed this system onto merchants through collusion, with banks agreeing not to compete over these fees, and through the market power that the banks exercise through the networks.  Because the RLC's members must accept debit cards to remain competitive, they have had no choice but to pay these fees.

To address this market failure, Congress in 2010 passed the Durbin Amendment to the Dodd-Frank Wall Street Reform and Consumer Protection Act (Pub. L. No. 111-203, 124 Stat. 1376 (2010)) ("Durbin Amendment").  Though it does not mandate any specific interchange rates, it requires the Federal Reserve to promulgate standards to ensure that debit card networks set interchange fees at levels that are reasonable and proportional to issuer transaction costs.  It also requires debit card issuers to provide at least two unaffiliated network

1

191036.2

options on all debit cards to give merchants the ability to route transactions to lower cost networks and thereby cause networks to compete for merchants.  This law will have the public benefit of increasing both competition and transparency in the debit card market.  It will also make it possible for retailers to help consumers by charging less money for their goods and services, and will encourage banks to issue debit cards that are more secure.

TCF, which issues Visa debit cards and collects approximately $100 million per year in interchange revenues, has sued to strike down the Durbin Amendment and enjoin its enforcement, based, among other arguments, upon the Fifth Amendment's taking clause.  But TCF largely ignores the main test for regulatory taking violations, which the Supreme Court announced in *Penn Central Transp. Co. v. N.Y.C.*, 438 U.S. 104, 124 (1978).  The *Penn Central* test looks predominately at two factors: whether the law interferes with the plaintiff's reasonable expectations regarding revenue, and whether the law adjusts economic benefits and burdens to promote the common good.  Here, TCF cannot satisfy either prong.

First, TCF has no reasonable expectation in any level of interchange.  Visa itself has informed its issuing banks, including TCF, that Visa has full authority to raise or lower interchange rates.  Additionally, companies that operate in heavily regulated industries such as banking, or face significant legal risk, have minimal expectations of maintaining established revenue streams.  And TCF has admitted that it will continue to make substantial profits by lending out or investing money in its customers' deposit accounts.

Second, TCF cannot establish a Fifth Amendment taking claim because the bank cannot show that the Durbin Amendment fails to adjust economic benefits and burdens to help the common good.

Additionally, even if TCF could establish a regulatory taking violation, the remedy would

191036.2

be limited to "just compensation," not injunctive relief.  For all of these reasons, TCF's Fifth Amendment challenge must fail.

With respect to TCF's equal protection arguments, to avoid burdening the Court with duplicative arguments, the RLC is addressing only whether the Durbin Amendment's exemption for small banks is severable from the remainder of the statute in the unlikely event that the Court finds an equal protection violation here.  If that happens, this Court should uphold the remainder of the amendment, allowing it to operate just as Congress intended.  This is especially so given that the Dodd-Frank Act contains a severability clause instructing that all constitutional provisions of the law be retained.

This brief also corrects some of the flawed factual allegations that underpin TCF's legal arguments.

Therefore, this Court should hold that TCF has not suffered a taking, should deny TCF's motion for a preliminary injunction, and should grant defendants' motion to dismiss.

## II.     FACTUAL BACKGROUND

### A.      The Durbin Amendment will inject competition and transparency that has been absent from the debit card market.

#### 1.      The current system forces merchants to pay billions of dollars in debit interchange fees to banks.

Debit cards allow consumers to use electronic networks to access money in their deposit accounts to pay merchants for goods and services.[1]  In that regard, they are similar to paper checks.  TCF even refers to its debit cards as "check cards," as did Visa when it first marketed debit cards.[2]  Ultimately, as TCF admits, debit cards merely serve as access devices to

---

[1]     The banking industry refers to a consumer's checking account as a "demand deposit account," or "DDA."

[2]     *See* TCF Am. Compl., Jan. 27, 2011, at ¶¶ 46-47, Dkt. No. 51; Press Release, *TCF Bank Announces Checking Product Enhancements and Introduces Mobile Banking* (Jan. 5, 2011)

191036.2

consumers' DDA accounts: "[t]oday, one cannot separate out the debit service from a checking account."[3]

There are two types of debit transactions.  The first type requires consumers to type in a personal identification number or "PIN," and is known as "PIN debit."  These transactions are similar to withdrawals from automated teller machines but, instead of receiving cash, the consumers receive the goods or services they purchase.  They are the most secure option for debit cards widely available in America today, they offer fast electronic processing, and they historically have cost less to process.[4]  The second type of debit transaction requires consumers to sign their names, and is called "signature debit."  These transactions operate in a similar manner to credit card transactions.  But while a credit card transaction allows a consumer to charge goods on credit, a signature debit transaction transfers the consumer's existing funds to complete the transaction.[5]  Signature debit transactions run on the same network infrastructure as credit cards, are generally processed overnight instead of instantly, and are more costly and less secure than PIN debit cards.[6]

If a consumer makes a purchase with a paper check, the merchant receives the entire face value of the check, minus a fee it may pay to its own bank.[7]  This is known as an "at par" system.  This does *not* occur with debit cards.

---

("TCF Press Release, App. A"),  *available at* http://ir.tcfexpress.com/phoenix.zhtml?c=95289&p=irol-newsArticle_print&ID=1513371&hi.

[3]      TCF Am. Compl. at ¶ 48.

[4]      Report of Stephen Craig Mott, Oct. 29, 2010 ("Mott Report, App. B"), at ¶¶ 3, 29.

[5]      *Id*. at ¶¶ 2-5, 10-11.

[6]      *Id*. at ¶ 10.

[7]      S*ee* Lloyd Constantine *et. al*, *Repairing the Failed Credit Market:  Lessons From an Historically Interventionist Federal Reserve and the Recent Visa Check/MasterMoney Antitrust Litigation*, 2 N.Y.U. J. of L. & Bus. 147, 150, 152-157 (Fall 2005) (banks that use Federal Reserve facilities must clear their checks at par).

191036.2

Interchange works as is described in the diagram below: [8]



As this diagram shows, when a consumer makes a debit card purchase, the merchant forfeits a portion of the charged price.  Most of this fee goes to the bank that issued the consumer's debit card (for instance, TCF) after passing through the debit network with which the card is associated (for instance, Visa).  In payment networks like Visa's and MasterCard's, merchants submit debit card transactions to their own banks, called "acquiring" banks, which initially process the debit transactions and forward them to the network.  The network charges fees to the acquirer not only for the network's own processing of a transaction, but also for an amount paid to the card's issuer.  The money that goes to the issuer is called "interchange." [9]

---

[8]      U.S. Gov't Accountability Office, GAO-10-45, *Credit Cards: Rising Interchange Fees Have Increased Costs for Merchants, but Options for Reducing Fees Pose Challenges* 8 (2009). The debit interchange system works essentially the same as credit card interchange.

[9]      Interchange fees currently are much higher than the relatively small cost of processing debit cards.  The main components of processing a payment are authorization, clearance, and settlement.  *See* Mott Report, App. B, at ¶¶ 1, 33-37; Report of Steven C. Salop, Oct. 27, 2010 ("Salop  Report, App. C"), at ¶¶ 7, 111-112.  Authorization means confirming whether the cardholder has sufficient funds to pay for the purchase; clearance means delivering final

191036.2

Signature debit interchange fees average 56 cents per transaction, and PIN debit interchange fees average 23 cents per transaction.[10]  In the United States, those swipe fees totaled approximately $16.2 billion in 2009.[11]

### 2. Banks benefit from issuing debit cards, even without any subsidy from merchants.

Given debit cards' positioning as the key access device to the DDA relationship, debit cards provide numerous benefits to banks that will continue to justify their issuance under the Durbin Amendment.  These benefits include: (i) displacing more costly access devices; (ii) motivating cardholders to maintain greater balances, which banks can then lend; and (iii) helping the bank to cross-sell other lucrative services.  Moreover, debit cards enhance the "stickiness" of the bank's valuable relationship with their DDA customers.[12]  Since filing this lawsuit, TCF itself has reaffirmed its commitment to free checking accounts for its customers, presumably because it recognizes the value of offering debit cards, even without high interchange.[13]  Other banks and networks have also indicated that they will continue to allow debit card transactions, and benefit from them.[14]

---

transaction data to the issuer for posting to the cardholder's account; and settlement means calculating fees and charges that apply to the merchant's bank and the consumer's banks, and calculating the net financial position of each after the debit transactions are completed.  Mott Report, App. B, at ¶ 1.

[10]     Debit Card Interchange Fees and Routing, Notice of Proposed Rulemaking, 75 Fed. Reg. 81722, 81725 (proposed Dec. 28, 2010) (hereinafter "NPRM").  The authorization, clearance, and settlement costs make up just a fraction of this: 0.33 cents per transaction for PIN debit, and 1.36 cents per transaction for signature debit.  Mott Report, App. B, at ¶ 35.

[11]     NPRM, 75 Fed. Reg. at 81725.

[12]     Mott Report, App. B, at ¶¶ 1, 29-30; Salop Report, App. C, at ¶¶ 19, 60-63.

[13]     Specifically, in January 2011, TCF issued a press release announcing that it is expanding availability of its free consumer deposit accounts.  *See* TCF Press Release, App. A.

[14]     *See, e.g.,* Ajay Banga, MasterCard President & CEO: "[W]e continue to anticipate some potential *upside to our volumes* as a result of the routing non-exclusivity, regardless of how it finally gets sorted out.  So from a share perspective, as I said in the past, we have more to gain than to lose."  (MasterCard Q4 2010 Earnings Call Transcript, Feb. 3, 2011) (emphasis added); Howard I. Atkins, Wells Fargo Company Senior EVP & CFO:  "In fact, the relationship model

191036.2

Historical and contemporary examples confirm that banks have strong incentives to provide debit cards even without income from interchange.  When banks first began to offer PIN debit cards, they did not charge interchange fees.  To the contrary, many paid merchants to provide debit services, a practice known as "reverse" or "negative" interchange.  Other banks cleared PIN debit card transactions at par.  This model prevailed until the mid-1990s, a period that saw widespread expansion of debit card services.[15]

The experience in other G-20 countries further confirms how banks benefit from offering debit even without high interchange fees: seven of the eight countries with the highest debit usage utilize an at par pricing model.  For example, the Canadian debit system has always been based on an at par pricing model, and Canada has traditionally had higher per capita debit usage than the United States, as well as higher debit penetration in merchant categories that do not accept PIN debit domestically.[16]

In short, banking fundamentals, as well as history and contemporary international experiences, demonstrate that banks do not need to receive any interchange in order to benefit from debit cards.  Despite this reality, banks have taken advantage of market failure in the current domestic debit card system to force consumers to pay for dramatically increasing interchange fees during the past 20 years.

3.   **Debit networks fix the price of interchange for rival issuers, and can change it at will.**

we employ here is probably the best thing — the best [antidote] to what's happening in the regulatory reform arena, because as we *deepen relationships*, profitability grows exponentially as we add products prophetically."  (Wells Fargo Company Q4 2010 Earnings Call Transcript, Jan. 19, 2011) (emphasis added).

[15]   Salop Report, App. C, at ¶¶ 21, 45, 136; Mott Report, App. B, at ¶¶ 7-9, 11, 14, 23. Thus, whether or not TCF offered reverse interchange, *see* Decl. of Gregory J. Pulles, Mar. 3, 2011, at ¶ 15, Dkt. No. 98, other banks did.

[16]   Report of Kenneth J. Morrison, Oct. 27, 2010, App. D, at ¶¶ 2, 13-14; Salop Report, App. B, at ¶¶ 48, 64-48.

191036.2

Banks compete against each other on almost every aspect of their businesses, save one. With respect to interchange fees, card networks establish the interchange fees that all rival issuing banks, including TCF, charge to merchants.  In a letter that Visa wrote to the Federal Reserve, it conceded that bank "issuers do not in practice set interchange transaction fees; rather, these fees are set by networks."[17]  Indeed, TCF admits that it does not negotiate specialized interchange rates; to the contrary, "Visa may not provide interchange rates to TCF different than the rates it provides to its other debit issuer members."[18]  As TCF Executive Vice President Earl D. Stratton stated in his affidavit accompanying TCF's preliminary injunction motion, "[t]he Company has never negotiated with any merchant for an interchange fee; instead, we accept the share Visa delivers to us."[19]

In addition to fixing these fees for rival banks, Visa has the discretion to change the level of fees at will.  Other sources demonstrate that Visa has and exercises this power.[20]  Visa's operating regulations also establish that "[i]nterchange is consistently monitored and adjusted - *sometimes increased and sometimes decreased*."  Visa International Operating Regulations, Apr. 2010 ("VIOR, App. E"), at 962 (emphasis added).  Additionally,  the VIOR states flatly that

---

[17]     Ltr. from Visa General Counsel Joshua R. Floum to Louise L. Roseman, Nov. 8, 2010, at 13, 17, *available at* http://www.federalreserve.gov/SECRS/2011/February/20110204/R-1404/R-1404_020311_63677_497738932765_1.pdf ("Visa Nov. 8, 2010 Ltr.").

[18]     TCF Opp. Br., Mar. 4, 2011, at 3, Dkt. No. 97.  *See also* TCF Opp. Br. at 11 ("TCF has been guaranteed by Visa (as have other issuers) to receive the same interchange rate as all other debit issuers"); Pulles Decl., at ¶¶ 4-6.

[19]     Aff. of Earl D. Stratton, Nov. 3, 2010, at ¶ 14, Dkt. No. 20.  While this case concerns TCF and the Visa debit cards it issues, other debit card networks aside from Visa also set interchange rates centrally.  *See, e.g.,* MasterCard Rules, Section 9.4, Oct. 29, 2010 (stating that MasterCard "has the right to establish default interchange fees and default service fees ") (included at App. G).

[20]     In this case, TCF offers its consumers only Visa-branded debit cards. TCF Am. Compl. at ¶¶ 27, 47.

191036.2

"Visa may establish different interchange reimbursement fees."[21]  Similarly, the November 2010 10-K form that Visa submitted to the SEC states that Visa engages in "establishing and modifying default interchange rates in response to marketplace conditions and strategic demands," and also engages in "proper management" of interchange fees.[22]  And when it registered for its initial public offering, Visa warned that "[i]nterchange fees are subject to significant legal and regulatory scrutiny worldwide, which may have a material adverse impact on our revenues, our prospects for future growth and our overall business."[23]

Additionally, according to TCF's amended complaint, absent the Durbin Amendment at issue in this litigation, "Visa and MasterCard can continue to charge whatever they want to participants in their networks . . . ."[24]  TCF further admits that Visa did not always raise the interchange rate, but that the network also lowered it.  On at least one occasion, Visa dropped the debit interchange rate by over 27% (from 1.65% to 1.20%) following the settlement of an antitrust case brought against it.[25]

### 4.      Networks have used market power to force merchants to accept these high interchange fees that are unrelated to costs.

Beginning in the early 1990s, Visa and MasterCard aggressively began to implement and enforce a strategy to leverage their market power and force merchants to pay higher debit interchange through their "Honor All Cards" rules.  These rules require merchants to accept all Visa and MasterCard debit cards if they accept any.  In essence, each network uses market power to force merchants to accept debit cards bearing its brand (either Visa or MasterCard) from all banks that issue them, under identical terms.

---

[21]      *See* VIOR, App. E, at 962.

[22]      *See* Visa Inc., Annual Report (Form 10-K) (Nov. 19, 2010) ("Visa 10-K, App. F"), at 13.

[23]      Visa, Inc. Registration Statement ("Visa Form S-1") (Nov. 9, 2007) at 14, *available at* http://www.sec.gov/Archives/edgar/data/1403161/000119312507242653/ds1.htm.

[24]      TCF Am. Compl. at ¶ 3.

[25]      TCF Opp. Br. at 4 & n.1; Pulles Decl., at ¶ 15.

191036.2

The effect of the market failure is unmistakable.  Currently, Visa and MasterCard dominate the debit card industry.  Together approximately 83% of debit transactions run on their networks.[26]  And between those two debit card networks, Visa is by far the larger, running a total of 66% of all debit transactions, accounting for about 74% of signature debit transactions, and 15% of PIN debit transactions.[27]  This market concentration has allowed debit networks to raise interchange rates sharply.  Over a period of eight years, from 1998 to 2006, they raised interchange rates by 234%.[28]

Visa and MasterCard began this increase in debit card interchange rates by using their market power to set the same or similar interchange for merchants' signature debit transactions as they did for credit card transactions.  These networks then used the lucrative interchange stream created by this practice to persuade banks to issue debit cards that use their networks.  As banks became accustomed to receiving high interchange rates for signature debit – rates that bore no relationship to costs – a competitive dynamic of merchants being forced to pay ever-increasing interchange rates to underwrite network competition for issuers became the norm for the industry.[29]

Historically, signature debit has had higher interchange rates, despite the fact that signature debit has higher costs and fraud than PIN debit.  Containing the growth of PIN debit was a cornerstone of Visa's strategy in debit in the 1990s.[30]

---

[26]     Salop Report, App. C, at ¶ 26.
[27]     *Id.*
[28]     Mott Report, App. B, at ¶ 24.  Arguments that PIN debit interchange rates have been generally flat during the past decade are wrong.  *See, e.g.,* TCF Opp. Br. at 10, n.19.  Signature debit interchange rates have been anticompetitively high for well over a decade.
[29]     Mott Report, App. B, at ¶¶ 12-14, 16; Salop Report, App. C, at ¶¶ 4, 11, 24, 33, 43-44, 55, 139, 145.
[30]     Mott Report, App. B, at ¶¶ 10, 11, 33, 43-44; Salop Report, App. C, at ¶¶ 7(d), 49-55, 89, 126, 129, 132, 157.  Many banks have charged penalty fees for PIN debit usage.  Others have

Later in the 1990s, however, Visa added a new strategy to keep interchange rates artificially high by purchasing Interlink, which was among the leading PIN debit networks in the United States.  Visa's purchase of Interlink started a systematic effort by it to drive up PIN debit interchange, an effort that picked up steam after 2000.  Visa raised Interlink's interchange from zero to 0.45% per transaction, an unprecedented increase at a time when all of the PIN debit networks offered at par interchange, or even paid merchants through reverse interchange.  As a key aspect of its strategy to drive up PIN debit interchange rates, Visa entered into various deals with debit issuing banks.  These deals made Interlink the exclusive or primary PIN debit acceptance mark on hundreds of millions of debit cards.  PIN debit fees are now so high that the interchange rates for PIN debit have, in some contexts, essentially converged with signature debit fees.[31]  TCF admits that it now charges an average of 1.38%, or 49 cents, per debit transaction.[32]

As Visa continued to drive up Interlink interchange rates, the competing PIN debit networks raised their rates to maintain levels of issuance under the pricing umbrella created by Visa's market power.[33]

### 5.    Regulation is the appropriate response to the market failure in the debit card market.

Debit card networks have forced merchants to incur increasingly higher interchange fees that are unrelated to the banks' costs.  This broken debit market results in harm to consumers, even those who use cash or checks.

---

used promotions like "Skip the PIN and Win" to encourage signature debit over PIN debit usage. And others have used deceptive marketing materials suggesting that using a PIN number in public would expose the cardholder to security risks – when in fact that method of authentication is far more secure than using a signature.  *See* Salop Report, App. C, at ¶¶ 47, 92; Mott Report, App. B, at ¶¶ 14, 16-18.

[31]    Salop Report, App. C, at ¶ 25; Mott Report, App. B, at ¶¶ 22-26.

[32]    TCF Opp. Br. at 4.

[33]    Mott Report, App. B, at ¶ 24; Salop Report, App. C, at ¶¶ 4, 5, 34, 36.

191036.2

When a market failure such as this arises, regulation is a standard policy response.  As one expert has written about debit card interchange specifically:

> [T]he case for regulatory intervention is strong.  This is truly a case of market failure: networks with monopoly power over merchants are setting prices for merchants' access to their networks on behalf of their (frequently overlapping) card-issuing members, utilizing agreements in which every bank participating in those card networks agrees to charge merchants exactly the same interchange fees, regardless of who issued the card.[34]

It is well-settled among mainstream economists and regulators that limited and targeted regulation is appropriate in situations like this.

> [S]ometimes a free market does not — or for any number of reasons cannot — correct a divergence from the competitive norm.  The persistence of such divergences over time, uncorrected by unencumbered economic forces, is among the few scenarios in which I believe there is reason for government to examine and possibly correct the underlying cause . . . .  [T]he proposed regulations appear to be consistent with both the limited mandate of [S]ection 920 and the policy prescriptions embodied in that provision.

*Id.*

### B.     The Durbin Amendment seeks to benefit the public by lowering debit interchange fees and offering debit routing options to merchants.

#### 1.     The amendment benefits the public.

The Durbin Amendment seeks to benefit the public by increasing competition.  As Senator Durbin stated on the Senate floor, Visa and MasterCard account for 80% of payment card business in the country and so "[t]hey are the giants in America."[35]  He continued:

> The credit and debit card markets are not normal.  Visa and MasterCard unilaterally set interchange fee rates that apply to all banks within their card networks.  There is no negotiation between the banks and merchants over reducing interchange rates.[36]

Senator Durbin further commented that:

---

[34]     James C. Miller III, *Addressing the Debit-Card Industry's Market Failure*, Prepared for the Retail Industry Leaders Association, Feb. 2011, App. H, at ¶¶ 21-26.

[35]     156 Cong. Rec. S3695 (daily ed. May 13, 2010)(statement of Sen. Richard Durbin).

[36]     *Id.* at S3696.

191036.2

It will prevent the giant credit card companies from using anti-competitive practices, allow merchants to offer discounts to their customers and restore common sense and fairness to this broken system.[37]

>        **2.      The amendment is narrowly tailored.**

Most important for purposes of this litigation, the Durbin Amendment amends Section

920 of the Electronic Fund Transfer Act, 15 U.S.C. § 1693o-2, to require cost-based interchange

fees.  Specifically, Section 920(c)(8) defines interchange as follows:

> The term "interchange transaction fee" means any fee *established*, *charged, or received by a payment card network* for the purpose of compensating an issuer for its involvement in an electronic debit transaction.

(emphasis added).  Thus, the Durbin Amendment does *not* regulate any debit card fees that any

issuing bank imposes on its own, independent of networks and its competitors.

>   **C.      TCF's opposition brief is based on fundamental factual errors.**

 Beyond this general factual background, the RLC believes the Court will benefit from a

correction of several important factual errors in TCF's brief filed last week that undercut its legal

arguments.

>        **1.      The fruit of anticompetitive conduct is not "property" to which TCF is entitled.**

As is discussed above, current interchange fees are a product of anticompetitive behavior

by networks and issuing banks: networks like Visa fix the price of interchange for TCF and its

rival issuing banks, and then their market power forces merchants to accept debit cards with

these anticompetitively high interchange fees.[38]  Thus, to sustain its Fifth Amendment challenge,

---

[37]      *See* Press Release, *Durbin Statement On His Debit Card Swipe Fee Amendment* (May 13, 2010), *available at,* http://durbin.senate.gov/showRelease.cfm?releaseId=324958.

[38]      With respect to price fixing, Visa itself concedes that "payment card networks currently set the interchange rates for transactions over those networks" and that "issuers do not in practice set interchange transaction fees; rather, these fees are set by networks."  Visa Nov. 8, 2010 Ltr.,. at 13, 17.  With respect to market power, Visa and MasterCard are dominant, currently controlling 83% of debit card transactions, and this dominance forces merchants to accept their

191036.2

TCF would need to establish that the Fifth Amendment protects its right to pursue anticompetitive conduct.  But the debit networks know first-hand that no such right exists, given that they have been forced to pay several multi-billion dollar settlements in recent years as a result of engaging in similar anticompetitive conduct.[39]

> ### 2. TCF's "marketplace risk" discussion demonstrates that it cannot rely on Visa continuing to fix high interchange rates.

TCF cannot reasonably expect to collect higher interchange profits than a competitive market would support, given the clear legal risk associated with the networks' and issuers' anticompetitive conduct.  TCF is correct that networks and issuing banks are subject to marketplace risk.  TCF Opp. Br. at 14.  One significant component of marketplace risk is legal risk.  Revenue streams resulting from conduct that may be subject to legal action are always subject to this type of marketplace risk and can fluctuate in value accordingly.  As such, a savvy investor would know that, while "something could be sold for cash today,"[40] tomorrow a new legal development could change the valuation substantially.  Thus, there cannot be any reasonable expectation of indefinitely generating revenue that is the product of anticompetitive

debit cards.  Salop Report, App. C, at ¶ 10.  In short, a merchant cannot refuse to accept Visa and MasterCard debit cards without risking severe adverse consequences to its business.  TCF's argument that it has no monopoly power itself is of no moment.  TCF Opp. Br. at 24.

[39]    *See In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503, 508-09, 511-12 (E.D.N.Y. 2003), *aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir.), *cert. denied sub nom. Leonardo's Pizza by the Slice, Inc. v. Wal-Mart Stores, Inc.*, 544 U.S. 1044 (2005) (settlement for over $3 billion and injunctive relief "result[ing] in future savings to the Class valued from approximately $25 to $87 billion or more"); Press Release, *American Express Reaches $2.25 Billion Settlement Agreement With Visa* (Nov. 7, 2007), *available at* http://www.sec.gov/Archives/edgar/data/4962/000000496207000053/visaexhibit99_1.txt; Eric Dash, *MasterCard Will Pay $1.8 Billion to American Express*, N.Y. Times, June 26, 2008, *available at* http://www.nytimes.com/2008/06/26/business/26credit.html; Press Release, *Discover Financial Services Reaches $2.75 Billion Settlement Agreement in Antitrust Dispute with Visa and MasterCard* (Oct. 27, 2008), *available at* http://investorrelations.discoverfinancial.com/phoenix.zhtml?c=204177&p=irol-newsArticle&ID=1218112&highlight=.

[40]    Decl. of John R. Chrin, Mar. 2, 2011, at ¶ 4, Dkt. No. 103.

191036.2

behavior such as fixing prices and exercising market power.  Indeed, Visa itself recognizes the legal risk facing the interchange system.[41]

This is especially true with respect to Visa's interchange system at issue, here given the pending multi-district litigation in federal court challenging it,[42] and given the recent related settlement with the Department of Justice.[43]  In this context of potential multi-billion dollar judgments and government enforcement of antitrust violations, the marketplace risk facing Visa and TCF is far from "non-existent."  *Id.*  In that respect at least, TCF economic expert Kevin Murphy is correct that "it is the context that matters."[44]

### 3.     It is indisputable that debit systems thrive without any interchange fees at all.

TCF's argument that lowering interchange rates will "destroy" Visa's network is contradicted by the facts.  TCF Opp. Br., at 16.  As is mentioned above, the history of debit cards in the United States as well as contemporary international experiences, demonstrate that debit card networks can thrive even if interchange rates are set at zero or below.  Thus, TCF's naked assertion that the Durbin Amendment will destroy debit networks is demonstrably false.

### 4.     Issuing banks will be able to recover *all costs* and earn a return after the Durbin Amendment is in effect.

Even after the Durbin Amendment is implemented, TCF can impose debit card fees to cover all of the costs listed on page 6 of TCF's Opposition Brief and earn a profit.  These fees simply must be transparent and subject to market discipline.  There are numerous possible debit

---

[41]     *See* Visa Form S-1 (stating "[i]nterchange fees are subject to significant legal and regulatory scrutiny worldwide, which may have a material adverse impact on our revenues, our prospects for future growth and our overall business.").

[42]     *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation*, No. 05-md-1720 (JG) (JO) (E.D.N.Y. Oct. 19, 2005).

[43]     *See* http://www.justice.gov/atr/public/press_releases/2010/262867.htm), mentioned above.

[44]     Decl. of Kevin M. Murphy, Mar. 2, 2011, at ¶ 21, Dkt. No. 100.

191036.2

card fees that issuing banks can impose.  The Durbin Amendment regulates only one of these because it is characterized by the anticompetitive price fixing and market power noted above. TCF can impose any other debit card fees it wishes (on its customers, on merchants, or on the merchant's own bank) as long as TCF does so independent of its rival banks and networks exercising market power.

## III.    ARGUMENT

The RLC supports defendants' motion to dismiss and opposition to TCF's motion for a preliminary injunction, and concurs with their analysis regarding the legal standards applicable to both motions.  *See* Defs.' Br., Feb. 18, 2010, at 12 n.16, 37-38, Dkt. No. 63.

### A.    The Durbin Amendment is not a taking under the Fifth Amendment.

TCF asserts both in its amended complaint and in its motion for a preliminary injunction that the Durbin Amendment has taken its property in violation of the Constitution's Fifth Amendment.[45]  TCF is wrong.

#### 1.    TCF has a "heavy burden" and "uphill battle" here, because Congress must have wide leeway to govern.

Plaintiffs face a heavy burden in taking cases because legislatures must have broad leeway to govern.  "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law."  *Penn Central*, 438 U.S. at 124 (*quoting Pa. Coal Co. v. Mahon*, 260 U.S. 393, 413 (1922) (Holmes, J.)).  "[T]his Court has accordingly recognized, in a wide variety of contexts, that government may execute laws or programs that adversely affect recognized economic values."  *Id.*  The Supreme Court grants legislatures flexibility with the full knowledge that "[l]egislation designed to promote the general welfare commonly burdens some more than others."  *Id.* at 133.  It has

---

[45]     TCF Am. Compl. at ¶¶ 129-133; TCF Prelim. Inj. Br., Nov. 4, 2010, at 34, Dkt. No. 16.

191036.2

emphasized in multiple opinions that legislatures need a wide berth.  *See Lingle v. Chevron U.S.A. Inc.,* 544 U.S. 528, 538-539 (2005) (*quoting Pa. Coal*); *Keystone Bituminous v. DeBenedictis*, 480 U.S. 470, 473 (1987) (same); *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 223 (1986) ("In the course of regulating commercial and other human affairs, Congress routinely creates burdens for some that directly benefit others. . . . [I]t cannot be said that the Taking Clause is violated whenever legislation requires one person to use his or her assets for the benefit of another."); *Concrete Pipe and Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 642 (1993) (*quoting Connolly*).

Accordingly, the Supreme Court has held that there is a "heavy burden placed upon one alleging a regulatory taking." *DeBenedictis*, 480 U.S. at 493.  TCF's "burden" here is especially heavy, because it has limited its challenge to the text of the Durbin Amendment, no matter how it is applied.[46]  *DeBenedictis* continued that "the posture of the case is critical," *id.* at 494, and that the Supreme Court would follow "this Court's oft-repeated admonition that the constitutionality of statutes ought not be decided except in an actual factual setting that makes such a decision necessary," *id.* at 494 (internal citation and quotation omitted). "Adherence to this rule is particularly important in cases raising allegations of an unconstitutional taking of private property." *Id.*  It follows that "Petitioners thus face an uphill battle in making a facial attack on the Act as a taking." *Id.* at 495.  As a result, in *DeBenedictis*, the Supreme Court refused to find a Fifth Amendment taking, even when a state statute flatly prohibited the development of a real estate interest in a mine.  *See also Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 320 (2002) (stating that plaintiffs claiming a regulatory taking "make only a facial

---

[46]     *See* Am. Compl. at ¶ 8 (alleging that TCF is challenging the Durbin Amendment "in light of the certainty that no rules that faithfully administer the amendment will allow TCF to maintain a profitable debit card operation").

191036.2

attack . . . . [h]ence, they face an uphill battle" which is "especially steep") (internal punctuation omitted); *Minn. v. Block*, 660 F.2d 1240, 1255 (8th Cir. 1981) (stating that the Supreme Court has "reiterated its reluctance to rule on a challenge to the constitutionality of a statute on its face, particularly a claim alleging an unconstitutional taking of property").

As is discussed next, however heavy its burden, TCF cannot satisfy *Penn Central*'s test for establishing whether a regulatory taking exists.

### 2. TCF chose not to discuss *Penn Central*, whose test governs regulatory taking cases.

While TCF claims that it has suffered a regulatory taking, TCF fails to address the Supreme Court's *Penn Central* line of cases that establishes the test for determining whether a regulatory taking exists.  Under *Penn Central*, there are two elements of the test for whether a regulatory taking exists.  First, courts must consider "[t]he economic impact of the regulation on the claimant."  438 U.S. at 124.  To determine this, courts should give weight "particularly, the extent to which the regulation has interfered with *distinct investment-backed expectations*."  *Id.* (emphasis added).  Second, courts must examine "the character of the governmental action."  *Id.* In considering this second element of the test, the Supreme Court held that:

> "[a] '"taking" may more readily be found when the interference with property can be characterized as a physical invasion by a government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.

*Id.* (internal citation omitted).  Of these, the Supreme Court has made clear that the "economic impact" as a function of "distinct investment-backed expectations" is the "primary" factor.

*Lingle*, 544 U.S. at 538-39.[47]

---

[47]    Instead of discussing the *Penn Central* line of cases, TCF focuses on ratemaking precedent.  But those cases speak to TCF's Due Process challenge, rather than to a regulatory taking analysis.

191036.2

The Supreme Court[48] and the Eighth Circuit[49] have applied the *Penn Central* test in

multiple opinions to determine whether a regulatory taking has occurred.[50]

### 3. The Durbin Amendment does not effect a taking under *Penn Central*.

Whatever its reasons for avoiding any mention of the test, TCF's taking claims cannot

satisfy *Penn Central*'s elements.  On every element discussed below of what constitutes a taking,

TCF has no case.

### a. TCF has no reasonable "distinct investment-backed expectations" in continuing to charge exorbitant levels of debit card interchange.

Under *Penn Central*, the first question concerns the "economic impact" of the challenged

law.  438 U.S. at 124.  In *Lingle*, the Supreme Court stated that this is the "primary" factor in the

*Penn Central* test.  544 U.S. at 538-539.  *Penn Central* also instructs that courts considering this

factor should look "particularly" to whether the plaintiff has "distinct investment-backed

expectations" that the law interferes with.  438 U.S. at 124; *see also Lingle*, 544 U.S. at 538-39.

The Supreme Court has since established that the expectations must also be "reasonable."

---

[48]    *See, e.g.*, *Lingle,* 544 U.S. at 538 (except for physical incursions and complete destruction of economic value, "regulatory takings challenges are governed by the standards set forth in [*Penn Central*]"); *Tahoe-Sierra*, 535 U.S. at 336 ("Our polestar instead remains the principles set forth in *Penn Central* itself and our other cases that govern partial regulatory takings."); *Connolly*, 475 U.S. at 224-25 (adopts and applies *Penn Central* test for regulatory takings); *Concrete Pipe*, 508 U.S. at 644 (same); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984) (same).  The test is so important that the Supreme Court has even remanded a case where the lower courts failed to apply the *Penn Central* factors to a regulatory taking claim, to make sure that the judge considered them.  *Palazzola v. R.I.*, 533 U.S. 606, 632 (2001).

[49]    *See, e.g.*, *Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 441 (8th Cir. 2007); *Outdoor Graphics, Inc. v. City of Burlington, Iowa,* 103 F.3d 690, 694 (8th Cir. 1996); *Armour and Co, Inc. v. Inver Grove Heights*, 2 F.3d 276, 278 (8th Cir. 1993); *Scott v. City of Sioux City, Iowa,*  736 F.2d 1207, 1217 (8th Cir. 1984).

[50]    Although substantively identical, there is a slight difference between how the Supreme Court and the Eighth Circuit describe the elements of the test.  *Penn Central* and *Lingle* essentially use economic impact and reasonable investment-backed expectations as synonyms. *See Penn Central*, 438 U.S. at 124; *Lingle*, 544 U.S. at 538-39.  The Eighth Circuit, by contrast, separates out these considerations into separate prongs.  *See Hawkeye*, 486 F.3d at 441-442.

191036.2

*Ruckelshaus*, 467 U.S. at 1005.  Indeed, "a reasonable investment-backed expectation must be *more than a unilateral expectation or an abstract need*."  *Id.* (internal citation and quotation marks omitted, emphasis added).

Here, TCF had no reasonable investment-backed expectation to support its taking claim, for three reasons.  First, TCF had no reason to expect debit interchange levels to continue at past levels because Visa gave all issuing banks in its network actual notice not to expect debit interchange rates to stay at any particular level.  Second, because banking is a heavily regulated industry as detailed below, it is especially hard for TCF to demonstrate a taking.  Third, TCF continues to make a significant profit on its consumers' deposit accounts.  And fourth, TCF can continue to charge fees for debit services.  Therefore, precedent dictates that no taking exists here.[51]

### i.    Visa gave TCF actual notice not to expect any level of debit interchange.

TCF cannot now claim that it holds a reasonable expectation in continuing to receive high debit interchange rates from its Visa debit card offerings, for the simple reason that Visa told its bank issuer not to expect any level of debit interchange.[52]  As is mentioned in the factual discussion above, Visa informed its issuing banks that it has the sole power to set interchange rates.  Visa's operating regulations state that "Visa may establish different interchange

---

[51]     As explained in Defendants' brief, TCF has the additional problem that, for purposes of the Fifth Amendment, it possesses no property to be taken in the first place.  *See* Defs.' Br. at 12-19.  As the Eighth Circuit has held, a company in a heavily regulated industry cannot claim a property stake in an expectation of future income.  *See Hawkeye*, 486 F.3d at 440 (stating a company that bought gambling machines that the state then banned had no "property right in the *continuation* of its [business] for Takings Clause purposes.") (emphasis added).  Thus, TCF's claim that it has a property interest in "future" earnings has no merit at all.  TCF Opp. Br. at 44.  Of course, whether this Court views TCF's claim as invalid because it has no property affected by the Durbin Amendment, or because its property interest has not been taken, the result is the same: TCF's taking claim must fail.

[52]     While this section focuses on the notice that Visa gave to issuing banks including TCF, other debit networks gave similar notice to their own issuers.  *See* App. G (MasterCard notice).

reimbursement fees," and that "[i]nterchange is consistently monitored and adjusted - *sometimes increased and sometimes decreased*."  *See* VIOR, App. E, at 962 (emphasis added).  Visa's SEC filing emphasizes that Visa engages in "proper management" of interchange rates.  *See* Visa 10-K, App F, at 13.  Given that TCF has issued Visa's debit cards for over 15 years,[53] TCF also should know full well that Visa has routinely changed the "default"[54] interchange rates over the years, and that TCF therefore could not expect to receive any level of revenue from interchange.

Simply put, Visa sets TCF's interchange rate.  Visa has announced to its bank issuers including TCF that Visa has full authority to change the interchange rate.  And Visa has on a regular basis exercised that power to change interchange rates.  Indeed, as is discussed in the factual section above, on at least one occasion, Visa dropped the debit interchange rate by over 27% following the settlement of an antitrust case brought against it.  TCF flatly admitted that "issuers have always reasonably expected that Visa would make modifications to its fee structure."  TCF Opp. Br. at 12.  In this situation, it is not possible to take seriously an argument that TCF held a reasonable expectation to continue receiving past levels of interchange revenue.[55]  This is especially so because of the heavily regulated nature of the banking industry in the United States, and because of legal risk, as is discussed next.[56]

---

[53]     *See* TCF Am. Compl. at ¶ 27, 47.

[54]     Visa's rules technically permit issuing and acquiring banks to enter into bilateral interchange agreements, but these arrangements do occur not in practice.

[55]     If Visa had told issuers to expect interchange to stay unchanged, even that would not alter the conclusion that TCF has no reasonable expectation in existing interchange rates.  According to the Supreme Court, contracts between private parties cannot deprive Congress of its power to legislate, and cannot form the basis for a taking claim.  *See Connolly*, 475 U.S. at 223-224 (stating "when contracts deal with a subject matter which lies within the control of Congress, they have a congenital infirmity" and "[i]f the regulatory statute is otherwise within the powers of Congress, therefore, its application may not be defeated by private contractual provisions") (internal quotations and citation omitted).

[56]     TCF claims in its opposition brief that it did not expect Visa to drop TCF's interchange rates too low.  *See, e.g.,* TCF Opp. Br. at 16.  Whatever TCF now claims its expectations to be,

### ii.   Federal and state laws heavily regulate the banking industry, and so preclude TCF's taking claim.

Plaintiffs in industries that are heavily regulated have, at best, minimal investment-backed expectations.  In holding that no taking exists where a company complained when a federal law required it to either participate in a pension plan or pay a penalty, the Supreme Court stated that "[t]hose who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end."  *Connolly*, 475 U.S. at 227 (*quoting FHA v. The Darlington, Inc.*, 358 U.S. 84, 91 (1958)).  The Court reiterated the point in *Concrete Pipe*, noting that plaintiffs suing under the same pension law as in *Connolly* had "long been subject to federal regulation," 508 U.S. at 645, and so could not successfully pursue their taking claim.  The Eighth Circuit has done the same.  In *Hawkeye*, when a state prohibited a type of gambling machine that the plaintiff had invested in, the circuit held that there was no taking.  Rather, the court "discounted" the plaintiff's "expectations" because of "the heavily regulated nature of gambling in" the state.  486 F.3d at 442.

In this case, there is no serious argument that banks operate without heavy regulation.  To the contrary, the scheme of laws and regulations governing banks is both vast and venerable.  As the Supreme Court has stated, "[b]anking is one of the longest regulated and most closely supervised of public callings."  *United States v. Winstar Corp.* 518 U.S. 839, 844 (1996) (opinion of Souter, J.) (*quoting Fahey v. Mallonee,* 332 U.S. 245, 250 (1947)).  The modern structure for regulating banks has existed for almost a century, since at least 1913, when Congress passed the Federal Reserve Act (ch. 6, 38 Stat. 251) that created the Federal Reserve system.  Significantly, the Federal Reserve Act mandates that banks that are members of the

---

the bank's contract with Visa gives the network full power to set debit interchange rates as it sees fit, as is described above.  As proof of Visa's broad power, and TCF's acceptance of it, one need not look beyond Visa's decision to drop interchange rates by over 27%, and TCF's decision nonetheless to continue issuing Visa debit cards.

Federal Reserve must clear checks at their face value.[57]  During the Great Depression, Congress

passed the Glass–Steagall Act, (Pub. L. No. 73-66, 48 Stat. 162 (1933) , which created the

Federal Deposit Insurance Corporation ("FDIC") to guarantee consumers' deposits and requires

banks to pay fees that guarantee fund.  12  U.S.C. §1817(b).[58]  And since then, Congress has

passed a bevy of laws that govern virtually every aspect of banking conduct.  These include the

Banking Act of 1935 (Pub. L. No. 74-305, 49 Stat. 684) (making the FDIC a permanent agency),

the Financial Institutions Regulatory and Interest Rate Control Act of 1978 (Pub. L. No.  95-630,

92 Stat. 3641) (regulating electronic transfers); and the Fair and Accurate Credit Transactions

Act of 2003 (Pub. L. No. 108-159, 117 Stat. 1952) (concerning credit reporting and identity

theft).  In fact, the FDIC lists two dozen major banking laws that Congress has passed since the

time of the Civil War.[59]  And multiple federal agencies maintain oversight over banks, credit

unions, and other lending institutions.  These agencies have included the FDIC, the Office of the

Comptroller of the Currency, the Federal Reserve, the National Credit Union Administration, the

Office of Thrift Supervision, and the Federal Financial Institutions Examination Council.  As

with the statutes, the regulations are extensive: the FDIC lists 48 categories of regulations, and

the Federal Reserve lists 33.[60]

        Further, several regulations exist that specifically govern debit card fees.  For example,

---

[57]     *See* 12 U.S.C. § 360.  For a more detailed history of the Federal Reserve's efforts to
enforce at par interchange of paper checks in the 1920s, *see* Constantine, 2 N.Y.U. J. of L. &
Bus. at 152-157.
[58]     Portions of the Glass-Steagall Act, and other banking laws, of course have been modified
or repealed over the years.
[59]     *See* FDIC, Important Legislation, *available at*
http://www.fdic.gov/regulations/laws/important/index.html.
[60]     *See* FDIC Law, Rules and Regulations, *available at*
http://www.fdic.gov/regulations/laws/rules/2000-50.html; Board of Governors of the Federal
Reserve System, Regulations, *available at*
http://www.federalreserve.gov/bankinforeg/reglisting.htm.

191036.2

under the Electronic Fund Transfer Act (or "EFTA," the same statute in which the Durbin Amendment now appears) the Federal Reserve Board recently issued regulations concerning overdraft fees for debit and ATM transactions.  The new rules prohibit banks from assessing fees on consumers unless those consumers opt in to overdraft programs, after seeing Board-drafted disclosures.  74 Fed. Reg. 59033 (Nov. 17, 2009).  Indeed, in establishing its final rule on this topic, the Federal Reserve wrote that "[t]he legislative history of the EFTA makes clear that the Board has broad regulatory authority. . . .  Moreover, since no one can foresee EFT developments in the future, regulations would keep pace with new services . . . ." *Id.* at 59037.  And under the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*, the Board also has issued standards limiting the "penalty" fees credit card issuers can charge for late payments or "over-limit" transactions.  75 Fed. Reg. 37526 (June 29, 2010).

The large federal regulatory apparatus exists in addition to the laws, regulations, and agencies that the states maintain and enforce.  Additionally, private plaintiffs and government agencies that use the courts to vindicate legal rights, including antitrust claims, introduce further legal risk into the banking industry.

Given the enormous apparatus of banking laws, regulations, and agencies at both the federal and state levels, it is not plausible for TCF to assert a reasonable expectation in debit interchange rates continuing at past levels.  Rather, as the Supreme Court stated in *Connolly*, TCF "cannot object" to the "subsequent amendment" that the Durbin Amendment makes to banking law.[61]

**iii.    Because it continues to receive millions of dollars and**

---

[61]    Even though banking is heavily regulated, the industry is not a public utility.  *See, e.g.*, *Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub. Welfare*, 742 F.2d 442, 446 (8th Cir. 1984) (nursing homes not subject to ratemaking cases where they "have freedom to decide whether to remain in business and thus subject themselves voluntarily" to regulation).

191036.2

**other benefits from both its debit and broader deposit operations, TCF cannot show sufficient economic impact for a taking.**

TCF also cannot show sufficient economic impact to maintain its taking claim, given the continuing benefits, including substantial profits, that TCF will earn even after the Durbin Amendment goes into effect.

TCF admits that it will continue to take in approximately $20 million per year on debit operations even after the Durbin Amendment goes into effect. *See* TCF Am. Compl. at ¶ 102 ("TCF's annual debit interchange revenue will drop from approximately $102 million to approximately $20 million.").[62]  TCF's Chairman and CEO, William Cooper, has made the same point: "We'll obviously still be profitable but certainly not anywhere – certainly not as profitable if this revenue stream went away."[63]  *See also* Stautz Decl. at ¶¶ 6, 11.[64]

Even though TCF argues it should be entitled to continue to earn its "revenue stream" resulting from card networks' exploitive market power and price fixing, the Supreme Court has already rejected such a taking theory:

> [T]he submission that appellant may establish a "taking" simply by showing that they have been denied the ability to exploit a property interest that they heretofore had believed was available for development is quite simply untenable.

*Penn Central*, 438 U.S. at 130.  That is, "our cases have long established that *mere diminution* in the value of property, however serious, is insufficient to demonstrate a taking."  *Concrete Pipe*,

---

[62]     TCF has more recently specified that its profits will vary from over $15 million to nearly $26 million.  *See* Decl. of David M. Stautz, Mar. 3, 2011 ("Stautz Decl."), at ¶¶ 4, 9, Dkt. No. 102.

[63]     *See TCB-TCF Discusses Lawsuit Challenging Durbin Amendment Conference Call*, Oct. 12, 2010 ("TCF Conf. Call, App. I"), at 7.

[64]     Additionally, according to Digital Transactions, *Durbin Amendment Will Hurt, But It's No Apocalypse for Debit, McKinsey Report Says* (Mar. 7, 2011), *available at* http://www.digitaltransactions.net/news/story/2960, "banks are likely to earn more income over the next three years from demand deposit accounts, the checking accounts to which debit cards are linked.".

191036.2

508 U.S. 645 (emphasis added).  Here, TCF has shown, at most, "mere diminution," and that is not an interest sufficient to support a taking claim.  TCF's remaining revenues "are valuable, even if not as valuable as the rights" that plaintiff had hoped for.  *Penn Central*, 438 U.S. at 129.

Further, even if the Durbin Amendment were to eliminate all of TCF's revenues from its debit operation –which TCF itself admits it will not – TCF still would not present sufficient economic impact for a valid taking claim.  The Supreme Court has emphasized in multiple opinions that, when analyzing a taking claim, courts cannot look simply at the property that the regulation will affect:

> To the extent that any portion of property is taken, that portion is always taken in its entirety; the relevant question, however, is whether the property taken is all, or only a portion of, the parcel in question.

*Concrete Pipe*, 508 U.S. at 644.  In other words, "defining the property interest taken in terms of the very regulation being challenged is circular."  *Tahoe-Sierra*, 535 U.S. at 331.  Rather, courts must look to the plaintiff's entire economic interest.  "'Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated."  *Penn Central*, 438 U.S. at 130.  Therefore, "where an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking because the aggregate must be viewed in its entirety."  *DeBenedictis*, 480 U.S. at 498 (internal citation and quotation omitted).

Following that reasoning, the Supreme Court has refused to find a taking where, for instance, a penalty comprises "25 percent of the firm's net worth."  *Connolly*, 475 U.S. at 222.  In a case that TCF itself cites in its opposition brief, the Supreme Court held:

> So long as a railroad is not caused by . . . regulations to lose money *on its over-all business*, it is hard to think that it could successfully charge that its property was being taken for public use "without due compensation."

191036.2

*Baltimore & Ohio R.R. Co. v. United States*, 345 U.S. 146, 148 (1953).[65]  And in *Hawkeye*, the Eighth  Circuit noted that even though the new anti-gambling law had a "devastating economic impact" on the value of the business-line the company invested in, no taking existed because the plaintiff could still "possess, lease and sell" the banned gambling machines.  *Hawkeye*, 486 F.3d at 442.

Similarly, here, TCF's debit operation is, at most, a single "strand" of its overall business.  TCF itself has emphasized that its debit operations do not constitute a product.  As is discussed above in the fact section, TCF admits in its amended complaint that its debit operations are inseparable from its deposit accounts.[66]  TCF's Mr. Cooper has confirmed this, noting that, "[d]ebit cards are not a product in and of itself.  It's a delivery system for the checking account in a similar way that the checks are."[67]  As Mr. Cooper correctly explains, debit merely allows customers to access their demand deposit accounts, and TCF makes its money from investing and lending out the assets within those deposit accounts: "The checking and savings money is what we fund our loans with".[68]  *See also* TCF Am. Compl. at ¶ 24 ("Checking accounts constitute the *core* of TCF's deposits . . . and, like all banks, these core deposits overwhelmingly fund the lending side of the business") (emphasis added).  Mr. Cooper also stated that, wholly separately from the interchange it receives, TCF makes money by charging other fees to buttress

---

[65]    The Supreme Court also held that the plaintiff could not maintain a due process challenge under the Fifth Amendment where it claimed that under challenged regulations "the rates would produce less money than it would cost the railroads to carry the particular vegetables covered by each rate."  345 U.S. at 147.  Similarly, here, TCF cannot sustain a Fifth Amendment challenge where it continues to make money on its debit operations – the equivalent of "vegetables" in this case, or the "bun" in the language of TCF's Mr. Cooper – let alone its overall operations.
[66]    TCF Am. Compl. at ¶ 48.
[67]    *See* TCF Conf. Call, App. I, at 2.
[68]    *Id.* at 9

191036.2

its bottom line.[69]  TCF has nowhere alleged that the Durbin Amendment prevents it from making those investments, or from charging those fees.  To the contrary.  Mr. Cooper has firmly established that TCF will continue to make a profit even under the Durbin Amendment.  And TCF could further protect its profits if it switched the bulk of its signature debit transactions to lower-cost and lower-fraud PIN debit transactions.  Finally, TCF National Bank's revenues comprise only a portion of the revenues of the bank's parent company, TCF Financial Corporation.  *See* Stautz Decl., at ¶¶ 5, 10.

Therefore, even if the Durbin Amendment had completely eliminated every cent of revenue from TCF's debit operations, that would constitute only one portion of TCF's larger business interests that continue to maintain their value.  It follows that TCF's taking claim must fail.

### iv. Because TCF is free to charge other debit card fees, TCF cannot show sufficient economic impact.

TCF also has not suffered a taking because the Durbin Amendment does not regulate fees directly charged by TCF or any issuer (*i.e.*, *not* through a network) to merchants or their acquirers.  This is because Section 920(c)(8) defines interchange as follows: "The term 'interchange transaction' means any fee *established*, *charged, or received by a payment card network* for the purpose of compensating an issuer for its involvement in an electronic debit transaction." (emphasis added).  Thus, a bank issuer (including TCF) can set debit fees by directly negotiating with merchants or their acquirers, without running afoul of the Durbin

---

[69]     *Id.* at 7.  TCF's Mr. Cooper further explains that focusing solely on the profit of debit cards "would be like saying, what's the profit on the bun at Burger Chef.  We don't sell a bun. We sell a hamburger which is a checking account and we've got all the costs associated with that checking account and all of the revenues associated with that.  Now if you take all of our revenues and our expenses into consideration, our retail banking system makes a profit.  We'll obviously still be profitable [even if the Board promulgates debit card regulations pursuant to the Durbin Amendment]."  *Id.*

191036.2

Amendment.  Such individually-negotiated fees independent of the network would not be "established, charged or received by a payment card network."[70]

Such issuer-specific fees (*e.g.*, to recover that issuer's fixed costs or its costs of customer service) are permissible if they are transparent and subject to the discipline of market competition, and are therefore not imposed through or under network rules, including the Honor All Cards rules.

### b.   The Durbin Amendment is precisely the sort of public program legislation that defeats a taking claim.

As is mentioned above, the secondary test that *Penn Central* uses to analyze taking cases concerns "the character of the governmental action" and, more specifically, whether the "interference with property can be characterized as a physical invasion by a government" or, on the other hand, whether the "interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good."  438 U.S. at 124.  The Durbin Amendment is clearly the latter, and so does not effect a taking.

The Supreme Court has declined to recognize regulatory takings involving a range of legislative schemes.  These include laws regulating historic preservation (*Penn Central*), coal mining (*Keystone*), retirement pensions (*Connolly*; *Concrete Pipe*), gas station leases (*Lingle*), commercial development (*Tahoe-Sierra*), and disclosure of pesticide research (*Ruckelshaus*).  The Eighth Circuit has turned down regulatory takings challenges concerning laws regulating gambling (*Hawkeye*), land use zoning (*Outdoor Graphics, Inc.; Scott*), and land management

---

[70]    These debit card revenues could take many forms; an issuer simply would be prohibited from utilizing a network's market power or collective price setting to impose such issuer-specific fees because that would violate the Durbin Amendment.  For example, if an issuer sets individual prices and then requires merchants to pay them (directly or through the merchants' acquirers) under a network's "Honor All Cards" rules, merchants would have no choice but to pay whatever the issuer charges because they would have no ability to reject the cards.  If an issuer did that, such conduct would merely reinstate the current market failures through another means, and therefore would violate the Durbin Amendment.

191036.2

planning (*Armour and Co., Inc.*; *Block*).  And multiple federal courts have declined to recognize unconstitutional takings concerning the banking industry.[71]  The Durbin Amendment is a "public program" that accomplishes at least as much as all of these laws to "adjust[] the benefits and burdens of economic life to promote the common good," in accordance with *Penn Central*.

First and foremost, under the Durbin Amendment, networks and issuers will no longer be able to engage in unbridled price fixing or force merchants to operate under their systemic market power, and this alone will promote market competition, innovation, and increased consumer welfare.  Further, by forcing networks to start competing for merchant acceptance, merchant control over routing will promote market competition on price as well as non-price aspects of transactions such as network reliability, speed, and accessibility.  The increased transparency and competition that the Durbin Amendment provides will make it possible to lower prices for all consumers, and provide incentives to use more secure and lower-cost debit cards.[72]

---

[71]    *See, e.g., Castle v. United States,* 301 F.3d 1328 (Fed. Cir. 2002) (no taking where new banking legislation allegedly breaches contract between bank and federal regulatory agency); *Wash. Legal Found. v. Legal Found. of Wash.*, 271 F.3d 835 (9th Cir. 2001) (no taking violation where state rule requires that interest on lawyers' trust accounts be used to pay for indigent legal services); *F.D.I.C. v. Mahoney*, 141 F.3d 913 (9th Cir. 1998) (no taking violation where Resolution Trust Company uses receivership authority to repudiate lease held by bank); *Meriden Trust & Safe Deposit Co. v. F.D.I.C.,* 62 F.3d 449 (2d Cir. 1995) (no taking where FDIC holds one bank liable for default of affiliated institution); *Branch v. United States,* 69 F.3d 1571 (Fed. Cir. 1995) (no taking where Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA") authorized government to hold bank liable for defaults of affiliated institution and then place bank into receivership); *Resolution Trust Corp. v. Ford Motor Credit Corp.,* 30 F.3d 1384 (11th Cir. 1994) (no taking violation where Resolution Trust Company uses receivership authority to repudiate equipment lease held by bank); *Cal. Housing Securities, Inc. v. United States,* 959 F.2d 955 (Fed. Cir. 1992) (no taking where FIRREA authorized the seizure and liquidation of savings and loan by the Resolution Trust Corporation ); *Golden Pacific Bancorp v. United States*, 15 F.3d 1066 (Fed. Cir. 1994) (no per se or regulatory taking where Office of Comptroller of the Currency places bank into receivership).

[72]    Far from "subsidiz[ing] retailers at the expense of issuer banks," TCF Opp. Br. at 23, the increased transparency and competition that the Durbin Amendment provides will make it

191036.2

The current interchange system has harmed consumers in two other key ways, which the Durbin Amendment will address.  First, consumers in the United States now use debit cards far less frequently than consumers in other industrialized countries with minimal or at par interchange.  Thus, the Durbin Amendment can lead more Americans to use debit cards more frequently, and to take advantage of the benefits that debit cards offer over checks and cash.  Second, as is also discussed above, the high rates of debit interchange have allowed banks to use incentives to attract consumers to signature debit, while charging penalties for using PIN debit.  This has happened even though signature debit cards are far less secure and more costly than PIN debit cards, and therefore cause consumers to suffer from heightened levels of fraud and identity theft.  The Durbin Amendment will therefore lead issuing banks to stop promoting inferior signature debit over superior PIN debit.  Indeed, the new law will increase the likelihood that banks in the United States will adopt still newer technologies, already available in other countries, that have lower cost and fraud rates than either signature or PIN debit.

Thus, the Durbin Amendment is very much a public program that will adjust economic burdens to promote the common good.  Accordingly, no taking can be established here.

### B.     The proper remedy for a taking violation is just compensation.

Even if a taking violation had taken place here (and for the reasons discussed above, no taking has occurred), there are no grounds to enjoin enforcement of the Durbin Amendment by way of the taking clause, as TCF requests.  *See* Am. Compl. at ¶ 133.  Rather, the only remedy for a taking violation is "just compensation."  U.S. Const., Amend. V (stating "nor shall private property be taken for public use, without *just compensation*.") (emphasis added).  The Supreme Court has confirmed that the Fifth Amendment means what it says.  "As its text makes plain, the

possible to lower prices for all consumers, and provide incentives to use more secure and lower-cost debit cards.

Takings Clause 'does not prohibit the taking of private property, but instead places a condition on the exercise of that power.'" *Lingle*, 544 U.S. at 536 (*quoting First English Evangelical Lutheran Church of Glendale v. County of L.A.*, 482 U.S. 304, 314 (1987)).  Thus, the taking clause "is designed not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking."  *Lingle*, 544 U.S. at 536-37 (*quoting First English*, 482 U.S. at 315).  TCF therefore has no grounds to point to the compensation clause as a basis for enjoining the enforcement of the Durbin Amendment.

  **C.**  **If any Durbin Amendment provisions violate equal protection, they are severable.**

  In addition to its taking arguments, TCF argues that the Durbin Amendment violates the Constitution's equal protection guarantee by imposing restrictions on debit interchange on large banks but not smaller ones.  For the reasons discussed in the defendants' brief, TCF's equal protection arguments are meritless.  *See* Defs.' Br. at 33-35.

  It is also worth noting that the banking industry is trying to have it both ways on this point.  In the context of the Federal Reserve's regulatory proceeding (including in the media and in Congress), debit networks and banks argue that small issuers ultimately will receive the *same* interchange as large issuers such as TCF.[73]  It is hard to take seriously TCF's charge that the

---

[73]  As Visa General Counsel Joshua Floum has alleged, "victims of the Durbin Amendment" will include "credit unions, community banks and other smaller financial institutions, who although are theoretically exempted from the Durbin amendment, in actuality are straight in its crosshairs."  Donna Borak, *Visa Mulls Litigation 'Options' in Debit Battle*, American Banker, Feb. 17, 2011.  His boss, Visa CEO & Chairman Joseph Saunders, reiterated the point, claiming "[t]hough smaller institutions are theoretically exempt from the fee rules, market forces created by the law will drive volume toward lower rates, negating any benefit intended by the exemption."  Joseph W. Saunders, *Proposed Debit Rules Would Harm All*, American Banker, Feb. 1, 2011.  *See also* Letter from American Banking Association and state banking associations to Members of the U.S. Senate and House of Representatives, Feb. 8, 2011 ("The proposed rule to implement the amendment, announced by the Federal Reserve in December,

Durbin Amendment will give small banks an unconstitutional advantage, when Visa and TCF's peers say that small banks will have no advantage at all.

However, if this Court nonetheless holds that portions of the Durbin Amendment violate the Constitution's equal protection guarantee, this Court should sever those specific provisions. It should do so, and refrain from enjoining the remainder of the Durbin Amendment, for two reasons. First, the severed law will continue to fully function. Second, Congress intended the law to be severed from any unconstitutional provisions.

As to the first point, courts refrain from striking down any more than the minimum of an unconstitutional statute:

> [A] court should refrain from invalidating more of the statute than is necessary. . . . Whenever an act of Congress contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of this court to so declare, and to maintain the act in so far as it is valid.

*Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987) (internal quotations and citations omitted). To make the decision of whether the statute can stand, the Supreme Court has held that "[u]nless it is evident that the Legislature would not have enacted those provisions which are within its power independently of that which is not, the invalid part may be dropped." *Id.* (internal quotations and citations omitted). *See also Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3161 (2010) ("'Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem,' severing any 'problematic portions while leaving the remainder intact.'").

Further, where a provision "by its very nature is separate from the operation of the substantive provisions of a statute," the Court has upheld the remaining provisions of the statute.

---

will cause severe harm to the entire banking industry and, in particular, to community-based banks and the communities they serve"). *See* http://www.aba.com/aba/documents/blogs/DoddFrank/InterchangeToCongressFeb8.11.pdf.

191036.2

*Brock*, 480 at 684-85.  Following that reasoning, in *Brock*, the Supreme Court upheld provisions of a statute that protected airline employees, where the unconstitutional provision was limited to improperly granting Congress a veto over agency regulations implementing the statute.  *Id.* at 680, 684.  In other words, courts should sever the unconstitutional provisions "if what is left is fully operative as a law."  *Id.* at 684.  *See also Free Enterprise*, 130 S. Ct. at 3161 (upholding Sarbanes-Oxley Act where it "remains fully operative as a law" absent a stricken provision).

Here, if this Court holds that equal protection concerns invalidate the portion of the Durbin Amendment exempting banks with assets below $10 billion, it should uphold the remainder of the Durbin Amendment.  The exemption for small banks is just that – an exemption.  It in no way impedes the main thrust of the bill, which obliges banks to charge lower interchange rates to merchants and provide routing options to them.  Put another way, as drafted, the Durbin Amendment requires non-exempt banks to charge reasonable and proportional interchange, and requires debit card networks to provide more routing options for debit transactions.  If the exemption is deleted, then those two key requirements will remain in force.  Thus, "what is left is fully operative as a law."  *Brock*, 480 U.S. at 684.

As to the second point, courts must give weight to language calling for the statute to be severed from unconstitutional provisions:

> The inquiry is eased when Congress has explicitly provided for severance by including a severability clause in the statute.  This Court has held that the inclusion of such a clause creates a presumption that Congress did not intend the validity of the statute in question to depend on the validity of the constitutionally offensive provision.

*Brock,* 480 U.S. at 686.  This is especially true with strong severability clauses.  "Congress itself has provided the answer to the question of severability" when the "language is unambiguous" and "Congress could not have more plainly authorized the presumption" to sever.  *I.N.S. v. Chadha*, 462 U.S. 919, 932 (1983).

Here, as in *Chadha*, Congress has provided the answer to the question of severability.

Section 3 of the Dodd-Frank Act, 12 U.S.C. § 5302, states:

> If any provision of this Act, an amendment made by this Act, or the application of such provision or amendment to any person or circumstance is held to be unconstitutional, the remainder of this Act, the amendments made by this Act, and the application of the provisions of such to any person or circumstance shall not be affected thereby.

Just like in *Chadha*, this language is "unambiguous."  By providing a categorical intent to sever, "Congress could not have more plainly authorized the presumption."  *Chadha*,  462 U.S. at 932.

Therefore, this Court must retain any portion of the Durbin Amendment it does not strike down.

## IV.    CONCLUSION

For the reasons discussed above, this Court should deny TCF's motion to preliminarily enjoin enforcement of the Durbin Amendment as it relates to the taking clause, and grant defendants' motion to dismiss TCF's case.

191036.2

Respectfully submitted,

DATE:  March 11, 2011

/s/ Thomas K. Wilka

Thomas K. Wilka (Counsel of Record)
HAGEN, WILKA & ARCHER, LLP
600 South Main Avenue, Suite 102, P.O. Box 964
Sioux Falls, SD 57104
Tel: (605) 334-0005
Fax: (605) 334-4814

W. Stephen Cannon
Todd Anderson
Richard O. Levine
Evan P. Schultz
CONSTANTINE CANNON LLP
1301 K Street N.W., Suite 1050 East
Washington, DC 20005
Tel: (202) 204-3500
Fax: (202) 204-3501

Jeffrey I. Shinder
CONSTANTINE CANNON LLP
335 Madison Avenue, 9th Floor
New York, NY 10017
Tel: (212) 350-2700
Fax: (212) 350-2701

*Attorneys for Retail Litigation Center, Inc.*

191036.2

## LOCAL RULE 7.1(B)(1) TYPE-VOLUME CERTIFICATE

Pursuant to Local Rule 7.1(B)(1) and this Court's Order of December 10, 2010 (Dkt. No. 47), I certify that the foregoing brief contains 11,983 words, excluding the cover page, table of contents, table of authorities, signature block, certificates, and appendices.

/s/ Thomas K. Wilka

Thomas K. Wilka
HAGEN, WILKA & ARCHER, LLP
600 South Main Avenue, Suite 102, P.O. Box 964
Sioux Falls, SD 57104
Tel: (605) 334-0005
Fax: (605) 334-4814

37

191036.2

## CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2011, a copy of the Retail Litigation Center, Inc.'s foregoing amicus brief and the accompanying appendices were filed electronically via the Court's ECF system, which sent notification of such filing to counsel of record.  I also certify that counsel to the RLC has mailed a printed copy to the Judge's address.

/s/ Thomas K. Wilka

Thomas K. Wilka
HAGEN, WILKA & ARCHER, LLP
600 South Main Avenue, Suite 102, P.O. Box 964
Sioux Falls, SD 57104
Tel: (605) 334-0005
Fax: (605) 334-4814

191036.2