UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

---

| | |
|---|---|
| TCF National Bank, | Case No. 4:10-cv-04149-LLP |
| Plaintiff, | |
| v. | [SECOND AMENDED] PROPOSED FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ON MOTIONS FOR (i) PRELIMINARY INJUNCTION; AND (ii) TO DISMISS |
| Ben S. Bernanke, Janet L. Yellen, Kevin M. Warsh, Elizabeth A. Duke, Daniel K. Tarullo, and Sarah Bloom Raskin, the Board of Governors of the Federal Reserve System, in their official capacities; and John Walsh, Comptroller of the Currency, in his official capacity, | |
| Defendants. | |

---

On April 4, 2011, the above-entitled matter came before the undersigned on the (i) motion of TCF National Bank for an order preliminarily enjoining enforcement of certain aspects of the Durbin Amendment, 15 U.S.C. § 1693o, of the Dodd-Frank Wall Street Reform and Consumer Financial Protection Act of 2010; and (ii) motion of defendants to dismiss the Amended Complaint. Mark V. Meierhenry of Meierhenry Sargent LLP, Timothy D. Kelly of Kelly and Hannah, P.A., Richard Epstein, and Martin L. Saad of Venable LLP appeared on behalf of plaintiff TCF National Bank. Bradley H. Cohen of the U.S. Department of Justice appeared on behalf of all defendants.

Based upon all the files, records, and proceedings herein and such oral argument as was heard, the undersigned hereby enters the following:

## ***PRELIMINARY* FINDINGS OF FACT**

A. **Background.**

1. Plaintiff TCF National Bank ("TCF") is a national bank with assets of $18 billion operating in eight states and is among the leading issuers of Visa debit cards in the United States.

2. The individual defendants are the members of the Board of Governors of the Federal Reserve Board of the United States (the "Board") and the Comptroller of the Currency of the United States ("Comptroller"). From time to time herein, all the defendants will be referred to herein as "the Government."

3. On October 12, 2010, TCF commenced this action against the Board and later moved for a preliminary injunction to bar enforcement of parts of the Durbin Amendment, which TCF contends facially violate the Due Process and Equal Protection clauses of the Fifth Amendment to the United States Constitution and, if TCF becomes subject to its restraints, will irreparably harm TCF by preventing TCF from recovering all the costs of providing debit card services to customers or retailers, and from recovering a reasonable profit on its investment by treating TCF differently than 99 percent of its competitors.

4. On January 27, 2011, TCF amended the Complaint and added the OCC as a defendant.

5. On February 18, 2011, the Government moved to dismiss the Complaint.

### B. The Debit Card Business.

6. This action involves the debit card payment system. Checking account holders use debit cards to pay merchants electronically for purchases. Over the last ten years, the debit card has become the primary way consumers purchase goods and services in transactions with merchants in this country. Debit cards are used today more often than checks or credit cards and as often as cash. In 2000, there were only 8 billion debit card transactions in this country, and in 2009 there were 38 billion.

7. Debit cards are issued by banks, credit unions, or savings institutions to their depository customers, and each debit card is affiliated with a card network, *e.g.*, Visa, MasterCard, Discover. It is the network logo on the cards, and the agreement of the issuing banks and merchants to abide by the rules of these networks, that allow debit cards to be honored by millions of merchants worldwide. All network-affiliated debit cards provide the same functionality to cardholders for purposes of this case.

8. Issuers incur many expenses in providing debit card services, including advertising and marketing expenses to gain customers, account opening and debit card issuance expenses, customer service costs for inquiries and disputes (automated telephone services for questions and complaints), and monthly statement issuance costs. Issuers also incur other costs related to their debit cards for support services like fraud detection and response, data security, and information technology services. Finally, issuers incur certain fraud (stolen cards) and overdraft (insufficient funds in account at settlement) losses that cannot be charged back if the issuer authorized the transaction and if the merchant followed network rules as to the transaction. In other words, in ordinary

3

transactions, the bank--not the merchant--takes the fraud or overdraft risk and suffers any loss on such transactions.

9. All the foregoing expenses are in addition to the expenses of electronically processing each debit card transaction, which is commonly referred to as a "swipe." The cost of processing individual electronic debit transactions is a small fraction of the overall cost issuers incur to provide debit card services.

10. In general, issuers today do not charge their depository account customers for issuance of debit cards or for use. Instead, merchants banks (known in the industry as "acquirers") pay card-issuing banks "interchange fees," and the acquirers seek to cover these interchange fees through the "merchant discount," which the acquirer deducts from the proceeds that it forwards to the merchant for purchases that are paid using debit cards.

11. For example, if a TCF customer uses his debit card to buy $38 of merchandise (TCF's average transaction), the retailer delivers the transaction electronically to its own bank (the acquirer) and receives $38 minus the "merchant discount," say two percent. The acquirer forwards the charge electronically to TCF through the Visa network. TCF charges the customer's account the $38 that the customer agreed to pay the merchant for the merchandise. The 76¢ difference between the $38 charged to the customer and the $37.24 the acquirer pays to the merchant enables the acquirer to cover fees it pays to Visa and to TCF for operating the payment network and issuing the payment card to the merchant's customer, as well as the acquirer's other costs of doing business and the acquirer's profit. The portion of the 76¢ that TCF receives

from the acquirer for serving as card issuer to the merchant's customer is called the "interchange fee."

12. This case involves a constitutional challenge to the first regulation ever of interchange fees by Congress. Until now, these fees have been unregulated. They are set by the network (Visa, MasterCard, etc.) for all issuers and acquirers operating on that network and are published. (Issuers may make individual private arrangements with merchants or acquirers regarding interchange rates, in lieu of the default rates set by a network, which generally does not happen.) The Durbin Amendment does not regulate either the acquirer's fee to the merchant, or the network's fee to the acquirer, but only the interchange fee paid by acquirers to banks that issue the debit card.

C. **TCF's Debit Card Business.**

13. In 1995, TCF began distributing Visa debit cards to its checking account customers at no charge for issuance or use of the card. Today, more than 800,000 customers use TCF branded Visa debit cards each month and TCF has over 1.5 million customers with TCF's Visa debit cards in their hands. TCF is the 11th largest issuer of Visa® Classic debit cards in the country, and last year TCF customers "swiped" their debit cards over 200 million times, which generated interchange revenue to TCF of just over $100 million, *i.e.*, average transaction $38; average interchange yield 48¢.

14. TCF faces competition in all its branch locations from both larger and smaller banks that offer competing free checking and offer debit card products. No bank or other depository institution in this country today could offer a checking account product without also offering a debit card.

### D. TCF's Relationship with Visa.

15.     TCF currently has a contract to issue Visa debit cards until 2016 that can only be terminated by Visa for cause. This contract began in 2006 with a ten-year term and has five years left to go. Among other things, Visa has promised TCF that it will not set default interchange rates to TCF different than the rates which it sets for other Visa debit issuers.

16.     In the last 15 years, with one brief exception, Visa's weighted average interchange rates to TCF have stayed within a range of 135-165 basis points (most recently at 138 basis points), or about 48¢ for the average transaction. This pricing is consistent with Visa's interchange pricing to its other issuers over the same period. Visa promises all its issuers that it constantly monitors and adjusts interchange rates to ensure that the economics of the rate present a competitive value proposition for all parties. Visa has acknowledged that, in setting default interchange rates, it does consider the costs to issuers of debit card service, among many other factors, including competition from other networks. TCF has submitted expert evidence that from an economic perspective it would not be in the interest of Visa to set an interchange rate below issuer cost, or without profit to the issuer.

17.     TCF has also submitted evidence that, absent the Durbin Amendment, TCF could sell its future debit income stream in the capital markets for a substantial amount now.

6

E.   **The Durbin Amendment.**

18.   TCF does not challenge the entire Durbin Amendment. The portions of the Durbin Amendment at issue here, subsections (a)(2), (4), and (6), address only interchange fees that issuers receive *from networks*.

19.   Paragraph (a)(2) of the Durbin Amendment provides that, effective July 21, 2011, "any interchange transaction fee that an issuer may receive from a network for or charge with respect to an electronic debit transaction shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction."

20.   Paragraph (a)(3) of the Durbin Amendment requires the Board to issue rate "standards" by April 21, 2011 in regard to paragraph (a)(2), as set forth below.

21.   Paragraph (a)(4) of the Durbin Amendment requires the Board to "consider" and "distinguish" certain elements in issuing standards to assess a fee's compliance with paragraph (a)(2). Paragraph (a)(4)(B) requires the Board to distinguish between:

  (i)   the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance or settlement of a particular electronic debit transaction, which cost shall be considered under paragraph (2); and

  (ii)  other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which costs shall not be considered under paragraph (2).

22.   This case focuses on the legal effect of these cost recovery restrictions. TCF alleges that, on its face, the Durbin Amendment prevents it from recovering its actual costs of providing debit service. TCF also alleges that, on its face, the Durbin

Amendment prohibits TCF from obtaining a profit for debit services from merchants and from receiving any profit or other return from merchants on debit service.

23. Paragraph (a)(3) of the Durbin Amendment requires the Board to conduct rulemaking and issue "regulations in final form" by April 21, 2011 that establish standards for determining whether an interchange fee complies with paragraph (a)(2).

24. Prior to the hearing, TCF supplied the Court with a copy of a March 29, 2011 letter from Federal Reserve Chairman Bernanke to the committee of the U.S. Senate involved in banking regulation stating that the Board will be unable to issue a final rule by the statutorily mandated date of April 21, 2011 but will issue a final rule by July 21, 2011, the date upon which, by its own terms, the Durbin Amendment's debit card fee provisions go into effect.

25. TCF does not challenge paragraph (a)(3), but instead challenges the mandatory provisions of (a)(2) and (a)(4), which apply to TCF and other regulated issuers effective July 21, 2011, and more particularly that after that date the "transaction fee" TCF may charge or receive for a debit transaction through a network must conform to the foregoing definition of "reasonable and proportional" to cost.

F. <u>The Small Issuers Exemption.</u>

26. Paragraph (a)(6) of the Durbin Amendment exempts from its mandated interchange rate reductions debit card issuers with less than $10 billion in assets, paragraph (a)(6) (and calls them "Small Issuers"). This exemption of so-called Small Issuers includes over 99 percent of all banks in this country that issue debit cards. The exempt banks control about 50 percent of all U.S. bank branches, including banks with

which TCF competes in all its locations. As a result, the interchange fees of only about 60 debit card issuers nationwide will be regulated by the Durbin Amendment. In Minnesota, for example, only five banks are subject to the interchange rate limits and hundreds of banks are exempted.

27.     TCF contends, and has submitted evidence in support of the contention, that the Small Issuer exemption makes it impossible for TCF to mitigate the revenue losses it claims that it will suffer from the Durbin Amendment by charging its own customers for debit services.

28.     TCF contends that the Small Issuer exemption in paragraph (a)(6) violates the Equal Protection Clause of the Fifth Amendment to the U.S. Constitution.

29.     The Durbin Amendment and the Board rules will take effect on July 21, 2011, paragraph (a)(9). Even if the Board did not issue final rules by that date, by its terms the Durbin Amendment compels TCF and other regulated banks to conform their interchange fees according to paragraph (a)(2) of the Durbin Amendment.

G.     **The Proposed Rule.**

30.     On December 16, 2010, pursuant to subsection (a)(3), the Board issued proposed regulations, presented two alternatives as to interchange rates, and asked for comments as to which alternative it should adopt. In short, one proposal allowed a safe harbor of 7¢ per transaction, but no more than 12¢ if an issuer could show ACS costs in excess of 7¢; the alternative was a flat rate of 12¢. The Board found that current interchange was about 44¢ for an average-sized transaction, so the revenue reduction for TCF would be 70 to 80 percent under the proposed alternatives.

9

31. In its November 2010 motion papers, TCF had calculated the post-Durbin interchange rate by applying its own costs to the terms of the Durbin Amendment and had submitted a 7¢ per swipe interchange rate as the amount allowed under the Durbin Amendment.

32. By its terms, the Proposed Rule would prevent regulated issuers from receiving interchange rates after July 21, 2011 that will allow the issuers to recover all their costs of debit services. The Board recognized this fact and suggested that regulated issuers could raise revenue in other ways to adjust for lost interchange revenue; for example by charging debit card usage fees to their customers.

33. The Board acknowledged that either option under the Proposed Rule would not allow regulated issuers to recover all the expenses of debit card service from merchants through interchange revenue, either fixed or variable. The Proposed Rule excluded the following "other costs:"

- fraud and overdraft costs;
- fixed costs;
- network processing fees;
- costs associated with providing debit cards to customers;
- account set-up costs;
- customer statement costs;
- cardholder rewards; and
- customer service costs, *e.g.*, telephone banks.

34. Shortly after the Board issued Proposed Rules, Visa and other networks (but not MasterCard) announced that they would issue two tiers of pricing--one for exempt banks, presumably current rates, and one for regulated banks, presumably consistent with the final rule to be issued by the Board.

35. TCF submitted expert and other evidence that, due to the Small Bank exemption, TCF will not be able to charge its customers for debit card services directly or indirectly and, therefore, TCF, which must continue to offer debit card services to stay in business, cannot mitigate revenue lost by the Durbin Amendment by charging its customers fees for debit card services or increasing other fees.

36. The Government speculated that, once the Board issues rules about "routing" of debit card transactions, any reduction in debit card interchange would soon become binding on small banks too and then the Small Bank exemption may not be effective, but this contention is speculation.

### H. The Effects of the Durbin Amendment on TCF.

37. TCF has submitted extensive evidence of the harm it contends it will suffer once the Durbin Amendment goes into effect, including a reduction of debit card interchange revenue from over $8 million per month to under $2 million per month, *i.e.*, a reduction of interchange revenue of over $80 million per year. This result arises under either TCF's view of how the Durbin Amendment will work or under the first alternative of the Proposed Rule. In addition, TCF has submitted evidence that on an enterprise-wide basis, a checking account basis, or a debit card only basis, TCF will not enjoy after the Durbin Amendment a rate of return on its capital sufficient to attract new capital and that TCF, therefore, fails the *Hope* and *Duquesne* Financial Integrity Test. But, in view of the disposition of the preliminary injunction motion, the Court need not examine this evidence unless and until the Court is called upon to apply the *Dataphase* factors to a preliminary injunction motion. For purposes of the motion, the Court preliminarily finds

that TCF's interchange revenue will drop about $6 million per month after July 21, 2011 as a result of the Durbin Amendment.

## *PRELIMINARY* CONCLUSIONS OF LAW

### A. Jurisdiction and Venue.

1. This Court has jurisdiction over this action under 28 U.S.C. § 1331, and venue is proper under 28 U.S.C. § 1391(e)(3) and 28 U.S.C. § 1348, except jurisdiction over the OCC is not clear at this time. *See Ridder v. Office of Thrift Supervision*, 146 F.3d 1035 (D.C. Cir. 1998).

### B. Property Interest.

2. TCF has a property interest for purposes of the protections of the Due Process and Equal Protection Clauses of the U.S. Constitution in its debit card business, including the future revenues (or "earning power") of that business. *Kimball Laundry Co. v. U.S.*, 338 U.S. 1 (1949) (Tr. 86). For purposes of any *Penn Central* test, the property interest may require further scrutiny.

### C. Ripeness.

3. TCF's claims of facial unconstitutionality of the Durbin Amendment are ripe for adjudication because the statute on its face will cause TCF to lose millions of dollars of monthly and annual debit interchange revenue when its provisions take effect on July 21, 2011 (Tr. 83), but the claims as to the unconstitutionality of any final rule are not yet ripe (*Id.*).

D. **Form of Preliminary Injunction Analysis.**

4. The proper form of analysis of the preliminary injunction motion here is found in *Planned Parenthood Minnesota v. Rounds*, 530 F.3d 724, 732-33 (8th Cir. 2008) (Tr. 84). That case requires the Court to examine first the likelihood that the plaintiff will demonstrate at trial that the challenged statute is unconstitutional before the Court applies the *Dataphase* factors. If a likelihood of demonstrating unconstitutionality is not shown, then the Court shall not perform a *Dataphase* analysis (*Id.*).

E. **Likelihood of Success.**

5. The proper test under the Due Process Clause of the U.S. Constitution for TCF's claim is the rational basis test (Tr. 87), not the confiscatory rate test found in cases such as *Hope* and *Duquesne*. TCF is not compelled by law to continue to offer debit services after the Durbin Amendment becomes effective and is not a utility "engaged in the type of continuous production of output for the benefit of the public," which is the trademark of a classic utility (Tr. 87). Thus, TCF will only suffer harm if TCF voluntarily continues to provide those services at rates it contends are confiscatory. TCF likely cannot base a regulatory Takings or a Substantive Due Process claim on such voluntary conduct. *Minnesota Association of Health Care Facilities v. Minnesota Dep't of Public Welfare*, 742 F.2d 442 (8th Cir. 1984).

6. As a preliminary matter, there is conflicting evidence as to whether increases in interchange amounts paid by merchants are due to rate increases from the networks or to transaction volume increases (Tr. 87-88); there are conflicting contentions as to whether interchange rates are less in foreign countries like Canada, New Zealand,

13

Australia, and the European Union than in this country because the cost of debit service is transferred to the consumer (Tr. 88); there does appear to be a "lack of price competition" (*Id.*). Those factors "do provide a reasonable basis for the Durbin Amendment" (Tr. 88).

7. TCF contends that, as a business matter, it cannot drop debit service as a way to avoid the impact of the Durbin Amendment. That may be true but it does not constitute the type of compulsion necessary to raise a Takings or a Substantive Due Process claim alleging confiscatory rate (Tr. 86).

8. Ninety-nine percent of debit card issuers (who control nearly half the bank branches in this country) are exempted from the debit card fee provisions. The exemption may so undermine those provisions as to create a debit card market where one group of suppliers is favored over another group with no persuasive reason to divide the two. The presence of so large an exempted group is fundamentally contradictory to the apparent purpose of the statute of reducing interchange rates to merchants. The Court is given pause by the contention the Durbin Amendment violates TCF's right to Equal Protection under the Fifth Amendment of the U.S. Constitution, "but at this preliminary stage, the Court does not find the distinction between [card issuer] financial institutions is irrational" (Tr. 91-92).

9. The Court, therefore, concludes TCF has failed to demonstrate a likelihood that the Durbin Amendment is unconstitutional and has failed to satisfy the first step of the *Planned Parenthood* test, so the Court may not proceed to apply the *Dataphase* test (Tr. 92).

F.   **Motions to Dismiss.**

10.   The motions to dismiss the Amended Complaint for failure to state a claim upon which relief may be granted are not meritorious except as set forth below.

11.   The Government contends, by virtue of 12 U.S.C. § 1818(i)(1), that no jurisdiction lies against the OCC in regard to the Amended Complaint. The Court will take this motion under advisement.

## ORDER

1.   The Government's motion to dismiss is DENIED, except that the motion to dismiss the OCC as a party is taken under advisement.

2.   TCF's motion for a preliminary injunction is DENIED.

3.   It has been suggested that the Durbin Amendment must be analyzed for constitutionality under the two-part test set forth in *Penn Central Transp. Co. v. New York*, 438 U.S. 104 (1978), but that cannot be done until the Board has issued its final rule, apparently sometime between April 21 and July 21, 2011 (Tr. 89-90). The Court requests prompt additional briefing from the parties upon issuance of the final rule as to (i) the applicability of *Penn Central* to this case; (ii) the nature and extent of TCF's property interest for purposes of a *Penn Central* test; and (iii) whether TCF's property interest may be different for a Due Process analysis (*Id.*).

SO ORDERED.

Dated: _____   BY THE COURT:

_____
Lawrence L. Piersol
United States District Court Judge