UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| TCF NATIONAL BANK,<br><br>Plaintiff,<br><br>v.<br><br>BEN S. BERNANKE, JANET L. YELLEN, KEVIN M. WARSH, ELIZABETH A. DUKE, DANIEL K. TARULLO, and SARAH BLOOM RASKIN, in their official capacities as members of the Board of Governors of the Federal Reserve System; and JOHN WALSH, in his official capacity as Acting Comptroller of the Currency,<br><br>Defendants. | Case No. 4:10-cv-04149-LLP<br><br>**PROPOSED FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

This matter comes before the Court on (1) Plaintiff TCF National Bank's Motion for a Preliminary Injunction and (2) a Motion to Dismiss Plaintiff's complaint, filed by Defendants Ben S. Bernanke, Janet L. Yellen, Kevin M. Warsh, Elizabeth A. Duke, Daniel K. Tarullo, and Sarah Bloom Raskin, in their official capacities as members of the Board of Governors of the Federal Reserve System (collectively "the Board"), and John Walsh, in his official capacity as Acting Comptroller of the Currency ("the OCC").  Argument on both motions was heard on April 4, 2011 in Sioux Falls, South Dakota.  The Court hereby finds as follows:

**FINDINGS OF FACT**

**I.      15 U.S.C. § 1693o-2(a)**

1. On July 21, 2010, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376, section 1075 of which amended the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693-1693r, by adding new provisions regulating debit card interchange fees.  Defs.' Mem. in Supp. of Mot. to Dismiss Pl.'s Claims and Resp. in Opp. to Pl.'s Mot. for a Prelim. Inj. ("Defs.' Mem.") (Doc. No. 63) at 8.

2. As revised, § 1693o-2(a)(1) authorizes the Board to "prescribe regulations . . . regarding any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction . . . ."  Under § 1693o-2(a)(2), "[t]he amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction."  Section 1693o-2(a)(3) requires the Board to "prescribe regulations . . . to establish standards for assessing whether the amount of any interchange transaction fee described in paragraph (2) is reasonable and proportional to the cost incurred by the issuer with respect to the transaction."  Defs.' Mem. at 8.

3. To establish standards for determining whether an interchange transaction fee is reasonable and proportional, § 1693o-2(a)(4) requires the Board to consider the "functional similarity" between debit transactions and checking transactions that are "required within the Federal Reserve bank system to clear at par."  The Board must also distinguish between "the incremental cost incurred by an issuing bank for its role in the authorization, clearance, or settlement of a debit transaction," and "other costs . . . which are not specific to a particular

electronic debit transaction." The statute prohibits the Board from considering these latter costs in prescribing its regulation. Defs.' Mem. at 8.

4.      The main objective of § 1693o-2(a) was twofold: (1) to ensure that interchange fees are reasonable and (2) to prevent retailers and consumers from having to bear a disproportionate amount of costs of the debit card system. Defs.' Mem. at 26-27.

5.      In addition, the Board may allow for adjustments to an interchange fee "if such an adjustment is reasonably necessary to make allowance for" an issuer's costs in preventing debit card fraud, provided that the issuer complies with fraud-prevention standards. Section 1693o-2(a)(6) exempts issuers that, together with affiliates, have assets totaling less than $10 billion, and § 1693o-2(a)(7) exempts debit cards for government-administered payment programs and certain reloadable prepaid debit cards. Defs.' Mem. at 8.

6.      In his floor statement introducing the bill, Senator Richard Durbin explained the rationale behind the exemption for smaller institutions by noting that "we are not trying to create any hardship on community banks and credit unions. Instead, we are going after the largest banks and credit card companies for what I consider to be unreasonable conduct when it comes to the treatment of small businesses and retail businesses." Defs.' Mem. at 34.

7.      Senator Durbin also rejected the notion that the statute would hurt consumers, stating that "[s]ome have argued that we would reduce credit availability by regulating credit card interchange rates. However, the amendment's reasonable fee requirement only applies to debit cards; it doesn't apply to credit cards . . . [and it] exempts small banks and credit unions and thrift savings and loans . . . ." Defs.' Mem. at 35.

8.      The law does not apply to credit card interchange fees or any other aspects of issuing banks' checking account products. Defs.' Mem. at 8.

## II.     THE BOARD'S ROLE AS REGULATOR

9.     Within days of the passage of Dodd-Frank, Board staff began meeting with parties interested in the interchange fee rulemaking, including representatives of merchants and retailers, representatives of card-issuing banks, Visa, MasterCard, American Express, and others to discuss the interchange fee provisions.  In September 2010, the Board distributed surveys to issuers, payment card networks, and merchant acquirers to assist it in developing proposed new rules governing interchange fees.  Defs.' Mem. at 9.

10.     In December 2010, the Board issued its proposed rule.  The Board requested public comment on two alternative standards for determining whether the amount of an interchange fee is reasonable and proportional to the issuer's transaction costs.  Public comments on the proposed rule were submitted by February 22, 2011.  The statute directs the Board to prescribe its regulations in final form by April 21, 2011, but they do not take effect until July 21, 2011.  Defs.' Mem. at 9.

11.     On March 29, 2011, Board Chairman Ben Bernanke informed Congress that the Board would not meet the April 21 deadline for prescribing the final rule, but that the Board was committed to meeting the Act's directive to issue final rules regarding network exclusivity and routing by July 21.  Doc. No. 149.

## III.     STRUCTURE OF PAYMENT CARD NETWORK

12.     Section 1693o-2 was passed in response to United States consumers' increasing reliance on payment cards, including credit, debit, and prepaid cards, as their preferred form of payment over cash and checks.  Nearly 38 billion debit card payments were made in the United States in 2009, and debit cards, which are now used in 35 percent of noncash payment

transactions, have eclipsed checks as the most frequently used noncash payment method. Defs.' Mem. at 4.

13. The current payment card system was established in the 1970s by Bank of America, operating its BankAmericard system, the predecessor to Visa U.S.A. ("Visa"). Visa and MasterCard International are currently the two largest payment card associations in the United States, accounting for three-fourths of the payment card market in 2008. Any financial institution that is eligible for FDIC insurance may join Visa. Defs.' Mem. at 4-5.

14. Visa does not issue payment cards; instead, it licenses member banks to do so. Visa members have the right to issue Visa cards and to acquire Visa transactions from merchants that accept Visa cards. In exchange, they must follow Visa's bylaws and regulations. Defs.' Mem. at 5.

15. Debit cards allow card holders to access their bank accounts directly and are thus generally offered only to customers who have checking accounts at the issuing bank. One of the original purposes of debit cards was to help banks reduce the high cost of processing checks. Defs.' Mem. at 5.

16. A debit card may be used to withdraw funds from an automated teller machine (ATM) or as a "point of sale card," where payment for a purchase is deducted directly from the cardholder's deposit account. Issuing banks can offer both "signature debit" cards, which generally require cardholders to authorize transactions by signing receipts like a credit card, and PIN debit cards, which evolved from ATM networks and typically require the holder to authorize a transaction by entering a personal identification number (PIN). Defs.' Mem. at 5.

17. In a typical debit card transaction, the consumer initiates a purchase by presenting his or her debit card to a merchant. An electronic-authorization request with a specific dollar

amount and the cardholder's identity is sent from the merchant to the merchant's bank (the "merchant acquirer") to the network, which then forwards it to the issuing bank. The issuing bank checks the transaction against its file of active card accounts, and sends a message authorizing or declining the transaction through the network to the merchant. Later, the issuing bank posts a charge for the transaction to the customer's account, and the merchant acquirer posts a credit to the merchant's account. Within a few days, the network clears the transaction and determines interchange and network fees, and the issuer and the merchant acquirer send and receive payments through their accounts at settlement banks associated with the network. Defs.' Mem. at 5-6.

**IV.   FEES ASSOCIATED WITH DEBIT CARD TRANSACTIONS**

18.   Every debit card transaction generates various fees. The interchange fee, which accounts for the bulk of the fees assessed, is paid by the merchant acquirer to the card-issuing bank. Interchange fees are not payments made by customers in exchange for services they receive from an issuing bank and are thus distinct from typical streams of revenue for other business entities, such as public utilities. Collectively, debit and prepaid debit card interchange fees totaled $16.2 billion in 2009. The average interchange fee for all debit transactions in 2009 was 44 cents per transaction (or 1.14% of the transaction amount) — 56 cents per transaction for signature debit (or 1.53% of the transaction amount), and 23 cents for PIN debit (or .56% of transaction amount). Interchange fees can vary by merchant type, merchant sales volume, or card program within the network. Defs.' Mem. at 6-7; 22.

19.   As competition for cardholders has intensified, issuers increasingly have turned to rewards programs, which offer cash back, points, airline miles, and other incentives to attract and

retain cardholders.  These programs are funded in part by interchange-fee revenue.  Defs.' Mem. at 7.

20.     Like other networks, Visa retains discretion to set debit interchange fees that are paid to issuing banks using its system, including Plaintiff TCF Bank.  Visa has publicly stated that the fees "are determined by Visa and provided on Visa's published fee schedule, or may be customized where Members have set their own financial terms for the interchange of a Visa Transaction or Visa has entered into business agreements to promote acceptance and Card usage."  Interchange fees are "consistently monitored and adjusted" by Visa, "sometimes increased and sometimes decreased — in order to ensure that the economics present a competitive value proposition for all parties."  Visa has further stated that it "may establish different interchange reimbursement fees in order to promote a variety of system objectives, such as enhancing the value proposition for Visa products, providing incentives to grow merchant acceptance and usage, and reinforcing strong system security and transaction authorization processes."  Defs.' Mem. at 7.

21.     When submitting its comments on the proposed regulation of interchange fees, Visa informed the Board that "issuers do not in practice set interchange fees; rather these fees are set by networks."  Visa has also represented in an antitrust lawsuit that its board of directors "could vote to eliminate interchange fees without any vote on whether Visa should exit its core payments business."  Reply Mem. in Supp. of Defs.' Mot. to Dismiss Pl.'s Claims for Failure to State a Claim ("Defs.' Reply") (Doc. No. 140) at 6.

22.     On multiple occasions in the past two decades Visa has reduced interchange fees as a way to entice retailers to accept debit cards.  No statute, regulation, or contract entitles the

Plaintiff to the current level or any level of debit interchange fees. Defs.' Mem. at 14-15; Defs.' Reply at 6-7.

## V. PLAINTIFF TCF BANK

23. Plaintiff TCF Bank is a debit card-issuing national bank with its main office in Sioux Falls, South Dakota with assets over $10 billion. TCF serves customers in Minnesota, Illinois, Michigan, Wisconsin, Indiana, Colorado, Arizona and South Dakota. Defs.' Mem. at 9.

24. TCF was the 10th largest issuer of Visa Classic debit cards in the U.S. for July-September 2009. Defs.' Mem. at 10.

25. In its 2009 Annual Report, TCF reported card revenue, primarily from interchange fees, of $104.8 million, up slightly from 2008, an average interchange rate of 1.34% of the value of each transaction, and an average of 843,825 active card users. A recent industry report has estimated that while a typical Midwestern bank derives 8% of its revenue from interchange and overdraft fees (including just 2% from debit interchange fees alone), TCF appears to be dependent on these sources for 28% percent of its revenue. Defs.' Mem. at 10.

26. TCF offers five kinds of checking accounts, all of which carry monthly maintenance fees between $4.95 and $15 if minimum balance or direct deposit requirements are not met. TCF also charges standard account-service fees, such as fees for nonsufficient funds or overdrafts. Defs.' Mem. at 10.

27. Debit interchange fees constitute just one stream of revenue for TCF's checking account product. As TCF CEO William Cooper has explained, a debit card "is just part of a checking account" and is "not a product in and of itself. It's a delivery system for the checking account in a similar way that checks are." TCF is not required by the government to provide

debit card or banking services to the public and may exit the market at any time.  Defs.' Reply at 17, 21.

28. Plaintiff has non-debit interchange sources of revenue with which it has the ability to make a profit.  Shortly after filing the complaint in the instant lawsuit, TCF CEO William Cooper stated in a conference call that "[t]here are a lot of revenues associated with retail banking.  There's the checking fees, there's the debit card fees, et cetera.  There's a lot of revenues, plus the margin we collect from the money that we bring in from checking accounts and so forth . . . we'll obviously still be profitable, but . . . not as profitable if this [debit interchange fee] revenue stream went away."  Defs.' Reply at 23.

29. TCF has unsuccessfully challenged reductions to interchange fees in the past.  Pursuant to a 2003 settlement agreement between Visa and retailers in an antitrust lawsuit, the network agreed to lower its interchange fees.  TCF filed an objection to the agreement based on its claimed interest in interchange fees, but the court rejected its attempt to become involved in the case.  Following the ruling, TCF CEO William Cooper publicly complained that Visa "never asked for our input" and that "we were misled as to the risks of being a debit card issuer."  Defs.' Reply at 7-8.

## VI. PROCEDURAL HISTORY

30. Plaintiff filed its Complaint in the present case on October 12, 2010 and immediately sought a preliminary injunction.  Doc Nos. 1, 16-21.

31. On January 27, 2011, Plaintiff filed an Amended Complaint seeking declaratory and injunctive relief against the OCC to prohibit it from undertaking an enforcement action against Plaintiff in conjunction with yet-to-be issued regulations by the Board as authorized by Section 1693o-2(a).  *See* Am. Compl. ¶¶ 1, 9, 18, 98, 120, Prayer for Relief, ¶ 2 (Doc. No. 51).

32. Defendants filed their Motion to Dismiss on February 18, 2011. Doc. No. 64.

33. This Court heard arguments on Plaintiff's motion on April 4, 2011. Doc. No. 150.

## **CONCLUSIONS OF LAW**

### I.   JURISDICTION

1. The Court has jurisdiction over Plaintiff's claims against the Board pursuant to 28 U.S.C. § 1331. Venue is proper under 28 U.S.C. § 1391(e)(3) and 28 U.S.C. § 1348.

2. Defendants have challenged the Court's jurisdiction over Plaintiff's claims against the OCC. The Court recognizes that 12 U.S.C. § 1818 provides for an administrative hearing at which all issues, including constitutional questions, may be raised and then finally decided by the agency head with review by a federal circuit court of appeals. Nevertheless, the Court concludes that in extraordinary circumstances, for which a record has not yet been made, it may be appropriate to review a constitutional issue outside of the procedures mandated by Congress in 12 U.S.C. § 1818. The Court has therefore determined that it should take the motion to dismiss the OCC under advisement rather than immediately rule on it. Prelim. Inj. Hr'g Tr. 82:19-20.

### II.   RIPENESS

3. Plaintiff's facial due process and equal protection challenges to § 1693o-2(a) are ripe for adjudication, but its takings claim regarding the Board's final regulation is unripe because there is no regulation to review at this time. Hr'g Tr. 83:7-23.

### II.   MOTION FOR A PRELIMINARY INJUNCTION

4. Because Plaintiff is seeking to enjoin a duly enacted statute, it must first show that it is likely to prevail on the merits of its claims. *Planned Parenthood Minn., N.D., S.D. v.*

*Rounds*, 530 F.3d 724, 731 (8th Cir. 2008) (en banc).  Once that showing has been made, the Court considers the remaining three factors of a preliminary injunction analysis:  (1) whether Plaintiff will suffer irreparable harm in the absence of an injunction, (2) any harm to other interested parties, and (3) the effect on the public interest.  *Dataphase Sys,. Inc. v. CL Sys., Inc.*, 640 F.2d 109, 112 (8th Cir. 1981).  Hr'g Tr. 84:4-16.

      5.      Plaintiff is unlikely to succeed on its due process challenge to § 1693o-2(a). Under *Minnesota Association of Health Care Facilities v. Minnesota Department of Public Welfare*, 742 F.2d 442 (8th Cir. 1984), rational basis review applies to this challenge because Plaintiff's offering of debit cards is not required by the government, nor is Plaintiff engaged in the type of "continuous production of output for the benefit of the public" that commentators have identified as the hallmark of a classic utility.  Likewise, there is no monopoly power assumed to be associated with issuing debit cards.  Plaintiff is not a public utility under rate case jurisprudence.  The caselaw relied upon by Plaintiff is therefore inapplicable to its due process claim. Hr'g Tr. 87:4-16.

      6.      Applying rational basis review, § 1693o-2(a) is afforded a "strong presumption of validity" and must be upheld "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *See Heller v. Doe*, 509 U.S. 312, 319-20 (1993). Given the recent rise in interchange fees and the lack of competition among networks, Congress's decision to link interchange fees to issuing banks' actual costs bears a reasonable relationship to two proper legislative purposes:  (1) to ensure that such fees are reasonable and (2) to prevent retailers and consumers from having to bear a disproportionate amount of costs of the debit card system.  For these reasons, §1693o-2(a) is likely to satisfy rational basis review. Hr'g Tr. 88:14-19.

7. Plaintiff is also unlikely to prevail on its due process claim because it has not demonstrated a property interest in debit interchange fees. Visa retains unmitigated discretion to set debit interchange fees and there is no statutory or contractual provision guaranteeing Plaintiff a certain level of interchange income. Interchange fees have also been historically subject to regulation and market pressures beyond Plaintiff's control. Although Plaintiff has an expectation regarding future debit interchange fees based on its contract with Visa, it lacks a constitutionally protected property interest in its opportunity to receive debit interchange fees for purposes of its due process claim. Hr'g Tr. 90:10-14.

8. Finally, Plaintiff is unlikely to succeed on its equal protection claim. As an economic classification not involving protected classes or constitutional rights, § 1693o-2(a)(6)'s exemption for small banks with less than $10 billion in assets is subject to rational basis review. *See Fitzgerald v. Racing Ass'n of Cent. Iowa*, 539 U.S. 103, 107 (2003). The statute must therefore be upheld "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *See FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314-15 (1993). A legislature's desire to help one class of businesses is a rational legislative purpose, even if it disadvantages another. *See Fitzgerald*, 539 U.S. at 109.

9. Defendants have offered two rational bases for § 1693o-2's exemption: (1) the desire to safeguard smaller institutions from the loss of revenue that could result from interchange fee regulation and (2) the desire to ensure the availability of debit cards for consumers. The exemption is thus likely to satisfy rational basis review. Hr'g Tr. 91:20-24.

10. For these reasons, Plaintiff has failed to show that it is likely to succeed on the merits of its claims, and the Court need not analyze the remaining three factors in the preliminary

injunction test. Plaintiff's Motion for a Preliminary Injunction is accordingly denied. Hr'g Tr. 92.

### III.   MOTION TO DISMISS

11.   Defendants' Motion to Dismiss is taken under advisement in its entirety. Hr'g Tr. 83; Doc. No. 150.

### ORDER

Based on the foregoing, it is hereby ORDERED that:

1. Plaintiff's Motion for a Preliminary Injunction is DENIED;

2. Defendants' Motion to Dismiss is taken under advisement;

3. Plaintiff's takings claim is reviewed under *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978). Once the Board's final regulation is issued, the parties shall provide additional briefing as to (1) whether there is any distinction between the property interest required to maintain a takings claim, as opposed to a due process claim, (2) whether Plaintiff has sufficiently alleged a property interest for purposes of its takings claim, and (3) assuming that Plaintiff has a property interest, whether it has sufficiently alleged a takings claim under the *Penn Central* test.

Dated:

                                                LAWRENCE L. PIERSOL
                                                UNITED STATES DISTRICT JUDGE